UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

DIEGO ALCANTARA,

                          Plaintiff,

             -against-

OFFICE OF THE SPECIAL NARCOTICS PROSECUTOR
FOR THE CITY OF NEW YORK UC 133, Individually and
as an undercover officer for The Office of the Special Narcotics
Prosecutor for the City of New York, UNITED STATES
DEPARTMENT OF JUSTICE DRUG ENFORCEMENT
ADMINISTRATION SPECIAL AGENT MARK CRANE,
UNITED STATES DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION SPECIAL AGENT
JOHN OLDANO, UNITED STATES DEPARTMENT OF
JUSTICE DRUG ENFORCEMENT ADMINISTRATION
SPECIAL AGENT MICHAEL DELLAMARA, and
UNITED STATES DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION Group Supervisor
NICHOLAS CARUSO, all individual USDOJ DEA
Defendants are being sued in their individual capacities,

                        Defendants.
--------------------------------------------------------------------------x

**SECOND AMENDED
COMPLAINT AND
DEMAND FOR
JURY TRIAL**

**07 CV 6480
(JGK) (JCF)**

**ECF Case**

## INTRODUCTION

    1.  This is an action for compensatory damages, punitive damages and attorney's fees for

the wrongful acts of defendants, including an undercover officer hereinafter referred to as UC 133

from the Office of the Special Narcotics Prosecutor for the City of New York, acting under color of

state law and pursuant to his authority, UNITED STATES DEPARTMENT OF JUSTICE DRUG

ENFORCEMENT ADMINISTRATION SPECIAL AGENTS MARK CRANE, JOHN

OLDANO, MICHAEL DELLAMARA, acting as federal agents under color of law and pursuant

1

to their authority and UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO, acting as a federal agent under color of law and pursuant to his authority in violation of plaintiff's rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

2.    Plaintiff alleges that beginning on or about April 20, 2004, when a "no arrest" indictment S1 04 Cr. 345 (HB) was filed charging plaintiff DIEGO ALCANTARA, among others, with conspiracy to commit money laundering and money laundering in violation of Title 18, United States Code, Section 1956, and continuing with the arrest of plaintiff DIEGO ALCANTARA on or about May 3, 2004, and continuing with the filing of a superseding indictment S2 04 Cr. 345 (HB), on or about May 3, 2004, and continuing throughout the time that plaintiff was represented by retained counsel on May 14, 2004, who after interviewing Mr. Alcantara, informed the prosecutor at their first meeting prior to the May 25, 2004 bail agreement being presented to the Court that plaintiff was innocent, and continuing through the time that plaintiff was incarcerated at the Metropolitan Correctional Center until the plaintiff DIEGO ALCANTARA was released on reduced bail on or about July 14, 2004, and continuing through an innocence proffer attended by a different prosecutor with the federal agents where details regarding plaintiff's innocence claim were provided, and continuing until the plaintiff's criminal case with respect to indictment S2 04 Cr. 345 (HB) and all underlying indictments were dismissed pursuant to an order of _nolle prosequi_ signed by Assistant United States Attorney Boyd M. Johnson III, and United States Attorney, Southern District of New York, David N. Kelley, and the Honorable Harold Baer, Jr., United States District Judge, on January 10, 2005, defendants committed wrongful and illegal acts against plaintiff, including violating plaintiff's civil rights secured  by the

Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 by wrongfully imprisoning and maliciously prosecuting him and unjustifiably continuing his prosecution despite the federal agents and prosecutor being presented with the serious problems in the lack of any report of any identification procedure or any follow-up on what the DEA agents reports referred to as the "tentative identification" of plaintiff, and despite any evidence of follow up on a report indicating that a photograph from the Department of Motor Vehicles would be subpoenaed to so identify the plaintiff, and other documentary evidence seriously undermining the legitimacy of plaintiff's prosecution and affirming his declaration of innocence, the defendants individually and collectively continued with the prosecution of the plaintiff for acts of which the plaintiff was wholly innocent, without any probable or just cause, and with extreme and wanton recklessness and unjustifiable deliberate indifference to the Constitutional and civil rights of the plaintiff.

## JURISDICTION

3.      This action is brought under 42 U.S.C. Sections 1981, 1983, 1985 and 1988, in conjunction with the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 29 L.Ed.2d 619, 91 S.Ct. 1999 (1971).

4.      Jurisdiction is invoked herein pursuant to the aforementioned statutory and Constitutional provisions, federal case law and pursuant to 28 U.S.C. Section 1331 and 1343 (3) and (4), this being an action seeking redress for the violation of the plaintiff's Constitutional and civil rights.

3

## VENUE

5.    Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. Section 1391(b) in that the incident arose in the Southern District of New York.

## JURY DEMAND

6.    Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.    At all times relevant hereto, plaintiff DIEGO ALCANTARA, was and is a citizen of the United States and resident of Queens County, in the City and State of New York.

8.    At all times relevant hereto, the individually named defendant, whose identity is known to the plaintiff and defendants and the City of New York, and referred to herein as UC 133, was employed by the Office of the Special Narcotics Prosecutor for New York City, in the New York County Division, and acting under color of state law according to his official duties. He is being sued in both his individual and official capacity.

9.    At all times relevant hereto and in all his actions described herein, the defendant UC 133 was acting under color of the statutes, ordinances, regulations, policies, customs and usages of the Office of the Special Narcotics Prosecutor for the City of New York, New York City, and the State of New York, pursuant to his authority as an employee, servant and agent of the Office of the Special Narcotics Prosecutor for the City of New York, within the scope of employment and incidental to his otherwise lawful duties and functions as an employee, servant, agent, officer and senior investigator.

10.    At all times relevant hereto, the individually named defendants, UNITED STATES

4

DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS MARK CRANE, JOHN OLDANO, MICHAEL DELLAMARA, were duly sworn special agents, employed by The United States Department of Justice, Drug Enforcement Agency, and acting under the supervision of Group Supervisor NICHOLAS CARUSO, also a special agent employed by The United States Department of Justice, Drug Enforcement Agency, and all were acting under color of law and according to their official duties. Each individually named special agent defendant is being sued in his individual capacity.

### FACTUAL BACKGROUND

11. On or about May 3, 2004, the plaintiff was handcuffed and arrested in his home located in Corona, Queens County at about 6:00 a.m. while his wife and children were at home by, upon information and belief, agents from the Drug Enforcement Administration, acting pursuant to an arrest warrant, based upon information provided by UC 133 assigned to the office of the Special Narcotics Prosecutor and UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS (hereinafter also "DEA SA or SA") MARK CRANE, JOHN OLDANO, MICHAEL DELLAMARA, and NICHOLAS CARUSO, all of whom were jointly involved in a long-term money laundering investigation.

12. The arresting agents searched the plaintiff's home but failed to find any evidence of any criminal activity or enterprise.

13. The arresting agents took the plaintiff by car to a federal field office located at Eleventh Avenue between 16th and 17th Streets in Manhattan.

14. During the ride, the plaintiff repeatedly told the arresting agents that they were making a mistake.

15. At the field office, upon information and belief, a federal agent from the Drug

5

Enforcement Administration, who spoke only some Spanish, interrogated the plaintiff, who speaks some English, but whose primary language is Spanish.

16.  The interrogating agent questioned the plaintiff in a very intimidating manner and told the plaintiff that he was caught in a really big case and that he could be locked up for twenty (20) years.

17.  The interrogating agent also said they had videos of the plaintiff receiving money and giving it to the undercover agent.

18.  Upon hearing about the video recordings, the plaintiff stated words to the effect that that was good, because then he would be able to prove that he was not the person in the video.

19.  After a while, a female began translating, but she was not actually proficient in the Spanish language.

20.  The interrogating agent advised the plaintiff that it would be better for him if he told the agent everything he knew.  The agent asked DIEGO ALCANTARA to provide him with names of others involved and repeated that he was in big trouble and he had to talk to them.

21.  The plaintiff, DIEGO ALCANTARA, who was a fifty (50) year old hard-working family man at the time, told the agents that they were making a mistake and that he did not have any information to provide to them because he did not know anything about what they were charging him with.

22.  The plaintiff saw cameras in the room where he was questioned, but did not know whether he was being videotaped.

23.  After remaining at the field office for approximately one hour, the plaintiff was transported to the United States Courthouse for the Southern District of New York located at 500 Pearl Street, New York, New York 10013.

24. The plaintiff met briefly with an attorney assigned by the Criminal Justice Agency and was arraigned on charges of conspiring to engage in money laundering in violation of Section 1956(a)(1)(B)(i) of Title 18, United States Code and money laundering of narcotics proceeds affecting interstate and foreign commerce in violation of Section 1956(a)(1)(B)(i) and 2 of Title 18, United States Code.

25. The overt act that the plaintiff was alleged to have committed in the conspiracy and the basis for the money laundering charge occurred on October 17, 2001, when the plaintiff was charged with having possessed $135,616.00 in illegal narcotics proceeds, that he transferred to an undercover law enforcement officer, defendant UC 133, on the southwest corner of 125th Street and Broadway, in Manhattan, New York.

26. On October 17, 2001, UNITED STATES DEPARTMENT of JUSTICE DEA SA MARK CRANE, JOHN OLDANO, and MICHAEL DELLAMARA were among the officers and agents that were part of the field team backing up UC 133, all of whom were acting under the supervision of UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO.

27. The laundered money pickup that occurred on October 17, 2001, which was the basis for the arrest, imprisonment and prosecution of the plaintiff, was visually recorded with surveillance cameras and video equipment with zoom capabilities by the field team that consisted of agents from the New York Division Office Group D-31 of the Drug Enforcement Administration.

28. The laundered money pickup that occurred on October 17, 2001, which was the basis for the arrest, incarceration and prosecution of the plaintiff, was recorded by UC 133, and the original Kel audio-cassette tape was preserved for evidence.

7

29.   UC 133 and UNITED STATES DEPARTMENT of JUSTICE DEA SA MARK CRANE, under the supervision of UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO and other agents, each prepared official reports and upon information and belief court related documents including presumably, affidavits in support of a search and/or arrest warrant for the plaintiff, regarding the undercover operation and the October 17, 2001, laundered money pickup and delivery that they knew would be relied upon by the Assistant United States Attorney assigned to prosecute the case.

30.   UC 133 and UNITED STATES DEPARTMENT of JUSTICE DEA SA MARK CRANE, under the supervision of UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO and other agents, each prepared official reports and court related documents regarding the undercover operation and the October 17, 2001 laundered money pickup and delivery that they knew would be relied upon by the Assistant United States Attorney assigned to prosecute the case, that only provided identifying information regarding the car that was used by the person who actually made the pickup and delivered the money to UC 133.

31.   None of the reports prepared by any of the defendants ever included any reference to any identification procedure with respect to the plaintiff.

32.   Defendants UC 133 and UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT MARK CRANE prepared the reports and court-related documents that they knew would be relied upon by the Assistant United States Attorney to prosecute the plaintiff, in a deliberately indifferent manner and with a grossly reckless disregard that there was never any reliable identification procedure, or any identification

procedure at all, providing reasonable and just cause to believe that the person who delivered the laundered money to UC 133 was the plaintiff, DIEGO ALCANTATA, by either UC 133 or any of the three DEA special agents, SA CRANE, OLDANO, and DELLAMARA, who were part of the back-up team responsible for surveillance of the transactions and protection of the undercover officer, all under the supervision of SA CARUSO.

33.  Defendant SA MARK CRANE wrote an October 17, 2001 report concerning the surveillance of the money pickup that occurred the same day and referred to the person from whom the undercover officer was to receive the money as "an unidentified Dominican male (Subsequently identified as ALCANTARA, Diego)" and makes reference to a DEA [Form] 6 written by CRANE titled "Identification of ALCANTARA," a report dated the following day, October 18, 2001 and a second DEA UC 6 written to the file by "SA" UC 133.  Defendant Supervisor CARUSO approved and signed the CRANE's October 17, 2001 surveillance report.

34.  In another report written by defendant CRANE dated October 17, 2001 concerning the acquisition of Exhibits related to the October 17, 2001 transaction (the Kel cassette tape, Polaroid photographs of the delivered money, and the bank deposit slip), CRANE used the phrase "male Hispanic target, later _tentatively identified_' as ALCANTARA, Diego S." (emphasis added).

35.  The United States Department of Justice Drug Enforcement Administration Report of Investigation form with the subject "Identification Report of Diego S. Alcantara" dated October 18, 2001, referred to by CRANE as described in paragraph 31 above, indicates no actual identification of the person who participated in the money laundering transaction, but merely the identification of a car that the male Hispanic drove to the pickup and delivery locations on October 17, 2001.  The details of the report indicate that: (1) Group D-31 picked up money from a Hispanic male and surveillance units saw him driving a 1995 red Ford Escort; (2) further investigation

connected the vehicle's tag to Diego S. Alcantara; and (3) Special Agent Mark Crane noted that he sent a subpoena to the Department of Motor Vehicles for a photograph of the Diego S. Alcantara. Thus, the identification report only identified the person who had at some time registered the CAR USED by the male Hispanic person that undercover SN SI UC 133 dealt with during the October 17, 2001 transaction.

36.  The DEA UC 6 report ultimately signed by SN SI UC 133 indicates in the "date prepared box" the typed date of October 18, 2001; however it was signed by UC 133 on October 26, 2001.  The report indicates that UC 133 working in an undercover capacity "received a telephone call from a male Dominican subject, later identified as ALCANTARA, Diego. . . . Reference is made to a DEA 6 titled identification of ALCANTARA, Diego by SA Mark Crane." UC 133 refers to CRANE's report that traced the tag of the car used by the male Dominican subject to DIEGO ALCANTARA as the identification.

37.  Group Supervisor CARUSO approved the report by signing it on December 4, 2001. CRANE refers to the report by UC 133 and UC 133 refers to the report by CRANE.  Notably absent is any identification procedure by anyone who participated in or observed the transaction. One report references another report that references another report with the end result that no actual identification of DIEGO ALCANTARA ever took place.

38.  No follow up report ever indicated that any photograph was received from the Department of Motor Vehicles.  If any such photograph was received, no report indicates that it was reviewed or shown to anyone for identification purposes, or that any person who had observed the transaction made any in-person or other form of identification of Mr. Alcantara.

39.  Defendant UC 133, who received the money to be laundered from the male Hispanic individual in a face to face, hand to hand encounter, failed to perform the most fundamental and

routine procedure for every undercover operation involving a hand to hand transaction, namely, he failed to ever make a lawful identification of the person he was to accuse of handing him the money, DIEGO ALCANTARA, the plaintiff herein.  Had he done so, had he promptly viewed a photograph of the plaintiff, readily obtainable from the New York State Department of Motor Vehicles, he would have immediately known that the plaintiff DIEGO ALCANTARA was not the person who gave him money to be laundered on October 17, 2001.

40.  A November 4, 2001 DEA 6 report written by another Special Agent in reference to "Money Flow Report Transaction #2, DOF #2-008" makes reference to all previous DEA Reports of Investigation and picks up the "tentatively identified" language with respect to Diego Alcantara. The report appears to be approved and signed by Group Supervisor CARUSO, but the date he signed the report is not indicated.

39.  As late as May 7, 2003, about a year before DIEGO ALCANTARA was arrested and prosecuted, a DEA 6 report written by another Special Agent regarding "Transaction #2 Amendment" notes that on October 17, 2001, an undercover "assigned to the New York Division picked up an alleged amount of $150,000.00 in United States Currency (USC) from an individual _**tentatively identified**_ as Diego ALCANTARA" and refers to the October 18, 2001 Money Flow Report. (emphasis added).

40.  Group Supervisor CARUSO approved and signed the May 7, 2003 report on May 9, 2003, about a year before the plaintiff was arrested and prosecuted.

41.  Defendants UC 133 and UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS MARK CRANE and Group Supervisor NICHOLAS CARUSO knew that the United States Attorney's Office and the Court would rely on their inconclusive investigative reports and other court-related documents.

11

42.  These reports were prepared with deliberate indifference and a wholly outrageous and grossly reckless disregard of whether the person who actually participated in the October 17, 2001 money laundering transaction was the same person who was quickly targeted solely by the identification of a car that had been previously registered in his name.

43.  DIEGO ALCANTARA was arrested two and one half years after the October 17, 2001 occurrence.  No one identified him at the time of the money laundering transaction and no one identified him after his arrest.  No identification procedure whatsoever was ever conducted, and yet DIEGO ALCANTARA was arrested, detained, incarcerated and prosecuted for the crimes set forth hereinabove that he did not commit.

44.  But for the wholly outrageously reckless and deliberately indifferent, willful disregard of DIEGO ALCANTARA's constitutional rights that caused his continuing prosecution, the fact that he was not the person who participated in the October 17, 2001 money laundering transaction would have been readily and easily discovered long before the plaintiff was arrested, spent months in jail and many more months appearing in court, under strictly supervised conditions, to face the serious federal criminal charges in a large multi-defendant case.

45.  Upon information and belief, the only fact relied upon by UC 133 and UNITED STATES DEPARTMENT of JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS MARK CRANE to tentatively identify the person who delivered the money to SPECIAL NARCOTICS SENIOR INVESTIGATOR ROGER UC 133 on October 17, 2001 was that the car driven by the person making the delivery was previously registered to the plaintiff DIEGO ALCANTARA.

46.  In order to present a case to the grand jury, the prosecutor had to learn who delivered money to be laundered to UC 133, as that action would constitute an overt act that the person

committed in furtherance of the money laundering conspiracy.

47.  The prosecutor obtained that information either directly from UC 133 or from his or the other DEA agents' reports.

48.  UC 133 and the field team of the DEA defendants were the only people with direct knowledge about the October 17, 2001 illegal money delivery.

49.  As the group supervisor, defendant CARUSO learned indirectly about the October 17, 2001 activity from UC 133 and the other DEA agent defendants, either in writing or orally or both.

50.  The prosecution of the plaintiff was commenced based upon information provided by each of the non-supervising defendants and reviewed by the supervising defendant.

51.  The information regarding the transaction that occurred on October 17, 2001 was the basis of the commencement of the prosecution of the plaintiff.

52.  But for the information regarding the October 17, 2001 transaction that was conveyed to the prosecutor that had to be generated by the participant and witnesses to that transaction, and that was reviewed and approved by the Defendant CARUSO, the plaintiff would not have been prosecuted

53.  The plaintiff had cancelled the insurance on the car (and did not re-register the car) that was used by another person to meet with UC 133 effective September 4, 2001, more than a month prior to the illegal money transaction conducted on October 17, 2001, due to problems he had with one of his sons and his son's companions.

54.  That son was deported, *inter alia,* due to drug related crimes that were prosecuted by the same office that employed UC 133, the Manhattan Office of the Special Narcotics Prosecutor for the City of New York, prior to the arrest of the plaintiff on May 3, 2004.

55.  The plaintiff transferred his insurance to another car.

13

56. After the plaintiff's arraignment in the United States District Court for the Southern District of New York on charges of conspiring to engage in money laundering and money laundering of narcotics proceeds affecting interstate and foreign commerce, the plaintiff was transferred to the Metropolitan Correctional Center located at 150 Park Row, New York, New York 10007 at approximately 6:30 p.m. on May 3, 2004, where he was held on a high bail that he was unable to make.

57. Notwithstanding that the plaintiff had done nothing wrong and had not committed any crime on October 17, 2001, or any other day before his arrest on May 3, 2004, the plaintiff was unconstitutionally deprived of his liberty, falsely charged, and maliciously prosecuted.

58. At no time on October 17, 2001 or at any time prior to his arrest on May 3, 2001, did plaintiff DIEGO ALCANTARA ever deliver money to UC 133 or conspire to engage in money laundering, or engage in money laundering of narcotics proceeds affecting interstate and foreign commerce.

59. The plaintiff hired a private attorney who appeared for the plaintiff on May 18, 2004.

60. Mr. Alcantara told his new attorney, Elliot Leibowitz that he would stay in jail forever rather than plead guilty to something he did not do.

61. Mr. Leibowitz began informing the prosecutor of the plaintiff's claim of innocence from the outset, including at their first meeting where terms of a bail package were discussed that occurred before the May 25, 2004 bail hearing.

62. In a letter dated June 3, 2004, the United States Attorney Boyd Johnson III, turned over initial discovery that included the reports referred to hereinabove.

63. When Attorney Leibowitz reviewed the material and could see that there was never any identification of his client, he obtained further documentation regarding the registration and

14

insurance of the car from the insurance company in order to demonstrate the plaintiff's innocence.

64. Because Mr. Johnson was unavailable, Mr. Leibowitz participated in what the other United States Attorney termed an "innocence proffer."

65. Mr. Leibowitz had never heard of an innocence proffer, but with the plaintiff and an interpreter and two federal agents, he and the plaintiff began to lay out the substantial evidence pointing to the plaintiff's innocence and the substantial lack of evidence justifying the continued prosecution of the plaintiff.

66. The federal agents, who upon information and belief included either the defendants herein or those who had been informed by the defendants herein, and who were actively engaged in pursuing the prosecution based upon the information provided by the defendants herein, refused to even consider the possibility that plaintiff was not the correct defendant despite significant indicia of plaintiff's innocence and culpability of another person.

67. The agents and prosecutor were informed and presented documentary evidence about the plaintiff's son, his conviction and deportation for a drug offense prosecuted by UC 133's office.

68. The agents and prosecutor were informed and presented documentary evidence about the plaintiff's former car and his cancellation of insurance on the "target car" and transfer of his insurance to a different car PRIOR to October 17, 2001.

69. The plaintiff's attorney noted that all of the many other co-defendants were young men, mostly in their twenties, like the defendant's son and his friends, and the plaintiff was fifty years old.

70. The defense counsel noted that there was no photograph of the plaintiff in the discovery material.

71.  The defense counsel pointed out that there were no photographs of the transaction in the initial discovery.

72.  Photographs were turned over in or about July of 2002.

73.  The plaintiff and his attorney repeatedly noted that there never was an identification procedure.

74.  Rather than take the evidence and evaluate it in a serious manner, the agents ridiculed and verbally assaulted the plaintiff.

75.  Their treatment of him was brutal and unjustified.

76.  The agents used profanity to berate and demean the plaintiff.

77.  The agents used the "f" curse word towards the plaintiff.

78.  The actions and words of the agents were without provocation or justification.

79.  Mr. Leibowitz told them the meeting was over.

80.  Mr. Leibowitz explained all of the facts set forth above to the prosecutor and pleaded with him to investigate with the defendants the issues he presented, particularly the lack of any identification of the plaintiff.

81.  The prosecutor had to meet with the defendants in order to prepare for hearings and trial.

82.  Despite all of the above, the plaintiff's prosecution was unjustly and maliciously continued.

83.  After approximately 72 days in jail, from May 3, 2001 to July 14, 2001, the plaintiff was released on bail that was reduced by the Honorable Harold Baer.

84.  Throughout his incarceration and prosecution, despite his never having been arrested before, his never having been incarcerated before, his risk of spending many, many years in federal

16

prison, the plaintiff steadfastly maintained his innocence and was proceeding to trial that was scheduled to commence on Monday, January 10, 2005.

85.   After the defense attorney requested the specific location of where the surveillance photographs and video were taken in order to have an expert witness testify regarding the characteristics such as height and weight of the person in the photograph as compared to the plaintiff standing in the same position photographed from the same location, the Assistant United States Attorney called the plaintiff's criminal defense attorney on or about January 8, 2005 – two days before the trial was set to commence -- and informed him that they decided to *nolle prosequi* the case in the interest of justice (since of course, it is unjust to prosecute an innocent man, who was never identified as the perpetrator of the crime and who was, in fact, not the perpetrator of the crime of which he was accused).

86.   In other words, the plaintiff was and is actually innocent of the crimes that he was accused of committing; the case was terminated in his favor as the prosecutor indicated that he relied, inter alia, upon information provided by plaintiff's defense counsel, who provided the pertinent information that there never was an identification revealing that the plaintiff was the person who committed the crime for which he was charged.   Had that fact not been true, the case would not have been dismissed.

87.   The plaintiff was imprisoned for approximately 72 days, and charged and prosecuted for crimes that he did not commit up until the very eve of trial.

88.   The plaintiff thought that he would lose his mind during the time when he was incarcerated for crimes that he knew nothing about and did not commit.

89.   The plaintiff's elderly father was very sick during the time of his incarceration and prosecution and the plaintiff was unable to assist him in his time of need due to the travel

restrictions imposed as part of his bail conditions.

90.   As a condition of his bail, the plaintiff was required to report to a pre-trial probation services officer about twice a week; his right to travel was limited to only the Southern and Eastern Districts for work purposes; he made court appearances throughout the duration of the prosecution; and he lived with the threat of prosecution on major charges that he was falsely accused of committing for about seven months.

91.   The plaintiff was substantially deprived of his liberty throughout not just his incarceration, but his prosecution as well.

92..  There was no probable or just cause for the criminal proceeding to have been brought and there was no likelihood that a full and fair hearing of the charges would have resulted in a successful prosecution of the plaintiff by the individual defendant agents, investigators, officers and supervisors involved in the case.

93.   The filing of false criminal charges against the plaintiff and the wrongful imprisonment of the plaintiff were, because of defendant special agents and their supervisor and the NYC Special Narcotics undercover officer's knowledge of the lack of any legitimate cause or justification for such arrest and imprisonment, deliberately indifferent, intentional, malicious and in bad faith, and/or so grossly and extremely reckless that it shocks the conscience and is intolerable to time-honored concepts of fundamental fairness.

94.   Defendants UC 133, CRANE, OLDANO, DELLAMARA and CARUSO acted with actual malice and/or extremely gross recklessness and deliberate indifference as to whether the plaintiff actually was the person who committed a crime on October 17, 2001,  in providing, approving or otherwise backing without justification the information that caused the plaintiff to be arrested on false charges, and caused him to be arraigned in the United States District Court for the

18

Southern District of New York and prosecuted and imprisoned on money-laundering charges that the defendants knew were false in that the plaintiff was not the person who picked up or delivered money to be laundered, and/or that that they were so extremely grossly indifferent to the truth or falsity of the charges and the continuing prosecution of the plaintiff, that the level of such extreme and wanton recklessness equates to intentional and constitutionally culpable behavior.

95.  Defendants UC 133, CRANE, OLDANO, DELLAMARA, and CARUSO caused these charges to be brought against the plaintiff and purposefully or with deliberate indifference and gross recklessness misused their police powers, their influence with the prosecutors and the courts, to recklessly, wantonly and with deliberate indifference as to whether the plaintiff was the actual perpetrator of the crime for which he was prosecuted, wrongfully imprison and maliciously prosecute the plaintiff.

96.     As a direct and proximate result of defendants' actions, plaintiff was deprived of rights, privileges and immunities under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and federal case law, including *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

97.  As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, malicious prosecution, the stress of preparing to stand trial on serious federal charges and thereby facing many years of imprisonment, emotional distress, traumatic stress, and other psychological damages, humiliation, and the deprivation of his constitutional rights.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF RIGHTS SECURED BY THE
## FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE
## UNITED STATES CONSTITUTION AND 42 USC § 1983

### (Malicious Prosecution as to Defendant UC 133)

98.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-97 of this complaint, as though fully set forth herein.

99.    All of the aforementioned acts of defendant UC 133 were carried out under the color of law.

100.  The actions of the individual defendant UC 133, a member of the Office of the Special Narcotics Prosecutor, while acting under color of state law, deprived plaintiff of his rights secured by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, in particular the rights to be secure in his person, to due process and equal protection under the law, and the concomitant rights to be free from false imprisonment and malicious prosecution.

101.  The acts complained of were carried out by the individual defendant UC 133 in his capacity as a senior investigator of the Office of the Special Narcotics Prosecutor of the City of New York, with all actual and apparent authority attendant thereto.

102.  The individual defendant UC 133, while acting under color of state law, engaged in conduct that is forbidden by the Constitution of the United States, namely, to deprive a person of liberty and to actively engage in actions and inactions leading to the wrongful and malicious prosecution of an individual without due process or probable cause or participation in any constitutionally reasonable identification procedure to protect against the arrest, incarceration and prosecution of an innocent man.

20

103.    By these actions, the individual defendant UC 133 deprived plaintiff of rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the defendant is individually liable.

104.    As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, wrongful and malicious prosecution, emotional distress, traumatic stress, and other psychological damages, humiliation, and the deprivation of his constitutional rights.

## SECOND CLAIM FOR RELIEF

## FALSE IMPRISONMENT UNDER 42 U.S.C. § 1983 and THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (Defendant UC 133)

105.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-104 of this complaint, as though fully set forth herein.

106.    As a result of the aforementioned conduct, plaintiff DIEGO ALCANTARA was subjected to an illegal, improper and false imprisonment by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined and incarcerated for seventy-two (72) days, without any probable cause, privilege or consent to be so confined, and plaintiff was acutely conscious of his imprisonment.

107.    By these actions, the individual defendant UC 133 deprived plaintiff of rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the defendant is individually liable.

108.    As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, emotional distress, traumatic stress, and other psychological damages, humiliation, and the deprivation of his constitutional rights.

21

## THIRD CLAIM FOR RELIEF

### DEPRIVATION OF RIGHTS UNDER THE FOURTH AND FIFTH AMENDMENTS TO THE UNITED STSTES CONSTITUTION MALICIOUS PROSECUTION – BIVENS ACTION
### (All Federal Agent Defendants)

109.   Plaintiff repeats and realleges the allegations contained in paragraphs 1-108 of this complaint, as though fully set forth herein.

110.   Defendants misrepresented and falsified evidence, or acted extremely and grossly recklessly, wantonly and with deliberate indifference as to the correctness or incorrectness of the information they and each of them presented to the United States Attorney for the Southern District of New York whom they knew would rely upon their information to prosecute the plaintiff.

111.   Defendants did not make a complete and full statement of facts to the United States Attorney for the Southern District of New York.

112.   Defendants withheld exculpatory evidence from the United States Attorney for the Southern District of New York.

113.   Defendants misrepresented and falsified evidence that they knew would be used before a Grand Jury, or provided false information to others who did so appear in reliance upon representations made by defendants.

114.   Defendants did not make a complete and full statement of facts to the Grand Jury or to others who did so appear in reliance upon representations made by defendants.

115.   Defendants withheld exculpatory evidence from the Grand Jury or failed to inform others who did so appear before the Grand Jury, so that they could not relate the withheld evidence to the Grand Jury based upon representations made or failed to be made by defendants.

116.   Defendants were directly and actively involved in the initiation of criminal

proceedings against DIEGO ALCANTARA, and provided false and misleading information in support of the warrant application, as plaintiff was only charged with one overt act, that is, handing money to undercover UC 133 on October 17, 2001, while being under the surveillance and supervised by the other federal agent defendants.

117.   Defendants lacked probable cause to initiate criminal proceedings against DIEGO ALCANTARA.

118.   Defendants acted with actual malice in initiating criminal proceedings against DIEGO ALCANTARA and with a reckless disregard and wanton and deliberate indifference to the truth of their assertions that the plaintiff was the perpetrator of the crime he was charged with.

119.   Defendants were directly and actively involved in the continuation of criminal proceedings against DIEGO ALCANTARA.

120.   Defendants lacked probable cause or reasonable grounds to continue criminal proceedings against DIEGO ALCANTARA.

121.   Defendants acted with malice and/or extreme and gross recklessness and extreme deliberate indifference in continuing criminal proceedings against DIEGO ALCANTARA.

122.   Notwithstanding the fraudulent, and extreme gross recklessness of the conduct of defendants, the criminal proceedings were terminated in DIEGO ALCANTARA's favor on January 10, 2005, when the prosecutor decided to *nolle prosequi* the plaintff's case, as the evidence clearly demonstrated that plaintiff absolutely was not the person who received or gave the undercover officer laundered money.

123.   The prosecutor's discontinuance of the case was clearly based upon the lack of any reasonable ground to have brought or to continue the prosecution.

124.   The defendants' actions and inactions that served to allow the plaintiff's prosecution to

continue, violated the plaintiff's rights under the Fourth and Fifth Amendments to the United States Constitution and pursuant to federal case law including, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

125.    As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, emotional distress, traumatic stress, and other psychological damages, humiliation, and the deprivation of his constitutional rights.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF CONSTITUTIONAL RIGHTS UNDER THE FOURTH AND FIFTH AMENDMENTS TO THE UNITED STATES CONSTITUTION - BIVENS ACTION
(All Federal Agent Defendants)

126.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-124 of this complaint, as though fully set forth herein.

127.    The actions and conduct of each individual defendant UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS, including MARK CRANE, JOHN OLDANO, MICHAEL DELLAMARA, and Group Supervisor NICHOLAS CARUSO, who participated directly and directly supervised the actions of the other federal agents in the operation as described above, violated the rights of the plaintiff to be free from unreasonable detention and seizure under the Fourth Amendment and to due process of law under the Fifth Amendment to the United States Constitution, and pursuant to federal case law including, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

128.    As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, emotional distress, traumatic stress, and other psychological damages, humiliation, and the

deprivation of his constitutional rights.


### FIFTH CLAIM FOR RELIEF

**MALICIOUS PROSECUTION UNDER THE FOURTH AMENDMENT
TO THE UNITED STATES CONSTITUTION –
SUPERVISORY LIABILITY – BIVENS ACTION**
**(Defendant CARUSO)**

129.   Plaintiff repeats and realleges the allegations contained in paragraphs 1-128 of this complaint, as though fully set forth herein.

130.   The actions and conduct of the individual defendant UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT Group Supervisor NICHOLAS CARUSO, who participated directly in the overall supervision of the operation as described above, violated the right of the plaintiff to be free from malicious prosecution under the Fourth Amendment and to due process of law under the Fifth Amendment of the United States Constitution and the principles of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), making the violation of Constitutional rights by federal agents actionable under the law.

131.   As a result of the foregoing, the plaintiff sustained, *inter alia*, loss of liberty, emotional distress, traumatic stress, humiliation, and other psychological damages.


**WHEREFORE,** Plaintiff demands judgment against the defendants, jointly and severally, and in favor f the plaintiff as follows:

a. Compensatory damages in an amount to be determined;

b. Punitive damages in an amount to be determined;

25

c. Reasonable attorneys fees, costs and disbursements of this action; and

d. Such other and further relief as this Court deems just and proper.

DATED:  New York, New York
           June 20, 2008


                                        Respectfully,


                                        _____*Joanne M. Dwyer*_____
                                        JOANNE M. DWYER (JD-9852)
                                        Attorney for Plaintiff
                                        DIEGO ALCANTARA
                                        225 Broadway, 41st Floor
                                        New York, NY 10007
                                        (212) 233-0591

Case No.  07 CV 6480 **(JGK) (JCF)**

UNITED  STATES  DISTRICT  COURT

SOUTHERN  DISTRICT  OF  NEW  YORK

DIEGO ALCANTARA,

Plaintiff,

-against-

OFFICE OF THE SPECIAL NARCOTICS PROSECUTOR          **07 CV 6480**
FOR THE CITY OF NEW YORK UC 133, Individually and          **(JGK) (JCF)**
as an undercover officer for The Office of the Special Narcotics
Prosecutor for the City of New York, UNITED STATES          **ECF Case**
DEPARTMENT OF JUSTICE DRUG ENFORCEMENT
ADMINISTRATION SPECIAL AGENT MARK CRANE,
UNITED STATES DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION SPECIAL AGENT
JOHN OLDANO, UNITED STATES DEPARTMENT OF
JUSTICE DRUG ENFORCEMENT ADMINISTRATION
SPECIAL AGENT MICHAEL DELLAMARA, and
UNITED STATES DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION Group Supervisor
NICHOLAS CARUSO, all individual USDOJ DEA
Defendants are being sued in their individual capacities,

Defendants.

**SECOND AMENDED COMPLAINT AND**

**DEMAND FOR JURY TRIAL**

**JOANNE M. DWYER**
Attorney for Plaintiff
225 Broadway, 41st Fl
New York, N.Y.  10007
*Tel:  (212) 233-0591*