UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIEGO ALCANTARA,

                              Plaintiff,

                    v.

OFFICE OF THE SPECIAL NARCOTICS
PROSECUTOR FOR THE CITY OF NEW YORK
UC 133, Individually and as an undercover officer
for the Office of the Special Narcotics Prosecutor
for the City of New York, UNITED STATES
DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION SPECIAL
AGENT MARK CRANE, UNITED STATES
DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION SPECIAL
AGENT JOHN OLDANO, UNITED STATES
DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION SPECIAL
AGENT MICHAEL DELLAMARA, and UNITED
STATES DEPARTMENT OF JUSTICE DRUG
ENFORCEMENT ADMINISTRATION Group
Supervisor NICHOLAS CARUSO, all individual
USDOJ DEA Defendants are being sued in their
individual capacities,

                              Defendants.

ECF Case

No. 07 Civ. 6480 (JGK)

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
DEFENDANTS DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENTS
MARK CRANE, MICHAEL DELLAMURA, JOHN OLDANO, AND NICHOLAS
CARUSO TO DISMISS THE SECOND AMENDED COMPLAINT OR, IN THE
<u>ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York
                                        86 Chambers Street, 3rd Floor
                                        New York, New York  10007
                                        Telephone: (212) 637-2718
                                        Facsimile:  (212) 637-2786
                                        david.bober@usdoj.gov

DAVID BOBER
Assistant United States Attorney
 – Of Counsel –

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Operation White Dollar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Indictment, Arrest, and Prosecution of Alcantara . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      POINT I - THE MALICIOUS PROSECUTION CLAIMS ARE NOT COGNIZABLE
               BECAUSE THE DISMISSAL OF PLAINTIFF'S PROSECUTION
               WAS NOT A "FAVORABLE TERMINATION" . . . . . . . . . . . . . . . . . . . . . . . 8

      POINT II - PLAINTIFF'S FIFTH CLAIM IS TIME-BARRED . . . . . . . . . . . . . . . . . . 12

      POINT III - ALL CLAIMS AGAINST THE DEA AGENTS SHOULD
               BE DISMISSED BECAUSE THEY WERE NOT PERSONALLY
               INVOLVED IN THE ALLEGED DEPRIVATIONS OF PLAINTIFF'S
               CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      POINT IV - EVEN ASSUMING THAT THE DEA AGENTS DIRECTLY
               PARTICIPATED IN ALCANTARA'S ARREST AND
               PROSECUTION, THE DEA AGENTS ARE ENTITLED TO
               QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           A.    Legal Standards for Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . 17

           B.    The DEA Agents Are Entitled to Qualified Immunity . . . . . . . . . . . . . 19

      POINT V - THE COURT SHOULD STAY DISCOVERY PENDING
               RESOLUTION OF THIS MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

*Cases*:                                                                                          Page

Aderonmu v. Heavey, No. 00 Civ. 9232, 2001 WL 77099 (S.D.N.Y. Jan. 26, 2001)  . . . . . . . .  8

Albright v. Oliver, 510 U.S. 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Anderson v. Creighton, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Annunziato v. City of New York, No. 06 Civ. 7637,
        2008 WL 2229903 (S.D.N.Y. May 28, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Assegai v. Bloomfield Board of Education, 308 F. Supp. 2d 65 (D. Conn. 2004) . . . . . . . . . .  11

Barbera v. Smith, 836 F.2d 96 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Berman v. Turecki, 885 F. Supp. 528 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Birdsall v. City of Hartford, 249 F. Supp. 2d 163 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . .  11

Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . .  passim

Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Caldarola v. Calabrese, 298 F.3d 156 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . .  19-20, 20

Cartier v. Lussier, 955 F.2d 841 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

County of Sacramento v. Lewis, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Davenport v. County of Suffolk, No. 99-CV-3088,
        2007 WL 608125 (E.D.N.Y. Aug. 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Davis v. Scherer, 468 U.S. 183 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Escalera v. Lunn, 361 F.3d 737 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Espada v. Schneider, 522 F. Supp. 2d 544 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . .  8

Evans v. Ball, 168 F.3d 856 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Fulton v. Robinson, 289 F.3d 188 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 8-9

Glendora v. Pinkerton Sec. & Detective Services,
        25 F. Supp. 2d 447 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 17

Golina v. City of New Haven, 950 F.2d 864 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Heck v. Humphrey, 512 U.S. 477 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hendrickson v. United States Attorney General, No. 91 Civ. 8135 (LMM),
    1994 WL 23069 (S.D.N.Y. Jan. 24, 1994), aff'd, 40 F.3d 1236 (2d Cir. 1994) . . . . . . . 14-15

Hill v. California, 401 U.S. 797 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Hope v. Pelzer, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hunter v. Bryant, 502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 10-11, 11

Jovanovic v. City of New York, No. 04 Civ. 8437 (PAC),
    2008 WL 355515 (S.D.N.Y. Feb.7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Lewis v. United States, 388 F. Supp. 2d 190 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . 17, 21

Loria v. Gorman, 306 F.3d 1271 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Marsden v. Federal Bureau of Prisons, 856 F. Supp. 832 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . 14

Martinez v. Simonetti, 202 F.3d 625 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Merritt v. Dunlap, No. 1:01-CV-1487, 2005 WL 3601645 (N.D.N.Y. Dec. 30, 2005) . . . . . . 11

Mitchell v. Forsyth, 472 U.S. 511 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11

Pierre v. City of New York, No. 05-CV-5018,
    2007 WL 2403573 (E.D.N.Y. Aug. 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rolon v. Henneman, 443 F. Supp. 2d 532 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rothstein v. Carriere, 373 F.3d 275 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

Ruiz v. Herrera, 745 F. Supp. 940 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Russell v. Smith, 68 F.3d 33 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Saghezi v. Reno, No. 94 Civ. 8291 (HB), 1996 WL 524338 (S.D.N.Y. Sept. 16, 1996) . . . 20-21

Saucier v. Katz, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19, 19

Sealey v. Giltner, 116 F.3d 47 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Siegert v. Gilley, 500 U.S. 226 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . passim

Singleton v. City of New York, 632 F.2d 185 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . .  11

Smith v. Reagan, 841 F.2d 28 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Tapia-Ortiz v. Doe, 171 F.3d 150 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Tavarez v. Reno, 54 F.3d 109 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Thomas v. Ashcroft, 470 F.3d 491 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 12, 19

United States v. Frias, 521 F.3d 229 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

United States v. Valez, 796 F.2d 24 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Wallace v. Conroy, 945 F. Supp. 628 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

Wallace v. Kato, 127 S. Ct. 1091 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Washington v. Summerville, 127 F.3d 552 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . .  11

Weinstock v. Wilk, 296 F. Supp. 2d 241 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . .  21

Wilkins v. DeReyes, 528 F.3d 790 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Wright v. Smith, 21 F.3d 496 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Zellner v. Smith, 494 F.3d 344 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Zoll v. Allen, 93 F. Supp. 95 (D.C.N.Y. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

**Statutes:**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

## Preliminary Statement

Defendants Drug Enforcement Administration ("DEA") Special Agents Mark Crane
("Special Agent Crane"), Michael Dellamura ("Special Agent Dellamura"), John Oldano
("Special Agent Oldano"), and Nicholas Caruso ("Special Agent Caruso") (collectively, the
"DEA Agents") respectfully submit this memorandum in support of their motion to dismiss the
second amended complaint filed by plaintiff Diego Alcantara ("Alcantara") pursuant to Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment
pursuant to Federal Rule of Civil Procedure 56.

In October 2001, three of the DEA Agents  – Special Agents Crane, Oldano, and
Dellamura – were members of a team that conducted surveillance on a drug-money-laundering
transaction in which a courier delivered a backpack containing approximately $135,000 in cash
to a non-DEA undercover police officer.  Those DEA Agents observed that the courier, a
Hispanic male, was driving a Ford Escort that they later learned was registered to Alcantara.
The fourth DEA Agent – Special Agent Caruso – was a Group Supervisor, and did not
participate in the surveillance; instead, he signed, and thus approved, DEA Reports of
Investigation that summarized the surveillance, including the fact that the courier had been
"tentatively identified" as Alcantara because the courier's car was registered to Alcantara.

On May 3, 2004, approximately two and a half years later, a grand jury of the Southern
District of New York returned an indictment charging Alcantara and thirty-three others with
drug-money-laundering offenses.  A United States magistrate judge issued a warrant for
Alcantara's arrest, and Alcantara was arrested at his home in Queens, New York, by law
enforcement officers who are not defendants in this action.  Approximately eight months later,
federal prosecutors, after engaging in discussions with Alcantara and his lawyer, recommended
that an order of nolle prosequi be entered as to Alcantara, and on January 10, 2008, a nolle

prosequi order was entered "in the interests of justice." The DEA Agents did not arrest

Alcantara, nor did they testify before the grand jury that indicted Alcantara.

       Nevertheless, in July 2007, more than three years after he was arrested, Alcantara filed

this Bivens action against the DEA Agents, alleging that they violated his constitutional rights by

conducting surveillance and writing or approving reports indicating that the courier had been

driving a car registered to Alcantara and that the courier had been "tentatively" identified as

Alcantara. In particular, although none of the DEA Agents arrested Alcantara or played any role

in his prosecution, plaintiff asserts Fourth Amendment claims against them, in their individual

capacities, for false arrest, false imprisonment, and malicious prosecution. As set forth below,

the Court should dismiss the second amended complaint for failure to state a claim upon which

relief can be granted, and for lack of subject matter jurisdiction.

       First, plaintiff cannot maintain a constitutional cause of action for malicious prosecution

because the criminal proceedings were not terminated in his favor. The Second Circuit

repeatedly has held that dismissals of criminal charges "in the interests of justice" are not, as a

matter of law, favorable terminations that can serve as the basis for a civil claim of malicious

prosecution. See Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997); Singer v. Fulton County

Sheriff, 63 F.3d 110, 118 (2d Cir. 1995); Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992) ("A

dismissal 'in the interests of justice' is neither an acquittal of the charges nor any determination

of the merits. Rather, it leaves the question of guilt or innocence unanswered. Consequently, as

a matter of law, it cannot provide the favorable termination required as the basis for a claim of

malicious prosecution."). Because the dismissal of Alcantara's criminal proceedings was

explicitly "in the interests of justice," it cannot serve as the basis for his claims of malicious

prosecution.

Second, Alcantara's claims of false arrest and false imprisonment are time-barred. Alcantara was arrested on May 3, 2004, and arraigned on May 11, 2004. The statute of limitations on a <u>Bivens</u> action in New York is three years, and a <u>Bivens</u> claim for false arrest or false imprisonment begins to run on the date of arraignment. Alcantara did not file this action until July 2007, more than three years after his arraignment. It is therefore barred by the statute of limitations.

Third, it is undisputed that the DEA Agents did not arrest Alcantara, testify before the grand jury, or directly participate in the decisions to indict or prosecute him. They therefore lack the requisite personal involvement required for liability under <u>Bivens</u>.

Finally, even if the DEA Agents had directly participated in Alcantara's arrest and prosecution, they would be entitled to qualified immunity because there was probable cause to arrest Alcantara, as his car was used in a money-laundering transaction, a grand jury indicted him, and a United States magistrate judge issued a facially valid arrest warrant.

## Statement of Facts

**A.     <u>Operation White Dollar</u>**

Alcantara's allegations against the DEA Agents arise from their work as members of a surveillance team involved in a drug-money-laundering investigation that was part of "Operation White Dollar." <u>See</u> Declaration of John Oldano ("Oldano Declaration") ¶ 2.[1] Operation White Dollar consisted of approximately thirty related investigations that the United States Attorney General authorized in September 2001 to permit the DEA to launder drug proceeds in an effort to identify and arrest members of drug money laundering organizations. <u>Id.</u> Agents involved in

---

[1] The declarations filed by the DEA Agents in support of their motion to dismiss the complaint are referred to herein as "[Last Name] Declaration."

investigations under Operation White Dollar used informants, or confidential sources ("CS"), affiliated with money launderers in Colombia.  Id. ¶ 4.  The CS would inform the Colombians that he had American and Canadian sources who were willing to receive illicit drug money, place the money in the United States banking system, and transfer it to accounts controlled by the Colombians.  Id.  Under Operation White Dollar, couriers would deliver large amounts of United States currency to undercover officers working with DEA; the undercover officers would, in turn, transfer the money to DEA agents, who would deposit it in DEA-controlled undercover bank accounts, and thereafter wire the money to other bank accounts.  Id. ¶ 2.

On or about October 15, 2001, a CS contacted Special Agent Oldano and informed him that an individual named German Cote, who was affiliated with a known Colombian money-laundering organization, was seeking to launder approximately $150,000 in United States currency.  Id. ¶ 5.  The CS provided a prepaid cellular telephone number for the currency courier.  Id.  An undercover officer from the Office of the New York City Special Narcotics Prosecutor (the "UC") contacted the courier at the number provided by the CS, and arranged to take delivery of the currency from the courier on October 17, 2001, in the vicinity of 96th Street and Broadway in New York City.  Id.

On October 17, 2001, Special Agents Crane, Dellamura, and Oldano were part of a team assigned to conduct surveillance of the delivery of the currency.  Id. ¶ 6; Dellamura Declaration ¶ 3; Crane Declaration ¶ 3.  At approximately 3:20 p.m., as the surveillance team watched, the courier met the UC at the intersection of 94th Street and Broadway, where they talked for approximately ten minutes.  Crane Declaration ¶ 3; Oldano Declaration ¶ 6.  During the encounter between the UC and the courier, the surveillance team observed that the courier was driving a red Ford Escort, and they recorded the license plate number.  Crane Declaration ¶ 6.

4

The UC and the courier then parted ways, and Special Agent Dellamura, in an unmarked vehicle, followed the courier to a building in the Bronx, while Special Agent Oldano followed the UC. Dellamura Declaration ¶ 4; Oldano Declaration ¶ 7.  Special Agent Dellamura watched  the courier enter the building and emerge shortly thereafter with a black backpack.  Dellamura Declaration ¶ 4.

At approximately 5:15 p.m., the courier and the UC met again, this time near the intersection of 125th Street and Broadway in Manhattan.  Oldano Declaration ¶ 7; Dellamura Declaration ¶ 4.  The courier and the UC walked to the UC's car, and the courier placed the backpack in the rear seat.  Oldano Declaration ¶ 7; Dellamura Declaration ¶ 4; Crane Declaration ¶ 4.  The courier and the UC then left in their respective vehicles.  Oldano Declaration ¶ 7.

Special Agents Oldano and Dellamura, with other special agents not named as defendants in this action, followed the UC to the vicinity of 110th Street and Riverside Drive.  Oldano Declaration ¶ 8; Dellamura Declaration ¶ 4.  The UC gave the backpack to the agents, who opened it and discovered that it contained a large amount of United States currency.  Oldano Declaration ¶ 8; Dellamura Declaration ¶ 4; Crane Declaration ¶ 4.  Special Agent Dellamura transported the backpack to the DEA New York Division Office, photographed the contents, and placed it in the evidence vault.  Dellamura Declaration ¶ 5.

The next day, October 18, 2001, Special Agent Oldano removed the money from the evidence vault and deposited it into an undercover bank account controlled by the DEA.  Oldano Declaration ¶ 9.  A few days later, the CS instructed Special Agent Oldano to wire the money into an account held in the name of a corporation at a bank in Florida.  Id.

Meanwhile, on October 18, 2001, Special Agent Crane determined that the courier's Ford Escort was registered to Alcantara.  Crane Declaration ¶ 6.  On October 22, 2001, Special Agent

Crane sent a subpoena to the New York State Department of Vehicles to obtain a photograph of Alcantara.  Id.  Also in late October 2001, Special Agent Crane prepared three DEA Reports of Investigation that summarized the surveillance and evidence, and Special Agent Caruso, as supervisor of the group that conducted the surveillance, signed those reports as the approving official.  Crane Declaration ¶ 7; Caruso Declaration ¶¶ 4-5.  One Report of Investigation indicated that the courier's car was registered to Alcantara; another indicated that the courier had been "tentatively identified" as Alcantara, and the third report referred back to the first.  Caruso Declaration ¶ 5.  After October 2001, none of the DEA Agents participated any further in the investigation of Alcantara, and his subsequent arrest, indictment, and prosecution.  Caruso Declaration ¶ 7; Crane Declaration ¶ 9; Dellamura Declaration ¶ 8; Oldano Declaration ¶ 12.[2]

**B.    Indictment, Arrest, and Prosecution of Alcantara**

Two and a half years after the surveillance of the currency transfer, in April 2004, a grand jury of the United States District Court for the Southern District of New York returned an indictment against Alcantara and thirty-three other individuals, charging them with money-laundering-related offenses, and United States Magistrate Judge Debra C. Freeman signed a warrant for Alcantara's arrest.  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004); Bober Declaration Exhibits A & B.  Alcantara was arrested on May 3, 2004. See 2d Am. Compl. ¶ 11.[3]  None of the DEA Agents arrested Alcantara, played any part in his arrest, or testified before the grand jury.  Crane Declaration ¶ 9; Caruso Declaration ¶ 7;

---

[2]  The sole exception – if it can be termed an exception – is that one of the Reports of Investigation approved by Special Agent Caruso (written by an agent who is not a defendant in this action) was prepared in May 2003.  Caruso Declaration ¶ 5.  That report indicated that the money that had been received from the courier (who had been "tentatively identified" as Alcantara) was deposited into an account controlled by the DEA.  Id.

[3]  Citations to the "2d Am Compl." are to the Second Amended Complaint, item number 11 on the Court's docket, entered June 23, 2008.

Dellamura Declaration ¶ 8; Oldano Declaration ¶ 12.[4]

Alcantara was arraigned on May 11, 2004, and pleaded not guilty.  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004).  The district court initially set Alcantara's bail at $250,000, and approximately six weeks later reduced the bail to $10,000.  Id.; 2d Am. Compl. ¶ 83.  Alcantara then made bail and was released from custody after having spent seventy-two days in jail.  2d Am. Compl. ¶ 83.

On January 10, 2005, at the prosecutor's request, Judge Harold Baer issued an order of nolle prosequi "in the interests of justice."  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004); Bober Declaration Exhibit C.  Specifically, the nolle prosequi order, which was signed by the Assistant United States Attorney assigned to the prosecution, indicated that "[b]ased on a review of the evidence in the case and information pertaining to this defendant acquired subsequent to the filing of this indictment, including information provided by the defendant and his counsel, it has been concluded that further prosecution of DIEGO ALCANTARA would not be in the interests of justice."  Bober Declaration Exhibit C.

Approximately two and a half years later, in July 2007, Alcantara filed this action, naming as defendants the DEA Agents and the UC from the Office of the New York City Special Narcotics Prosecutor.  The second amended complaint asserts five causes of action.  The first two are directed solely at the UC as a state actor under 42 U.S.C. § 1983, and therefore are not addressed in this motion.  See 2d Am. Compl. at 20-21.  The third claim, entitled "Malicious Prosecution – Bivens Action," and the fourth claim, entitled "Violation of Constitutional Rights Under the Fourth and Fifth Amendments to the United States Constitution – Bivens Action," are

---

[4]  Special Agent Oldano, in his capacity as co-case agent, prepared a Report of Investigation indicating that Alcantara had been arrested on May 3, 2004, along with a number of other defendants.  He did not, however, participate in Alcantara's arrest.

asserted against the DEA Agents, and arise under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens").  The fifth claim, entitled "Malicious Prosecution Under the Fourth Amendment to the United States Constitution – Supervisory Liability – Bivens Action," is asserted only against Special Agent Caruso.

As explained below, each of the claims against the DEA Agents should be dismissed.

## ARGUMENT

### POINT I

### THE MALICIOUS PROSECUTION CLAIMS ARE NOT COGNIZABLE BECAUSE THE DISMISSAL OF PLAINTIFF'S PROSECUTION WAS NOT A "FAVORABLE TERMINATION"

To prevail on a constitutional claim of malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law."  Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted); see also Espada v. Schneider, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007) (same).[5]  To establish a claim of malicious prosecution under New York law, a plaintiff must demonstrate "that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor."  Fulton, 289 F.3d at 195 (citations omitted); see also Heck v. Humphrey, 512 U.S. 477, 484 (1994) ("One element that must be

---

[5]  Although Fulton concerned a constitutional claim for malicious prosecution against a state actor under 42 U.S.C. § 1983, rather than a constitutional claim against a federal actor under Bivens, the Second Circuit has explained that "Bivens actions are not significantly dissimilar to claims under [§ 1983] in terms of the relief which may be granted, and the defenses which may be asserted."  Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995) (citations omitted).  Accordingly, "federal courts have typically incorporated § 1983 law into Bivens actions."  Id.; see also Aderonmu v. Heavey, No. 00 Civ. 9232, 2001 WL 77099, at *1 n.2 (S.D.N.Y. Jan. 26, 2001) ("Federal courts commonly analogize Bivens and Section 1983 claims, and have used Section 1983 rulings as precedent in Bivens actions) (collecting cases); Berman v. Turecki, 885 F. Supp. 528, 532 n.6 (S.D.N.Y. 1995) (same).

alleged and proved in a malicious prosecution action is termination of the prior criminal
proceeding in favor of the accused.") (citations omitted); Singer v. Fulton County Sheriff, 63
F.3d 110, 118 (2d Cir. 1995) (applying common law principles to constitutional claim of
malicious prosecution; "[a]t common law, an accused, in order to maintain a cause of action for
malicious prosecution, must establish that the state prosecution terminated in his favor.")
(citation and quotation marks omitted); Evans v. Ball, 168 F.3d 856, 862 n.9 (5th Cir. 1999)
("[M]alicious prosecution may be a constitutional violation . . . only if all of its common law
elements are established.").

     Not all dismissals of criminal prosecutions, however, are favorable terminations for
purposes of a subsequent constitutional malicious prosecution claim.  Rather, "[w]here the
prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused . . .
only when its final disposition is such as to indicate the innocence of the accused."  Murphy v.
Lynn, 118 F.3d 938, 948 (2d Cir. 1997) (citations omitted); see also Russell v. Smith, 68 F.3d
33, 36 (2d Cir. 1995) ("[T]he plaintiff must show that the final disposition is indicative of
innocence.").[6]  Thus, "certain types of dispositions that do not result from adjudication of the

---

    [6]  In a 2004 case, Rothstein v. Carriere, 373 F.3d 275 (2d Cir. 2004), the Second Circuit,
without citing Murphy or Russell, appeared to slightly modify this legal standard.  There, the
Court wrote that a plaintiff need not prove that the termination of the criminal proceeding was
indicative of innocence.  "Rather, the plaintiff's burden is to demonstrate a final termination that
is not inconsistent with innocence."  Id. at 286.  Nevertheless, district courts have continued to
apply the Murphy and Russell standard.  See, e.g., Davenport v. County of Suffolk, No. 99-CV-
3088, 2007 WL 608125, at *9 (E.D.N.Y. Feb. 23, 2007) (applying Murphy and Russell
standard); Pierre v. City of New York, No. 05-CV-5018, 2007 WL 2403573, at *11 (E.D.N.Y.
Aug. 17, 2007) (same).  To the extent there is conflict between Murphy and Rothstein, it would
appear that Murphy controls, as decisions of prior panels are binding "until such time as they
are overruled either by an en banc panel of our Court or the Supreme Court."  United States v. Frias,
521 F.3d 229, 231 n.3 (2d Cir. 2008).  In any event, the difference is immaterial, because
Rothstein does not call into question the holdings of Murphy, Singer, and Hygh that dismissals
in the interests of justice are inadequate as a matter of law, and thus dismissal of the malicious
prosecution claims is appropriate under either standard.

merits have generally been held not sufficiently favorable to the accused to be indicative of innocence." Murphy, 118 F.3d at 948. These include dismissals for lack of subject matter jurisdiction, dismissals for failure to allege sufficient facts to support the charge, and adjournments in contemplation of dismissal. See id. at 948-49.

In addition, and significantly, the Second Circuit repeatedly has held that "dismissals by the prosecution 'in the interests of justice' . . . are generally considered not to be dispositions in favor of the accused." Id. at 949 (collecting cases). Accordingly, "as a matter of law, [a dismissal in the interests of justice] cannot provide the favorable termination required as the basis for a claim of malicious prosecution." Singer, 63 F.3d at 118 (alterations in original) (quotation marks and citation omitted); see also Hygh, 961 F.2d 359, 368 (2d Cir. 1992) ("A dismissal 'in the interests of justice' is neither an acquittal of the charges nor any determination of the merits. Rather, it leaves the question of guilt or innocence unanswered. Consequently, as a matter of law, it cannot provide the favorable termination required as the basis for a claim of malicious prosecution.").

Here, unquestionably, the dismissal of Alcantara's prosecution was solely "in the interests of justice." Indeed, the order of nolle prosequi stated:

> Based on a review of the evidence in the case and information pertaining to this defendant acquired subsequent to the filing of this indictment, including information provided by the defendant and his counsel, it has been concluded that further prosecution of DIEGO ALCANTARA would not be in the interests of justice.

See Order of Nolle Prosequi, Bober Declaration Exhibit C (emphasis added). Judge Baer signed the order on January 10, 2005. Id. Because the order was explicitly entered "in the interests of justice," and because the Second Circuit has repeatedly held that, "as a matter of law," such dismissals "cannot provide the favorable termination required as the basis for a claim of

malicious prosecution," Hygh, 961 F.2d at 368, Alcantara cannot establish a required element of

his malicious prosecution claims. Accordingly, those claims should be dismissed. See Murphy,

118 F.3d at 948; Singer, 63 F.3d at 118; Hygh v. Jacobs, 961 F.2d at 368; see also Merritt v.

Dunlap, No. 1:01-CV-1487, 2005 WL 3601645, at *8 (N.D.N.Y. Dec. 30, 2005) (dismissal

citing "insufficient evidence at this time" analogous to dismissal in interests of justice, and is

therefore "not sufficiently favorable" to form basis for malicious prosecution claim).[7]

    In addition, apart from being unable to establish that his prosecution terminated

favorably, plaintiff has failed to establish the remaining elements of a malicious prosecution

claim – i.e., that the DEA Agents "initiated a criminal proceeding," that "there was no probable

cause," and that they "acted maliciously." Rothstein, 373 F.3d at 282. As to the first element –

---

    [7] Apart from the fact that the dismissal of the criminal charges against Alcantara was
entered in the interests of justice, some courts have found that a dismissal pursuant to an order of
nolle prosequi, in and of itself, cannot form the basis of a malicious prosecution claim, because
an order of nolle prosequi is "not a final disposition of a case but is a procedure which restores
the matter to the same state which existed before the Government initiated the prosecution."
Washington v. Summerville, 127 F.3d 552, 557 (7th Cir. 1997). As one district court in this
Circuit has explained, "[a] nolle is simply a statement by the prosecution that it will not be
pursuing the case at this time; it does not foreclose the possibility that, if prosecuted, the plaintiff
would have been found guilty." Assegai v. Bloomfield Bd. of Educ., 308 F. Supp. 65, 71 (D.
Conn. 2004). Accordingly, "[a] nolle is not a final disposition in the plaintiff's favor for the
purposes of a malicious prosecution claim." Id. at 70; see also Birdsall v. City of Hartford, 249
F. Supp. 2d 163, 171 (D. Conn. 2003) (nolle prosequi not favorable termination because it
"leaves open the question of the accused's guilt"); Singleton v. City of New York, 632 F.2d 185,
193 (2d Cir. 1980) (dismissals that "leave[] open" the question of guilt not favorable
terminations). Indeed, a nolle prosequi does not bar a subsequent reindictment. Zoll v. Allen, 93
F. Supp. 95, 97 (D.C.N.Y. 1950) ("A nolle prosequi, while entitling the accused to an
unconditional release from custody, does not operate as an acquittal nor does it bar another
indictment and prosecution for the same offense."). Other courts have held, however, that a
dismissal pursuant to nolle prosequi may in some circumstances constitute a favorable
termination, depending on "the stated reasons for the dismissal as well as the circumstances
surrounding it." Wilkins v. DeReyes, 528 F.3d 790, 803 (10th Cir. 2008). Here, the Court need
not decide whether a dismissal pursuant to an order of nolle prosequi is, per se, not a favorable
termination, because the "stated reasons for the dismissal" were the interests of justice, and, as
explained above, the Second Circuit has repeatedly held that such dismissals may not, as a
matter of law, serve as the basis for a malicious prosecution claim.

initiation of a criminal proceeding – it is "well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment.  At least that is so in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment."  Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999); see also Annunziata v. City of New York, No. 06 Civ. 7637, 2008 WL 2229903, at *5 (S.D.N.Y. May 28, 2008) (no malicious prosecution claim where officers made arrest and "took no part in subsequent criminal proceedings").  Here, none of the DEA Agents participated in Alcantara's indictment, arrest, or prosecution, and thus the "chain of causation by the intervening exercise of independent judgment" by prosecutors and a grand jury, two years later, to initiate criminal proceedings.  As to the elements of probable cause and malice, as further discussed below, probable cause existed to arrest Alcantara, which would defeat a finding of malice.[8]  See Point IV, infra.

## POINT II

### PLAINTIFF'S FIFTH CLAIM IS TIME-BARRED

The fifth claim for relief is the only cause of action against the DEA Agents that is not explicitly premised on malicious prosecution.  Rather, it is entirely unclear upon what basis the claim is alleged.  The claim is vaguely entitled "Violation of Constitutional Rights Under the Fourth and Fifth Amendments to the United States Constitution – Bivens Action."  2d Am. Compl. at 24.  In conclusory fashion, it alleges, in its entirety, that the DEA Agents "violated the rights of the plaintiff to be free from unreasonable detention and seizure under the Fourth Amendment and to due process of law under the Fifth Amendment to the United States

---

[8]  The elements of probable cause and malice are related, because if "a jury could find that probable cause . . . was lacking . . . , that finding alone would support an inference of malice."  Zellner v. Smith, 494 F.3d 344, 365 (2d Cir. 2007) (citation omitted).

Constitution, and pursuant to federal case law including [Bivens]." 2d Am. Compl. ¶ 127.

As an initial matter, it is clear that this case does not implicate any due process rights under the Fifth Amendment. As the Supreme Court has explained, "the Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." Albright v. Oliver, 510 U.S. 266, 274 (1994); see also County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (citation omitted). Thus, Alcantara's claims relating to alleged pretrial deprivations of liberty "arise[] under the Fourth Amendment." Rolon v. Henneman, 443 F. Supp. 2d 532, 539 (S.D.N.Y. 2006); see also Singer, 63 F.3d at 115 ("the Fourth Amendment provides the source for [claims] premised on a person's arrest.").

Thus, plaintiff's fifth claim appears to be a constitutional cause of action premised on false imprisonment or false arrest in violation of the Fourth Amendment. This claim is time-barred. The statute of limitations on an action "seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." Wallace v. Kato, 127 S. Ct. 1091, 1100 (2007); see also Jovanovic v. City of New York, No. 04 Civ. 8437 (PAC), 2008 WL 355515, at *2 (S.D.N.Y. Feb. 7, 2008) (explaining that "[i]n lieu of allowing the claim to accrue indefinitely, the Supreme Court found it more desirable to force a petitioner to bring a false arrest claim within three years of arraignment (or other commencement of legal process)") (citing Wallace, 127 S. Ct. at 1097). "The statute of limitations for Bivens actions arising in New York is three years." Tapia-Ortiz v. Doe, 171 F.3d 150, 151 (2d Cir. 1999); see also

Kronisch v. United States, 150 F.3d 112, 123 (2d Cir. 1998) ("Federal courts in New York apply

a three-year statute of limitations period to Bivens claims.").  Accordingly, plaintiff had three

years after his arraignment to commence this civil action.

Here, Alcantara was arraigned on May 11, 2004.  See Docket Sheet in United States v.

Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004).  He did not file the original

complaint in this action until July 17, 2007, more than three years later.  Accordingly, any claim

premised on false arrest or false imprisonment is time-barred and must be dismissed.

### POINT III

### ALL CLAIMS AGAINST THE DEA AGENTS SHOULD BE DISMISSED BECAUSE THEY WERE NOT PERSONALLY INVOLVED IN THE ALLEGED DEPRIVATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

The DEA Agents cannot be held liable, under any claim plaintiff asserts against them, for

the additional, independent, reason that they had no personal involvement in any of the alleged

deprivations of Alcantara's constitutional rights.  To be liable under Bivens, a defendant must

have been personally involved in the purported constitutional violation.  See Barbera v. Smith,

836 F.2d 96, 99 (2d Cir. 1987); Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000); Marsden

v. Federal Bureau of Prisons, 856 F. Supp. 832, 835 (S.D.N.Y. 1994).  "The 'personal

involvement' requirement is satisfied where a plaintiff demonstrates that a defendant directly

participated in the acts alleged to constitute a violation of plaintiff's rights."  Wallace v. Conroy,

945 F. Supp. 628, 637 (S.D.N.Y. 1996) (emphasis added).  "To be sufficient before the law, a

[Bivens] complaint must state precisely who did what and how such behavior is actionable under

law."  Hendrickson v. United States Attorney Gen., No. 91 Civ. 8135 (LMM), 1994 WL 23069,

at *3 (S.D.N.Y. Jan. 24, 1994), aff'd, 40 F.3d 1236 (2d Cir. 1994); see also Glendora v.

Pinkerton Sec. & Detective Servs., 25 F. Supp. 2d 447, 452 (S.D.N.Y. 1998) ("In order to state a

claim under <u>Bivens</u>, [plaintiff] must allege that [defendant] personally violated a well-established constitutional right of which a reasonable person would have known.  Absent such specific allegations, the complaint is insufficient as a matter of law and must be dismissed." (internal citations omitted)).

For the same reasons, a supervisor, such as Special Agent Caruso, may not be held liable on a <u>Bivens</u> claim under a <u>respondeat superior</u> theory.  <u>See, e.g.</u>, <u>Poe v. Leonard</u>, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort.").  Rather, a supervisory official may be deemed to have personal involvement sufficient to support a <u>Bivens</u> claim only if he:  (1) directly participated in the infraction; (2) failed to remedy the wrong even after learning of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in managing subordinates who caused the unlawful condition or event; or (5) demonstrated deliberate indifference to the constitutional rights of the plaintiff by failing to act on information demonstrating that unconstitutional practices were taking place.  <u>See</u> <u>Thomas v. Ashcroft</u>, 470 F.3d 491, 497 (2d Cir. 2006); <u>Sealey v. Giltner</u>, 116 F.3d 47, 51 (2d Cir. 1997); <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).

Applying these standards, plaintiff cannot maintain against the DEA Agents any of the constitutional claims relating to his arrest and subsequent prosecution.  Although the Second Amended Complaint goes on at length about the purported deficiencies in the DEA Agents' surveillance of the courier driving Alcantara's car, at bottom the constitutional deprivations of which Alcantara complains – his allegedly false arrest, false imprisonment, and malicious prosecution – did not occur until 2004, years after any of the DEA Agents played any role in the

15

investigation. And, as noted, none of the DEA Agents arrested Alcantara, or played any role in his indictment and prosecution. Rather, their involvement in the investigation, as it related to Alcantara, can be summarized as follows:

>Special Agent Crane: Conducted surveillance of money-laundering transaction. Crane Declaration ¶ 3. Prepared three Reports of Investigation describing the surveillance and indicating that the courier's car was registered to Alcantara. Id. ¶ 7. Placed copy of audio recording of the transaction in evidence vault. Id. ¶ 5. Sent subpoena to New York Division of Motor Vehicles to obtain copy of Alcantara's photograph. Id. ¶ 6. No further involvement.

>Special Agent Dellamura: Conducted surveillance of money-laundering transaction. Dellamura Declaration ¶ 3. Photographed currency and placed it in evidence vault. Id. ¶ 5. No further involvement.

>Special Agent Oldano: Conducted surveillance of money-laundering transaction. Oldano Declaration ¶ 6. Deposited currency into undercover account controlled by DEA and wired money per CS's instructions. Id. ¶ 9. No further involvement.

>Special Agent Caruso: Approved, in supervisory capacity, six Reports of Investigation, three of which "tentatively" identified Alcantara. Caruso Declaration ¶ 5. No further involvement.[9]

Thus, as none of the DEA Agents were involved in Alcantara's arrest and prosecution – which occurred more than two years after their surveillance had been completed – they cannot be deemed to have "directly participated," Wallace, 945 F. Supp. at 637, in the acts alleged to constitute a violation of plaintiff's rights. See, e.g., Lewis v. United States, 388 F. Supp. 2d 190 (S.D.N.Y. 2005) (federal agent entitled to qualified immunity on false arrest claim because he was not physically present at time of arrest, even where he had executed affidavit in support of arrest warrant). Put simply, where law enforcement officers have tangential involvement in an

---

[9] The Second Amended Complaint readily demonstrates that Special Agent Caruso played no role in the investigation of Alcantara apart from his supervisory capacity. See 2d Am. Compl. ¶ 10 (alleging that Special Agents Crane, Oldano, and Dellamura acted "under the supervision" of Special Agent Caruso); ¶ 26 (same); ¶ 29 (same); ¶ 32 (same); ¶ 49 (alleging that Special Agent Caruso "learned indirectly" about the results of the surveillance in his capacity as Group Supervisor).

investigation and the decision to indict and arrest occurs years later after other law enforcement officials, federal prosecutors, a grand jury, and a United States magistrate judge have reviewed the evidence, those officers cannot be said to have "personally violated a well-established constitutional right of which a reasonable person would have known."  Glendora, 25 F. Supp. 2d at 452 (emphasis added).  Accordingly, the Second Amended Complaint against the DEA Agents should be dismissed.

**POINT IV**

**EVEN ASSUMING THAT THE DEA AGENTS DIRECTLY PARTICIPATED IN
ALCANTARA'S ARREST AND PROSECUTION, THE DEA AGENTS
ARE ENTITLED TO QUALIFIED IMMUNITY**

**A.    Legal Standards for Qualified Immunity**

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Public officials are entitled to qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."  Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000) (internal quotations and citation omitted).

The doctrine of qualified immunity "strikes a balance between the need to provide a means for the vindication of constitutional guarantees and the societal costs that inhere in litigation against public officials."  Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002).  The doctrine "recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if

17

unjustified lawsuits are quickly terminated." Davis v. Scherer, 468 U.S. 183, 195 (1984). Thus, to ensure that government officials do "not err always on the side of caution because they fear being sued," the "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quotations and citations omitted). If the official "reasonably believed that his actions did not violate the plaintiff's rights, [the official] is entitled to qualified immunity even if that belief was mistaken." Loria, 306 F.3d at 1282 (emphasis added).

In light of these considerations, the Supreme Court has emphasized that qualified immunity is "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). Accordingly, a qualified immunity ruling "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001). "The Supreme Court has expressly encouraged the use of summary judgment when qualified immunity is raised as a defense." Cartier v. Lussier, 955 F.2d 841, 844 (2d Cir. 1992).

Generally, courts perform a two-step analysis in determining whether an official is entitled to qualified immunity. See Loria, 306 F.3d at 1281 "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citation omitted). If a plaintiff's allegations do not state a constitutional claim, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

On the other hand, if a plaintiff adequately alleges a constitutional violation, a court must then determine whether the constitutional right at issue was clearly established at the time of the alleged infringement. Id. If it was not clearly established, then the court must "analyze the

18

objective reasonableness of [a defendant official's] belief in the lawfulness of his actions."

Loria, 306 F.3d at 1282.  Even where the right alleged to have been infringed was clearly

established, a public official is entitled to qualified immunity if the official "reasonably believed

that his actions did not violate the plaintiff's rights, . . . even if that belief was mistaken."  Id.;

accord Anderson v. Creighton, 483 U.S. 635, 641 (1987).

## B.    The DEA Agents Are Entitled to Qualified Immunity

Alcantara's constitutional claims against the DEA Agents are based on allegations of

false arrest/false imprisonment and malicious prosecution.  The existence of probable cause,

however, is an absolute defense to these claims and affords the DEA Agents qualified immunity

from suit.  See, e.g., Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (false arrest); Boyd v.

City of New York, 336 F.3d 72, 75 (2d Cir. 2003) (false arrest and malicious prosecution);

Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999) (false arrest/false imprisonment).

It is well-settled that in the Second Circuit an officer is entitled to qualified immunity where

"arguable probable cause" exists, i.e., "if either (a) it was objectively reasonable for the officer to

believe that probable cause existed, or (b) officers of reasonable competence could disagree on

whether the probable cause test was met."  Escalera, 361 F.3d at 743; Caldarola v. Calabrese,

298 F.3d 156, 162 (2d Cir. 2002) ("[W]here an officer may have reasonably but mistakenly

concluded that probable cause existed, the officer is nonetheless entitled to qualified

immunity.").

Probable cause exists "when the officers have knowledge or reasonably trustworthy

information of facts and circumstances that are sufficient to warrant a person of reasonable

caution in the belief that the person to be arrested has committed or is committing a crime."

Caldarola, 298 F.3d at 162 (citation omitted).  While "subjective good-faith belief" alone is not

19

enough to create probable cause, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment," and even where police officers may end up being mistaken, their mistake may nevertheless be "understandable" and the arrest "a reasonable response to the situation facing them at the time." Hill v. California, 401 U.S. 797, 804 (1971); see also Ruiz v. Herrera, 745 F. Supp. 940, 946 (S.D.N.Y. 1990) (no constitutional violation exists where officer "arrests someone with probable cause, but by mistake"). The reasonableness of an officer's conduct is "determined by considering the totality of the objective circumstances surrounding the arrest." United States v. Valez, 796 F.2d 24, 26 (2d Cir. 1986). This inquiry into whether probable cause exists "must consider those facts available to the officer at the time of the arrest and immediately before it." Caldarola, 298 F.3d at 162 (citation omitted). The Second Circuit has warned that probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." Id. (citation omitted). Rather, courts "must be aware that probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts." Id.

Significantly, probable cause is presumed where, as here, an arrest is made pursuant to a court-ordered arrest warrant. As one court has explained, "[g]enerally, a magistrate's review of an arrest warrant application results in a presumption that the warrant was issued on probable cause." Saghezi v. Reno, No. 94 Civ. 8291 (HB), 1996 WL 524338, at *11 (S.D.N.Y. Sept. 16, 1996) (citations omitted). "Substantial deference" is owed by a reviewing court, and a challenge to an arrest warrant under such circumstances is "an uphill battle." Id.; see also, e.g., Weinstock v. Wilk, 296 F. Supp. 2d 241, 247 (D. Conn. 2003) ("[T]he arrest warrant was issued by a neutral magistrate, which in itself supports a finding of probable cause."); Lewis, 388 F. Supp. 2d at 196 ("[T]he warrant pursuant to which Mr. Lewis was arrested was issued by a neutral magistrate,

20

automatically inuring [a non-arresting officer] with qualified immunity."); Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) ("Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden.").  To rebut the presumption of probable cause, the plaintiff must make a "substantial preliminary showing" that the defendants "knowingly and intentionally, or with reckless disregard for the truth" made a false statement and that the allegedly false statement was "necessary to the finding of probable cause."  Golino, 950 F.2d at 870.

Here, plaintiff has not met his "heavy burden" of showing that the DEA Agents committed perjury or engaged in other misconduct that would rebut the strong presumption of probable cause.  Plaintiff primarily complains that two of the DEA Agents participated in the creation of Reports of Investigation that "tentatively identified" the courier as Alcantara, see 2d Am. Compl. ¶¶ 2, 34, 40, 39,[10] based on the courier's use of Alcantara's car.  The tentative identification, even if it was ultimately mistaken, cannot qualify as a "substantial preliminary showing" of a knowingly or recklessly false statement, for the simple reason that it was, in fact, true – the courier had been tentatively identified as Alcantara.  And, in any event, regardless of the tentative (or mistaken) nature of the identification, the DEA Agents played no role in any probable cause determination two years later because they had no involvement in Alcantara's indictment, arrest, or prosecution.

## POINT V

## THE COURT SHOULD STAY DISCOVERY PENDING

---

[10]  There is a typographical error in the Second Amended Complaint, such that paragraphs 39 and 40 appear more than once each.  The citation is to the first paragraph 40.

## RESOLUTION OF THIS MOTION

Pending the Court's resolution of this motion, the DEA Agents respectfully request a stay of any discovery.  The Supreme Court has instructed that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed."  <u>Harlow</u>, 457 U.S. at 818; <u>see also</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991); <u>X-Men Sec., Inc. v. Pataki</u>, 196 F.3d 56, 67 (2d Cir. 1999).  Likewise, the Second Circuit has instructed that a motion to dismiss on qualified immunity grounds should not be held in abeyance while discovery proceeds, as "[t]he purpose of early determinations of immunity defenses is, after all, to lift the burdens of litigation from a defendant who should not be a party at all."  <u>Smith v. Reagan</u>, 841 F.2d 28, 31 (2d Cir. 1988).

## Conclusion

For the foregoing reasons, the Court should grant the DEA Agents' motion and dismiss the Second Amended Complaint as against them, with prejudice.

Dated: New York, New York
         August 8, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney
Attorney for Defendants Mark Crane, Michael Dellamura, John Oldano, and Nicholas Caruso

By:      /s/ David Bober
         DAVID BOBER
         Assistant United States Attorney
         86 Chambers Street, 3rd Floor
         New York, New York  10007
         Telephone:  (212) 637-2718
         david.bober@usdoj.gov

22