UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIEGO ALCANTARA,

           Plaintiff,

    v.

OFFICE OF THE SPECIAL NARCOTICS PROSECUTOR FOR THE CITY OF NEW YORK UC 133, Individually and as an undercover officer for the Office of the Special Narcotics Prosecutor for the City of New York, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT MARK CRANE, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT JOHN OLDANO, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT MICHAEL DELLAMARA, and UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO, all individual USDOJ DEA Defendants are being sued in their individual capacities,

           Defendants.

ECF Case

No. 07 Civ. 6480 (JGK)

**DECLARATION OF DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT <u>JOHN OLDANO</u>**

    John Oldano, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") where I have been employed for 12 years.

2.     In October 2001, I was the DEA co-case agent in charge of the New York Division Group D-31's participation in an investigation that was part of "Operation White Dollar." Operation White Dollar was comprised of a series of approximately thirty investigations

that the Attorney General authorized in September 2001 to permit the DEA to launder drug proceeds. In this operation, money would be delivered to undercover officers, deposited in an undercover bank account controlled by the DEA, and wired to other bank accounts in an attempt to identify, arrest, and prosecute participants in multi-million dollar drug-money-laundering conspiracies.

3. As co-case agent, my responsibilities included gathering intelligence through physical and/or electronic surveillance, identifying target subjects in the organization, debriefing confidential informants, and overseeing the investigation.

4. Agents involved in investigations under Operation White Dollar used an informant, or confidential source ("CS"), who was affiliated with drug money launderers in Colombia. The CS informed the Colombians that he had American and Canadian sources who were willing to receive illicit drug money, place the money in the United States banking system, and transfer it to accounts controlled by the Colombians.

5. On or about October 15, 2001, the CS informed me that an individual named German Cote, who was affiliated with a known Colombian money-laundering organization, was seeking to launder approximately $150,000 in United States currency. The CS provided a prepaid cellular telephone number for the currency courier. Arrangements were made for an undercover officer from the Office of the New York City Special Narcotics Prosecutor (the "UC") to take delivery of the currency from the courier on October 17, 2001.

6. On October 17, 2001, I was a member of a surveillance team that conducted surveillance of the delivery of the currency. At approximately 3:20 p.m., the surveillance team observed the UC greet the courier on the corner of 94th and Broadway in New York City. The UC and the courier engaged in conversation for approximately 10 minutes before

parting ways.

7. After the courier and the UC parted ways, I followed the UC while other surveillance units followed the courier. At about 5:10 p.m., I observed the UC park his car in the area of 125th and Broadway. At around the same time, the surveillance team saw the courier drive up to the UC in a red Ford Escort and then proceed north on Broadway. About five minutes later, the courier approached the UC on foot carrying a black backpack. The courier and the UC walked to the UC's vehicle and the courier placed the backpack in the rear seat. The courier and the UC then left the area in their respective vehicles.

8. I then followed the UC to the vicinity of 110th Street and Riverside Drive, where the UC gave the backpack to members of the surveillance team. The backpack contained a large amount of United States currency. I took photographs of the currency and then other members of the surveillance team took possession of the backpack and placed it in the evidence vault at the DEA New York Division Office in Manhattan.

9. The next day, October 18, 2001, I removed the bag from the evidence vault and deposited the money into an undercover bank account that DEA controlled. A few days later, I received instructions from the CS to wire the money into an account in the name of a corporation at a bank in Florida.

10. Meanwhile, members of the surveillance team determined that the courier who delivered the currency was driving a car registered to Diego Alcantara.

11. On April 29, 2004, a grand jury of the United States District Court for the Southern District of New York returned an indictment that charged Alcantara and thirty-three other individuals with drug and money-laundering offenses. The same grand jury returned a superseding indictment on May 2, 2004. Accordingly, a United States magistrate judge

issued a warrant for Alcantara's arrest, and he was subsequently arrested. I did not participate in Alcantara's arrest.

12. I did not testify before the grand jury, nor did I provide any written materials to the grand jury. I played no role in the decision to indict Alcantara, nor did I have any role in the arrest of Alcantara or the decision to prosecute Alcantara. Apart from conducting surveillance and laundering the suspected drug proceeds as described above, I played no role in the investigation, indictment, arrest, or prosecution of Alcantara.

13. I acted reasonably and believed in good faith that my actions were lawful during my role in the investigation described above.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on:            August 8, 2008

*JOHN OLDANO*