UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIEGO ALCANTARA,<br><br>                            Plaintiff,<br><br>                 v.<br><br>OFFICE OF THE SPECIAL NARCOTICS PROSECUTOR FOR THE CITY OF NEW YORK UC 133, Individually and as an undercover officer for the Office of the Special Narcotics Prosecutor for the City of New York, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT MARK CRANE, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT JOHN OLDANO, UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT MICHAEL DELLAMARA, and UNITED STATES DEPARTMENT OF JUSTICE DRUG ENFORCEMENT ADMINISTRATION Group Supervisor NICHOLAS CARUSO, all individual USDOJ DEA Defendants are being sued in their individual capacities,<br><br>                            Defendants. | ECF Case<br><br>No. 07 Civ. 6480 (JGK)<br><br>**STATEMENT PURSUANT TO LOCAL RULE 56.1 OF DEFENDANTS MARK CRANE, MICHAEL DELLAMURA, JOHN OLDANO, AND NICHOLAS CARUSO** |

       Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, defendants Mark Crane, Michael Dellamura, John Oldano, and Nicholas Caruso (the "DEA Agents") state that there is no genuine issue to be tried with respect to the following facts:

       1.      Alcantara's allegations against the DEA Agents arise from their work as members of a surveillance team involved in a drug-money-laundering investigation that was part of

"Operation White Dollar." See Declaration of John Oldano ("Oldano Declaration") ¶ 2.[1]

2.  Operation White Dollar consisted of approximately thirty related investigations that the United States Attorney General authorized in September 2001 to permit the DEA to launder drug proceeds in an effort to identify and arrest members of drug money laundering organizations. Id.

3.  Agents involved in investigations under Operation White Dollar used informants, or confidential sources ("CS"), affiliated with money launderers in Colombia. Id. ¶ 4.

4.  The CS would inform the Colombians that he had American and Canadian sources who were willing to receive illicit drug money, place the money in the United States banking system, and transfer it to accounts controlled by the Colombians. Id.

5.  Under Operation White Dollar, couriers would deliver large amounts of United States currency to undercover officers working with DEA; the undercover officers would, in turn, transfer the money to DEA agents, who would deposit it in DEA-controlled undercover bank accounts, and thereafter wire the money to other bank accounts. Id. ¶ 2.

6.  On or about October 15, 2001, a CS contacted Special Agent Oldano and informed him that an individual named German Cote, who was affiliated with a known Colombian money-laundering organization, was seeking to launder approximately $150,000 in United States currency. Id. ¶ 5.

7.  The CS provided a prepaid cellular telephone number for the currency courier. Id.

8.  An undercover officer from the Office of the New York City Special Narcotics Prosecutor (the "UC") contacted the courier at the number provided by the CS, and arranged to take delivery of the currency from the courier on October 17, 2001, in the vicinity of 96th and

---

[1] The declarations filed by the DEA Agents in support of their motion to dismiss the complaint are referred to herein as "[Special Agent Last Name] Declaration."

Broadway in New York City.  Id.

9.      On October 17, 2001, Special Agents Crane, Dellamura, and Oldano were part of a team assigned to conduct surveillance of the delivery of the currency.  Id. ¶ 6; Dellamura Declaration ¶ 3; Crane Declaration ¶ 3.

10.     At approximately 3:20 p.m., as the surveillance team watched, the courier met the UC at the intersection of 94th and Broadway, where they talked for approximately ten minutes.  Crane Declaration ¶ 3; Oldano Declaration ¶ 6.

11.     During the encounter between the UC and the courier, the surveillance team observed that the courier was driving a red Ford Escort, and they recorded the license plate number.  Crane Declaration ¶ 6.

12.     The UC and the courier then parted ways, and Special Agent Dellamura, in an unmarked vehicle, followed the courier to a building in the Bronx, while Special Agent Oldano followed the UC.  Dellamura Declaration ¶ 4; Oldano Declaration ¶ 7.

13.     Special Agent Dellamura watched the courier enter the building and emerge shortly thereafter with a black backpack.  Dellamura Declaration ¶ 4.

14.     At approximately 5:15 p.m., the courier and the UC met again, this time near the intersection of 125th Street and Broadway in Manhattan.  Oldano Declaration ¶ 7; Dellamura Declaration ¶ 4.  The courier and the UC walked to the UC's car, and the courier placed the backpack in the rear seat.  Oldano Declaration ¶ 7; Dellamura Declaration ¶ 4; Crane Declaration ¶ 4.  The courier and the UC then left in their respective vehicles.  Oldano Declaration ¶ 7.

15.     Special Agents Oldano and Dellamura, with other special agents not named as defendants in this action, followed the UC to the vicinity of 110th Street and Riverside Drive.  Oldano Declaration ¶ 8; Dellamura Declaration ¶ 4.  The UC gave the backpack to the agents, who

opened it and discovered that it contained a large amount of United States currency. Oldano Declaration ¶ 8; Dellamura Declaration ¶ 4; Crane Declaration ¶ 4. Special Agent Dellamura transported the backpack to the DEA New York Division Office, photographed the contents, and placed it in the evidence vault. Dellamura Declaration ¶ 5.

16.     The next day, October 18, 2001, Special Agent Oldano removed the money from the evidence vault and deposited it into an undercover bank account controlled by the DEA. Oldano Declaration ¶ 9. A few days later, the CS instructed Special Agent Oldano to wire the money into an account held in the name of a corporation at a bank in Florida. Id.

17.     Meanwhile, on October 18, 2001, Special Agent Crane determined that the courier's Ford Escort was registered to Alcantara. Crane Declaration ¶ 6. On October 22, 2001, Special Agent Crane sent a subpoena to the New York State Department of Vehicles to obtain a photograph of Alcantara. Id.

18.     Also in late October 2001, Special Agent Crane prepared three DEA Reports of Investigation that summarized the surveillance and evidence, and Special Agent Caruso, as supervisor of the group that conducted the surveillance, signed those reports as the approving official. Crane Declaration ¶ 7; Caruso Declaration ¶¶ 4-5.

19.     One Report of Investigation indicated that the courier's car was registered to Alcantara; another indicated that the courier had been "tentatively identified" as Alcantara, and the third report referred back to the first. Caruso Declaration ¶ 5.

20.     After October 2001, none of the DEA Agents participated any further in the investigation of Alcantara, and his subsequent arrest, indictment, and prosecution. Caruso Declaration ¶ 7; Crane Declaration ¶ 9; Dellamura Declaration ¶ 8; Oldano Declaration ¶ 12.

21.     Two and a half years after the surveillance of the currency transfer, in May 2004, a grand

jury of the United States District Court for the Southern District of New York returned an indictment against Alcantara and thirty-three other individuals, charging them with money-laundering-related offenses, and United States Magistrate Judge Debra C. Freeman signed a warrant for Alcantara's arrest.  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004); Bober Declaration Exhibits A & B.

22.     Alcantara was arrested on May 3, 2004.  See 2d Am. Compl. ¶ 11.[2]  None of the DEA Agents arrested Alcantara, played any part in his arrest, or testified before the grand jury.  Crane Declaration ¶ 9; Caruso Declaration ¶ 7; Dellamura Declaration ¶ 8; Oldano Declaration ¶ 12.

23.     Alcantara was arraigned on May 11, 2004, and pleaded not guilty.  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004).  The district court initially set Alcantara's bail at $250,000, and approximately six weeks later reduced the bail to $10,000.  Id.; 2d Am. Compl. ¶ 83.  Alcantara then made bail and was released from custody after having spent seventy-two days in jail.  2d Am. Compl. ¶ 83.

24.     On January 10, 2005, at the prosecutor's request, Judge Harold Baer issued an order of nolle prosequi "in the interests of justice."  See United States v. Otalvaro-Ortiz, et al., No. 04 Cr. 345 (HB) (S.D.N.Y. 2004); Bober Declaration Exhibit C.  Specifically, the nolle prosequi order, which was signed by the Assistant United States Attorney assigned to the prosecution, indicated that "[b]ased on a review of the evidence in the case and information pertaining to this defendant acquired subsequent to the filing of this indictment, including information provided by the defendant and his counsel, it has been concluded that further prosecution of DIEGO

---

[2]  Citations to the "2d Am. Compl." are to the Second Amended Complaint, item number 11 on the Court's docket, entered June 23, 2008.

ALCANTARA would not be in the interests of justice." Bober Declaration Exhibit C.

Dated: New York, New York
       August 8, 2008

                           Respectfully submitted,

                           MICHAEL J. GARCIA
                           United States Attorney for the
                           Southern District of New York
                           Attorney for Defendants Mark Crane,
                           Michael Dellamura, John Oldano, and
                           Nicholas Caruso


                   By:    /s/ David Bober
                           DAVID BOBER
                           Assistant United States Attorney
                           86 Chambers Street, 3d Floor
                           New York, NY  10007
                           Telephone:  (212) 637-2718
                           Facsimile:  (212) 637-2786
                           david.bober@usdoj.gov