UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

     - v. -                                :    **SEALED INDICTMENT**

NICHOLAS ALBERTO OTALVARO-ORTIZ,            :    S1 04 Cr. 345
GABRIEL JAIME OTALVARO-ORTIZ,
JOSE ROBERTO VALENZUELA-BELL,               :
MARIA EUGENIA GARZON-CARDONA,
    a/k/a "Marina,"                       :
TERESITA OSPINA DE AGUDELO,
    a/k/a "Carolina,"
GERMAN ARTURO MORENO-ZULUAGA,
HECTOR IGNACIO GOMEZ-VARGAS,
    a/k/a "Nacho,"
EDUARDO DUQUE-GOMEZ,
DIANA MARIA QUINTERO-VARGAS,
MARGARITA LUCIA QUINTERO-VARGAS,
DORA LUZ MESA-RIOS,
MIRIAM DEL SOCORRO MESA-RIOS,               :
CARLOS EDUARDO GUARIN-LOPEZ,
JUAN CARLOS ELLIS,
HUGO PALMA,
GERARDO PALMA,                              :
JUAN MANUEL MANRIQUE-HERRERA,
ROBERTO SARABIA-MARTINEZ,                   :
ROMANO ALONSO-ZUNIGA,
DIEGO ALCANTARA,
NIXON HURTADO,
MAURICIO ORDONEZ,                           :
MIGUEL SANTOS,
WILMUR GIRALDO,
MARCOS SABINO,
JOSE CORTEZ,
SEBASTIAN TAMAYO,
YIP OI MAN,                                 :
SALOMON EILENBURG-DRUCKMAN,
RTV CORPORATION,                            :
BTS CORPORATION,
CLEMENCIA PINZON-BARCO,                      :
JAIME TRUJILLO-DAVILA, and
INVERTITULOS C.A.,

             Defendants.          :

- - - - - - - - - - - - - - - - - - x

U.S. DISTRICT COURT
FILED
APR 20 2004
S.D. OF N.Y.

A TRUE COPY
UNITED STATES MAGISTRATE
FOR THE SOUTHERN DISTRICT OF N.Y.
DEPUTY CLERK

## COUNT ONE

The Grand Jury charges:

COLOMBIAN MONEY LAUNDERING AND THE BLACK MARKET PESO EXCHANGE

1. Colombia is one of the world's primary sources of cocaine and heroin. Each year Colombian narcotics traffickers generate billions of dollars of narcotics proceeds. In the United States, these narcotics are sold for dollars, almost always in cash, and often in small denominations.

2. To profit effectively from this illegal activity, Colombian narcotics traffickers must find a way to "launder" these vast sums of cash, that is, to have the funds transferred to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

3. Banking laws in both the United States and Colombia prevent narcotics traffickers from simply depositing drug monies into accounts in the United States and transferring them to Colombia or other third countries. As a result, narcotics traffickers must disguise, or "launder," the funds in order to hide their true source.

4. The Colombian Black Market Peso Exchange (the "BMPE") is one of the primary methods used by Colombian narcotics traffickers to launder their narcotics proceeds. The basic BMPE scheme typically operates as follows. In Colombia, a narcotics trafficker owning narcotics proceeds generated in the United States contacts a third party -- generally referred to as a "peso

broker" -- who agrees to trade Colombian pesos he controls in Colombia in exchange for the cash narcotics proceeds in the United States.  Once this exchange occurs, the narcotics trafficker, having received Colombian pesos in Colombia from the peso broker, has effectively laundered his money and is out of the BMPE process.  The peso broker, on the other hand, must now do something with the drug dollars that he has acquired in the United States so that he can obtain more pesos to begin the BMPE process again.

5.  To do so, the peso broker uses contacts in the United States to receive the narcotics trafficker's drug proceeds he purchased, often arranging for criminal associates to receive the drug proceeds in suitcases or bags from the narcotics trafficker's operatives who control the money.  After the money is physically transferred, the peso broker uses additional contacts in the United States to get the drug proceeds into the United States banking system.  To avoid detection, this is often done either through deposits into bank accounts in company names that are intended to appear to be related to legitimate business activity or through multiple deposits of small amounts of drug proceeds into different bank accounts which are then consolidated into larger accounts both in the United States and abroad.  The peso broker, still operating in Colombia, now has a pool of narcotics-derived proceeds in the United States to sell to

individuals or businesses in Colombia who desire United States dollars.

6. Colombians, either individuals or corporations, who have pesos to sell -- whether from legitimate sources or not -- and who want to exchange pesos for dollars in a manner that avoids Colombian currency exchange and income reporting requirements and the payment of Colombian taxes, tariffs, and duties owed to the Colombian government, then make arrangements with the peso broker. In an effort to conceal the true nature of these transactions, dealings between the Colombian businessperson and the peso broker are almost always based only on verbal agreements and without any paperwork. As a result, these transactions enable the Colombian businessman to avoid currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government. Once the transaction is completed, the peso broker then uses his contacts in the United States and elsewhere to transfer the drug proceeds he has accumulated from the narcotics trafficker to wherever the Colombian businessperson asks them to be transferred. Therefore, under the BMPE system, the dollar drug proceeds can and often do end up in the accounts of Colombian businesspeople who appear to have no direct involvement in narcotics trafficking crimes.

7. All three parties involved in the BMPE process benefit: (a) the Colombian narcotics trafficker receives

laundered pesos; (b) the Colombian businessperson evades United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, or duties owed to the Colombian government; and (c) the peso broker makes a profit from commissions retained during the unofficial currency exchange process.  Meanwhile, the BMPE process frustrates the efforts of the United States, Colombia, and other governments around the world to enforce currency exchange and income reporting requirements, to collect taxes, tariffs, and duties owed, and to maintain the integrity of their financial institutions.

8.   In practice, the BMPE process typically involves more than one peso broker:  in many instances, one broker (the "First-Tier Peso Broker") has the direct relationship with the narcotics traffickers in Colombia and bears ultimate responsibility for the laundering of the drug money; a second broker (the "Second-Tier Peso Broker") has the contacts in the United States who can collect and accumulate the narcotics proceeds; and a third broker (the "Third-Tier Peso Broker") has the contacts with Colombian businesspeople and corporations who want to sell pesos for dollars while avoiding United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government.  Irrespective of the number of intermediaries involved, however, the result of the BMPE process is the same:

Colombian pesos in Colombia are used to buy United States drug dollars in the United States.

<u>THE MONEY LAUNDERING CONSPIRACY</u>

9.    From in or about 2001 up to and including the present, in the Southern District of New York and elsewhere, NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ, JOSE ROBERTO VALENZUELA-BELL, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," GERMAN ARTURO MORENO-ZULUAGA, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a "Nacho," EDUARDO DUQUE-GOMEZ, DIANA MARIA QUINTERO-VARGAS, MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS, MIRIAM DEL SOCORRO MESA-RIOS, CARLOS EDUARDO GUARIN-LOPEZ, JUAN CARLOS ELLIS, HUGO PALMA, GERARDO PALMA, JUAN MANUEL MANRIQUE-HERRERA, ROBERTO SARABIA-MARTINEZ, ROMANO ALONSO-ZUNIGA, DIEGO ALCANTARA, NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL SANTOS, WILMUR GIRALDO, MARCOS SABINO, JOSE CORTEZ, SEBASTIAN TAMAYO, and YIP OI MAN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate Section 1956(a)(1)(B)(i) of Title 18, United States Code.

10.    It was a part and an object of the conspiracy that NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ, JOSE ROBERTO VALENZUELA-BELL, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," GERMAN ARTURO MORENO-ZULUAGA, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a

"Nacho," EDUARDO DUQUE-GOMEZ, DIANA MARIA QUINTERO-VARGAS, MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS, MIRIAM DEL SOCORRO MESA-RIOS, CARLOS EDUARDO GUARIN-LOPEZ, JUAN CARLOS ELLIS, HUGO PALMA, GERARDO PALMA, JUAN MANUEL MANRIQUE-HERRERA, ROBERTO SARABIA-MARTINEZ, ROMANO ALONSO-ZUNIGA, DIEGO ALCANTARA, NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL SANTOS, WILMUR GIRALDO, MARCOS SABINO, JOSE CORTEZ, SEBASTIAN TAMAYO, and YIP OI MAN, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of hundreds of thousands of dollars in cash, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of illegal narcotics transactions, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>MEANS AND METHODS OF THE MONEY-LAUNDERING CONSPIRACY</u>

11.    Among the means and methods by which NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ, JOSE ROBERTO VALENZUELA-BELL, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," GERMAN

ARTURO MORENO-ZULUAGA, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a

"Nacho," EDUARDO DUQUE-GOMEZ, DIANA MARIA QUINTERO-VARGAS,

MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS, MIRIAM DEL

SOCORRO MESA-RIOS, CARLOS EDUARDO GUARIN-LOPEZ, JUAN CARLOS

ELLIS, HUGO PALMA, GERARDO PALMA, JUAN MANUEL MANRIQUE-HERRERA,

ROBERTO SARABIA-MARTINEZ, ROMANO ALONSO-ZUNIGA, DIEGO ALCANTARA,

NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL SANTOS, WILMUR GIRALDO,

MARCOS SABINO, JOSE CORTEZ, SEBASTIAN TAMAYO, and YIP OI MAN, the

defendants, and their co-conspirators would and did carry out the

conspiracy were the following:

      a. At all times relevant to this Indictment,

NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ,

JOSE ROBERTO VALENZUELA-BELL, MARIA EUGENIA GARZON-CARDONA, a/k/a

"Marina," TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," GERMAN

ARTURO MORENO-ZULUAGA, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a

"Nacho," EDUARDO DUQUE-GOMEZ, DIANA MARIA QUINTERO-VARGAS,

MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS, MIRIAM DEL

SOCORRO MESA-RIOS, CARLOS EDUARDO GUARIN-LOPEZ, JUAN CARLOS

ELLIS, HUGO PALMA, GERARDO PALMA, JUAN MANUEL MANRIQUE-HERRERA,

ROBERTO SARABIA-MARTINEZ, ROMANO ALONSO-ZUNIGA, DIEGO ALCANTARA,

NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL SANTOS, WILMUR GIRALDO,

MARCOS SABINO, JOSE CORTEZ, SEBASTIAN TAMAYO, and YIP OI MAN, the

defendants, conspired to use the BMPE process in order to launder

Colombian drug money in the United States and to exchange

Colombian pesos for United States drug dollars while evading

United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government.

      b. As described below, different members of the criminal organization played different roles in its money-laundering activities. A number of the defendants operated as First-Tier Peso Brokers in Medellin, Colombia, and secured contracts from Colombian narcotics traffickers to launder millions of dollars of narcotics proceeds in the United States and Canada. Once these contracts were secured, other defendants based in Colombia, the Second-Tier Peso Brokers, arranged for the narcotics proceeds to be picked up from still other defendants who served as the narcotics traffickers' operatives in the United States and Canada. After the drug dollars were picked up and successfully transferred into the United States banking system, other defendants, the Third-Tier Peso Brokers, made arrangements with Colombian businesspeople and companies to provide Colombian pesos in Colombia in exchange for the drug money to be wire transferred from bank accounts in the United States into bank accounts owned by the Colombian businesspeople and companies around the world in a manner that avoided United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government. The Colombian businesspeople and corporations then transferred their Colombian pesos to the peso brokers, who in

turn provided the pesos to the Colombian narcotics traffickers to complete the BMPE process.  More specifically:

(1)  At all times relevant to this Indictment, NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," JOSE ROBERTO VALENZUELA-BELL, and TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," the defendants, were First-Tier Peso Brokers based in Colombia who obtained contracts from Colombian narcotics traffickers and other First-Tier Peso Brokers to launder drug money in the United States and Canada.  These defendants then made arrangements with Second-Tier Peso Brokers, described below, to collect the drug money in the United States and Canada so that it ultimately could be laundered through the BMPE.

(2)  At all times relevant to this Indictment, GERMAN ARTURO MORENO-ZULUAGA and JUAN MANUEL MANRIQUE-HERRERA, the defendants, were Second-Tier Peso Brokers based in Colombia who arranged for the collection and accumulation of drug dollars in the United States and Canada to be sold through the BMPE to Colombian businesspeople and corporations.  During the course of the conspiracy, MORENO-ZULUAGA, unbeknownst to him, employed the services of an undercover officer working with the United States Drug Enforcement Administration (the "UC") and other law enforcement officers acting in undercover capacities in this investigation to

coordinate the collection of narcotics proceeds in the United

States and Canada.

(3)  At all times relevant to this

Indictment, JUAN CARLOS ELLIS, HUGO PALMA, GERARDO PALMA, JUAN

MANUEL MANRIQUE-HERRERA, ROBERTO SARABIA-MARTINEZ, ROMANO ALONZO-

ZUNIGA, DIEGO ALCANTARA, NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL

SANTOS, WILMUR GIRALDO, MARCOS SABINO, JOSE CORTEZ, SEBASTIAN

TAMAYO, and YIP OI MAN, the defendants, acted as the Colombian

narcotics traffickers' operatives in the United States and

Canada, gathering drug proceeds and providing them unwittingly to

the UC and other law enforcement officers acting in undercover

capacities in this investigation to be laundered through the

BMPE.

(4)  At all times relevant to this

Indictment, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a "Nacho," EDUARDO

DUQUE-GOMEZ, CARLOS EDUARDO GUARIN-LOPEZ, DIANA MARIA QUINTERO-

VARGAS, MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS,

MIRIAM DEL SOCORRO MESA-RIOS, the defendants, were Third-Tier

Peso Brokers based in Colombia who arranged for the sale of drug

dollars to Colombian businesspeople and corporations in a manner

that avoided United States and Colombian currency exchange and

income reporting requirements and the payment of taxes, tariffs,

and duties owed to the Colombian government.  In addition to

acting as Third-Tier Peso Brokers, GOMEZ-VARGAS, DUQUE-GOMEZ, and

GUARIN-LOPEZ controlled bank accounts in Bogota and Medellin,

Colombia that were used to receive laundered funds, and also transported pesos for their criminal associates in Colombia in armored cars.

<u>OVERT ACTS</u>

12.  In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  On or about October 17, 2001, DIEGO ALCANTARA, the defendant, possessed approximately $135,616 in narcotics proceeds in New York, New York.

b.  On or about November 15, 2001, MAURICIO ORDONEZ, the defendant, possessed approximately $295,795 in narcotics proceeds in Queens, New York.

c.  On or about November 16, 2001, NIXON HURTADO, the defendant, possessed approximately $300,005 in narcotics proceeds in Queens, New York.

d.  On or about January 15, 2002, MIGUEL SANTOS, the defendant, possessed approximately $440,453 in narcotics proceeds in New York, New York.

e.  On or about January 22, 2002, MIGUEL SANTOS, the defendant, possessed approximately $259,080 in narcotics proceeds in New York, New York.

f. On or about March 6, 2002, WILMUR GIRALDO, the defendant, possessed approximately $289,980 in narcotics proceeds in Queens, New York.

g. On or about May 9, 2002, JUAN CARLOS ELLIS, the defendant, possessed approximately $500,000 in narcotics proceeds he had previously received from HUGO PALMA, the defendant, in Montreal, Canada.

h. On or about May 20, 2002, ROMANO ALONSO-ZUNIGA, the defendant, possessed approximately $400,605 in narcotics proceeds in Miami, Florida.

i. On or about June 27, 2002, JUAN MANUEL MANRIQUE-HERRERA, the defendant, possessed approximately $167,800 in narcotics proceeds secreted inside the metal tubing of luggage carriers at JFK Airport in Queens, New York.

j. On or about August 22, 2002, a co-conspirator not named as a defendant herein possessed approximately $291,305 worth of narcotics proceeds in Canadian currency in Montreal, Canada.

k. In or about October 2002, GERMAN ARTURO MORENO-ZULUAGA, the defendant, met with the UC in Aruba and discussed laundering Colombian narcotics proceeds present in the United States and other countries.

l. On or about December 12, 2002, ROBERTO SARABIA-MARTINEZ, the defendant, possessed approximately $400,635 in narcotics proceeds in Atlanta, Georgia.

m.  On or about January 15, 2003, MARCOS SABINO, the defendant,  possessed approximately $990,000 in narcotics proceeds in New York, New York.

n.  On or about February 4, 2003, SABASTIAN TAMAYO and JOSE CORTEZ, the defendants, possessed approximately $300,195 in narcotics proceeds in Queens, New York.

o.  On or about May 9, 2003, GERMAN ARTURO MORENO-ZULUAGA, the defendant, spoke over the telephone to the UC about laundering approximately $500,000 in narcotics proceeds in Puerto Rico.

p.  On or about June 7, 2003, CARLOS EDUARDO GUARIN-LOPEZ and GABRIEL JAIME OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about the collection of approximately of $200,000 in narcotics proceeds in the United States.

q.  On or about June 25, 2003, JOSE ROBERTO VALENZUELA-BELL and HECTOR IGNACIO GOMEZ-VARGAS, a/k/a "Nacho," the defendants, spoke over the telephone in Colombia about a dispute they were having with a co-conspirator over the availability of laundered narcotics proceeds.

r.  On or about June 25, 2003, EDUARDO DUQUE-GOMEZ and GABRIEL JAIME OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about approximately $100,000 in laundered narcotics proceeds.

s.  On or about June 25, 2003, MIRIAM DEL SOCORRO MESA-RIOS and NICHOLAS OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about account balances for laundered funds.

t.  On or about June 25, 2003, NICHOLAS OTALVARO-ORTIZ and GABRIEL JAIME OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about laundering approximately $500,000 in narcotics proceeds in the United States.

u.  On or about June 27, 2003, NICHOLAS OTALVARO-ORTIZ and GABRIEL JAIME OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about kidnaping family members of a co-conspirator who was responsible for collecting approximately $400,000 in narcotics proceeds in Florida that had been seized by law enforcement officers.

v.  On or about June 27, 2003, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a "Nacho," and GABRIEL JAIME OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia regarding a co-conspirator's concern about the loss of laundered narcotics proceeds.

w.  On or about July 1, 2003, MARGARITA LUCIA QUINTERO-VARGAS and NICHOLAS OTALVARO-ORTIZ, the defendants, spoke over the telephone in Colombia about the receipt of a quantity of laundered narcotics proceeds.

x.  On or about July 11, 2003, TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," and GERMAN ARTURO MORENO-ZULUAGA, the

defendants, spoke over the telephone in Colombia about the collection of narcotics proceeds in the United States.

y.  On or about July 14, 2003, DORA LUZ MESA-RIOS, the defendant,  spoke with a co-conspirator not named as a defendant herein about wire transfers to be made in Panama with laundered narcotics proceeds.

z.  On or about July 15, 2003, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," and GERMAN ARTURO MORENO-ZULUAGA, the defendants, spoke over the telephone in Colombia about the collection of approximately $200,000 in narcotics proceeds in New York.

aa.  On or about July 15, 2003, DIANA MARIA QUINTERO-VARGAS, the defendant, spoke with a co-conspirator not named as a defendant herein about the availability of narcotics proceeds in New York.

ab.  On or about September 18, 2003, JUAN CARLOS ELLIS, the defendant, possessed approximately $500,080 in narcotics proceeds that he had previously received from GERARDO PALMA, the defendant, in Montreal, Canada.

ac.  On or about February 12, 2004, JUAN CARLOS ELLIS and GERARDO PALMA, the defendants, possessed approximately $790,000 in narcotics proceeds in Montreal, Canada.

ad.  On or about February 17, 2004, JUAN CARLOS ELLIS, the defendant, possessed approximately $790,808 in narcotics proceeds in Montreal, Canada.

ae.   On or about February 26, 2004, YIP OI MAN, the defendant, possessed approximately $99,900 in narcotics proceeds in Queens, New York.

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO THROUGH FIVE

The Grand Jury further charges:

13.   On or about the dates specified in the chart below, in the Southern District of New York and elsewhere, the defendants specified in the chart below, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, the transfer of the amount of United States Currency specified in the chart below, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of illegal narcotics transactions, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, the specified defendants transferred United States Currency that constituted the proceeds of illegal narcotics activities to an undercover law enforcement officer in New York, New York.

| COUNT | DATE | DEFENDANT | AMOUNT TRANSFERRED |
|-------|------|-----------|--------------------|
| TWO | 10/17/01 | DIEGO ALCANTARA | $135,616 |
| THREE | 1/14/02 | MIGUEL SANTOS | $440,453 |
| FOUR | 1/22/02 | MIGUEL SANTOS | $259,080 |
| FIVE | 1/15/03 | MARCOS SABINO | $990,000 |

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT SIX

The Grand Jury further charges:

### INTRODUCTION

14.   The allegations above describing the BMPE set forth in Paragraphs One through Eight are incorporated by reference as if set forth fully herein.

15.   In Colombia, currency exchange transactions conducted within the authorized Colombian banking system trigger both transaction fees and reporting requirements to the Colombian government.  Such reporting requirements also provide the Colombian government with information that can lead to the imposition of taxes. One of the reasons that the BMPE is used by Colombian businesspeople and companies to purchase United States dollars is that BMPE transactions are conducted outside the authorized Colombian banking system and therefore avoid such fees and reporting requirements.  Accordingly, BMPE transactions permit Colombian businesspeople and companies to avoid financial reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government.

## THE MONEY-LAUNDERING CONSPIRACY

16.  From in or about 1997 up to and including the present, in the Southern District of New York and elsewhere, SALOMON EILENBURG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate Section 1956(a)(1)(B)(i) of Title 18, United States Code.

17.  It was a part and an object of the conspiracy that SALOMON EILENBURG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of hundreds of thousands of dollars in cash, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of illegal narcotics transactions, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in

violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

      18.   It was a further part and an object of the
conspiracy that SALOMON EILENBURG-DRUCKMAN, RTV CORPORATION, BTS
CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and
INVERTITULOS C.A., the defendants, and others known and unknown,
in an offense involving and affecting interstate and foreign
commerce, knowing that the property involved in certain financial
transactions, to wit, the transfer of hundreds of thousands of
dollars in cash, represented the proceeds of some form of
unlawful activity, unlawfully, willfully, and knowingly would and
did conduct and attempt to conduct such financial transactions
which in fact involved the proceeds of specified unlawful
activity, to wit, the proceeds of a scheme to defraud the
Colombian government of property through the use of the wires and
currency transactions conducted for the purpose of evading and
avoiding United States and Colombian currency exchange and income
reporting requirements and the payment of taxes, tariffs, and
duties owed to the Colombian government, knowing that the
transactions were designed in whole and in part to conceal and
disguise the nature, the location, the source, the ownership and
the control of the proceeds of specified unlawful activity, in
violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

19. At all times relevant to this Indictment, SALOMON EILENBURG-DRUCKMAN, CLEMENCIA PINZON-BARCO, and JAIME TRUJILLO-DAVILA, the defendants, were Third-Tier Peso Brokers based in Colombia who arranged for the sale of drug dollars to Colombian businesspeople and corporations in a manner that avoided United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government. In order to carry out their illegal activities:

a. EILEMBERG-DRUCKMAN operated bank accounts in the United States at Ocean Bank and Citibank in the names of RTV CORPORATION and BTS CORPORATION, the defendants, that were used to receive millions of BMPE dollars and then to transfer the funds to Colombian businesspeople and corporations at bank accounts around the world.

b. PINZON-BARCO operated bank accounts in the United States at Suntrust Bank in her own name that were used to receive millions of BMPE dollars and then to transfer the funds to Colombian businesspeople and corporations at bank accounts around the world.

c. JAIME TRUJILLO-DAVILA, the defendant, operated bank accounts in the United States at Euro Bank in the name of INVERTITULOS C.A., the defendant, that were used to receive millions of BMPE dollars and then to transfer the funds to

Colombian businesspeople and corporations at bank accounts around the world.

OVERT ACTS

20.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about March 21, 2001, JAIME TRUJILLO-DAVILA, the defendant, caused a wire transfer of $50,000 to be made from a Eurobank account in the name of INVERTITULOS C.A., the defendant, to an account at Barclay's Bank.

b.   On or about November 29, 2001, SALOMON-EILEMBERG-DRUCKMAN, the defendant, caused a $200,000 wire transfer to be made from an Ocean Bank account in the name of BTS CORPORATION, the defendant, to an account at Barclay's Bank.

c.   On or about December 4, 2002, CLEMENCIA PINZON-BARCO, the defendant, caused a $130,000 wire transfer to be made from a Suntrust Bank account in her name to an account at Barclay's Bank.

d.   On or about December 18, 2002, SALOMON EILEMBERG-DRUCKMAN, the defendant, caused a $130,000 wire transfer to be made from an Ocean Bank account in the name of RTV CORPORATION, the defendant, to an account at Barclay's Bank.

(Title 18, United States Code, Section 1956(h).)

## COUNT SEVEN

The Grand Jury further charges:

21.    From at least in or about 1997 up to and including on or about the present, in the Southern District of New York and elsewhere, SALOMON EILEMBERG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, and others known and unknown, unlawfully, wilfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Section 1343 of Title 18, United States Code.

22.    It was an object of the conspiracy that SALOMON EILEMBERG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, and others known and unknown, unlawfully, wilfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises by evading and avoiding Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and

artifice, in violation of Section 1343 of Title 18, United States Code.

OVERT ACTS

23.    In furtherance of said conspiracy and to effect the illegal object thereof, SALOMON EILEMBERG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, and others known and unknown, committed the following overt acts in the Southern District of New York and elsewhere:

a.    EILEMBERG-DRUCKMAN operated bank accounts in the United States at Ocean Bank and Citibank in the names of RTV CORPORATION and BTS CORPORATION, the defendants, that were used to receive millions of BMPE dollars and then to transfer the funds to Colombian businesspeople and corporations at bank accounts around the world.

b.    PINZON-BARCO operated bank accounts in the United States at Suntrust Bank in her own name that were used to receive millions of BMPE dollars and then to transfer the funds to Colombian businesspeople and corporations at bank accounts around the world.

c.    JAIME TRUJILLO-DAVILA, the defendant, operated bank accounts in the United States at Euro Bank in the name of INVERTITULOS C.A., the defendant, that were used to receive millions of BMPE dollars and then to transfer the funds to

-24-

Colombian businesspeople and corporations at bank accounts around the world.

d.  On or about March 21, 2001, JAIME TRUJILLO-DAVILA, the defendant, caused a wire transfer of $50,000 to be made from a Eurobank account in the name of INVERTITULOS C.A., the defendant, to an account at Barclay's Bank.

e.  On or about November 29, 2001, SALOMON-EILEMBERG-DRUCKMAN, the defendant, caused a $200,000 wire transfer to be made from an Ocean Bank account in the name of BTS CORPORATION, the defendant, to an account at Barclay's Bank.

f.  On or about December 4, 2002, CLEMENCIA PINZON-BARCO, the defendant, caused a $130,000 wire transfer to be made from a Suntrust Bank account in her name to an account at Barclay's Bank.

g.  On or about December 18, 2002, SALOMON EILEMBERG-DRUCKMAN, the defendant, caused a $130,000 wire transfer to be made from an Ocean Bank account in the name of RTV CORPORATION, the defendant, to an account at Barclay's Bank.

(Title 18, United States Code, Section 371.)

**COUNT EIGHT**

(Unlicenced Money Transmitting Business)

The Grand Jury charges:

Background

24.    For all times relevant to this Indictment, SALOMON EILEMBERG-DRUCKMAN, the defendant, served as a "Third-Tier Peso Broker" in the BMPE.  Accordingly, on behalf of several clients and for a commission, EILEMBERG-DRUCKMAN exchanged Colombian pesos for foreign currency, usually United States dollars.  For those customers who had pesos and wished to obtain dollars, EILEMBERG accepted Colombian pesos in Colombia and transferred a corresponding value of dollars to wherever that client instructed.  For those customers who controlled dollars and wished to obtain pesos, EILEMBERG-DRUCKMAN accepted dollars in the United States and transferred a corresponding value of pesos to the customer in Colombia.

25.    SALOMON EILEMBERG-DRUCKMAN, the defendant, conducted his peso brokerage business in the United States through two companies, BTS CORPORATION ("BTS") and RTV CORPORATION ("RTV"), the defendants.  Both BTS and RTV use addresses at 20533 Biscayne Boulevard, #470, Aventura, Florida.

26.    SALOMON EILEMBERG-DRUCKMAN, the defendant, conducted his BTS business through bank accounts opened at Florida branches of Citibank and Ocean Bank (the "BTS Accounts").  EILEMBERG-DRUCKMAN caused interstate and international wire

transfers to be made from the BTS Accounts, including into New York, New York.

27.   SALOMON EILEMBERG-DRUCKMAN, the defendant, conducted his RTV business through bank accounts opened at a Florida branch of Ocean Bank (the "RTV Accounts"). EILEMBERG-DRUCKMAN caused interstate and international wire transfers to be made from the RTV Accounts, including into New York, New York.

28.   Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitter business without so registering. Neither BTS CORPORATION nor RTV CORPORATION, the defendants, have ever been so registered. SALOMON EILEMBERG-DRUCKMAN, the defendant, knows that neither BTS nor RTV have been registered.

29.   The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government. Neither BTS CORPORATION nor RTV CORPORATION, the defendants, have ever been so registered. SALOMON EILEMBERG-DRUCKMAN, the defendant, knows that neither BTS nor RTV have been registered with the federal government.

<u>Statutory Allegation</u>

30.   From on or about October 26, 2001 to on or about February 25, 2002, in the Southern District of New York and elsewhere, SALOMON EILEMBERG-DRUCKMAN, the defendant, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting

business affecting interstate and foreign commerce, to wit, BTS
CORPORATION, the defendant, (a) without an appropriate money
transmitting license in a State where such operation is
punishable as a misdemeanor and a felony under State law, and (b)
failing to comply with the money transmitting business
registration requirements under section 5330 of title 31, United
States Code, and regulations prescribed under such section.

(Title 18, United States Code, Section 1960.)

## COUNT NINE

(Unlicenced Money Transmitting Business)

The Grand Jury further charges:

31.    The allegations set forth in Paragraphs Twenty-
Four through Twenty-Nine are incorporated by reference as if set
forth herein in full.

32.    From on or about December 11, 2001 to on or about
July 1, 2003, in the Southern District of New York and elsewhere,
SALOMON EILEMBERG-DRUCKMAN, the defendant, unlawfully, willfully,
and knowingly did conduct, control, manage, supervise, direct,
and own all or part of an unlicenced money transmitting business
affecting interstate and foreign commerce, to wit, RTV
CORPORATION, the defendant, (a) without an appropriate money
transmitting license in a State where such operation is
punishable as a misdemeanor and a felony under State law, and (b)
failing to comply with the money transmitting business

registration requirements under section 5330 of title 31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Section 1960.)

### COUNT TEN

(Unlicenced Money Transmitting Business)

The Grand Jury charges:

Background

33.    At all times relevant to this Indictment, CLEMENCIA PINZON-BARCO, the defendant, served as a Third-Tier Peso Broker in the BMPE.  As such, on behalf of clients and for a commission, PINZON exchanged Colombian pesos for foreign currency, usually United States dollars.  For customers who had pesos and wished to obtain dollars, PINZON-BARCO accepted Colombian pesos in Colombia and transferred a corresponding value of dollars to wherever that client instructed.  For those customers who controlled dollars and wished to obtain pesos, PINZON accepted dollars in the United States and transferred a corresponding value of pesos to the customer in Colombia.

34.    CLEMENCIA PINZON-BARCO, the defendant, conducted her peso brokerage business through a bank account held in her name at SunTrust Bank in Miami, Florida.

35.    In conducting her peso brokerage businesses, CLEMENCIA PINZON-BARCO, the defendant, caused interstate and

international wire transfers to be made through New York, New York.

36. Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitter business without so registering. CLEMENCIA PINZON-BARCO, the defendant, has never been so registered. CLEMENCIA PINZON-BARCO, the defendant, knows that she has never been so registered with Florida.

37. The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government. CLEMENCIA PINZON-BARCO, the defendant, has never been so registered. CLEMENCIA PINZON-BARCO, the defendant, knows that she has never been registered with the federal government.

<u>Statutory Allegation</u>

38. From on or about October 26, 2001 to at least on or about May 19, 2003, in the Southern District of New York and elsewhere, CLEMENCIA PINZON-BARCO, the defendant, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, a bank accounts held in her own name at SunTrust Bank in Miami, Florida, (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under state law, and (b) failing to comply with the money

transmitting business registration requirements under section 5330 of title 31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Section 1960.)


## COUNT ELEVEN

(Unlicenced Money Transmitting Business)

The Grand Jury charges:

### Background

39.  At all times relevant to this Indictment, JAIME TRUJILLO-DAVILA, the defendant, served as a Third-Tier Peso Broker in the BMPE.  As such, on behalf of clients and for a commission, TRUJILLO-DAVILA exchanged Colombian pesos for foreign currency, usually United States dollars.  For customers who had pesos and wished to obtain dollars, TRUJILLO-DAVILA accepted Colombian pesos in Colombia and would transfer a corresponding value of dollars to wherever that client instructed.  For those customers who controlled dollars and wished to obtain pesos, TRUJILLO-DAVILA accepted dollars in the United States and would transfer a corresponding value of pesos to the customer in Colombia.

40.  JAIME TRUJILLO-DAVILA, the defendant, conducted his peso brokerage business through, among other places, an account at Eurobank in Coral Gables, Florida, held in the name of

INVERTITULOS C.A., the defendant, of which TRUJILLO-DAVILA is president and the sole authorized signatory.

41.   In conducting his peso brokerage businesses, JAIME TRUJILLO-DAVILA, the defendant, caused interstate and international wire transfers to be made from and through New York, New York.

42.   Florida law requires that money transmitters be registered, and it is a felony under Florida law to conduct a money transmitter business without so registering.  Neither JAIME TRUJILLO-DAVILA nor INVERTITULOS C.A., the defendants, have ever been so registered.  TRUJILLO-DAVILA knows that neither he nor INVERTITULOS C.A. have been so registered with Florida.

43.   The United States Code and regulations promulgated thereunder require that money transmitters be registered with the federal government.  Neither JAIME TRUJILLO DAVILA nor INVERTITULOS, C.A., the defendants, have ever been so registered. TRUJILLO DAVILA knows that neither he nor INVERTITULOS have been registered with the federal government.

<u>Statutory Allegation</u>

44.   From on or about October 26, 2001 to at least on or about April 1, 2003, in the Southern District of New York and elsewhere, JAIME TRUJILLO-DAVILA and INVERTITULOS C.A., the defendants, unlawfully, willfully, and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and

-32 -

foreign commerce, to wit, a bank account held in the name of INVERTITULOS C.A. (a) without an appropriate money transmitting license in a state where such operation is punishable as a misdemeanor and a felony under State law, and (b) failing to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, and regulations prescribed under such section.

(Title 18, United States Code, Section 1960.)

## FIRST FORFEITURE ALLEGATION

45.    As the result of committing one or more of the money laundering offenses in violation of Title 18, United States Code, Section 1956, alleged in Counts One through Five of this Indictment, NICHOLAS ALBERTO OTALVARO-ORTIZ, GABRIEL JAIME OTALVARO-ORTIZ, JOSE ROBERTO VALENZUELA-BELL, MARIA EUGENIA GARZON-CARDONA, a/k/a "Marina," TERESITA OSPINA DE AGUDELO, a/k/a "Carolina," GERMAN ARTURO MORENO-ZULUAGA, HECTOR IGNACIO GOMEZ-VARGAS, a/k/a "Nacho," EDUARDO DUQUE-GOMEZ, DIANA MARIA QUINTERO-VARGAS, MARGARITA LUCIA QUINTERO-VARGAS, DORA LUZ MESA-RIOS, MIRIAM DEL SOCORRO MESA-RIOS, CARLOS EDUARDO GUARIN-LOPEZ, JUAN CARLOS ELLIS, HUGO PALMA, GERARDO PALMA, JUAN MANUEL MANRIQUE-HERRERA, ROBERTO SARABIA-MARTINEZ, ROMANO ALONSO-ZUNIGA, DIEGO ALCANTARA, NIXON HURTADO, MAURICIO ORDONEZ, MIGUEL SANTOS, WILMUR GIRALDO, MARCOS SABINO, JOSE CORTEZ, SEBASTIAN TAMAYO, and YIP OI MAN, the defendants, shall forfeit to the United States pursuant

to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a. A sum of money equal to at least $100 million in United States currency, representing the amount of property involved in the money laundering offenses and traceable to the money laundering offenses;

b. Approximately $120,008 in Account No. 361-416-65, in the name of Moon Flower International Corporation, at Citibank;

c. Approximately $55,800 in Account No. 172-000360365, in the name of New York Export Co., at Chase Manhattan Bank;

d. Approximately $674,448.30 in Account No. 003730560134, in the name of Kata Corporation, at Bank of America;

e. Approximately $250,000 in Account No. 36020417, in the name of Colmena Corporation, at Citibank;

f. Approximately $50,000 in Account No. 1001170850001, in the name of Inversiones La Tierruca, at Banco Sudameris;

g. Approximately $110,000 in Account No. 51270, in the name of Jack Cybul, at Banco Industrial de Cayman;

h.   Approximately $247,512 in Account No. 10922914, in the name of C.I. Carare/C.I. Punta Del Este, at Citibank;

i.   Approximately $45,097 in Account No. 36009162, in the name of Julio Alberto Solorzano, at Bancolombia;

j.   Approximately $276,605 in Account No. 0303017258, in the name of JVC Corporation, at Eagle Bank;

k.   Approximately $67,582 in Account No. 01-60096-956, in the name of Marta Helena Gaviria, at Banco Continental de Panama;

l.   Approximately $100,000 in Account No. 1-9393-733, in the name of F.V. Constructor S.A., at Banco Continental de Panama;

m.   Approximately $55,692 in Account No. 09253186, in the name of Astrid Velez Bernal & Luis Martin Uribe, at Citibank;

n.   Approximately $42,650 in Account No. 4049581, in the name of Gloria Eugenia Moreno, at First Bank of Conroe Texas;

o.   Approximately $87,200.40 in Account No. 006-505184-2, in the name of Sale & Kuehne PA, at Mellon United National Bank;

p.   Approximately $939,834.80 in Account No. 200003200, in the name of Yacobi, at Banco de Occidente S.A.;

q.  Approximately $124,184 in Account No. 5740075422641, in the name of Casa Bee's B.T., at Banco Mercantil del Istmo;

r.  Approximately $85,270 in Account No. 000049522, in the name of Ezcony Trading Corporation, at HSBC;

s.  Approximately $20,000 in Account No. 010003296, in the name of Jaime Arosemena, at Banco Nacional de Panama;

t.  Approximately $95,200 in Account No. 18200816, in the name of Jaime Londono, at Chase Manhattan Bank;

u.  Approximately $25,000 in Account No. 1724018205, in the name of Luis Fernando Pelaez-Ramirez, at Union Planters Bank;

v.  Approximately $60,000 in Account No. 1505146406, in the name of M Services Inc., at Total Bank;

w.  Approximately $25,000 in Account No. 75099287, in the name of Margarita Maria Velez, at IPB International Personal Bank;

x.  Approximately $108,000 in Account No. 001012004061, in the name of Multi Fortune Company Ltd., at HSBC;

y.  Approximately $70,000 in Account No. 131003003, in the name of Casing Associates, at Chase Manhattan Bank;

z.  Approximately $129,560 in Account No. 0055325276, in the name of Narbeth Ltd., at Bank Atlantic;

aa.   Approximately $129,560 in Account No. 003449021786, in the name of Ynals Corporation, at Bank of America;

ab.   Approximately $22,500 in Account No. 200002766544, in the name of Quality Improvement Group, at First Union National Bank;

ac.   Approximately $20,000 in Account No. 003449021786, in the name of Mario Malkum, at Bank of America;

ad.   Approximately $50,000 in Account No. 003449021786, in the name of The Life Line Program International, at Northern Trust Bank of Florida;

ae.   Approximately $46,518 in Account No. 5022733518, in the name of Aero Tex Limited, at Citibank;

af.   Approximately $70,000 in Account No. 739140032, in the name of Broussards Int., at Bancafe International;

ag.   Approximately $232,454 in Account No. 2000002085102, in the name of Divax Corporation, at First Union National Bank;

ah.   Approximately $105,800 in Account No. 0141007051, in the name of General Appliances Electronics Distributors, at Union Planters Bank;

ai.   Approximately $45,000 in Account No. 03739094520, in the name of King International Business Co., at Bank of America;

aj.   Approximately $100,000 in Account No. 36009162, in the name of Astrid Helener Belez Bernal, at Citibank;

ak.   Approximately $37,482 in Account No. 739140032, in the name of Astrid Helener Belez Bernal, at Citibank;

al.   Approximately $20,000 in Account No. 0311008451, in the name of Alton Manufacturing, at Union Planters Bank;

am.   Approximately $258,942 in Account No. 22N07H25, in the name of Ben Overseas, at Merrill Lynch;

an.   Approximately $16,643 in Account No. 06399, in the name of Billion Act Limited, at HBZ Finance Limited, Kowloon Branch, Hong Kong;

ao.   Approximately $35,000 in Account No. 0617-7123811, in the name of Soul Soto, at Canada Trust;

ap.   Approximately $9,200 in Account No. 0058028725, in the name of David Brand M.E.V., at Banco Atlantico;

aq.   Approximately $90,000 in Account No. 574075422641, in the name of Halbura Ltda/Industria Conservera de la Pesca Incopes C. Ltda, at Banco International Ecuador;

ar.   Approximately $20,000 in Account No. 703704010, in the name of Multivalores, at Bancafe International;

as.   Approximately $20,299 in Account No. 6799002556, in the name of Orlando Chain, at Antrust;

at.   Approximately $21,800 in Account No. 061028626, in the name of Santa Elena Ranch, Inc., at Sterling Bank;

au.   Approximately $7,729 in Account No. 063102152, in the name of Silvia Moises, at Suntrust Bank;

av.   Approximately $111,471 in Account No. 936, in the name of Vide Panama Z. L.S.A., at International Commercial Bank of China, Colon Free Zone Branch, Panama;

aw.   Approximately $67,270 in Account No. 060343035001, in the name of Ezcony, at Panama Republic Bank;

ax.   Approximately $18,648 in Account No. 320489987, in the name of Secutronex, at Citibank;

ay.   Approximately $14,081 in Account No. 01053921, in the name of Jose Perez & Lilia Gomez, at Citibank;

az.   Approximately $75,000 in Account No. 131003003, in the name of Casings Associates, at Chase Manhattan Bank;

ba.   Approximately $50,000 in Account No. 003954, in the name of Divax Corporation, at Wachovia Bank;

bb.   Approximately $33,213.90 in Account No. 30092, in the name of Eduardo Marino, at Federal Bank of America;

bc.   Approximately $100,000 in Account No. 06703002479, in the name of Ezcony, at Banco Mercantil del Istmo S.A.;

bd.   Approximately $13,882 in Account No. 1010085447541, in the name of Jorge A. Cabanzo, at Wachovia Bank;

be.   Approximately $30,000 in Account No. 0220005006, in the name of Juan Carlos Villalobos, at Banco Continental de Panama;

bf.   Approximately $10,000 in Account No. 066011392, in the name of Mavex Corporation, at Ocean Bank;

bg.   Approximately $10,000 in Account No. 050509886605, in the name of Nautica World, at Ocean Bank;

bh.   Approximately $3,325 in Account No. 0110010637206, in the name of New City Inc., at Terra Bank;

bi.   Approximately $50,000 in Account No. 80508, in the name of Rafael Roa, at Bancolombia Cayman, Panama;

bj.   Approximately $14,700 in Account No. 3544033504001, in the name of Santana Textile S.A., at Banco Industrial E. Commercial S.A., Barasi;

bk.   Approximately $75,000 in Account No. 565021729, in the name of Wolfson Casing Corp., at HSBC;

bl.   Approximately $17,684 in Account No. 17714341218, in the name of C.I. Omega Express, at Bancolombia;

bm.   Approximately $50,000 in Account No. 048-051155, in the name of Cristian Truppel, at HSBC;

bn.  Approximately $61,141 in Account No. 048051155, in the name of Evenor Management, at HSBC;

bo.  Approximately $100,000 in Account No. 5506312596, in the name of Genetic Resources International, at Wells Fargo;

bp.  Approximately $15,000 in Account No. 0007000309-2, in the name of Jorge Cavanzo, at Wachovia Bank;

bq.  Approximately $17,000 in Account No. 06310027, in the name of Silvia L. Moises, at Bank of America;

br.  Approximately $20,000 in Account No. 20214402654, in the name of Techimoda, at Bancolombia;

bs.  Approximately $106,080 in Account No. 2000192000851, in the name of Editorial Medios Degitales Ltda, at Wachovia Bank;

bt.  Approximately $35,000 in Account No. 0709902468, in the name of General Appliances Electronics, at Bank United;

bu.  Approximately $157,732 in Account No. 36009162, in the name of Carlos Alberto Castillon Castano, at Bancolombia;

bv.  Approximately $140,000 in Account No. 635-6174167-01, in the name of Carmelo de Grazia, at JP Morgan Chase;

bw.  Approximately $110,000 in Account 1000068975, in the name of Exportadora Spaglio, at Binteceo Banco Internacional;

bx.   Approximately $150,535.40 in Account No. 2000015545105, in the name of Global Sky Aviation Corp., at Wachovia Bank;

by.   Approximately $3,091 in Account No. 9427773046, in the name of GVI Security Inc., at Fleet Bank;

bz.   Approximately $45,068 in Account No. 3290014285, in the name of Panasonic Latin America, S.A., at Citibank;

ca.   Approximately $15,000 in Account No. 49100336-42, in the name of Raul Leopoldo Berizo, at Union Argentino;

cb.   Approximately $51,908 in Account No. 8050004937, in the name of Sands and Moskwitz, at Union Planters Bank; and

cc.   Approximately $20,000 in Account No. 0820375, in the name of Wonder de Venezuela, at Israel Discount Bank.

## Substitute Asset Provision

46.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)

### SECOND FORFEITURE ALLEGATION

47.    As the result of committing the money laundering offenses in violation of Title 18, United States Code, Section 1956, alleged in Count Six of this Indictment, SALOMON EILEMBERG-DRUCKMAN, RTV CORPORATION, BTS CORPORATION, CLEMENCIA PINZON-BARCO, JAIME TRUJILLO-DAVILA, and INVERTITULOS C.A., the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   A sum of money equal to at least $100 million in United States currency, representing the amount of property involved in the money laundering offenses and traceable to the money laundering offenses; and

b.  All funds on deposit in Suntrust Bank Account Nos. 597096964796 and 0597058067006 in the name of CLEMENCIA PINZON-BARCO, the defendant, and all funds traceable thereto.

<u>Substitute Asset Provision</u>

48.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1)  cannot be located upon the exercise of due diligence;

(2)  has been transferred or sold to, or deposited with, a third person;

(3)  has been placed beyond the jurisdiction of the Court;

(4)  has been substantially diminished in value; or

(5)  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)

## THIRD FORFEITURE ALLEGATION

49.  As the result of committing one or more of the unlicensed money transmitting offenses in violation of 18 U.S.C. § 1960 alleged in Counts Eight and Nine of this Indictment, SALOMON EILEMBERG-DRUCKMAN, RTV CORPORATION, and BTS CORPORATION,

the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the unlicensed money transmitting offenses and all property traceable to such property, included but not limited to a sum of money equal to at least $11 million in United States currency, representing the amount of property involved in the unlicensed money transmitting offenses and traceable to such offenses.

<u>Substitute Asset Provision</u>

50.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1960.)

## FOURTH FORFEITURE ALLEGATION

51.   As the result of committing one or more of the unlicensed money transmitting offenses in violation of 18 U.S.C. § 1960 alleged in Count Ten of this Indictment, CLEMENCIA PINZON-BARCO, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the unlicensed money transmitting offenses and all property traceable to such property, included but not limited to:

a.   A sum of money equal to at least $1 million in United States currency, representing the amount of property involved in the unlicensed money transmitting offenses and traceable to such offenses; and

b.   All funds on deposit in Suntrust Bank Account Nos. 597096964796 and 059705806700 6 held in the name of CLEMENCIA PINZON-BARCO, the defendant, and all funds traceable thereto.

### Substitute Asset Provision

52.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1960.)

## FIFTH FORFEITURE ALLEGATION

53.    As the result of committing the unlicensed money transmitting offenses in violation of 18 U.S.C. § 1960 alleged in Counts Eleven and Twelve of this Indictment, JAIME TRUJILLO-DAVILA and INVERTITULOS C.A., the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the unlicensed money transmitting offenses and all property traceable to such property, included but not limited to a sum of money equal to at least $700,000 in United States currency, representing the amount of property involved in the unlicensed money transmitting offenses and traceable to such offenses.

### Substitute Asset Provision

54.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

-47-

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

_____
FOREPERSON

_____
DAVID N. KELLEY
United States Attorney

-48-

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICHOLAS ALBERTO OTALVARO-ORTIZ,
GABRIEL JAIME OTALVARO-ORTIZ,
JOSE ROBERTO VALENZUELA-BELL,
MARIA EUGENIA GARZON-CARDONA,
        a/k/a "Marina,"
TERESTIA OSPINA DE AGUDELO,
        a/k/a "Carolina,"
GERMAN ARTURO MORENO-ZULAGA,
HECTOR IGNACIO GOMEZ-VARGAS,
        a/k/a "Nacho,"
EDUARDO DUQUE-GOMEZ,
DIANA MARIA QUINTERO-VARGAS,
MARGARITA LUCIA QUINTERO-VARGAS,
DORA LUZ MESA-RIOS,
MIRIAM DEL SOCORRO MESA-RIOS,
CARLOS EDUARDO GUARIN-LOPEZ,
JUAN CARLOS ELLIS,
HUGO PALMA,
GERARDO PALMA,
JUAN MANUEL MANRIQUE-HERRERA,
ROBERTO SARABIA-MARTINEZ,
ROMANO ALONSO-ZUNIGA,
DIEGO ALCANTARA,
NIXON HURTADO,
MAURICIO ORDONEZ,
MIGUEL SANTOS,
WILMUR GIRALDO,
MARCOS SABINO,
JOSE CORTEZ,
SEBASTIAN TAMAYO,
YIP OI MAN,
SALOMON EILENBURG-DRUCKMAN,

RTV CORPORATION,
BTS CORPORATION,
CLEMENCIA PINZON-BARCO,
JAIME TRUJILLO-DAVILA, and
INVERTITULOS C.A.,

                    Defendants.

SEALED INDICTMENT

S1 04 Cr. 345

18 U.S.C. § 1956(h); 18 U.S.C. § 1956; 18
U.S.C. § 371; 18 U.S.C. § 1960

                    David N. Kelley
                    United States Attorney.

_____  20 APR 04
                    Foreperson