**WILFREDO BATISTA and ANNA SANCHEZ, -v- Plaintiffs, THE CITY OF NEW YORK; STATE OF FLORIDA: DEPARTMENT OF CORRECTIONS; STATE OF FLORIDA: TAMPA EAST DIVISION and PAROLE, Defendants.**

**Case No. 05-CV-8444 (KMK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 71905*

**September 24, 2007, Decided
September 25, 2007, Filed**

COUNSEL: [*1] Joy S. Bunch, Esq., Law Offices of Brogdon & Bunch, LLP Hempstead, NY, Counsel for Plaintiffs.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, Hillary A. Frommer, Esq., Assistant Corporation Counsel, New York, NY Counsel, for Defendant City of New York.

Bill McCollum, Esq., Attorney General of the State of Florida, Gerald D. Siebens, Esq., Assistant Attorney General, Tampa, FL, Counsel for Defendants State of Florida: Department of Corrections, and State of Florida: Tampa East Division and Parole.

JUDGES: KENNETH M. KARAS, District Judge.

OPINION BY: KENNETH M. KARAS

OPINION

OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiff, Wilfredo Batista ("Batista"), brings this action pursuant to *42 U.S.C. § 1983*. Batista alleges various violations of his constitutional rights, as well as his common law rights under New York State law, arising from his arrest in the City of New York following the issuance of an arrest warrant in the State of Florida for alleged probation violations. Plaintiff, Anna Sanchez ("Sanchez"), Batista's wife, claims loss of consortium as a result of Batista's arrest and subsequent detention.

Before this Court is Defendant City of New York's ("New York City") Motion for [*2] Summary Judgment pursuant to *Fed. R. Civ. P. 56*, and Defendants State of Florida: Department of Corrections and State of Florida: Tampa East Division and Parole's ("Florida Defendants") Motion to Dismiss under *Fed. R. Civ. P. 12(b)(6)*. In opposition to both Motions, Plaintiffs rely on materials outside the Amended Complaint, including letters sent by Plaintiffs to the State of Florida which Plaintiffs claim demonstrate a waiver of the state's sovereign immunity. For the reasons set forth below, the Court will consider both Motions under the summary judgment standard and GRANTS both Motions.

I. Background

A. Factual Background

On February 12, 1998, Batista was arrested in Hillsborough County, Florida, on charges of robbery in the second degree and criminal mischief in the first degree. (Aff. In Opp'n P 3 ("Batista's Aff. In Opp'n.").) Batista pled guilty to both charges and was sentenced to a forty-eight month term of probation and was ordered to pay forty dollars each month towards the cost of his probation supervision. (Def. City's Notice of Mot., Ex. B ("City's Notice of Mot.").) As a condition of his guilty plea, Batista was ordered to comply with special conditions of his probation, [*3] which included payments to the State of Florida for restitution in the amount of $200, $256 in court costs, $150 to the court improvement fund, $150 for the cost of prosecution, a $50 PD application fee, and the performance of fifty hours of community service. (Affirmation in Opp'n to Def's Mot. for Summ. J., Ex. C ("Pls.' Affirmation in Opp'n").) The exact amount of the payments required by the special conditions of Batista's probation is in dispute. It appears from exhibits attached to the Parties' Motion papers that the State of Florida issued two separate orders of probation both dated July 1, 1998, indicating different payment

amounts, (Pls.' Affirmation in Opp'n, Exs. B, C; City's Notice of Mot., Ex. B), one of which bears Batista's signature, (Pls.' Affirmation in Opp'n, Ex. C; Batista Aff. In Opp'n P 7). Batista contends that he was unaware of any monetary obligations imposed as conditions to his Florida probation. (Batista's Aff. In Opp'n P 6.) This dispute is immaterial to the resolution of these Motions.

On July 1, 1998, Batista filed an application with the Florida Department of Corrections' Parole Commission seeking to transfer his probation supervision from Florida to [*4] the State of New York, where he planned to take up residence with his mother, Celeste Batista. (City's Notice of Mot., Ex. C.) As a condition of his probation supervision transfer request, Batista agreed to comply with the conditions of supervision as fixed by the State of Florida. (Def. City's Statement of Uncontested Material Facts Pursuant to *Local Rule 56.1* PP 9, 13. ("New York City's 56.1 Stmt.").) He further agreed that failure to comply with those provisions would be deemed a violation of the terms of his probation which could result in his extradition to the State of Florida. (*Id.* On October 14, 1998, the City of New York's Department of Probation accepted Batista's probation supervision transfer request, under which Batista was still required to make all payments to which he was subject under the conditions of his Florida probation, with the exception that he did not have to pay for the cost of his probation supervision. (*Id.* PP 10-14.)

Before Batista's term of probation was scheduled to expire on June 30, 2001, the Florida Department of Corrections requested a progress report on March 19, 2001 on his compliance with the special conditions of his probation from the City of [*5] New York's Department of Probation. (*Id.* P 15; City's Notice of Mot., Ex. F.) The Florida Department of Corrections' records indicated that Batista had failed to satisfy any of the monetary obligations under the special conditions of his probation. (*Id.* On June 7, 2001, the Florida Department of Corrections issued a warrant for Batista's arrest, citing two probation violations. (City's Notice of Mot., Ex. G.) The first violation alleged that Batista failed to pay the cost of his probation supervision and court costs. (*Id.* The second violation indicated that because the Florida Department of Corrections failed to locate Batista on three separate occasions by either directly contacting the State of New York or via Interstate Compact with a request for a progress report, Batista's whereabouts were determined to be unknown, and as a result, he was considered an absconder by the Florida Department of Corrections. (*Id.*

On June 16, 2004, Detectives from the 33rd Precinct in New York County attempted to execute the arrest warrant at the residence of Celeste Batista, which was Batista's last known address, but Batista was not home. (Am. Compl. P 1.) The next day, Batista surrendered at

the 33rd [*6] Precinct, and was arrested pursuant to the Florida arrest warrant. (Batista's Aff. In Opp'n P 10.) Batista remained in the custody of the New York City Police Department for nine days. Then, on June 25, 2004, the Circuit Court of Hillsborough County, Florida, issued an order dismissing the Batista warrant. (New York City's 56.1 Stmt. P P 24-26.) That same day, Batista was released from police custody and all charges against him were dismissed after Anna Sanchez, Batista's wife, paid $905, presumably in satisfaction of the payments required by the Florida sentencing court. (Batista's Aff. in Opp'n P 12.)

B. Plaintiffs' Claims

Plaintiffs' Complaint contains six claims for relief. First, Batista alleges that his arrest "without probable cause" and subsequent "detainment, harassment and intimidation" caused him "to suffer emotional injuries" in violation of his *Eight* and *Fourteenth Amendment* rights as secured by *42 U.S.C. § 1983.* (Am. Compl. P 27.) Batista further alleges in the first claim for relief that "Defendants conspired among themselves to deprive [him] of his rights secured by *42 U.S.C. § 1983* . . . and took numerous overt steps in furtherance of such conspiracy." (*Id.* P 28.) Batista's [*7] second claim for relief alleges false arrest and false imprisonment and claims that for "a period of approximately nine days, [Batista] was unlawfully, wrongfully, and unjustifiably held in a New York City jail, under arrest and in uncivilized conditions, and deprived of his liberty, and falsely charged." (*Id.* P 36.) Batista's third claim for relief is for intentional infliction of emotional distress, and claims that "Defendants engaged in extreme and outrageous conduct intentionally and recklessly causing [him] severe emotional distress," and that he was held "for a period of nine days without proper food and hygienic care." (*Id.* P 43.) Relatedly, Batista claims that Defendants are also liable for negligent infliction of emotional damages in the fourth claim for relief. (*Id.* P 50.) Batista's fifth claim for relief is for negligent hiring, training, and retention of employment services, and alleges that Defendants "owed a duty of care to Mr. Batista to prevent the conduct alleged," *id.* P 53, and were "negligent in screening, hiring, training, disciplining, and retaining" those employees proximately causing Batista's damages, *id.* P 56. Batista's sixth [1] and final claim for relief is [*8] a claim under *Article I, § 12, of the New York State Constitution,* which prohibits unreasonable searches and seizures. Finally, Plaintiff Sanchez brings one claim for a relief under New York State law, alleging loss of consortium as a result of Batista's arrest. (Am. Compl. P P 31, 41, 57, 51, 58, 65; Pl's Mem. of Law in Opp'n 9.)

1  Plaintiffs' Amended Verified Complaint mis-labels their sixth claim for relief as their fifth claim for relief.

C. Procedural History

On December 11, 2006, the City of New York moved the Court for an order pursuant to *Federal Rule of Civil Procedure 56*, granting summary judgment to dismiss Plaintiffs' Amended Complaint in its entirety with prejudice. On December 13, 2006, the Florida Defendants moved pursuant to *Federal Rule of Civil Procedure 12(b)(6)* to dismiss Plaintiffs' Amended Complaint with prejudice for failure to state a claim upon which relief can be granted. On August 13, 2007, the Court held oral argument. [2]

2  Originally, the Court scheduled oral argument for July 19, 2007, but Plaintiffs' counsel failed to appear.

II. Discussion

A. Standard of Review

1. Converting a Motion to Dismiss to a Motion For Summary Judgment

Florida Defendants argue that  [*9] the *Eleventh Amendment to the U.S. Constitution* renders them immune from suit in this Court. Florida Defendants thus move to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. Plaintiffs oppose Florida Defendants' Motion by arguing that Florida Defendants waived their *Eleventh Amendment* immunity. In support of that claim, Plaintiffs point to correspondence between counsel and Florida Defendants. (Pls.' Affirmation in Opp'n, Exs. L, M.) During oral argument on these Motions, Plaintiffs expressly relied on that correspondence to rebut Florida Defendants claim that it is immune from suit in federal court. (Tr. 25-28, Aug. 13, 2007.) To consider this correspondence, the Court must convert the Motion to a motion for summary judgment, because the correspondence is outside the four corners of the pleadings. *See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)* (explaining that when a court ruling on a motion to dismiss considers matters outside the pleadings, it is required to convert the motion from a *Rule 12(b)(6)* motion to dismiss into a *Rule 56* motion for summary judgment). When the Parties ask the Court to weigh evidence outside of the pleadings and thereby  [*10] test the merits of the evidence, not the complaint, such action is "more appropriately reserved for the summary judgment procedure, governed by *Rule 56*, where both parties 'may conduct appropriate discovery and submit the additional supporting material contemplated by' that rule." *Id.* (quoting *Chambers v. Time Warner,*

*Inc., 282 F.3d 147, 154 (2d Cir. 2002)*). A court may convert a motion to dismiss into a motion for summary judgment, and thus consider the external exhibits and affidavits, when it is "satisfied that the parties are not taken by surprise or deprived of a reasonable opportunity to contest facts averred outside the pleadings" and the issues involved are "discrete and dispositive." *Adipar Ltd. v. PLD Int'l Corp., No. 01 Civ. 0765, 2002 U.S. Dist. LEXIS 23375, 2002 WL 31740622, at *4 (S.D.N.Y. Dec. 4, 2002)*. When a non-moving party submits its own exhibits and affidavits in its response papers, it cannot claim to be caught by surprise. *See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999)* ("In this case, it was plaintiff who submitted the affidavit relied upon by the district court and who thus invited Judge Stanton to rely not only on the complaint, but upon the more elaborate explication of plaintiff's [*11] grievance contained in his affidavit. He certainly cannot be heard to claim that he was surprised when the district court accepted his invitation. Indeed, the district court arguably would have erred in declining to do so. In consequence, the motions properly were converted." (internal quotation omitted)).

Florida Defendants' Motion will be converted to a motion for summary judgment, because discovery is complete and it was Plaintiffs, the non-movants, who asked the Court to rely on materials outside the pleadings to defeat Florida Defendants' Motion. Under these circumstances, Plaintiffs cannot claim to have been prejudiced or surprised by the application of *Fed. R. Civ. P. 56*, rather than *Fed. R. Civ. P. 12(b)(6)*. *See Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 592 (2d Cir. 1993)* (holding that conversion was proper, and Plaintiffs could not claim unfair surprise, because Plaintiffs submitted and relied on correspondence in opposition to motion to dismiss to demonstrate exhaustion of remedies).

2. Summary Judgment

It is well established that summary judgment is appropriate where there exists "'no genuine issue as to any material fact and that the moving party is entitled  [*12] to a judgment as a matter of law.'" *Celotex Cop. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (quoting *Fed. R. Civ. P. 56(c)*). "If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines, 339 F.3d 158, 161 (2d Cir. 2003)*. Although the burden is on the movant to show that there is no genuine factual dispute, *see L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998)*, once the moving party has satisfied its burden, the nonmoving party must set forth specific facts demonstrating that there exists a genuine issue for trial,

see *Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003)*. A motion for summary judgment cannot be defeated by relying on mere speculation, conjecture, or conclusory allegations to create an issue of fact. *Id.*

B. New York City's Motion for Summary Judgment

1. Municipal Liability Under *Section 1983*

Batista alleges that he was arrested and detained by New York City without probable cause in violation of his rights under the *Eighth* and [*13] *Fourteenth Amendments of the United States Constitution.* (Am. Compl. PP 27-28.) To establish municipal liability in an action under *Section 1983* for alleged violations of constitutional rights, Batista must demonstrate that the constitutional deprivation resulted from a municipal policy or custom. *See Russo v. City of Bridgeport, 479 F.3d 196, 212 (2d Cir. 2007); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* ("[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[,] the government as an entity is responsible under *§ 1983.*"). "[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under *§ 1983* on a respondeat superior theory." *Monell, 436 U.S. at 691* (emphasis omitted). Rather, Batista must demonstrate that there exists some municipal policy or custom, and some causal connection between the policy and the alleged deprivation. *See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004); see also Dominguez v. Beame, 603 F.2d 337, 341 (2d Cir. 1979).* [*14] The mere assertion that there exists such a policy or custom, absent specific allegations of fact tending to support such an inference, is insufficient. *See Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).* Furthermore, "[a] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir 1991); see also Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).*

Applying these straightforward principles, Batista must first show that his rights were violated as a result of a municipal policy or custom. Batista has failed to do so, because rather than identify a municipal policy maintained by New York City which results in false arrests and illegal detentions, Batista has only pled a particular instance of alleged misconduct by low-ranking police officers, which alone is insufficient to state a claim. *See Ricciuti, 941 F.2d at 123.* Furthermore, even reading Batista's pleadings liberally to construct a failure to train

claim based on a policy of failing to "exchang[e] vital information," there is no admissible evidence before [*15] this Court to suggest the existence of such a policy beyond Batista's own singular incident. *See Tuttle, 471 U.S. at 823-24* ("Proof of a single incident of unconstitutional activity is not sufficient to impose municipal liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *see also Vann v. City of New York, 72 F.3d 1040, 1050 (2d Cir. 1995)* ("In order to establish the liability of a municipality in an action under *§ 1983* for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy."). Indeed, putting aside the paucity of evidence to support his case, Batista's allegations amount to little more than a recitation of the facts surrounding his own arrest, and consist of exactly the type of "'conclusory, boilerplate statement[s]'" proscribed by the courts as insufficient to establish a finding of an unconstitutional municipal policy. *Smith v. City of New York, 290 F. Supp. 2d 317, 322 (E.D.N.Y 2003)* (quoting *Perez v. County of Westchester, 83 F. Supp. 2d 435, 438 (S.D.N.Y. 2000)*); [*16] *see also Dwares, 985 F.2d at 100.*

Furthermore, where the basis of a claim of municipal liability is a failure to train or supervise, the Supreme Court has held that liability will only be triggered where the failure "amounts to deliberate indifference to the rights of persons with whom the municipal actor will come in contact." *City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); see also Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007).* Under *Harris*, Batista must also "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury.'" *Amnesty Am., 361 F.3d at 129* (quoting *Harris, 489 U.S. at 391*). The Second Circuit has identified three requirements necessary to satisfy the "deliberate indifference" standard to give rise to municipal liability under a failure to train claim. *See Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1993).* First, Batista must establish that a "policymaker knows 'to moral certainty' that her employees will confront a given situation." *Jenkins, 478 F.3d at 94* (quoting *Walker, 974 F.2d at 297*). "Second, the plaintiff must show that the situation either presents the employee [*17] with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* Finally, Batista must establish that a municipal employee's failure to handle the given situation appropriately will often cause the deprivation of a citizen's constitutional rights. *Id.* As noted above, Batista has failed to present *any* evidence of, let alone suffi-

ciently plead, a municipal policy maintained by the City of New York giving rise to his alleged constitutional deprivation, no less a specific deficiency in its training program. Morever, Batista has failed to address the appropriate standard for a finding of municipal policy evidencing deliberate indifference as recognized in the Second Circuit. Accordingly, Batista's *Section 1983* claim must fail.

Even assuming, *arguendo*, that Batista had pled facts sufficient to establish municipal liability based on a municipal policy or custom, it is well established that there is no civil remedy available to a plaintiff arrested pursuant to a valid arrest warrant under *Section 1983*. *See Russo, 479 F.3d at 206* (holding that a plaintiff held "pursuant to warrant satisfying *fourth amendment* [*18] standards . . . did not . . . give rise to a constitutional claim." (citing *Baker v. McCollan, 443 U.S. 137, 145, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)*)). Despite Batista's protestations otherwise, he has not pointed to any evidence that suggests he was arrested pursuant to anything other than a valid arrest warrant for probation violations. Correspondence between the Florida Department of Corrections and New York Department of Probation makes clear that the State of Florida maintained records indicating that Batista had failed to pay any of the monetary obligations under the special conditions of his probation (making the total amount he owed irrelevant), and as such, Batista was deemed to be in violation of his probation. (City's Notice of Mot., Exs. F, G.) And, even if Batista could lodge a constitutional objection to the *issuance* of the Florida warrant, he has failed to allege, let alone substantiate, a claim that New York City official somehow knew or should have known that the warrant was invalid. This deficiency alone is fatal to Batista's case against New York City. [3] *See Tornheim v. Eason. 363 F. Supp. 2d 674 at 676-77* (when relying upon a facially valid warrant, a sheriff is "'afforded complete protection from liability [*19] for any proper act done in its execution.'" (quoting *Iovinella v. Sheriff of Schenectady Co., 67 A.D.2d 1037, 413 N.Y.S.2d 497, 499 (App. Div. 1979)*.)

[3]  Batista does not deny that he failed to satisfy the monetary obligations of his probation. Instead, he meekly claims he was unaware of the conditions of his probation, including the monetary obligations imposed on him. (Batista's Aff. In Opp'n P 6.) This argument is unpersuasive. First, although Batista points to the two separate orders of probation issued by the State of Florida as evidence to bolster his claim of ignorance, he concedes that one of those orders bears his signature. (*Id.* Ex. C.) Second, Batista touts to his own credit the fact that he completed 307 hours of community service, some 257 hours in excess of

the court order. (*Id.* P 8.) Interestingly, Batista's community service requirements were laid out on the very same page of the signed court order that detailed Batista's monetary obligations. (*Id.* Ex. C.) Given these facts, no reasonable fact finder could agree with Batista that he was unaware of his monetary obligations. Finally, it is well settled that failure to read or comprehend a court order will not satisfy the excusable neglect [*20] standard for failure to comply. *See Canfield v. Van Atta Buick/GMC Truck, 127 F.3d 248, 250 (2d Cir. 1997)* ("[F]ailure to follow the clear dictates of a court rule will generally not constitute such excusable neglect.").

Regardless of the minor differences between the two orders of probation issued by the State of Florida, the uncontroverted fact remains that Batista failed to fulfill *any* of the monetary obligations under the terms of his probation, which in turn triggered the issuance of a warrant for his arrest. (New York City's 56.1 Stmt. Exs. F, G.) As a result, Batista's claim that the arrest warrant issued by the Circuit Court of Hillsborough County on June 7, 2001 was "facially invalid." (Plaintiffs' Statement of Contested Material Facts Pursuant to *Local Rule 56.1* P 13 ("Pls.' 56.1 Stmt.")), is without merit.

Finally, in accordance with the Supreme Court's ruling in *City of Los Angeles v. Heller, 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)*, the Second Circuit has consistently held that "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001).* [*21] Since none of Batista's constitutional rights was violated, Batista cannot advance a claim for inadequate training or supervision.

2. Conspiracy Claim

Batista also alleges that Defendants conspired to deprive him of his rights secured by the *Eighth* and *Fourteenth Amendments of the United States Constitution* in violation of *Section 1983*, as well as his rights secured by *Article 1, § 12 of the New York Constitution.* [4] To state a claim for conspiracy under *Section 1983*, Batista must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).* Conclusory allegations of a *Section 1983* conspiracy are not sufficient to survive a motion to dismiss, *see Dwares v. City of New York, 985 F.2d 94, 99-*

*100 (2nd Cir. 1993)*, even though the Second Circuit has acknowledged that "conspiracies are by their very nature secretive operations," *Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994)*, and may have to be proven by circumstantial, instead of direct, evidence.

> 4 For the [**22**] reasons given below, Batista's conspiracy claim brought under *Article I, § 12 of the New York Constitution* is dismissed, because conspiracy claims can be brought under *Section 1983*.

Even assuming that Batista's arrest and detention satisfies the overt act requirement of a *Section 1983* claim, which is extremely generous given that his arrest was obtained pursuant to a facially valid arrest warrant, he has no evidence that any of the Defendants in this case agreed to act in concert to inflict an unconstitutional injury on Batista. Batista has failed to produce any admissible evidence on at least two of the three elements of a *Section 1983* conspiracy claim, so summary judgment is granted in favor of New York City on this claim.

### 3. Batista's Claims Under New York State Law

In addition to his claim of municipal liability and his federal conspiracy claim, both brought under *Section 1983*, Batista asserts common law claims under New York state law for false arrest and false imprisonment; intentional infliction of emotional distress; negligent infliction of emotional distress; negligent hiring, training and retention of employment services; and a claim under *Article I, § 12 of the New York Constitution.* [**23**] The Court will address each claim individually below. a. False Arrest and False Imprisonment

Batista alleges that his arrest by unnamed officers of the New York City Police Department constitutes false arrest and false imprisonment. (Am. Compl. P 34.) A claim for false arrest under New York law is "substantially the same" as a claim under *Section 1983. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)*. Additionally, the "common law tort of false arrest is a species of false imprisonment," as both claims have identical elements. *Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)*. A plaintiff claiming false arrest or false imprisonment under New York law, must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* (quoting *Broughton v. State, 37 N.Y.2d 451, 335 N.E.2d 310, 314, 373 N.Y.S.2d 87 (N.Y. 1975)); see also Weyant, 101 F.3d at 852*. It is well-settled that the existence of probable cause is justification for an arrest within the meaning of the fourth element, and will be "a complete defense to an action for false arrest." *Bernard v. United States, 25 F.3d*

*98, 102 (2d Cir. 1994)*. [**24**] Similarly, it is abundantly clear "that a finding of probable cause will defeat a state tort claim for false imprisonment," *Zanghi v. Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985)*. An arrest made pursuant to a valid arrest warrant "creates a presumption that probable cause existed, and is rebuttable only through proof of fraud, perjury or the misrepresentation or falsification of evidence." *Artis v. Liotard, 934 F. Supp. 101, 103 (S.D.N.Y. 1996)*.

As noted above, Batista was arrested pursuant to a valid arrest warrant issued by the State of Florida for probation violations. Batista has offered no evidence or even a viable allegation that any New York City official engaged in any misconduct in the procurement of the Florida Warrant. All he has pointed to is a document issued by the Florida Department of Corrections requesting a progress report on Batista's compliance with the terms of his probation. (Pls.' Affirmation in Opp'n, Ex. F.) That document does not indicate that it was received by New York City-in fact, it is stamped as "received" by the Florida Defendants-and even if New York City had received it, it would be of no avail. The uncontroverted fact remains that Batista was arrested [**25**] pursuant to a facially valid arrest warrant, and Batista waived any objection in open court to the imposition of financial obligations owed to Florida as part of his probation. (*See* Tr. of R. at 8-9, *Florida v. Batista*, No. 98-002442, Div. A (Fla. Cir. Ct. July 1, 1998).) Beyond that, Batista has failed to identify the individuals who he says injured him, and he has failed to identify where any actor erred in a way that entitles him to compensation under the law. None of Batista's unsubstantiated allegations is sufficient to rebut the presumption of probable cause for a facially valid arrest warrant, which proves fatal to his false arrest and false imprisonment claims. As a result, summary judgment is granted on this claim.

### b. Intentional and Negligent Infliction of Emotional Distress

Batista alleges that during his nine-day detention by New York City, he was held without proper food or hygienic care, and that such conduct intentionally caused him emotional distress. (Am. Compl. P 43.) Batista also alleges that by nature of his alleged "wrongful and false arrest, detention and imprisonment," New York City is liable to him for negligent infliction of emotional distress. (*Id.* P 49.)

Batista's [**26**] intentional infliction of emotional distress claim must fail as a matter of law, because it is "'well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.'" *Rivera v. City of New York, 392 F. Supp. 2d 644, 657 (S.D.N.Y. 2005)* (quoting *Lauer v. City of New York, 240 A.D.2d 543, 659 N.Y.S.2d 57, 58 (App.*

*Div. 1997)*). As the only named defendants in this action are the City of New York and the State of Florida, without identifying any specific individual responsible for Batista's alleged emotional distress, Batista cannot state a claim for intentional infliction of emotional distress claims.

Moreover, even assuming Batista had named an individual municipal actor instead of a government entity in his complaint, his claim would still fail as New York law "requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999).* "Liability has been found only where the conduct has been so outrageous **[*27]** in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotations omitted). The requirements to sustain such a claim are difficult to satisfy, and as a result, Batista's wholly conclusory allegations fail to satisfy such a burdensome standard. As described above, Batista was arrested pursuant to a facially valid warrant for violation of his probation, and detained for a total of nine days. (New York City's 56.1 Stmt. PP 24-26.) While the Second Circuit has sustained claims for intentional infliction of emotional distress where the cases involved "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy," *Stuto, 164 F.3d at 828,* there is no evidence or specific allegation of conduct in this case that rises to such a level. While detention can undoubtedly be unpleasant, Batista's circumstances certainly do not rise to the level of conduct "utterly intolerable in a civilized society." *Id. at 827* (internal quotations **[*28]** omitted).

Similarly, in order to sustain a claim of negligent infliction of emotional distress, a plaintiff must allege conduct which satisfies the outrageous and extreme standard described above. *See Dorn v. Maffei, 386 F. Supp. 2d 479, 486 (S.D.N.Y. 2005).* Because Batista has failed to offer any evidence to support his claim of inadequate food and hygienic care during his detention by New York City, let alone allege any conduct which might be characterized as extreme or outrageous, his claim of negligent infliction of emotional distress claim must likewise fail.

#### c. Negligent Hiring, Training and Retention of Employment Services

Batista next claims that New York City was negligent in hiring, training, and retaining the officers respon-

sible for his arrest and subsequent detention. More specifically, Batista argues that New York City "should have known through the exercise of reasonable diligence that the individual defendants would act in an irrational manner." (Am. Compl. P 55.) Batista alleges that New York City is liable for the alleged tortious conduct of its employees based on a theory of negligent hiring, training, and retention. In order to sustain such a claim under New York **[*29]** law, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004)* (internal quotations and citations omitted).

With respect to the first element, Batista has failed to name any of his alleged tortfeasors, and thus cannot establish the requisite employee-employer relationship. Furthermore, because Batista has failed to name any individual defendant employed by the City of New York, it is impossible to maintain that the City of New York was aware of any employee's propensity for the alleged tortious conduct. Consequently, summary judgment is granted on this claim.

#### d. New York Constitution

Finally, Batista alleges that by nature of his arrest and detention, he was deprived of his rights secured by *Article I, § 12 of the New York State Constitution,* prohibiting unreasonable searches, seizures, **[*30]** and interceptions. The Court grants summary judgment on this claim, because there is no private right of action under the New York State Constitution for claims that are remediable under *Section 1983* or other state laws. *See Coakley v. Jaffe, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999).* Because Batista alleged federal constitutional violations under *Section 1983,* as well as numerous other state common law tort claims, he cannot assert a separate cause of action under the New York State Constitution.

### C. Florida Defendants' Motion to Dismiss/Motion for Summary Judgment

The Florida Defendants argue that they enjoy sovereign immunity under the *Eleventh Amendment of the U.S. Constitution.* The *Eleventh Amendment* provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by citizens or Subjects of any Foreign State." *U.S. Const. amend. XI.* It has long been settled that the *Eleventh Amendment* generally bars

private individuals from bringing suit against nonconsenting states in federal court. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. Of Educ., 466 F.3d 232, 236 (2d Cir. 2006).* [*31] *Eleventh Amendment* immunity has also been interpreted as extending to prohibit "federal suits against state governments by a state's own citizens." *Id.* (citing *Hans v. Louisiana, 134 U.S. 1, 15, 10 S. Ct. 504, 33 L. Ed. 842 (1890)).*

*Eleventh Amendment* immunity extends not only to the individual states, but also to state agents and state instrumentalities said to be arms of the state. *See McGinty v. New York, 251 F.3d 84, 95 (2d Cir. 2001).* Whether or not a state's sovereign immunity extends to a particular state instrumentality generally turns on its relationship to the state. *See Woods, 466 F.3d at 236* ("[A] governmental entity is entitled to *Eleventh Amendment* immunity only if 'it is more like an arm of the state, such as a state agency, than like a municipal corporation or other political subdivision.'") (internal quotations omitted). "In most cases, if the suit names a state instrumentality, but seeks money damages, which, if awarded, would be paid by the state, that instrumentality may invoke sovereign immunity." *Simons v. New York, 472 F. Supp. 2d 253, 260 (N.D.N.Y. 2007)* (citing *Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997)).*

Plaintiffs have named the "State of Florida: Department of Corrections, [*32] and the State of Florida: Tampa East Division and Parole" as defendants, and seek compensatory damages of $500,000 for each of the six counts in the Complaint. (Am. Compl. P P (a)-(f).) The State of Florida: Department of Corrections is an agency of the State of Florida, and enjoys sovereign immunity. *See Walden v. Florida Dep't of Corr., 975 F. Supp. 1330, 1331 (N.D. Fla. 1996)* (holding that Florida State: Department of Corrections is "clearly the equivalent of the State of Florida for *Eleventh Amendment* purposes"). Moreover, there can be no doubt that any money damages, if awarded, would be paid by the State of Florida. *See Fla. Stat. § 768.28(1).*

With respect to the remaining named defendant, the Court takes judicial notice of the fact that State of Florida, Tampa East Division and Parole, is a field office of the State of Florida:

Department of Corrections, and is entitled to all the rights, privileges and immunities enjoyed by the Department of Corrections. *See* Florida Department of Corrections Website, http://dc.state.fl.us/facilities/comcor/13.html (noting the relationship between the Tampa East Division and Parole and the Department of Corrections). Thus, it is also immune from [*33] suit. *See Walden, 975 F. Supp. at 1331.*

Of course, Florida's sovereign immunity under the *Eleventh Amendment* is not absolute. Congress may exercise its authority under *Section 5 of the Fourteenth Amendment* to abrogate a state's immunity, or a state may waive its immunity and consent to be sued in federal court. *See Woods, 466 F.3d at 236.* Indeed, Batista contends that the Florida Defendants waived their *Eleventh Amendment* immunity through their correspondence with the Florida State Attorney General's office and their compliance with *Fla. Stat. § 768.28(6)(a).* [5] While it is clear that *section 768.28* expressly waives Florida's state sovereign immunity from tort claims in its state courts subject to certain limitations, *section 768.28* contains no such waiver of its *Eleventh Amendment* immunity in federal courts, and none should be inferred from the state court waiver. *See Schopler v. Bliss, 903 F.2d 1373, 1379 (11th Cir. 1990)* ("Evidence that a state has waived sovereign immunity in its own courts is not by itself sufficient to establish waiver of *Eleventh Amendment* immunity from suit in federal court."). In fact, *section 768.28(18)* expressly reserves Florida's immunity from suits in federal [*34] court. It reads:

> No provision of this section, or of any other section of the Florida Statutes, whether read separately or in conjunction with any other provision, shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the *Eleventh Amendment to the Constitution of the United States*, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its agencies from suit in federal court.

*Fla. Stat. § 768.28(18). Section 768.28(18)* "declares the legislature's intention that Florida statutes not be construed to waive *Eleventh Amendment* immunity unless they explicitly waive immunity from suit in federal court." *Schopler, 903 F.2d at 1379* (emphasis omitted); *see also Gamble v. Florida Dep't of Health & Rehab. Servs., 779 F.2d 1509, 1515 (11th Cir. 1986).* Thus, the Eleventh Circuit has held that *section 768.28* "does not waive Florida's *Eleventh Amendment* immunity" in federal court. *Schopler, 903 F.2d at 1379.*

5    *Section 768.28(6)(a)* provides: "An action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents [*35] the claim in writing to the appropriate agency, and also, except as to any claim against a municipality or the Florida Space Authority, presents such claim in writing to the

Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing..." *Fla. Stat. § 768.28(6)(a).*

Although Batista argues that his correspondence with the Florida Attorney General's Office constitutes the requisite waiver of sovereign immunity, that correspondence fails to expressly and clearly waive Florida Defendants' immunity. Instead, the correspondence Batista relies on merely instructs Plaintiffs that service of the Complaint on the Florida Defendant was defective, and that the State of Florida Attorney General's Office was not authorized to accept service on their behalf. (Pls.' Affirmation in Opp'n, Ex. M.) There is no language in the correspondence to suggest the State of Florida unequivocally intended to waive its *Eleventh Amendment* immunity or any other defense, and no reasonable factfinder could find otherwise. *See Welch v. Texas Dep't of Highways & Public Transp., 483 U.S. 468, 473 , 107 S. Ct. 2941, 97 L. Ed. 2d 389(1985)* ("[T]he Court will find a waiver **[*36]** by the State only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." (internal quotations and citations omitted)); *see also CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs., 306 F.3d 87, 95 (2d Cir. 2002)* (noting that a state's valid waiver of its *Eleventh Amendment* immunity must be "'an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the *Eleventh Amendment.*'" (quoting *Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1, 105 S. Ct. 3142, 87 L.*

*Ed. 2d 171 (1985)).* Consequently, summary judgment in favor of Florida Defendants is granted, because Florida Defendants are immune from suit in this Court. [6]

> 6 Batista's claims against the Florida Defendants also fail for the reasons discussed in Part II. B.

### D. Sanchez's Claim for Loss of Consortium

Anna Sanchez, Batista's wife, asserts a state law claim for loss of consortium and companionship stemming from her husband's arrest and subsequent detention by New York City. (Am. Compl. P P 31, 41, 57, 51, 58, 65; Pl's Mem. of Law in Opp'n 9.) As loss of consortium is a derivative claim, it may only **[*37]** survive if one of Batista's claims is viable. *See Smith v. City of New York, 388 F. Supp. 2d 179, 187 (S.D.N.Y. 2005).* Since all of Batista's claims have been dismissed, Sanchez's loss of consortium claim must also be dismissed.

### III. Conclusion

For the reasons stated above, New York City's and Florida Defendants' Motions are GRANTED. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: September 24, 2007

New York, New York

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

LEXSEE 2003 U.S. DIST. LEXIS 21642

TIMOTHY BRYANT, MAURICE CASSIDY, JOSEPH DEFILIPPIS, JESSICA
DYSON, LEONARD GAY, ROBERT TAKACS, ULRIK TROJABORG, Plaintiffs,
v. CITY OF NEW YORK, Defendant.

99 Civ. 11237 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2003 U.S. Dist. LEXIS 21642*

December 1, 2003, Decided
December 2, 2003, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Bryant v. City of New York, 2005 U.S. App. LEXIS 5376 (2d Cir. N.Y., Apr. 5, 2005)*

**PRIOR HISTORY:** *Bryant v. City of New York, 2002 U.S. Dist. LEXIS 11114 (S.D.N.Y., June 20, 2002)*

**DISPOSITION:**    **[\*1]** Defendants' motion for summary judgment granted with respect to plaintiffs' federal claims. Jurisdiction over plaintiffs' state law claims declined.

**COUNSEL:** For Timothy Bryant, Maurice Cassidy, Joseph Defilippis, Jessica Dyson, Leonard Gay, Steven Story, Robert Takacs, Ulrik Trojaborg, PLAINTIFFS: Daniel L Alterman, Alterman & Boop, PC, New York, NY USA.

For City of New York, City of New York Police Department, Rudolph Giuliani, Howard Safir, Allan Hoehl, john Doe, DEFENDANTS: Jonathan M Houghton, Corporation Counsel of the City of New York, New York, NY USA.

For Rudolph Giuliani, Howard Safir, Allan Hoehl, DEFENDANTS: Michael Oliver Hueston, Corporation Counsel of the City of NY, New York, NY USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Plaintiffs bring this action against the City of New York pursuant to *42 U.S.C. § 1983* and **[\*2]** New York state law alleging violations of their civil rights arising from arrests made on October 19, 1998. Plaintiffs seek to hold the city liable under *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*, for violation of their constitutional rights under the *First* and *Fourteenth Amendments*, alleging that city policy caused the violations, and under the doctrine of respondeat superior for state law claims of false arrest and imprisonment and malicious prosecution. Plaintiffs seek injunctive and monetary relief.

On July 31, 2002, Defendants filed a motion pursuant to *56 of the Federal Rules of Civil Procedure* for summary judgment on all of Plaintiffs' claims. On October 25, 2002, Plaintiffs filed a cross-motion for partial summary judgment on the state law claims for false arrest and imprisonment. For the reasons set forth below, Defendants' motion for summary judgment is granted as to the federal claims, and the Court declines to exercise jurisdiction over the state claims.

**Background**

On the evening of October 19, 1998, all Plaintiffs attended **[\*3]** an event [1] in memory of Matthew Shepard. Matthew Shepard was a gay college student whose beating and death garnered national media attention. The event, which took place approximately one week after Matthew Shepard's death, was both to honor him and to protest anti-gay violence. (Pl. Mem. at 1.) Although the event, scheduled to begin around 6:00 pm, was expected to draw around 200 people (Def. 56.1 Stmt. P 10-11), the

number of participants rose to over 4000 within about two hours, and the number of mobilized police increased accordingly (NYPD Unusual Incident Report dated Oct. 20, 1998, Houghton Decl. Ex. E (Unusual Incident Rep.) at 2; Pl. Resp. 56.1 Stmt. P 16). The event was to include a march down Fifth Avenue from 59th Street to Madison Square Park, which spans from 26th to 23rd Streets, and conclude in a candlelight vigil. (Def. 56.1 Stmt. P 12; NYPD Manhattan Borough South Detail Report dated Oct. 19, 1998, Houghton Decl. Ex. F P 1; Unusual Incident Rep. at 2.) During the event itself, participants marched on both the sidewalk and in the street. (Def. 56.1 Stmt. PP 31-32, 36, 40.) The march was directed and temporarily diverted by the police at 56th Street (Pl. Resp. 56.1 [*4] Stmt. P 35; Pl. Mem. at 1), where it went west to Sixth Avenue, then proceeded down Sixth Avenue to 54th Street, at which point it was directed back to Fifth Avenue (Def. 56.1 Stmt. P 39; Pl. Resp. 56.1 Stmt. P 39). It continued down Fifth Avenue with another pause at 43rd Street (Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 104-05), and eventually continued all the way to Madison Square Park at 26th Street, arriving there around 9 pm (Def. 56.1 Stmt. P 42; Unusual Incident Rep. at 2). Once there, the participants held a candlelight vigil and heard from speakers (Unusual Incident Rep. at 2; Gay Decl. P 11). The event and corresponding police mobilization ended at approximately 10:30 pm. (Unusual Incident Rep. at 2-3.)

> 1    The parties disagree as to the appropriate designation for the event: defendants characterize it as a demonstration (Def. 56.1 Stmt P 8), whereas plaintiffs state that this is an improper label and call it a vigil (Pl. Resp. 56.1 Stmt. P 8). However, both parties have used both labels to describe the event, and the nomenclature is not a material issue.

[*5] During the course of the event, 115 people, including the seven plaintiffs, were arrested by the police. (Def. 56.1 Stmt. P 9; Pl. Resp. 56.1 Stmt. P 187.) Eventually, almost all arrestees were taken to police facilities downtown. [2] All Plaintiffs, except for Plaintiff Gay, were arrested while in the roadway and presumably for blocking traffic. A brief description of the circumstances of each of Plaintiffs' arrests follows.

> 2    Apparently, one arrestee was taken to police facilities in midtown Manhattan due to a misunderstanding between Inspector Graham and the arresting officer. (Graham Dep. at 96-97.)

Plaintiffs Timothy Bryant and Jessica Dyson, who were coworkers, attended the event together after work. (Def. 56.1 Stmt. P 55; Pl. Resp. 56.1 Stmt. P 55.) Police arrested Dyson while she was standing in the roadway of Fifth Avenue near the beginning of the march. (Def. 56.1 Stmt. P 116-17.) While Dyson was being arrested, Bryant went up to the arresting officer to intervene on Dyson's behalf. (Def. 56.1 Stmt. [*6] P 66; Pl. Resp. 56.1 Stmt. PP 64-67.) The police then arrested Bryant. (Def. 56.1 Stmt. P 67; Pl. Resp. 56.1 Stmt. P 67.) Both Bryant and Dyson were handcuffed, led to a van, and eventually taken to Central Booking. (Bryant Decl. PP 10, 14, 19; Dyson Decl. PP 18-19.) Both were in police custody until the following day; Bryant was arraigned around noon (Bryant Decl. P 22) and Dyson was arraigned between 4:30 and 5:30 pm (Dyson Decl. P 33). Bryant and Dyson were each charged with one count of disorderly conduct for obstructing vehicular or pedestrian traffic in violation of N.Y. Penal Law § 240.20(5). (Pl. Mem. at 23.) Bryant appeared at trial on November 17, 1998. (Pl. Resp. 56.1 Stmt. P 68A.) The arresting police officer admitted during his testimony that the accusatory instrument, which said Bryant was sitting in the street, was untrue, and Bryant was found not guilty by the judge. (Pl. Resp. 56.1 Stmt. PP 68A-68G; Bryant 50(h) Testimony, dated Apr. 1, 1999, Houghton Decl. Ex. L at 10.) On November 25, 1998, on motion of the district attorney, the charges against Dyson were dismissed. (Pl. Resp. 56.1 Stmt. P 121L.)

Plaintiff Maurice Cassidy also went to [*7] the event from work. (Def. 56.1 Stmt. P 69.) He marched with the crowd down Fifth Avenue to 56th Street, where he went west to Sixth Avenue, and was eventually approached by an officer who pointed to various marchers saying, "He's one of them," or "She's one of them." (Def. 56.1 Stmt. PP 79-82; Pl. Resp. 56.1 Stmt. PP 77-80.) As Cassidy was standing in the street near the southwest corner of Sixth Avenue and 56th Street, he was handcuffed and placed on a city bus that had been commandeered by the police. (Def. 56.1 Stmt. PP 82-83; Pl. Resp. 56.1 Stmt. P 81.) Cassidy remained on the bus from about 7:15 pm until about 1:00 am (Cassidy Decl. P 16, 26), and his handcuffs were removed around 9:00pm while he was still on the bus. (Cassidy Decl. P 19.) The officer who released the arrestees on the bus at around 1:00 am informed them that their arrests would be voided. (Def. 56.1 Stmt. P 84; Cassidy Decl. P 25.)

Plaintiff Joseph DeFilippis joined the event at Fifth Avenue and turned with the crowd onto 56th Street. (Pl. Resp. 56.1 Stmt. P 97; DeFilippis Decl. P 7.) He was arrested and handcuffed with plastic handcuffs while standing in the roadway at the intersection of Sixth Avenue and 56th [*8] Street (Def. 56.1 Stmt. PP 101-04; DeFilippis Decl. P 12). DeFilippis was placed on a bus with other arrestees. (Def. 56.1 Stmt. P 105.) Another arrestee on the same bus cut off DeFilippis's handcuffs, as well as those of other arrestees, with an Xacto knife

around 8:30 pm, and the police released DeFilippis and the other arrestees from the bus and voided their arrests at approximately 1:15 am. (Def. 56.1 Stmt. PP 106-07; Pl. Resp. 56.1 Stmt. P 106; DeFilippis Decl. PP 30-31.)

Plaintiff Leonard Gay saw the event taking place as he was at the New York Public Library at Fifth Avenue and 40th Street. (Pl. Resp. 56.1 Stmt. P 122.) He followed the crowd, eventually joining them at Madison Square Park. (Def. 56.1 Stmt. P 123; Pl. Resp. 56.1 Stmt. P 123; Gay Decl. P 9.) At the conclusion of the event, Gay walked to the area near 25th Street and Fifth Avenue. (Def. 56.1 Stmt. P 124.) He stood on the sidewalk about three feet from a group of people recording interviews for television. (Pl. Resp. 56.1 Stmt. P 125; Gay Decl. P 16.) A police officer asked Gay for his press credentials, and, when he said he had none, asked him to step away from the press area. (Def. 56.1 Stmt. P 126-29.) After [*9] asking again, the officer told him, "Sir, if you don't step off the sidewalk, you are going to be arrested." (Def. 56.1 Stmt. P 129-30.) Eventually, the officer motioned to a nearby van, and another officer came up and handcuffed and arrested Gay. (Def. 56.1 Stmt. P 134-38.) The officer took Gay to the police van, which took him to One Police Plaza, after which he was placed on a commandeered MTA bus with other arrestees. (Def. 56.1 Stmt. PP 139-40.) While on the bus, the police replaced Gay's metal handcuffs with plastic ones. (Pl. Resp. 56.1 Stmt. PP 141-43.) After being on the bus about an hour, Gay was placed in a cell at One Police Plaza, where his plastic handcuffs were eventually removed. (Def. 56.1 Stmt. PP 144-45; Pl. Resp. 56.1 Stmt. P 145.) The police took Gay to the criminal court building between 7:00 am and 8:00 am the following morning, and he appeared before a judge at approximately 12:15 pm, where he was charged with two counts of disorderly conduct for making unreasonable noise and for refusing to disperse under *N.Y. Penal Law §* 240.20(2)and (6). (Def. 56.1 Stmt. PP 146-48; Pl. Resp. 56.1 Stmt. PP 146-47; Gay's Misdemeanor Criminal Cmplt. [*10] , dated Oct. 20, 1998, Houghton Decl. Ex. T.) Gay accepted a plea of Adjournment in Contemplation of Dismissal (Def. 56.1 Stmt. P 149), and the case was dismissed on October 6, 1999 (Gay Decl. P 42).

Plaintiff Robert Takacs joined the event at 59th Street and Fifth Avenue. (Def. 56.1 Stmt. P 153.) With the crowd, Takacs moved down Fifth Avenue to 56th Street, where he went west to Sixth Avenue and down to 54th Street, and then headed east on 54th back in the direction of Fifth Avenue. (Def. 56.1 Stmt. PP 156-59.) Takacs was arrested while standing in the roadway on 54th Street. (Def. 56.1 Stmt. P 161-62.) Takacs, hindered by parked cars and scaffolding from getting onto the sidewalk, "got loud" when the officer arrested him. (Def. 56.1 Stmt. P 163 (quoting Takacs's 50(h) Testimony,

dated May 18, 1999, Houghton Decl. Ex. V at 8); Pl. Resp. 56.1 Stmt. P 158-60.) A brief struggle ensued, during which other officers, assisting the original arresting officer, forced Takacs to the ground and handcuffed him, as well as stomped on his candle. (Def. 56.1 Stmt. PP 164-66; Pl. Resp. 56.1 Stmt. P 162-66.) The officers then placed Takacs on a commandeered city bus. (Def. 56.1 Stmt. P 167.) The [*11] bus went downtown at approximately 10:00 pm, and Takacs was eventually placed in a cell. (Def. 56.1 Stmt. P 169; Pl. Resp. 56.1 Stmt. P 169.) The police voided Takacs's arrest, and he was released sometime after midnight. (Def. 56.1 Stmt. P 171; Pl. Resp. 56.1 Stmt. P 171.)

Plaintiff Ulrik Trojaborg joined the event at 59th and Fifth Avenue. (Def. 56.1 Stmt. P 172-73.) Trojaborg went with the crowd to Sixth Avenue, continued down to 54th Street, and was stopped by a police officer while in the roadway near 54th Street and Sixth Avenue. (Def. 56.1 Stmt. P 179-83.) Like Takacs, Trojaborg also maintains that he was prevented from getting to the sidewalk by parked cars and scaffolding. (Pl. Resp. 56.1 Stmt. PP 181-82.) He was handcuffed and placed on a city bus, after which he was taken to Central Booking. (Def. 56.1 Stmt. P 184-85.) He was not charged with an offense, and was released at approximately 4:00 am. (Pl. Resp. 56.1 Stmt. P 185.)

Under New York criminal procedure law, police officers, under certain circumstances, may issue a desk appearance ticket to an arrestee rather than holding him or her in custody until a judge is available. The arrestee may then be released and must [*12] return to the criminal court at a future date for arraignment. *See N.Y. Crim. Proc. Law § 150.20(2)(a)* (McKinney 1992); *see also* Preiser, *Practice Commentaries,* McKinney's Vol. 11A Crim. Proc. Law § 150.20, at 682 (1992). In a situation like the one at issue here, the statute contemplates that those arrested will be brought to the stationhouse, where a post arrest evaluation can be made to determine the "necessity for continuing with the costly and liberty restricting physical arrest procedures." Preiser, *Practice Commentaries,* at 682. In 1987, a police officer's ability to issue desk appearance tickets was expanded as part of a bill "primarily devoted to the subject of relieving jail overcrowding in the city of New York." *Id.* at 683. Desk appearance tickets can be made available, based upon a variety of criteria, to persons arrested for a number of offenses, including disorderly conduct. *See N.Y. Crim. Proc. Law § 150.20(2)(a)*; Police Procedures Regarding Issuance of Desk Appearance Tickets, Alterman Decl. Ex. D. The decision to issue a desk appearance ticket or not is at the discretion of the [*13] police. *Id.* In the current case, had the Plaintiffs received a desk appearance ticket, they would arguably have spent a shorter time in police custody after their arrests. (Pl. Mem. at 15-16.)

Plaintiffs assert, and it is assumed for the purposes of this motion, that none of the Plaintiffs had outstanding warrants and all were otherwise eligible to receive desk appearance tickets. (Pl Resp. 56.1 Stmt. P 188; Pl. Mem. at 18.)

No desk appearance tickets were issued to the Plaintiffs or to any other person at Central Booking arrested in connection with the Shepard event. (Pl. Resp. 56.1 Stmt. P 53.) Plaintiffs allege that Chief of Department Louis Anemone made a blanket decision not to issue desk appearance tickets before he left the event, without considering the individual circumstances of each arrestee. (Pl. Mem. at 9, 16-17.) According to Anemone, desk appearance tickets were not issued because the participants in the Shepard event were violating police directives, threatening public and police safety, would continue to engage in illegal activity after release, and were part of a violent, uncontrollable group. (Anemone Dep. at 48-49, 56.) [3] Plaintiffs assert that none of these [*14] reasons applied to them. (Pl. Mem. at 19-20.)

> 3  Anemone also expressed a desire to preserve
> police manpower. (Anemone Dep. at 70-71.)

**Standard of Review**

Under 56, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986))*.

Once a moving party [*15] presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e); see Anderson, 477 U.S. at 256*. The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e)*. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)*.

**Discussion**

In Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment (Pl. Mem.), Plaintiffs assert that [*16] the denial of desk appearance tickets (DATs) despite their eligibility to receive them was in violation of their constitutional rights. (Pl. Mem. at 3.) Specifically, they claim that this denial deprived them of due process, both by punishing them for the acts of others and by the arbitrary and capricious nature of the decision, and was retaliatory in violation of their *First Amendment* rights. (Pl. Mem. at 15-17 (due process), 20-21 (*First Amendment*).) Additionally, they claim the denial was discriminatory in violation of their rights under the *Equal Protection Clause of the Fourteenth Amendment*. (Pl. Mem. at 3.) Under New York state law, they claim that the arrests violated their rights because they were effectuated without probable cause. (Pl. Mem. at 22.) Accordingly, they assert claims under New York state law for false arrest and false imprisonment as to all the Plaintiffs, as well as claims of malicious prosecution for the prosecutions of Bryant and Dyson. (Pl. Mem. at 22 (false arrest and imprisonment), 34 (malicious prosecution).)

**I. Monell Liability**

A municipality cannot be held liable under § 1983 solely under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*. [*17] Plaintiffs must establish the fault of the municipality itself. *Oklahoma City v. Tuttle, 471 U.S. 808, 810, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985); Monell, 436 U.S. at 690-91*. In other words, the plaintiffs must demonstrate that an official policy or custom of the municipality was the cause of the deprivation of constitutional rights. *Id.* This causation has two components. First, Plaintiffs "must ... prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused [their] injuries beyond merely employing the misbehaving officer." *Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)* (citing *Tuttle, 471 U.S. at 824, n.8*) (plurality opinion). Second, Plaintiffs must establish a "causal connection ... between the policy and the deprivation of [their] constitutional rights." *Id.*

**A. Existence of a municipal policy**

Plaintiffs can demonstrate the existence of the requisite municipal policy by showing that an official or officials with final decision-making authority with respect to the subject matter in question took action or made [*18]

a specific decision which caused the alleged violation of constitutional rights. *Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003); Pembaur v. City of Cincinnati, 475 U.S. 469, 482-84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986).*

Whether or not an official has final policymaking authority is an issue of state and local law, to be determined by the court before the case goes to a jury. *Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000)* (citing *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989)).* "The court must 'ask whether [the] governmental official[is a] final policymaker[] for the local government in a particular area, or on [the] particular issue' involved in the action." *Id.* (quoting *McMillian v. Monroe County, 520 U.S. 781, 785, 138 L. Ed. 2d 1, 117 S. Ct. 1734 (1997))* (alterations in *Jeffes*).

Here, Plaintiffs argue that the denial of desk appearance tickets was a decision by an official whose action represented official policy. Under New York criminal procedure law, the police have discretion over whether or not to issue a [*19] desk appearance ticket to a statutorily-eligible arrestee. *N.Y. Crim. Proc. Law § 150.20(2)(a).* Former Police Chief Allan Hoehl, who was present at the event, testified that the decision to deny the desk appearance tickets that night would have been made by either the First Deputy Commissioner, Patrick Kelleher, or by the Chief of Department, Louis Anemone. (Deposition of Police Chief Allan Hoehl, Alterman Decl. Ex. B (Hoehl Dep.) at 10-12, 19-20.) When Chief Anemone was deposed, he stated that, as Chief of Department, he was the chief operating officer for the NYPD, the highest-ranking uniformed officer, and reported directly to the Police Commissioner, Howard Safir. (Deposition of Former Chief of Department Louis Anemone, Alterman Decl. Ex. C (Anemone Dep.) at 9, 12.) During the event, Anemone took over operation command from Chief Hoehl, and remained in command until the conclusion of the event. (Anemone Dep. at 33-34, 99.)

Plaintiffs point to evidence suggesting that Chief Anemone either gave the order not to issue desk appearance tickets after the event or had final review of the decision. (Anemone Dep. at 47-49.) As Commissioner Safir was out of town [*20] at the time of the event (Def. 56.1 Stmt. P 45), Plaintiffs argue, Anemone's decision represented official municipal policy. (Pl. Mem. at 8-10.)

Although Defendants do not concede this issue, they do not brief opposing arguments in their Reply Memorandum, and Plaintiffs have pointed to evidence that could allow the Court to find as a matter of law that Chief Anemone was the final policymaker with respect

to the issuance of desk appearance tickets to the seven plaintiffs. (See Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 160-62 (stating that the chief of department makes the policy regarding issuance of desk appearance tickets).) However, because the claims fail on other grounds, this determination is unnecessary at this time.

## B. Violation of a constitutionally protected right

The second step in establishing *Monell* liability is to show a causal connection between the policy and a constitutional violation. *Vippolis, 768 F.2d at 40.* "A plaintiff may prove the causation element by showing ... that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal [*21] rights ...." *Jeffes, 208 F.3d at 61.* Because Plaintiffs are alleging this sort of direct causation, the causal connection itself is not in question.

What is at issue, however, is whether Plaintiffs have demonstrated that a constitutional violation took place -- a crucial step in holding a municipality liable under *Monell. See, e.g., Los Angeles v. Heller, 475 U.S. 796, 799, 89 L. Ed. 2d 806, 106 S. Ct. 1571 (1986)* (municipality cannot be held liable for police department training policy without showing of constitutional violation); *Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001)* (affirming grant of summary judgment as to municipal liability when individual officers did not violate constitutional rights while making arrest, and village was implicated only by individual defendants' conduct) (citing *Heller, 475 U.S. at 799*).

The plaintiffs' various constitutional claims are addressed below.

## II. Federal Constitutional Claims: Denial of Issuance of Desk Appearance Tickets

Defendants argue that, because only three of the plaintiffs were arraigned, while the other four had their arrests voided, [*22] only the former three were eligible to receive desk appearance tickets in the first place. (Def. R. Mem. at 5-6.) Plaintiffs, on the other hand, assert that the issuance of desk appearance tickets would have shortened the confinement of all Plaintiffs. (Pl. Mem. at 16.) Because summary judgment is granted on other grounds, this point does not need to be discussed.

### A. Substantive Due Process

The Due Process Clause of the *Fourteenth Amendment* "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams, 474 U.S. 327, 331-32, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 277, 15 L.*

Ed. 372 (1856) (discussing the Due Process Clause of the *Fifth Amendment*)). It protects not only against procedural unfairness, but also against "'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Wantanabe Realty Corp. v. City of New York*, 2003 U.S. Dist. LEXIS 11617, No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at \*42 (S.D.N.Y. July 10, 2003) (quoting *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)*). [\*23]

Plaintiffs claim that Anemone's refusal to issue desk appearance tickets was arbitrary and capricious in violation of their due process rights. (Pl. Mem. at 15.) "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)* (quoting *Bishop v. Wood, 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976))* (other citations omitted). *See also Daniels, 474 U.S. at 331* ("The Due Process Clause, like its forebear in the Magna Carta, ... was 'intended to secure the individual from the arbitrary exercise of the powers of government.'") (quoting *Hurtado v. California, 110 U.S. 516, 527, 28 L. Ed. 232, 4 S. Ct. 111 (1884)* (other citations omitted)). "Moreover, government action might be so arbitrary that it violates substantive due process 'regardless of the fairness of the procedures used.'" *Lowrance, 20 F.2d at 537* (quoting *Foucha v. Louisiana, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992)*). [\*24]

Plaintiffs also allege that the refusal to issue desk appearance tickets, because it was based on the supposedly violent and uncontrollable conduct of the other participants in the event, violated their rights to due process by depriving them of their liberty because of the conduct of others. Instead, they argue, the determination should have been made on an individual basis. (Pl. Mem. at 17.) To support their position that Defendants have violated their substantive due process rights, Plaintiffs cite, among other cases, *Scales v. United States, 367 U.S. 203, 224, 6 L. Ed. 2d 782, 81 S. Ct. 1469 (1961)*. In *Scales*, the Supreme Court stated the following:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ..., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the *Fifth Amendment.*

*Id.* at 224-25.

Imposing criminal liability for the acts of another offends substantive [\*25] due process. *See id.; see also Ferguson v. Estelle, 718 F.2d 730, 735-36 (5th Cir. 1983)* (interpreting vicarious criminal liability under *Texas Anti-Riot Law*) (citing *Scales, 367 U.S. 203, 6 L. Ed. 2d 782, 81 S. Ct. 1469*). The principle reaches beyond criminal liability. For example, in *St. Ann v. Palisi, 495 F.2d 423, 426 (5th Cir. 1974)*, the 5th Circuit found that suspension of schoolchildren for an altercation their mother had with the assistant principal violated the children's due process rights. "Personal guilt is a fundamental element in the American scheme of liberty." *Id.* In *Tyson v. New York City Housing Auth., 369 F. Supp. 513, 518-19 (S.D.N.Y. 1974)*, the district court, denying a motion to dismiss the claim, applied the notion of personal guilt to the termination of tenants' public housing leases for the acts of the tenants' adult children. *United States v. One 1971 Ford Truck, 346 F. Supp. 613, 619 (C.D. Cal. 1972)*, applied the same notion to a case involving the *Takings Clause of the Fifth Amendment*, in which the federal government seized a truck because of the illegal activities [\*26] of the owner's son. "Implicit within the concept of due process is that liability may be imposed on an individual only as a result of that person's own acts or omissions, not merely because of his association with any group." *Tyson, 369 F. Supp. at 518.*

A substantive due process claim has two elements:

(1) identification of the constitutional right at stake, and (2) consideration of whether the state action was arbitrary in a constitutional sense. *Lowrance, 20 F.3d at 537* (citations omitted).

## 1. Constitutional Violation

The analysis first requires the identification of the constitutional violation. *See Lowrance, 20 F.3d at 537* (citing *Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992))*. "This threshold determination of the right at issue is critical because the seriousness of the official misconduct may determine whether the constitutional line between a procedural and a substantive due process violation has been crossed." *Curro v. Watson, 884 F. Supp. 708, 719 (E.D.N.Y. 1995)* (citing *Lowrance, 20 F.3d at 537*).

The cases [\*27] cited above each involved a protected property or liberty interest. In *One 1971 Ford Truck*, the government seized a truck because it was used in connection with possession and sale of an unregistered firearm. The owner of the truck, however, was innocent of any wrongdoing, and was connected to the crime only

because his son -- without his father's permission -- used the truck at the time. *One 1971 Ford Truck*, 346 *F. Supp. at 616-17*. The decision in *Tyson* dealt with the tenants' leases in public housing, and was a related decision to *Escalera v. New York City Housing Authority*, 425 *F.2d 853 (2d Cir. 1970)*, in which the Second Circuit determined that continued tenancy in public housing was subject to due process protection. *Escalera*, 425 *F.2d at 861-62*; *Tyson*, 369 *F. Supp. at 518-19*. *Palisi*, likewise, involved a constitutionally protected liberty interest in a public education. [4] 495 *F.2d at 426-27*. And *Lowrance* involved the liberty interest, defined under state regulations, of a prisoner's right to remain free from administrative confinement unless a corrections officer had reasonable grounds [*28] to believe him a threat to the order, safety, or security of the prison. *Lowrance*, 20 *F.3d at 537*.

> [4]   *Palisi* contains language that could be read to suggest that a "cardinal notion of liberty" could stem solely from the notion of punishment in the absence of personal guilt. 495 *F.2d at 426-27*. However, the *Palisi* court did note its belief that the states did not have the power to arbitrarily deny the right to a public education. *See id. at 427*. Furthermore, later treatment of *Palisi* indicates that this protected interest was crucial to the decision. *See Burris v. Willis Indep. Sch. Dist., Inc.*, 713 *F.2d 1087, 1093 n.3 (5th Cir. 1983)* (finding no property right in employment contract renewal with school district, contrasting it with the constitutionally protected right present in *Palisi*); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 *F. Supp. 356, 369-70 (D. Ariz. 1983)* (finding no constitutionally protected property or liberty interest in the right to participate in post-season or televised college athletic competitions).

[*29] New York state law does not create a protected right in the issuance of a desk appearance ticket; its issuance is purely discretionary. "Under New York law, a 'defendant has no constitutional or statutory right to a DAT, and a police officer who has arrested a defendant for a misdemeanor may choose instead to retain custody of the defendant until his arraignment in a local Criminal Court.'" *Greenfield v. City of New York*, No. 99 Civ. 2330, 2000 U.S. Dist. LEXIS 1164, at *30 (S.D.N.Y. Feb. 3, 2000) (quoting *People v. Bracken*, 129 *Misc. 2d 1048, 494 N.Y.S.2d 1021, 1023 (Crim. Ct. Kings Co. 1985)*), *aff'd without opinion*, 234 *F.3d 1262 (2d Cir. 2000)*. *See also People v. Stone*, 128 *Misc. 2d 1009, 491 N.Y.S.2d 921, 924 (Crim. Ct. Richmond Co. 1985)* ("The issuance of a DAT is at the discretion of the arresting police officer. The defendant has no right to receive a DAT.").

*Harlen Associates v. Incorporated Village of Mineola*, 273 *F.3d 494 (2001)*, a land use regulation case, is analogous to the current case. In *Harlen Associates*, the plaintiffs challenged the denial of a special use permit for their [*30] convenience store. *Id. at 497-98*. In affirming the grant of summary judgment, the Second Circuit said that no property right existed in the special use permit, in part because the board making the decision had full discretion whether or not to issue it. *Harlen Assoc.*, 273 *F.3d at 503-04*. The Second Circuit stated that in a land use regulation case, it would apply a strict "entitlement test" to determine whether the property right in question was protected under the substantive component of the Due Process Clause. *Id. at 503*. The court determined that the necessary entitlement "'turns on whether the issuing authority lacks discretion to deny the permit, *i.e.*, is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met.'" *Id. at 504* (quoting *Natale v. Town of Ridgefield*, 170 *F.3d 258, 263 (2d Cir. 1999)*). Because the issuing board had the discretion to grant or deny special use permits, even though it was required to consider certain standards, the required entitlement was not present that would have given the plaintiffs substantive due process protection. [*31] *Id. at 505*.

In this case, the Plaintiffs suggest that because they met the criteria set forth in the regulations for issuing desk appearance tickets, the police should have issued them. At the very least, they argue the decision was illfounded. (*See* Pl. Mem. at 18.) A similar argument made in *Harlen Associates* was rejected by the Second Circuit: "Such a result [requiring a permit after the filing of a valid application] is diametrically opposed to the intent of the Village in drafting its zoning law to give the Board discretion and the duty to protect the interests of the community." *Harlen Assoc.*, 273 *F.3d at 504*. *See also Maybee v. Town of Newfield*, 789 *F. Supp. 86, 90 (N.D.N.Y. 1992)* (holding that entitlement analysis must focus on the degree of official discretion and not on the probability of favorable action in the particular case) (citing *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 *F.2d 911 (2d Cir. 1989)*).

In contrast to a land use regulation case, which involves a property interest, the plaintiffs here argue that they were deprived of a liberty interest. (*See* Pl. Mem. at 14 n.3.) [5] However, [*32] the analysis surrounding the existence of a discretionary procedure also affects cases in which a liberty interest is potentially at stake. In *Morel v. Thomas*, the district court, citing *Barna v. Travis*, 239 *F.3d 169, 171 (2d Cir. 2001)* (per curiam), found that there was no liberty interest in parole under New York state law such as to create full procedural due process protection. *Morel v. Thomas*, No. 02 CV 9622, 2003 U.S. Dist. LEXIS 10935, at *11 (S.D.N.Y. June 25, 2003).

Because the Parole Board had the discretion, after weighing the various factors prescribed by the regulations, to grant or deny parole, the petitioner's due process rights "extended only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds." 2003 U.S. Dist. LEXIS 10935, [WL] at *13. Although the court did not agree with the ultimate decision of the Parole Board, because the Board considered all the evidence before it, the decision did not rise to the level of arbitrariness or capriciousness necessary under a substantive due process analysis. [*33] 2003 U.S. Dist. LEXIS 10935, [WL] at *16 n.8.

> 5   As mentioned above, Plaintiffs argue that the issuance of desk appearance tickets would have shortened their confinement following their arrests. (Pl. Mem. at 15-16.) They argue separately that the arrests themselves were unlawful under New York state law. (Pl. Mem. at 21-30.) Those claims, however, are not discussed in this opinion, as the Court will not exercise supplemental jurisdiction over them.

This does not fully address Plaintiffs' argument, because they claim that Anemone did not conduct any individual assessment of the type undertaken in both *Harlen Associates* and *Morel*. However, *Harlen Associates* involved a Mineola, New York, zoning statute, which required that the zoning board consider certain standards in making its decision whether or not to issue the permit. *Harlen Assoc., 273 F.3d at 504. Morel*, likewise, involved the New York state parole statute, which, although creating no legitimate expectancy of release. *Barna, 239 F.3d at 171,* [*34] does contain language imposing obligations regarding the review process itself. The parole statute at issue in *Morel* reads, "The state board of parole shall ... have the power *and duty* of determining which inmates ... may be released on parole ...." *N.Y. Exec. Law § 259-c(1)* (McKinney 2001) (emphasis added).

The statute governing the issuance of desk appearance tickets, in contrast, has no such mandatory language: "Whenever a police officer is authorized ... to arrest a person without a warrant ..., he *may* ... issue to and serve upon such person an appearance ticket." *N.Y. Crim. Proc. Law § 150.20(1)* (emphasis added). The Practice Commentaries do mention a focus upon the individual circumstances of each arrestee. *See* Preiser, *Practice Commentaries,* at 682-83. As Defendants point out, however, the discussion pertains to the issuance of a desk appearance ticket, and not the denial. (Def. R. Mem. at 8-9.) Both parties agree that Plaintiffs have a constitutionally protected right to due process before

deprived of their liberty. Defendants argue, however, that this right attaches to the arrest as a whole, and not solely [*35] to a discretionary procedure designed to ease the burden on the court and corrections system. (Def. R. Mem. at 9.) The Court agrees.

## 2. Arbitrary in a constitutional sense

Plaintiffs also fall short with respect to the second prong of the substantive due process analysis. Even if the Plaintiffs had a right in the issuance of a desk appearance ticket, Defendants' behavior in denying them did not rise to the level necessary to sustain a substantive due process claim. *See Harlen Assoc., 273 F.3d 494, 505* ("Even if it had a cognizable property right, the Board did not deprive it of any such right in an arbitrary manner."). The scope of substantive due process is limited to behavior that "shocks the conscience" and violates "decencies of civilized conduct." *Wantanabe Realty Corp. v. City of New York,* No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at *42 (S.D.N.Y. July 10, 2003) (denying summary judgment because jury could potentially find that City decided to tear down roller coaster in order to accommodate owners of the New York Mets, and that would qualify as outrageously arbitrary) (citing *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)).* [*36] *Compare Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)* (forcibly pumping suspect's stomach shocked the conscience), *Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992)* (forced administration of antipsychotic drugs absent overriding justification violated substantive due process), *and Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 252 (2d Cir. 2001)* (choking, ramming head into bleachers and against metal fuse box, and punching in face of student by gym teacher shocked the conscience, and violated right to be free from excessive use of force), *with Sundbye v. Ogunleye, 3 F. Supp.2d 254, 261-62 (E.D.N.Y. 1998)* (lewd remarks and coercing plaintiff into signing letter by threatening to take child away not violation of substantive due process because statement that actor had power take child away was accurate), *and McCormack Sand Co. v. Town of N. Hempstead Solid Waste Mgmt., 960 F. Supp. 589, 596 (E.D.N.Y. 1997)* (town's sale of stockpiles of sand when ownership uncertain "not the type of oppression which gives rise to a substantive due [*37] process claim").

"An abuse of official authority may violate the substantive guarantees of the *Due Process Clause* when it is 'clearly unjustified by any legitimate objective of law enforcement.'" *Mahase v. City of New York,* No. 96 CV 6105, 2000 U.S. Dist. LEXIS 2046, at *13 (quoting *County of Sacramento v. Lewis, 523 U.S. at 840).* Here, rather than being irrational, the decision not to issue desk

appearance tickets was based in part, according to Anemone, on a decision that the participants in the demonstration were violating police directives, were a threat to police and public safety, would potentially continue their illegal activity, and were part of an uncontrollable group. (Anemone Dep. at 48-49, 56.) Although Plaintiffs question the validity of these reasons (*See infra*; Pl. Mem. at 19-20), Anemone also stated a desire to preserve police manpower resources and to save paperwork, which Plaintiffs do not address. (Anemone Dep. at 70-71.) It cannot be said, without more, when an event leads to the arrest of 115 people, that a decision not to issue desk appearance tickets violates the Plaintiffs' substantive due process rights. It is not "arbitrary [*38] or conscience-shocking in the constitutional sense." *Lowrance*, 20 F.3d at 537.

### B. First Amendment Retaliation Claim

Although grant of a desk appearance ticket is discretionary, as discussed above, both parties agree that a municipality cannot grant or withhold a discretionary privilege with a constitutionally impermissible motive, or use such discretion to otherwise infringe upon constitutionally protected rights. (*See* Pl. Mem. at 13-14; Def. R. Mem. at 7-8, 10.)

A *§ 1983* action is appropriate where a plaintiff can show that the government took negative action on him for exercising his or her constitutional rights. *Smith v. Metro North Commuter R.R.*, No. 98 Civ. 2528, 2000 U.S. Dist. LEXIS 14168, at *13 (S.D.N.Y. Sept. 29, 2000) (applying *First Amendment* standard to private individual punished by public official for protected speech) (citing *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). Plaintiffs, citing *Speiser v. Randall*, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958), point out that to deny a desk appearance ticket because an arrestee "would engage in constitutionally-protected [*39] expression" is unconstitutional. (Pl. Mem. at 14.) [6] Defendants do not challenge this. (Def. R. Mem. at 7-8.)

> 6    Plaintiffs also cite *Sherbert v. Verner*, 374 U.S. 398, 404, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), and *Perry v. Sindermann*, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), for the same proposition.

Plaintiffs allege that denial of the desk appearance tickets was in retaliation for speech protected by the *First Amendment*. (Pl. Mem. at 3.) A plaintiff asserting a *First Amendment* claim alleging retaliation for exercise of free speech must prove that (1) they had an interest protected by the *First Amendment*, (2) that defendants' actions were motivated by or substantially caused by the exercise of that right, and (3) defendants' actions effectively

chilled the exercise of that right. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)). *See also Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1998) [*40] (requiring only first two prongs for *First Amendment* retaliation claim) (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)); *Friedl*, 210 F.3d at 85 (same) (citing *Posr*, 180 F.3d at 418).

Neither party argues that Plaintiffs' participation in the event was not constitutionally protected. Such activity is classic *First Amendment* expression. *See Edwards v. South Carolina*, 372 U.S. 229, 237, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963). The primary issue for the purposes of this motion, therefore, is whether the motivation behind the denial of desk appearance tickets was impermissible.

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a *First Amendment* retaliation claim." *Curley*, 268 F.3d at 73 (pointing out that the allegation of mean-spiritedness in plaintiff's complaint would not suffice without further evidence of improper motivation) (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995)). In this case, Plaintiffs point to no evidence showing that the motivation behind the denial of desk appearance tickets [*41] was in response to their exercise of *First Amendment* rights.

Plaintiffs point out that Chief Anemone, allegedly the person responsible for the decision not to issue desk appearance tickets, cites a number of reasons for his decision. For instance, Anemone states in his deposition that a decision not to issue desk appearance tickets might have been based on the participants' violation of police directives, possible danger to public and police safety, likelihood that they would continue in their illegal activities, and that they were part of a violent mob. (Pl. Mem. 19-20, Anemone Dep. at 48-49, 56.) [7] Plaintiffs challenge these reasons. First, Plaintiffs point out that only one plaintiff, Gay, was charged with violating a police directive and that none was arrested for conduct threatening public or police safety. (Pl. Mem. at 19.) They also assert that public safety is listed in neither the statute nor the police policies outlining the criteria for issuing desk appearance tickets. *Id.* at 19-20. Furthermore, Plaintiffs state, Anemone made the decision not to issue the desk appearance tickets well after the event had concluded, thus making its articulated worry that they would engage [*42] in further illegal conduct unreasonable. *Id.* at 20. Finally, Anemone's suggestion that the Plaintiffs were part of a violent mob is unconvincing, as none of the Plaintiffs was accused of violence. *Id.*

> 7    Plaintiffs cite the following passages of Anemone's deposition as proof of improper mo-

tive, saying that they were denied desk appearance tickets specifically to prevent them from continuing in the event and engaging in expressive activity. (Pl. Mem. at 21 n.8.)

> Q. And why would they not be eligible for a desk appearance ticket?
>
> A. Their actions during the course of the demonstration; their violation of police direction; their actions to endanger the public safety, not only of themselves; not only the public that was present in the street, but the police officers that had to maintain order indicated to me that they were very likely to continue to engage in this process.
>
> Q. When you say, very likely to engage in this process; do you mean that they were very likely to continue to demonstrate if they were let out?
>
> A. The decision had nothing to do with the demonstration. It had to do with the illegality of their actions.

(Anemone dep. at 48-49.) Anemone stated later that

> The group, from my perspective, was a violent mob. It was out of control. There was very little leadership, or any, that anyone on the police side could detect .... To me, that was the issue; that, you know, they couldn't be controlled. And until they could and abide by some legitimate police requests, we shouldn't allow them to continue .... To me it was crystal clear that they should be not be [sic] given the privilege of a desk appearance ticket because this would probably end up becoming a bigger problem for us later on that evening, early in the morning, at some other point.

(Anemone Dep. at 56.)

[*43] Although Plaintiffs' criticism of Anemone's rationales for declining to issue desk appearance tickets may question the soundness of his decision, it does not provide the type of evidence tending to establish the crucial link between the denial of desk appearance tickets and Plaintiffs' exercise of *First Amendment* rights. In fact, the depositions submitted suggest that desk appearance tickets would have been denied in any event. For example, Anemone testified that the extra manpower required to issue desk appearance tickets would have made the issuance difficult in a situation in which so many people were arrested at once (Anemone Dep. at 70-72), and that he was reluctant to issue desk appearance tickets, no matter what the surrounding circumstances, stating, "my belief is that the arrest and arraignment process are frustrated by the use of the desk appearance ticket, they're not enhanced." *Id.* at 66.

Plaintiffs suggest that it was the modus operandi of Defendants not to issue desk appearance tickets during demonstrations, which, they claim, would be an impermissible burden on *First Amendment* rights. (Pl. Mem. at 21.) To support this conclusion, they cite Anemone's deposition: [*44] "I think it was my decision because I know the way I've operated in the past at demonstrations." (Anemone Dep. at 51.)

At that point, however, Anemone was recalling what factors he may have used in deciding to deny the desk appearance tickets, and shortly thereafter said specifically that he declined to issue desk appearance tickets during demonstrations that were a threat to public safety. *Id.* at 52. Plaintiffs also point to similar testimony of Inspector Graham, at the time a deputy inspector (Graham Dep. at 31), who was present at the event. In his testimony, however, Graham stated that in some demonstrations desk appearance tickets were given, and in some -- more confrontational ones -- they were not, and that he did consider the Shepard event to be confrontational. *Id.* at 145-46. Later in his deposition, Graham states that the decision to issue a desk appearance ticket or not during a demonstration tended to depend on the number of arrests, and not the number of people at the demonstration. *Id.* at 151. [6]

> 8    Arguably, the most compelling evidence is Gay's assertion that the police told him that they would normally get desk appearance tickets, but that superiors at Central Booking were deliberately slowing the process. (Gay Decl. P 40.) Although this is in their 56.1 statement (Pl. Resp. 56.1 Stmt. P 151H), they do not cite it in their brief, and because it is inadmissible hearsay, it cannot be considered for purposes of this summary judgment motion. *See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)* ("Affidavits

submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.")

[*45] A useful contrast to this case is *Black Jack Distributors, Inc. v. Beame, 433 F. Supp. 1297 (S.D.N.Y. 1977)*, in which desk appearance tickets were withheld from employees of adult bookstores who were arrested on obscenity charges. *Id. at 1306.* The defendants in that case admitted that the purpose of the denial was to discourage the employees from working in the stores. *Id.* The court determined that the desk appearance ticket issuance procedures could not be used so as to discourage the sale of material protected by the *First Amendment. Id. at 1306-07.* Accordingly, the issuance of desk appearance tickets was specifically mentioned in the granting of the preliminary injunction. *Id. at 1309.* Such motivation is not apparent in this case.

In short, Plaintiffs have not pointed to any evidence showing that the motivation behind the denial of desk appearance tickets implicated their *First Amendment* rights. As a result, Defendants' motion for summary judgment with respect to Plaintiffs' *First Amendment* claims is granted.

### C. Equal Protection

"To establish an Equal Protection violation based on selective enforcement, [*46] plaintiffs must show '(1) the person, compared with others similarly situated, was selectively treated, and (2) that such selective treatment was based on impermissible conditions such as race.'" *Mahase v. City of New York, 2000 U.S. Dist. LEXIS 2046*, at *21 (quoting *Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999)). See also Harlen Assoc., 273 F.3d at 499* (recognizing that equal protection extends to those who do not claim specific class membership but are nonetheless subjected to invidious discrimination); *LaTrieste Rest. & Cabaret v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994)* (adding additional impermissible considerations including religion, exercise of constitutional rights, and malicious intent), *quoted in Harlen Assoc., 273 F.3d at 499.*

After briefly mentioning their claim, Plaintiffs do not address the merits in their memorandum. Additionally, the evidence submitted does not tend to show that police acted with an intent unconstitutional under the *Equal Protection Clause.* Therefore, Defendants' motion for summary judgment with respect to Plaintiffs' [*47] equal protection claim is granted.

### III. State Claims

The remaining claims in Plaintiff's complaint, arising under New York common law, are for false arrest and imprisonment and malicious prosecution. Because summary judgment is granted dismissing all Plaintiffs' federal claims, the Court, pursuant to *28 U.S.C. § 1367*, declines to exercise jurisdiction over the remaining state law claims. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C.A. § 1367(c)(3) (West 1993).* [9]

> 9   Plaintiffs argue that because the case is old, and because substantial discovery has been conducted and concluded, that the Court should retain jurisdiction, even in the event that all federal claims are dismissed. (Pl. Mem. at 33.) They also make the argument that both parties have submitted lengthy materials pertaining to these claims and arguing them on their merits, and particularly that it was the original motion of Defendants that necessitated this work at this stage. (Pl. Mem. at 33; *see, e.g.*, Pl. Mem. at 21-30 (false arrest and imprisonment), 34-36 (malicious prosecution); Def. R. Mem. at 1-8; Pl. R. Mem. in Support of Cross-Motion for Partial Summary Judgment at 1-9.) However, with the consent of both parties, discovery already undertaken may be used in further state court proceedings, as can the work already completed.

[*48] Defendants have filed a motion for summary judgment dismissing these claims, and Plaintiffs have filed a cross-motion on the false arrest and false imprisonment claims. Both of these motions are denied without prejudice as moot.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Defendants' federal claims, and the Court declines to exercise jurisdiction over Plaintiffs' state law claims of false arrest and imprisonment. Defendants' motion for summary judgment on Plaintiffs' state law claims, as well as Plaintiffs' cross-motion for summary judgment on their claims of false arrest and imprisonment, are therefore denied without prejudice as moot. [10]

> 10   Plaintiffs motion for class certification, not yet fully briefed, and stayed pending the determination of this motion is also denied as moot.

So Ordered.

Dated: December 1, 2003

Lawrence M. McKenna

U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 1617

**WINSTON CAMPBELL, Plaintiff, - against - RUDOLPH GIULIANI, in his official capacity as Mayor of the City of New York; HOWARD SAFIR, in his official capacity as Commissioner of the New York City Police Department; CHARLES J. HYNES, in his official capacity as the District Attorney for County of Kings in the City of New York; Police Officer/Detective GONZALES of the 70th Precinct of the New York City Police Department; New York City Police Officers "JOHN DOE 1" thru Police Officers "JOHN DOE 10"; and MILTON S. ALTMAN. Defendants.**

99-CV-2603 (JG)

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 1617*

**February 16, 2000, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**SUBSEQUENT HISTORY:** The Name of this Case has been Corrected by the Court July 14, 2000.

**DISPOSITION:** Defendants' motion to dismiss granted in part and denied in part.

**COUNSEL:** EDWARD A. ROBERTS, ESQ., Brooklyn, New York, for Plaintiff.

Barbara Curtis, Assistant Corporation Counsel, MICHAEL D. HESS, Corporation Counsel of the City of New York, New York, New York, for Defendants.

**JUDGES:** JOHN GLEESON, United States District Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

*MEMORANDUM AND ORDER*

JOHN GLEESON, United States District Judge:

Plaintiff Winston Campbell commenced this action alleging, *inter alia*, claims of false arrest and malicious prosecution in violation of *42 U.S.C. §§ 1981, 1983*, and *1988* and corresponding supplemental claims under New York law. The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons set forth below, the motion is granted in part and denied in part.

*FACTS*

On March 16, 1997, Winston Campbell, owner of Campbell Home Care Agency. Inc., began providing home care services to defendant Milton A. Altman. Pursuant to their agreement, Campbell assigned one of his employees to tend to Altman at his [*2] home. In July of that year, Campbell discovered that he was being investigated by the New York City Police Department for allegedly signing one of Altman's checks. Campbell claims that he contacted the police and offered information to "exonerate him and show that it was a conspiracy" between Altman and the employee assigned to take care of Altman. (Compl. P 19.)

Detective Gonzales and other police officers arrested Campbell on August 7, 1997, and the Kings County District Attorney's Office subsequently charged and prosecuted him under Docket No. 97K062569. *People of the State of New York v. Winston Campbell.* The charges were dismissed on February 6, 1998.

On May 6, 1999, Campbell filed this complaint for damages. He alleges that his arrest, detention, and prosecution were unlawful, and were the direct result of Mayor Guiliani's. Commissioner Safir's, and District Attorney Hynes's failure to train their officers and prosecutors.

*DISCUSSION*

## A. *The Standard for Dismissal Under Rule 12(b)(c)*

A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* **[*3]** The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule *12(b)(6)* warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59 (2d Cir. 1997).*

In considering defendants' motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton, 128 F.3d at 59* (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740, 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1976)).* The Court should also consider "documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial **[*4]** notice may be taken," or "documents either in [plaintiff's] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)* (citing *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).*

## B. *The Claims of False Arrest and Malicious Prosecution*

### 1. *Official Capacity v. Individual Capacity Claims*

As an initial matter, I must address the distinction between official-capacity and individual-capacity claims. A suit against a government officer in his or her official capacity is, in essence, a suit against the government entity itself. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* Such a claim requires proof that the "the entity's policy or custom played a part in the violation of federal law." *Hafer v. Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991)* (quoting *Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985))* (internal quotation marks omitted). In contrast, an individual-capacity **[*5]** suit seeks to impose personal liability on a government official for actions taken under color of state law. Thus, to establish individual liability, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right." *id.*

(citing *Graham, 473 U.S. at 166*), and not that a governmental policy or custom caused the violation.

Here, Campbell has brought claims of false arrest and malicious prosecution against Detective Gonzales, unnamed police officers, and District Attorney Charles Hynes in their official capacities. [1] (*See* Compl. PP 6-8.) However, these claims are premised on allegations of personal liability and not on a government entity's official policy or custom. Accordingly, these official-capacity claims are dismissed. [2] I nevertheless construe, as the defendants apparently have done, Campbell's counseled complaint to raise false arrest and malicious prosecution claims against these officers in their individual capacities as well. I now turn to whether Campbell has sufficiently alleged such claims.

> 1 The defendants claim that neither District Attorney Hynes nor Detective Gonzales has been served in this action. Campbell has provided the Court with affidavits of service as to both defendants. (*See* Pl.'s Mem. Opp. Mot. Dismiss Ex. B.)

**[*6]**

> 2 In addition, all of the claims against District Attorney Hynes in his official capacity must be dismissed on *Eleventh Amendment* grounds. "'In spite of the statutory classification a District Attorney is not an officer or employee of the municipality but is instead a quasi-judicial officer acting for the state in criminal matters.'" *Ying Jing Gan v. City of New York, 996 F.2d 522, 535-36 (2d Cir. 1993)* (quoting *Davis Construction Corp. v. County of Suffolk, 112 Misc. 2d 652, 447 N.Y.S.2d 355 (N.Y. Sup. Ct. 1982), aff'd, 95 A.D.2d 819, 464 N.Y.S.2d 519 (2d Dep't 1983))* (internal citations omitted). As such, District Attorneys sued in their official capacities for damages are immune from liability under the *Eleventh Amendment. See id.*

### 2. *False Arrest*

Claims brought under *42 U.S.C. § 1983* are guided by the tort law of the forum state. *See Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); Singer v. Fulton County Sheriff's Dep't, 63 F.3d 110, 118 (2d Cir. 1996).* To state a claim of **[*7]** false arrest under New York law, the plaintiff must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." [3] *Broughton v. New York, 37 N.Y.2d 451 456-57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975).*

> 3 The common law elements of false arrest and false imprisonment under New York law are the

same. *See Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)* (citing *Jacques v. Sears, Roebuck & Co., 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)).*

New York courts uniformly recognize that, if the arrest and imprisonment occurred without a warrant, the plaintiff is not required to allege want of probable cause to state a claim. *See Broughton v. New York, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)* (collecting cases). Rather, the burden is on the defendant to prove the affirmative defense of justification, *i.e.,* that the arrest was based on probable cause. *See id.* In the context of § *1983,* however, federal courts have reached the opposite conclusion and have held that the plaintiff bears the burden of establishing the absence of probable cause. *See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); See also Raysor v. Port Authority, 768 F.2d 34, 39-40 (2d Cir. 1985)* (recognizing that the burden of establishing probable cause rests with the defendant under New York law but with the plaintiff under § *1983*).

[*8] Generally, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).* Where "there is no dispute as to the pertinent events and the knowledge of the officers, "probable cause may be determined as a matter of law. *Id.* Moreover, even if material facts are in dispute, probable cause may be established by the plaintiff's own allegations. *See Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).*

The defendants contend that Campbell's false arrest and malicious prosecution claims must be dismissed because he alleges in his complaint facts and circumstances which establish that Detective Gonzales had probable cause to arrest him. In support of their argument, the defendants point to the statements contained in the King's County Criminal Court Complaint, Docket No. 97K062569, knowledge of which can reasonably be attributed to plaintiff in this action alleging false arrest. In [*9] the criminal complaint, Detective Gonzales attests to the following facts:

[Gonzales] is informed by Milton Altman that . . . [Campbell] and [Altman] were the only people at [Altman's] house.

[Gonzales] is further informed by [Altman] that [Altman] gave [Campbell's]

check # 111 on May 6, 1997 for [Campbell's] services through [Campbell's] company, the Campbell Agency and that [Altman] left [Campbell] in a room with [Altman's] checkbook for several minutes and that [Altman] had no other visitors on 05/06/97.

[Gonzales] is informed by the official bank records of Citibank that check # 112 was written out to Campbell Agency, on May 6, 1997, in the amount of $ 5,376 and endorsed with Wilton [sic] Altman's signature and that said check was cashed by Campbell Agency on May 7, 1997 for $ 5,376.

[Gonzales] is further informed by [Altman] that [Altman] did not write check # 112 nor did he endorse it, that [Altman] did not give [Campbell] permission or authority to take, use or possess said U.S. currency.

(Curtis Aff. Ex. C.) [4] Thus, the defendants contend that Detective Gonzales's interview of the complaining witness (Altman) before [*10] arresting Campbell establishes probable cause as a matter of law. I disagree. I cannot conclude at this stage in the proceedings that Campbell can prove no set of facts in support of his claim which would entitle him to relief. [5]

4   "Curtis Aff." refers to the affidavit of Barbara Curtis, counsel for the defendants, dated September 24, 1999.
5   As previously explained, Campbell need not allege the absence of probable cause to state a claim for false imprisonment and false arrest under New York law. However, because such a showing is required for his malicious prosecution claim under state law and all of his § *1983* claims, I will address the issue.

"When an officer is advised of a crime by a person who claims to be the victim, and that person signs a complaint accusing another, the officer generally has probable cause to arrest." *Mistretta, 5 F. Supp. 2d at 133* (citing *Singer, 63 F.3d at 119*). However, there is a caveat to that general rule: If the surrounding circumstances [*11] give the officer reason to doubt the victim's veracity, then the victim's complaints may not be sufficient to establish probable cause to arrest. *See id.* (quoting *Singer, 63 F.3d at 119*). "The most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *Id.*

Here, I can conceive of facts which, if proved, would tend to negate the existence of probable cause. First, Altman may have never, in fact, imparted the allegations in the criminal complaint to Detective Gonzales. Second, Campbell may have presented Detective Gonzales with such compelling exonerating evidence that no reasonable person could have found probable cause -- notwithstanding Altman's complaint. Third, the nature of the relationship between Campbell and Altman may have been such that more was required before Altman's allegations could establish probable cause. I do not mean to suggest there is reason to believe that any of the foregoing set of facts can be established. But unless it "appears beyond doubt" that they cannot, I must conclude that Campbell has sufficiently alleged [*12] the absence of probable cause. [6]

> 6  Finally, although Campbell appears to allege as separate claim a "failure to investigate" the exculpatory evidence he presented, there is no such independent claim. Under New York law, "a plaintiff may not recover under broad general principles of negligence [for an inadequate police investigation], . . . but must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution." *Boose v. City of Rochester, 71 A.D.2d 59, 421 N.Y.S.2d 740, 744 (4th Dep't 1979).* Thus, in the context of § 1983, allegations of officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution. *See Mistretta, 5 F. Supp. 2d at 135* (allegations of an officer's failure to investigate exculpatory statements prior to arrest addressed in the context of a false arrest claim); *Dukes v. City of New York, 879 F. Supp. 335, 343 (S.D.N.Y. 1995)* (allegations of an officer's failure to interview witnesses and discover addition evidence addressed in the context of a malicious prosecution claim).

[*13] 3. *Malicious Prosecution*

The tort of malicious prosecution has the following elements under New York law "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the plaintiff, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Broughton, 37 N.Y.2d at 456.* Thus, the burden is squarely on the plaintiff to establish the absence of probable cause. *See id.; Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).*

a. *The District Attorney*

The malicious prosecution claim against District Attorney Hynes is barred by absolute prosecutorial immu-

nity. In *Imbler v. Pachtman, 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976),* the Supreme Court held that prosecutors have absolute immunity from § 1983 liability for activities "intimately associated with the judicial phase of the criminal process." *Id. at 430.* Such activities include the initiation of prosecution and the presentation of the government's case. *See Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987)* (citing *Taylor v. Kavanagh, 640 F.2d 450, 452 (2d Cir. 1981)).* [*14] In contrast, if a prosecutor acts in an investigative or administrative capacity, *see id.* (quoting *Taylor, 640 F.2d at 452),* or "proceeds in the clear absence of all jurisdiction," *id.,* the doctrine of qualified immunity controls.

Here, Campbell alleges that the District Attorney of Kings County "in wanton disregard for the attendant facts and circumstances, and in spite of having all of the information and evidence tending to clearly exonerate the plaintiff from all wrongdoing alleged by the complainant and having in his possession all of the evidence showing the conspiratorial nature of the false allegations lodge [sic] against the plaintiff, said defendant willfully, unlawfully and wrongfully rejected the evidence and prosecuted the plaintiff under Docket No.: 97K062569, encaptioned the *People of the State of New York v. Winston Campbell.*" (Compl. P 21.) Campbell plainly bases his claim on the District Attorney's decision to initiate his prosecution, not on any investigative activity. Indeed, Campbell insists that all of the evidence exonerating him was already before the prosecutor and, thus, no further investigation was necessary. Therefore, the [*15] malicious prosecution claim against District Attorney Hynes must be dismissed. [7]

> 7  In addition, in order to state a claim against a government officer in his or her individual capacity, the plaintiff must allege that the officer had personal involvement with the deprivation of the plaintiff's constitutional rights. *See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).* As it is highly doubtful that District Attorney Hynes had any personal involvement with Campbell's prosecution, and Campbell does not specifically allege such involvement, the malicious prosecution claim against Hynes may be dismissed for this reason as well.

b. *The Officers*

The malicious prosecution claim is also deficient with respect to Detective Gonzales and the other police officers. As explained above, to state a claim for malicious prosecution, the plaintiff must allege that the prosecution terminated in favor of the [*16] plaintiff. *See Broughton, 37 N.Y.2d at 456.* "Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only

when its final disposition is such as to indicate the innocence of the accused." *Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997)* (collecting cases). Examples of unfavorable terminations are: dismissal for lack of subject matter jurisdiction, dismissal for failure to allege sufficient facts to support the charge, adjournments in contemplation of dismissal, and dismissal in the interests of justice. *See id. at 948-949* (citations omitted). In contrast, the Second Circuit has held that a dismissal for lack of timely prosecution should generally be considered a favorable termination for malicious prosecution purposes. *See id. at 950.* Here, Campbell has alleged that the "charges were dismissed by the Criminal Court of the City of New York, County of Kings." (Compl. P 22.) I find that the bare allegation of dismissal, absent any explanation of the basis on which the case was dismissed, is insufficient to meet the favorable termination requirement. [*17] Accordingly, Campbell's common law and § 1983 malicious prosecution claims are dismissed without prejudice to Campbell filing an amended complaint. [8]

    8    Campbell also premises his false arrest and malicious prosecution claim under *42 U.S.C. § 1981. Section 1981(a)* provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*42 U.S.C. § 1981.* To state a claim under *§ 1981,* a plaintiff must establish the following elements: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir.1993).* As Campbell alleges only the first of these elements, his *§ 1981* claim is dismissed.

    Finally, Campbell claims that the defendants acted in violation of the *Ninth* and *Thirteenth Amendments.* The *Ninth Amendment,* concerning

unenumerated rights, and the *Thirteenth Amendment,* concerning slavery and involuntary servitude, simply have no application to this case. Accordingly, these claims are dismissed.

[*18]  C. *Failure to Train*

    Campbell has also brought claims against Mayor Guiliani, Commissioner Safir, and District Attorney Hynes in their official capacities, alleging that they failed to train their officers and prosecutors and thus displayed deliberate indifference to the deprivation of Campbell's constitutional rights. As I previously explained, official-capacity claims are tantamount to claims against the government entity itself. However, because District Attorney Hynes is an officer of the State of New York, the claim as against him is barred by the *Eleventh Amendment.* Mayor Giuliani and Commissioner Safir, in contrast, are officers of the City of New York, not the state, and may be sued in their official capacity to establish liability against the city.

    To state a claim against a municipality under *§ 1983,* a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom. "The inference that such a policy existed may arise from 'circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. [*19]  '" *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)* (quoting *Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991))* (upholding district court's dismissal of *Monell* claim under *Fed. R. Civ. P. 12(b)(6)*). "The mere assertion, however, that a municipality has a custom or a policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference. Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal police or custom caused the plaintiff's injury. A single incident alleged in a complaint, especially if it only involved actors below the policy-making level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* (internal citations omitted).

    Campbell alleges that the City's "policies, practices, and customs are evidenced, *inter-alia*, by the fact that the general orders, training, bulletin and training curriculum and instructions are inadequate to train police officers to refrain from abusing, threatening and assaulting law-abiding citizens and these [*20] defendants did not consider the performance of the New York City Police Department and Police Officers to evaluate the adequacy of the training and supervision; that these defendants do not have and have not properly trained or supervised the vast majority of those officers who have committed the acts

of violence and brutality against the citizens of the City of New York, particularly those citizens who are non-white; and there [sic] police academy training as well as their on-the-job training and supervision encourages the unconstitutional use of excessive and deadly force and unlawful actions against black citizens." (Compl. P 42.) I find that these bare and conclusory allegations are insufficient to state a *Monell* claim, notwithstanding the liberal notice pleading standard set forth in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*. Campbell has not identified any specific facts in support of his assertion of an official policy or custom. Indeed, the reference to excessive and deadly force suggested that Campbell simply cribbed this para-graph from another complaint entirely **[*21]** -- and counsel admitted as much at oral argument. Accordingly, Campbell's *Monell* claim is dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted in part and denied in part.

So ordered.

JOHN GLEESON, U.S.D.J.

DATED: February 16, 2000

Brooklyn, New York

5 of 10 DOCUMENTS

**CHARLES CUNNY, Plaintiff, - against - CITY OF NEW YORK; DETECTIVE JOHN GREANEY, SH. # 1205; DETECTIVE JOHN BARNETT (PH), BOTH AT 40TH PRECINCT NYC; AND OTHER OTHER JOHN DOES, WHOSE NAMES ARE UNKNOWN AT THIS TIME, Defendants.**

**99 Civ. 4634 (VM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 10806*

**July 30, 2001, Decided**
**July 31, 2001, Filed**

**DISPOSITION:**    **[*1]**  City Defendants' motion for summary judgment granted and complaint dismissed.

**COUNSEL:** For CHARLES CUNNY, plaintiff: Charles Cunny, Beacon, NY.

For CITY OF NEW YORK, JOHN GREANY, JOHN BARNETT, defendants: Richard J. Cardinale, Micahel D. Hess, Corp. Counsel of the City of NY, New York, NY.

**JUDGES:** Victor Marrero, U.S.D.J.

**OPINION BY:** Victor Marrero

**OPINION**

**AMENDED DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge**

Plaintiff Charles Cunny ("Cunny"), alleging violations of his constitutional rights, brought a number of claims under *42 U.S.C. § 1983* and state law against the City of New York ("the City") and City Police detectives John Greaney ("Greaney") and John Barnett ("Barnett"), in connection with Cunny' s arrest on April 26, 1996. The City, Greaney, and Barnett (collectively, the "City Defendants") have moved for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* on all of Cunny's federal claims. For the reasons set forth below, the motion is granted, and the complaint is dismissed.

**FACTS AND PROCEDURAL HISTORY**

In April 1996, Greaney fielded unsolicited civilian complaints at the 40th Precinct **[*2]** in the Bronx, NY, relating to a series of robberies and assaults allegedly perpetrated by Cunny. (See Defendants' Rule 56.1 Statement, dated Dec. 19, 2000 (hereinafter "Defendants' Rule 56.1"), P 5). On April 10, 1996, based on those complaints and a tip as to Cunny's whereabouts, Greaney, along with two other officers of the New York City Police Department ("NYPD"), approached Cunny, who fled into a nearby apartment. (Id. at PP 7-9). When they caught up with him, the officers handcuffed Cunny and discovered approximately 40 bags of crack cocaine around the floor where Cunny was ordered to lie down. (Id. at P 11). Later, Greaney recovered two bags of marijuana ostensibly belonging to Cunny. (Id.). Cunny was arrested and charged with burglary, trespass, resisting arrest and possession of a controlled substance and marijuana. (Id. at P 12). Barnett was not involved in the April 10 arrest.

On April 11, 1996, one of the civilian complainants, Dameon Samuels ("Samuels"), returned to the 40th Precinct to file at least six formal complaints against Cunny. [1] (Id., Ex. B). Another complainant, Leon Glover ("Glover"), presented similar formal claims of assault and menacing **[*3]** by Cunny to officers at the 40th Precinct on the same day. [2]

> 1   In particular, Samuels alleged that Cunny punched him, threatened him with a razor blade, robbed him of money and jewelry and threatened his life. Id. at P 17.
> 2   In addition, Glover claimed that Cunny threatened to kill him if he did not sell drugs for Cunny. (Id. at P 23).

On April 19, 1996, Cunny was released on bail. Greaney continued to record additional civilian complaints against Cunny. One woman who lived in the apartment to which Cunny fled on April 10, 1996 complained that Cunny threatened to kill her if she testified against him. (Id. at P 25). Another woman, Samuels' girlfriend, stated that Cunny threatened to kill her if she did not persuade Samuels to refuse to cooperate with the police in their investigation. (Id. at P 26).

After hearing these additional complaints, Greaney again arrested Cunny on April 21, 1996 and charged him with possession of a controlled substance, tampering with a witness and possession [*4] of a weapon. (Id. at P 28). Barnett had no involvement in Cunny's second arrest.

On April 22, 1996, a grand jury returned an indictment against Cunny based on the complaints submitted by Samuels and Glover. (Id., Ex. D1). Greaney's investigation of Cunny continued and culminated in a warrant for Cunny's arrest issued on April 26, 1996. (Id., Ex. E).

On that day, Greaney arrested Cunny for a third time (the "April 26 Arrest") on charges of robbery, assault and menacing. Again, Barnett had no involvement in this arrest. The current action arises out of Cunny's April 26 Arrest. (Compl. P 5).

The indictments relating to Cunny's arrests on April 10 and April 21, 1996 were consolidated under Indictment No. 2600/96, and Cunny was subsequently tried by jury. On October 30, 1997, Cunny was convicted of two counts, possession of a controlled substance and intimidating a witness. (See Defendants' Rule 56.1, Exs. F1 and G1).

On March 20, 1998, Cunny was tried on a separate indictment, number 2869/96, relating to his April 26 Arrest. The jury returned a verdict of not guilty on all ten counts. (Id., Ex. J1).

In connection with his April 26 Arrest, Cunny alleges numerous [*5] violations of 42 U.S.C. § 1983 and state law against the City Defendants for false imprisonment, false arrest, malicious prosecution, retaliation, conspiracy to violate his constitutional rights and negligent hiring, training and instruction of police officers. Cunny also alleges that the City operated under a policy or practice which tolerated and approved of police misconduct. In particular, Cunny asserts that Greaney and Barnett manufactured the complaints against him by instructing the civilian complainants on what to say to NYPD detectives and that, therefore, the criminal proceedings against him were procured by fraud.

**STANDARD OF REVIEW**

In considering a *Rule 56* motion, the Court must consider that "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York, 132 F.3d 145, 149* (2d Cir.) (citations omitted), cert. denied, *524 U.S. 911 (1998)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* [*6] At the outset, the moving party bears the burden of showing that there is no genuine issue of material fact. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* All ambiguities are to be resolved and all reasonable inferences made in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)).*

If, however, the moving party sufficiently shows the absence of genuine, triable issues of fact, it falls upon the non-moving party to "produce specific facts indicating that a genuine factual issue exists." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* (quotations and citations omitted). To meet its burden, the party opposing a summary judgment motion "may not rely on conclusory allegations or unsubstantiated speculation." Id. The non-moving party must be able to point to factual evidence from which a jury could reasonably find for the non-movant on that disputed issue. See id.

**THE CLAIMS AGAINST BARNETT**

Barnett [*7] argues that all of Cunny's claims against him should be dismissed for failure to allege Barnett's personal involvement in the actions giving rise to Cunny's complaint. (See Defendants' Memorandum of Law in Support of Motion Summary Judgment, dated Dec. 19, 2000 (hereinafter "Defendants' Memorandum"), at 4). The Second Circuit has held that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)* (citations omitted), cert. denied, *434 U.S. 1087, 55 L. Ed. 2d 792, 98 S. Ct. 1282 (1978).*

To establish sufficient personal involvement, a party does not have to show direct participation. See *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986).* But if direct participation is absent, a plaintiff must show some personal connection of the charged defendant to the alleged wrongdoing sufficient to justify liability under § 1983. The categories of indirect, personal involvement giving rise to liability under § 1983 include (1) the failure of a supervisor to remedy a known deprivation of constitutional rights; [*8] (2) the creation or toleration of a policy or custom under which unconstitutional prac-

tices occur; and (3) gross negligence in supervising employees that allegedly causes the unlawful condition or event. See id. (citations omitted).

In response to the motion for summary judgment, Cunny claims that Barnett is "under the command of defendant Greaney so as to make his [sic] responsive to orders or instructions without explanation." (See Declaration in Opposition to Defendants' Motion for Summary Judgment, dated Mar. 21, 2001 (hereinafter "Cunny Decl."), at 4). Beyond this bare assertion, Cunny does no more than "direct the court to his original complaint, and states that for all the reasons alleged therein and herein, the claim against defendant Barnett should not be dismissed." (Id. at 4-5.) Cunny's complaint, likewise, offers nothing more than the unsubstantiated allegations that Barnett "engaged in a conspiracy to obtain plaintiff's conviction" and that he participated in instructing the witnesses on what to say in their accusations against Cunny. (Compl. PP 36, 39.)

Barnett, on the other hand, offers ample evidence negating his personal involvement in the events giving [*9] rise to Cunny's claims against him. Barnett was not present at any of the three arrests of Cunny in April 1996, a fact which Cunny does not even dispute. (Defendants' Rule 56. 1 P 13, 29 and 33.) The first contact Detective Barnett had with Cunny was on April 11, 1996, when he was told to retrieve allegedly stolen property on Cunny's person while Cunny was at the Bronx Criminal Courthouse. (Barnett Aff., sworn to on Dec. 13, 2000, P 4). Barnett's only other contact with Cunny occurred when he testified at Cunny's trial on March 26, 1998. (Id. at P 6). Thus, prior to Cunny's first arrest on April 10, 1996, Barnett had never had any contact with Cunny or any of the civilian complainants. (Id. at PP 6 and 8).

Based on the facts presented above, the Court is persuaded that no genuine issue of fact exists as to Barnett's lack of direct participation in any of the events of which Cunny complains. Cunny merely points out that Greaney is Barnett's superior and concludes, without any further support, that Barnett was part of a conspiracy to violate Cunny's constitutional rights. Furthermore, Cunny has failed to marshal any facts that support his assertion of Barnett's personal [*10] involvement in a way that may give rise to liability under § 1983. Therefore, the motion for summary judgment is granted as to all § 1983 claims against Barnett.

## THE CLAIMS AGAINST GREANEY

Cunny alleges that Greaney manufactured false civilian complaints against him, which led to Cunny's arrest and prosecution. His complaint asserts § 1983 claims for false imprisonment, false arrest, malicious prosecution and arrest and prosecution for retaliatory motives. Although each of these distinct claims separately state violations of § 1983, they are also unified to an extent by a single a concept: the existence of probable cause to arrest the defendant and probable cause to prosecute is a complete defense to any claim for false imprisonment, false arrest, malicious prosecution and retaliatory prosecution. [3] See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ("the existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.'") (citations omitted); Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) [*11] ("there can be no federal civil rights claim for false arrest where the arresting officer had probable cause.") (citations omitted), cert. denied 517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996); Zanghi v. Inc. Village of Old Brookville, 752 F.2d 42, 46 (2d Cir. 1985) ("we agree that there is no genuine issue of material fact as to the existence of probable cause . . . and summary judgment was correctly granted as to the claims of false arrest, false imprisonment and malicious prosecution . . . which form a basis for this Section 1983 action.").

> 3    For § 1983 purposes, courts have distinguished probable cause to prosecute from probable cause to arrest. See Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("the probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim. . . . First, in a malicious prosecution action, the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced.") (citations omitted). In the present case, however, the Court finds that the civilian complaints, the arrest warrant and the grand jury indictment conclusively establish probable cause for both the arrest and the prosecution of Cunny and addresses both probable cause determinations in tandem.

## [*12]

In general, probable cause to arrest exists when an arresting officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993) (quotations and citations omitted). Probable cause to prosecute turns on the inquiry of "whether a reasonably prudent person would have believed the plaintiff guilty of the crime charged on the basis of the facts known to the defendant at the time the prosecution was initiated . . . ." See Mejia, 119 F. Supp. 2d at 254 (quotations and citations omitted) (emphasis in original). Greaney points to a series of

events which he contends undoubtedly establish probable cause for both the April 26 Arrest and the subsequent prosecution of Cunny: (1) the civilian complaints filed by Glover and Samuels; (2) the arrest warrant issued by a neutral judge; and (3) Cunny's April 22, 1996 grand jury indictment.

The Court finds that the existence of probable cause was conclusively established by these three events. In *Singer, 63 F.3d at 119,* [*13] an officer fielded a complaint of larceny from a store clerk who signed a criminal information and supporting deposition. The Court of Appeals held that the officer "needed nothing further to lawfully arrest Singer. An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." Id. Therefore, upon being advised by the complainants that Cunny had threatened to kill them with a razor and that Cunny attempted to coerce them into selling drugs, Greaney had probable cause to arrest Cunny.

In addition, Cunny's April 26 Arrest was made pursuant to a valid warrant issued by the New York State Supreme Court, Bronx County. (See Defendants' Rule 56.1, Ex. E.) Courts in this district have held that an arrest warrant issued by a neutral judge creates a presumption of probable cause. *Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991),* cert. denied, *505 U.S. 1221 (1992).*

Furthermore, after Greaney heard additional complaints against Cunny [*14] and investigated his activities, the facts were presented to a grand jury which issued an indictment on April 22, 1996. The return of an indictment by a grand jury creates a strong presumption of probable cause that defeats a claim for malicious prosecution pursuant to § 1983. See *Campanaro v. City of Rome, 999 F. Supp. 277, 281 (N.D.N.Y. 1998)* ("because Plaintiff was indicted by a grand jury, Defendants are entitled to a legal presumption that the indictment was procured with probable cause. . . . Plaintiff's grand jury indictment is sufficient to conclude that probable cause existed for Plaintiff's prosecution."); see also *Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994).* Therefore, Greaney has sufficiently established a presumption of probable cause for Cunny's arrest and prosecution.

Cunny faces a "heavy burden" to defeat the presumption of probable cause created by the arrest warrant and the grand jury indictment. See *Simms v. Village of Albion, 115 F.3d 1098, 1107 (2d Cir. 1997)* (quotations and citations omitted). In the context of the arrest warrant, Cunny would have to make a "a substantial preliminary showing" that [*15] either Greaney or the civilian complainants, upon whom the arrest warrant was presumably based, knowingly and intentionally presented false evidence. Id. (quotations and citations omitted). In the context of the grand jury indictment, Cunny must produce evidence establishing that "the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bernard, 25 F.3d at 104* (quotations and citations omitted).

In his challenge to probable cause, Cunny advances two arguments: first, that he was ultimately acquitted of the ten charges relating to his April 26 Arrest; and second, that the civilian complainants were instructed by Greaney on what to say. Cunny's first argument fails because it is well established that probable cause does not turn on the ultimate disposition of charges after trial. See *Pierson v. Ray, 386 U.S. 547, 555, 18 L. Ed. 2d 288, 87 S. Ct. 1213 (1967),* overruled on other grounds, *Harlow v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).* As to his second argument, Cunny could rebut, in theory, the presumption of probable cause if Glover and [*16] Samuels in fact gave false testimony. Cunny's claims fail, however, because he has presented no facts from which even an inference of false testimony may be drawn. By repeating the bare allegation that Greaney told the complainants what to say and reiterating the assertions in his complaint, Cunny cannot meet his heavy burden of rebutting the presumption of probable cause.

In contrast to Cunny's unspecified allegations, Greaney has cited sworn testimony negating Cunny's assertion of wrongdoing. In his deposition under oath, Glover testified that neither Greaney nor anyone else from the NYPD instructed him to lie either to the grand jury or at Cunny's trial. (Declaration of Laura Eberstein, sworn to Dec. 19, 2000, Ex. K).

This Court finds that the civilian complaints, the arrest warrant and the grand jury indictment created a presumption of probable cause for Cunny's arrest and prosecution and that Cunny has not met his burden of defeating the presumption. Accordingly, Cunny's claims of false imprisonment, false arrest, malicious prosecution, and retaliatory prosecution against Greaney are dismissed. Because the Court's finding rests on the probable cause determinations, there is [*17] no need to reach Greaney's argument that he is entitled to qualified immunity. See *Singer, 63 F.3d at 118* ("probable cause for the arrest . . . subsumes the issue of immunity.").

In addition to his substantive claims pursuant to § 1983, Cunny also alleges a conspiracy between Greaney and Barnett to violate his constitutional rights. In order to substantiate a claim of conspiracy to deprive him of his constitutional rights pursuant to § 1983, Cunny must prove (1) the existence of a conspiracy and (2) actual

deprivation of his constitutional rights. See *Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000).* To prevail with respect to the second element, Cunny must show that his constitutional rights were somehow violated. See *Id.* As set forth in the discussion above, none of Cunny's constitutional rights were violated because there was probable cause for his arrest and prosecution. Having determined that none of Cunny's substantive claims of constitutional violations are meritorious, the Court also grants the City Defendants' motion for summary judgment as to Cunny's conspiracy claim.

### THE CLAIMS AGAINST THE CITY

Cunny also [*18] brings § 1983 claims against the City alleging that its negligent hiring, instructing and training of police officers caused the alleged deprivation of his constitutional rights. Furthermore, he claims that the City operated under a policy or practice that tolerated and approved of police misconduct. In order to hold a municipality liable under § 1983, plaintiff must show that the alleged policy or practice was "the moving force of the constitutional violation." *Polk County v. Dodson, 454 U.S. 312, 326, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)* (quotations and citations omitted). At a basic level, absent a sufficient showing of a constitutional violation, a municipality cannot be liable for the alleged deprivations of constitutional rights. See *Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)* ("[a] municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees. In order to impose § 1983 liability upon a municipality, a plaintiff must demonstrate that any constitutional harm suffered was the result of a municipal policy or custom.") (citations omitted) (emphasis [*19] supplied). Because the Court has already found that none of Cunny's constitutional rights were violated, the motion for summary judgment is granted as to the City, thereby dismissing Cunny's negligent hiring and training claims.

### THE STATE LAW CLAIMS

Although the complaint is not a model of clarity, some of Cunny's claims could be interpreted as raising actions under New York state law for negligence and breach of duty. (See Compl. PP 8, 15 and 18.) In addition, many of Cunny's § 1983 claims have substantially similar state law analogues.

Having dismissed all of Cunny's federal claims, this Court declines to exercise jurisdiction over any state law claims, to the extent they are raised in the complaint. See *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988).* After summary judgment for defendant on all federal claims, it "would be an inappropriate exercise of pendent jurisdiction and a waste of federal judicial resources for the District Court to hold a trial on a purely state state claim." *Rounseville v. Zahl. 13 F.3d 625, 631 (2d Cir. 1994).*

### CONCLUSION AND ORDER

For the reasons [*20] set forth above, it is hereby

**ORDERED** that the Court's Order of June 29, 2001 is hereby amended to incorporate the foregoing discussion; and it is further

**ORDERED** that City Defendants' motion for summary judgment is granted and the complaint is dismissed; and it is further

**ORDERED** that the Clerk of Court is directed to change the caption on this case to reflect the proper spelling of defendant "John Greaney"; and it is finally

**ORDERED** that the Clerk of Court is directed to close this case.

### SO ORDERED.

Dated: New York, New York

July 30, 2001

Victor Marrero

U.S.D.J.

LEXSEE 2004 U.S. DIST. LEXIS 9557

**JUAN DECRISTO, Plaintiff, -against- THE CITY OF NEW YORK, POLICE OF-FICER CORNEILUS SULLIVAN, POLICE OFFICER CAPOLINO, and UNI-DENTIFIED NEW YORK CITY POLICE OFFICERS, EMPLOYEES, and AGENTS, Defendants.**

**03 Civ. 1819 (LAP)(AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 9557*

**May 25, 2004, Decided**
**May 26, 2004, Filed**

**DISPOSITION:**    [*1] Defendants' motion for summary judgment granted.

**COUNSEL:** For Juan Decristo, Plaintiff: Thomas Gregory Sheehan, a, LEAD ATTORNEY, Cheda & Sheehan, Jackson Heights, NY.

For Corneilus Sullivan, Capolino, Defendants: Alison Elaine Gugel, LEAD ATTORNEY, New York City Law Department Off. of the Corporation Counsel, New York, NY.

For Corneilus Sullivan, Capolino, Unidentified New York City Police Officers, Defendants: John A. Compton, Jr., LEAD ATTORNEY, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*OPINION & ORDER*

LORETTA A. PRESKA, United States District Judge:

On or about March 1, 2004, plaintiff, Juan Decristo, agreed to withdraw all claims against the City of New York and the unnamed "John Doe" defendants. On or about March 31, 2004, the remaining two defendants, Corneilus Sullivan and Craig Capolino, moved for an order of dismissal pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure.* Plaintiff submitted [*2] no opposition to defendants' motion for summary judgment, and on or about May 19, 2004, I ordered that defendants' motion would be deemed fully submitted.

Plaintiff's claims for false arrest, false imprisonment, and excessive force are barred by the three year statute of limitations for claims brought under Title *42 United States Code section 1983.* Plaintiff's false arrest and imprisonment claim accrued at the time of plaintiff's arrest on October 4, 1998, more than three years before plaintiff's complaint was filed on March 13, 2003. [1] *See Covington v. City of New York, 171 F.3d 117, 121 (2d Cir. 1999).* The actions giving rise to plaintiff's excessive force claim are alleged to have occurred November 1, 1999, and, therefore, were required to have been brought no later than November 1, 2002. Accordingly, these claims are time-barred.

1    Though the Complaint is dated January 23, 2001, the Complaint was filed on March 13, 2003 and served on the City of New York on March 24, 2003, and on Sullivan on April 9, 2003. Though the date Capolino was served is not reflected on the docket, there is no reason to believe that service upon him was any more timely.

[*3] Plaintiff's state tort law claims are barred by *section 50-i of the General Municipal Law,* which requires that all personal injury claims brought against a city or its officers, agents or employees be brought within one year and ninety days from the event upon which the claim is based. *See Singleton v. City of Newburgh, 1 F. Supp.2d 306, 316-17 (S.D.N.Y. 1998).* None of the events upon which plaintiff bases his tort claims occurred within one year and ninety days of plaintiff's

filing of his complaint. Accordingly, these claims are also time-barred.

Plaintiff's claim for malicious prosecution fails to state a claim. Plaintiff has offered no facts upon which a jury could determine that there was a lack of probable cause to commence the proceedings against him nor has plaintiff demonstrated any facts upon which a jury could find actual malice motivated any of the defendants' actions. *See Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).* Accordingly, this claim must also be dismissed.

For the reasons stated above, Sullivan's and Capolino's motion for summary judgment pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* [*4] (docket no. 13) is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED

May 25, 2004

LORETTA A. PRESKA, U.S.D.J.

4 of 27 DOCUMENTS

**ANDREW HOFFMAN, Plaintiff, -against- NASSAU COUNTY POLICE DE-
PARTMENT, OFFICER EILEEN RYAN, FIRST DEPARTMENT, SHIELD
NUMBER 1829; OFFICER DUANE SEABROOKS, NASSAU COUNTY HIGH-
WAY PATROL, SHIELD NUMBER 1846; OFFICER NOEL CLIFFORD, SHIELD
NUMBER 432, FIRST PRECINCT; LIEUTENANT DANIEL JAY GALLAGHER,
JOHN DOES, Defendants.**

**06-CV-1947 (SJF) (AKT)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

*2008 U.S. Dist. LEXIS 35377*

**April 30, 2008, Decided
April 30, 2008, Filed**

**COUNSEL:** [*1] For Andrew Hoffman, Plaintiff: An-
thony John Colleluori, LEAD ATTORNEY, The Law
Offices of Anthony J. Colleluori and Associates, Wood-
bury, NY; Diane C. Petillo, Law Offices of Anthony J.
Colleluori & Associates, LLC, Woodbury, NY.

For Nassau County Police Department, Officer Eileen
Ryan, First Department, Shield Number 1829, Officer
Duane Seabrooks, Nassau County Highway Patrol,
Shield Number 1846, Officer Noel Clifford, Shield
Number 432, First Precinct, Lieutenant Daniel Jay Gal-
lagher, Defendants: Joseph Anci, LEAD ATTORNEY,
Office of the Nassau County Attorney, Mineola, NY.

**JUDGES:** SANDRA J. FEUERSTEIN, United States
District Judge.

**OPINION BY:** SANDRA J. FEUERSTEIN

**OPINION**

**OPINION & ORDER**

On Defendants' Motion to Dismiss & Plaintiff's Mo-
tion to Amend

FEUERSTEIN, J.

**I. INTRODUCTION**

Plaintiff Andrew Hoffman commenced this action
on April 27, 2006, alleging various federal constitutional
and state law tort claims against Defendant Nassau
County Police Department ("Police Department") and
individual defendants Officer Eileen Ryan ("Defendant

Ryan", "Officer Ryan" or "Ryan"), Officer Duane Sea-
brooks ("Defendant Seabrooks", "Officer Seabrooks" or
"Seabrooks"), Officer Noel Clifford ("Defendant Clif-
ford", "Officer Clifford" [*2] or "Clifford"), and Lieu-
tenant Daniel Jay Gallagher ("Defendant Gallagher",
"Lieutenant Gallagher" or "Gallagher") (collectively,
"Defendant Officers" or "Officers"), arising out of Plain-
tiff's June 27, 1998 arrest. Defendant Officers move pur-
suant to *Federal rule of Civil Procedure 12(c)* to dismiss
Plaintiff's Complaint. (See Defs.' Notice of Mot. Dismiss
(doc. # 23).)

Plaintiff moves to amend his Amended Complaint to
name the County of Nassau as a defendant. [1]

> 1    Plaintiff amended his original Complaint on
> May 23, 2006. (See Am. Compl. (doc. # 2).)

For the reasons set forth below, the Defendant Offi-
cers' Motion to Dismiss is GRANTED and Plaintiff's
Motion to Amend is DENIED.

**II. THE FACTS** [2]

> 2    Except as noted, the facts are taken from
> Plaintiff's Complaint, assumed to be true, and all
> reasonable inferences are drawn in Plaintiff's fa-
> vor. See *ATSI Commn's Inc. v. Shaar Fund, Ltd.,
> 493 F.3d 87, 98 (2d Cir. 2007)*.

**A. The Events of June 27, 1998**

Plaintiff Andrew Hoffman is a Caucasian male. [3] In
1975, he suffered a fractured skull and brain injury for
which he has continued to require medication. (See Am.

2008 U.S. Dist. LEXIS 35377, *

Compl., P 139.) In 1998, Plaintiff was an accounting student at SUNY Old Westbury University [*3] (see id. P 79), residing in East Meadow, New York (see id. P 5).

> 3    Although not stated in Plaintiff's Amended Complaint, Plaintiff does not dispute this assertion. (See Defs.' Mem. Supp. Mot. Dismiss at 11 (doc. # 24).)

At 3:30 a.m. on June 27, 1998, Plaintiff left his house to pick up a friend. (See id. P 9.) While returning home on North Jerusalem Road, Plaintiff noticed a police car approaching from the opposite direction. (See id. P 14.) With his friend in the car, Plaintiff continued on North Jerusalem Road until he reached the intersection of Bellmore Avenue and North Jerusalem Avenue, where he stopped at the red traffic light and activated his right-turn directional signal. (See id.) While waiting for the light to turn green, Plaintiff noticed a police car behind him. (See id. P 15.)

When the light turned green, Plaintiff turned right onto Bellmore Avenue as did the police car. (See id. P 16.) Plaintiff continued on Bellmore Avenue following the road as it merged into Merrick Avenue. (See id. P 17.) As Plaintiff approached Cedar Drive, he signaled a right turn. (See id. P 18.) As Plaintiff proceeded to make a right turn onto Cedar Drive, the overhead lights of the police car were [*4] activated. (See id.) Plaintiff continued down Cedar Drive, stopping for the stop sign at the intersection of Cedar Drive and Cedar Lane. (See id. P 19.) As indicated by his directional signal, Plaintiff turned left onto Cedar Lane. (See id.) With the police car following, Plaintiff continued driving to the corner of Cedar Lane and Apple Lane and stopped at the right-side curb. (See id. PP 21, 22.)

Plaintiff waited for three (3) minutes for the police officer to approach his vehicle. (See id. P 23.) The police officer did not approach Plaintiff's car. (See id. PP 24, 25.) Therefore, Plaintiff drove on, turned the corner and parked his car in front of his house. (See id. P 25.) Plaintiff exited his car and ran to the front door of his house. (See id. P 26.) As he was putting his key in the door lock, Defendant Ryan grabbed Plaintiff and ordered him to remove his key from the door. (See id.) Defendant Ryan asked Plaintiff why he ran to the door. (See id.) Plaintiff responded that he saw Defendant Ryan following him, he knew he had done nothing wrong, and he waited for Defendant Ryan to approach his car, but she did not. (See id. P 27.) Plaintiff also told Defendant Ryan that he wanted [*5] his mother to be a witness to what was now transpiring as he had recently been falsely arrested by officers of Defendant Ryan's precinct and charged with crimes he did not commit, which were dismissed for lack of evidence. (See id. P 28.)

Plaintiff removed his key from the door lock and began to frantically ring the door bell. Simultaneously, Defendant Ryan radioed for back-up assistance. (See id. P 29.) Defendant Gallagher, a lieutenant with the Nassau County Police Department, arrived at the scene shortly thereafter. (See id. PP 7, 32.) While Plaintiff and Defendant Gallagher were standing in Plaintiff's driveway, Defendant Ryan and Plaintiff's mother walked to Defendant Ryan's police car; at the car Ryan explained to Plaintiff's mother that she, Ryan, had responded to a DWI call that had identified Plaintiff's car, but that Plaintiff had not done anything wrong. (See id. PP 33, 35.)

A third police officer, Defendant Seabrooks, came up behind Plaintiff and grabbed Plaintiff's neck, pushed him down to the ground and laid on top of him. (See id. P 36.) Plaintiff shouted to Defendant Seabrooks to "get off" him to which Seabrooks responded that he wanted to conduct a field sobriety test [*6] on Plaintiff. (See id. PP 37, 38.) Plaintiff told Seabrook that he had not had a drink in over seven (7) years and agreed to take the test. (See id. P 39.) Plaintiff was then allowed to stand and took the field sobriety test. (See id. PP 40, 41.)

While the test was being administered, Plaintiff's mother was told to go inside her home or that she would be arrested. (See id. P 43.) Although an Officer pushed Plaintiff's mother towards the home, "she remained outside as a witness to the events as they unfolded." (Id. P 44.)

Having passed the field sobriety test, one of the Defendant Officers told Plaintiff, "We want to bring you in for a breathalyzer test." (Id. P 45.) Plaintiff responded that he did not want the Officers to bring him anywhere, but that he would be willing to take such a test if it was brought to his house. (See id. P 46.) Defendant Gallagher told him that if he passed the portable breathalyzer test, the Officers would leave him alone. (See id. P 48.) In response to a radio request, Defendant Clifford arrived at Plaintiff's house with a portable breathalyzer test and administered the test in Plaintiff's driveway. (See id. PP 50, 51.) The machine registered "zero alcohol". [*7] (Id. P 52.)

Defendant Officers then asked Plaintiff to walk up to the sidewalk and then told him to place his hands behind his back. (See id. PP 53, 54.) Plaintiff responded, "You told me that you would leave me alone if I passed the test." (Id. P 55.) The Defendant Officers again instructed Plaintiff to place his hands behind his back. (See id. P 56.) Plaintiff complied and was handcuffed. (See id.) Plaintiff was arrested at 4:14 a.m. on June 27, 1998 and placed in Defendant Ryan's police car. (See id. PP 58, 62.) Plaintiff was not given Miranda warnings, informed that he was "under arrest" (see id. P 59.), or given a summons for any moving violation. (See id. P 93.)

From the back of Defendant Ryan's police car, Plaintiff observed Defendant Seabrooks searching his car. (See id. P 62.) Defendant Seabrook told Plaintiff's mother that he was looking for guns, drugs, and alcohol. (See id. P 63.)

During the ride to the First Precinct, Plaintiff asked Defendant Ryan why he had been arrested. (See id. P 65.) Her response was, "My supervising officer, Sergeant Gallagher, said I should bring you in. When we get to the station house, we will find out why." (Id.) Once at the precinct, Plaintiff [*8] remained in handcuffs while Defendant Ryan typed up the arrest report. (See id. P 66.) While she was preparing her report, Ryan said to Plaintiff, "I could say that you pushed me." (Id. P 68.) Plaintiff responded, "But, I never did." (Id.) Ryan retorted, "But, I can say that you did." (Id.) Defendant Ryan's arrest report alleged that Plaintiff had committed the crime of Obstructing Governmental Administration in violation of § 195.05 of New York Penal Law and Resisting Arrest under § 205.30 of the New York Penal Law. (See id. P 69.) Plaintiff was arraigned later in the day. (See id. P 70.) His mother posted bail and he was released into her custody. (See id. PP 72, 74.) In late September 1998, a superseding information was filed against Plaintiff, charging him with Harassment in violation of § 240.26(1) of the New York Penal Law. (See id. PP 77, 78.)

### B. *Subsequent Legal Proceedings*

#### 1. The September 14--17, 1999 Trial

A trial was held in September 1999. (See id. P 87.) Defendants Ryan and Clifford testified that the police had received an anonymous 911 call that the driver of a vehicle matching the description of Plaintiff's vehicle was intoxicated and that Plaintiff was never given a [*9] breathalyzer test. (See id. P 90.) Defendant Ryan also testified that Plaintiff did not appear to be intoxicated: his breath did not smell of alcohol, his motor coordination appeared normal, his eyes were not glassy or bloodshot, and his speech was not slurred. (See id. P 91.) Defendant Ryan further testified that she observed Plaintiff speeding and failing to signal. (See id. P 92.)

Plaintiff, his mother, and his friend and passenger, Robert Hauswald, also testified. (See id. PP 99, 102.) Plaintiff testified that he was administered a field sobriety test (see id. P 102.) and a portable breathalyzer test. (See id. P 104.) Plaintiff also testified that after blowing into the breathalyzer device, an officer said "Zero". (Id.) Plaintiff testified that, in response, he stated, "Then, I'm okay." (Id.) Plaintiff's mother's testimony corroborated Plaintiff's testimony that he was administered a field sobriety test and a portable breathalyzer test. (See id. PP 102, 103.)

Robert Hauswald testified that Plaintiff had been cooperative with the Defendant Officers and did not resist being placed in handcuffs. (See id. P 100.) Hauswald also testified that Plaintiff had not initiated any physical contact [*10] with the Defendant Officers, but that the Officers made physical contact with Plaintiff by pushing him in the back of his head. (See id. PP 100, 101.)

A jury acquitted Plaintiff on the charges of obstructing governmental administration and harassment, and convicted him on the charge of resisting arrest. (See id. P 107.)

#### 2. The Motion to Set Aside the Verdict

On December 10, 2001, Plaintiff moved in state court for an Order Setting Aside a Guilty Verdict pursuant to *§ 330.30 of N.Y.S. Criminal Procedure Law*. (See id. P 108.) On March 12, 2002, the judge issued a decision denying Plaintiff's motion. (See id. P 110.) Plaintiff was sentenced to perform two hundred (200) hours of community service. (See id. P 111.)

#### 3. Plaintiff's Appeal of the Conviction

On March 27, 2002, Plaintiff filed a Notice of Appeal alleging ineffective assistance of counsel. (See id. PP 112, 113.) On March 23, 2004, Plaintiff's conviction was reversed and the matter remanded for a new trial. (See id. P 114.)

#### 4. Plaintiff's January 2005 Trial

Plaintiff's retrial commenced on January 4, 2005. (See id. P 123.) Defendant Ryan testified that she had stopped Plaintiff because he had been speeding and failed to signal before [*11] making a turn (see id. P 124), but acknowledged that a stop based on an anonymous tip was not valid (see id. P 129) and that Plaintiff had passed the field sobriety test. (See id. P 130.) There was also testimony that Plaintiff was not advised of his Miranda rights. (See id. P 134.) On January 6, 2005, a jury acquitted Plaintiff of resisting arrest. (See id. P 135.)

#### 5. Damages

According to Plaintiff, he was diagnosed with depression after the 1999 trial (see id. P 143) and had been scheduled to take the certified public accountant examination in November 1999 (see id. P 138.), but withdrew due to stress he experienced as a result of his arrest and the subsequent court appearances. (See id. P 142.) Plaintiff is currently receiving monthly disability payments as a result of this diagnosis. (See id. P 144.)

### III. DEFENDANT OFFICERS' MOTION TO DISMISS

#### A. Standard of Review for a Motion to Dismiss

*Rule 8(a)* provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Recently, the Supreme Court clarified the pleading standard applicable in evaluating a motion to dismiss under *Rule 12(b)(6)*. [4] See *Bell Atlantic Corporation v. Twombly, U.S. , 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. **[*12]** The previous standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, was replaced to require that a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Twombly, 127 S. Ct. at 1974*.

> While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id. at 1964-65* (citations and internal quotation marks omitted).

4   The Court notes that Defendants moved "pursuant to *12(c) of the Federal Rules of Civil Procedure*." (Defs.' Notice of Mot. (doc. # 23).) *Rule 12(c)* is entitled "Motion for Judgment on the Pleadings". Since "[a] **[*13]** motion for judgment on the pleadings pursuant to *Rule 12(c)* is evaluated under the same standard as a *Rule 12(b)(6)* motion to dismiss for failure to state a claim," *Worldhomecenter.com, Inc. v. L.D. Kichler Co., Inc., No. 05-cv-3297 (DRH)(ARL), 2007 U.S. Dist. LEXIS 22496, 2007 WL 963206 (E.D.N.Y. March. 28, 2007)*(citing *Nicholas v. Goord, 430 F.3d 652, 658 n.8 (2d Cir. 2005)*), the Court shall proceed as if Defendants moved pursuant to *Rule 12(b)(6)*.

The Second Circuit has stated that Twombly does not require a universally heightened standard of fact pleading, but "instead requir[es] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausi-

ble." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)*. In other words, Twombly "'require[s] enough facts to 'nudge [a plaintiff's] claim across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)*(quoting *Twombly, 127 S. Ct. at 1974)*). [5]

> 5    The Second Circuit has "declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases." *ATSI Commn's Inc., 493 F.3d at 98 n.2*.

## B. **[*14]** The Amended Complaint

The Plaintiff alleges four (4) claims of federal constitutional violations and three (3) claims of state law torts. The federal claims are: (1) a *§ 1985(3)* claim of conspiracy to interfere with civil rights claim; (2) a *§ 1983* claim of failure to instruct and supervise; (3) a *§ 1983* claim of detention and confinement; and (4) a violation of due process. Plaintiff's state law tort claims are: (a) intentional infliction of emotional distress; (b) malicious prosecution; and (c) battery. (See Am. Compl. (doc. # 2).)

### 1. Plaintiff's *§ 1985(3)* Claim

To state a claim under *42 U.S.C. § 1985(3)*, a plaintiff must assert:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Armstrong v. Brookdale Univ. Hosp. & Med. Ctr., No. 98-cv-2416 (SJ), 2002 WL 13222, * 3 (Jan. 3, 2002 E.D.N.Y.)* (citing *Mian v. Donaldson, 7 F.3d 1085, 1087 (2d Cir. 1993)* (further citation **[*15]** omitted)); see also *Schuler v. Bd. of Educ., Cent. Islip Union Free Sch. Dist., No. 96-cv-4702 (JG), 2000 U.S. Dist. LEXIS 1006, 2000 WL 134346, *15 (E.D.N.Y. Feb. 1, 2000)*; *Strong v. Montava, 64 F. Supp. 2d 101, 107 (E.D.N.Y. 1999)*.

Plaintiff's *§ 1985(3)* claim fails because the alleged conspirators are employees of a single organization, the Nassau County Police Department and their alleged actions were taken in the course of their employment. "[I]t is well settled that there can be no actionable conspiracy under the civil laws if the alleged conspirators are employees of a single organization and their alleged actions

were taken in the course of their employment." Armstrong, 2002 WL 13222, at * 3 (citing *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir.), cert. denied, *425 U.S. 974, 96 S. Ct. 2173, 48 L. Ed. 2d 798 (1976)*); see also *Danielak v. City of New York*, No. 02-cv-2349 (KAM), 2005 U.S. Dist. LEXIS 40901, 2005 WL 2347095, *13-*14 (E.D.N.Y. Sept. 26, 2005) ("[T]he intra-corporate conspiracy doctrine bars plaintiff's conspiracy claims because all of the individual defendants were employees of the New York City Police Department, and were acting within the scope of their employment as police officers when they arrested plaintiff.").

Alternatively, Plaintiff's [*16] § 1985(3) cause of action fails because the Complaint does not allege some class-based discriminatory animus. See *Mian, 7 F.3d at 1088* ("[T]he conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." (internal quotations and citation omitted)); *Schuler, 2000 U.S. Dist. LEXIS 1006, 2000 WL 134346, at *15*. The Second Circuit has extended the protections of § 1985(3) to people with mental disabilities. See *Schuler 2000 U.S. Dist. LEXIS 1006, 2000 WL 134346, at *15 n.20* (citing *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42 (2d Cir. 1982), modified on other grounds, 718 F.2d 22 (1983)).

However, even assuming without deciding that Plaintiff's depression is a mental disability, he asserts he was diagnosed with depression after the September 1999 trial. (See Am. Compl., P 143.) Plaintiff does not allege that he was mentally disabled on June 27, 1998. Furthermore, Plaintiff makes only a conclusory allegation that his diagnosis of depression is the result of the Defendant Officers' actions. (See Pl.'s Am. Compl., P 144 ("Currently, Plaintiff is receiving monthly disability payments as a result of this depression. As [sic] a result of the unlawful, malicious [*17] prosecution by the Defendants.") [6] See, e.g., *Schuler 2000 U.S. Dist. LEXIS 1006, 2000 WL 134346, at *15* ("The vague and conclusory allegations relied upon by plaintiffs cannot suffice, especially in a claim predicated upon discrimination." (citing *Temple of the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir.), cert. denied, 502 U.S. 866, 112 S. Ct. 193, 116 L. Ed. 2d 153 (1991)). Since, Plaintiff's Complaint does not state a cause of action pursuant to § 1985(3), that claim is dismissed.

---

6  Plaintiff's assertions in his Opposition Memorandum (see Pl.'s Opp'n Mem. at 4.) attempt to circumvent the clear law of this Circuit that a court is restricted to considering the facts presented in a plaintiff's complaint when deciding a motion to dismiss. See, e.g., *Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d

Cir. 1999) ("In ruling on [a motion for dismissal], the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint to assume all well-pleaded factual allegations to be true, . . . .") (internal citations omitted); *Serby v. Town of Hempstead*, No. 04-cv-901 (DRH)(MLO), 2006 U.S. Dist. LEXIS 69079, 2006 WL 2795234 (E.D.N.Y. Sept. 26, 2006) (same).

### 2. Plaintiff's § 1983 [*18] Causes of Action

"*Section 1983* itself creates no substantive rights; it only provides a procedure for redress for the deprivation of rights established elsewhere." *Caracciola v. City of New York*, No. 95-cv-3896 (CSH), 1999 U.S. Dist. LEXIS 2983, 1999 WL 144481, *4 (S.D.N.Y. Mar. 17, 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)). Further, it does not contain a statute of limitations; therefore, applicable state law determines the limitations period for a § 1983 cause of action. See *Geslak v. Suffolk County*, No. 06-cv-251, 2007 U.S. Dist. LEXIS 94542, 2007 WL 4591252, *5 (E.D.N.Y. Dec. 27, 2007) (citing *Fiesel v. Bd. of Educ. of City of N.Y.*, 675 F.2d 522, 524 (2d Cir. 1982), partially vacated on other grounds on recons., 2008 WL 620732 (E.D.N.Y. Mar. 5, 2008). "The appropriate statute of limitations for § 1983 actions brought in New York is three years from the date 'the plaintiff knows or has reason to know of the injury that is the basis of the action.'" Id. (quoting *Pauk v. Bd. of Trustees of the City Univ. of N.Y.*, 654 F.2d 856, 859, 861 (2d Cir. 1981)); see also *Perez v. County of Nassau*, 294 F. Supp. 2d 386, 389 (E.D.N.Y. 2003). Further, the Supreme Court has recently articulated that "the accrual date of a [*19] §1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, U.S.    , 127 S. Ct. 1091, 1095, 166 L. Ed. 2d 973 (2007) (emphasis in original). "A claim begins to accrue 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *McCloud v. Cutler*, No. 06-cv-5442 (RJD)(LB), 2008 WL 906701 (E.D.N.Y. Apr. 3, 2008) (quoting *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (further citation omitted)).

In his first § 1983 claim, Plaintiff alleges that Defendant Gallagher "[a]cting under color of law and pursuant to official policy or custom . . . knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendant police officers in their duties . . ." (Am. Compl., P 153.) Drawing all inferences in Plaintiff's favor, Plaintiff knew or should have known of negligent supervision on June 27, 1998, the date of his arrest, and the date when his claim accrued. Even assuming, arguendo, that Plaintiff did not know of his negligent supervision

claim until his 1999 trial (where he was acquitted of the obstruction and harassment charges), this [*20] claim is still time-barred as Plaintiff did not commence this action until April 27, 2006, more than three years from these events. In any event, Plaintiff has not provided any factual allegations that would support this claim. See, e.g., ATSI Comm'n Inc., 493 F.3d at 98 (instructing courts to "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor"). Rather, Plaintiff provides a formulaic recitation of the relevant Monell elements to support his negligent supervision claim. See, e.g., City of Canton v. Harris, 489 U.S. 378, 394-95, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution."); see also Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) (providing Monell's policy or custom requirement).

As to Plaintiff's § 1983 claim of unlawful detention and confinement, they are considered together as false imprisonment. [*21] See Wallace, 127 S. Ct. at 1095.

> The running of the statute of limitations on false imprisonment is subject to a distinctive rule--dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned: "Limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends." 2 H. Wood, Limitation on Actions § 187d(4), p. 878 (4th rev. ed. 1916). Thus, to determine the beginning of the limitations period in this case, we must determine when petitioner's false imprisonment came to an end. Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process-- when, for example, he is bound over by a magistrate or arraigned on charges.

Id. at 1095-96 (further internal citations omitted)(emphasis in original).

Although Plaintiff does not provide the date of his arraignment, "[i]t is safe to assume that Plaintiff's arraignment took place at some point between June 27, 1998 and September 14, 1999 [the commencement date of Plaintiff's first trial]." (Defs.' Reply Mem. at 2 (doc. #

26).) Therefore, "[l]egal process was initiated [*22] against Plaintiff no later than 1999." (Id.) Under this generous assumption, the three-year limitations began to run in 1999 and expires in 2002. Since Plaintiff did not commence his § 1983 false imprisonment cause of action until April 27, 2006, it is time-barred and dismissed.

3. Plaintiff's Claims of Violation of Due Process

In his Fourth Cause of Action, Plaintiff alleges that his arrest violated his Fourteenth Amendment rights. (See Am. Compl., P 160-161 ("[T]he actions of the Defendants, resulted in the Plaintiff being deprived of his freedom of movement . . .").) However, a constitutional claim alleging deprivation of liberty "must be examined under Fourth Amendment standards, not due process standards under the Fifth and Fourteenth Amendments." Caracciola, 1999 U.S. Dist. LEXIS 2983, 1999 WL 144481, at *4 (citing Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (plural opinions agreeing that Fourth Amendment provides source for a § 1983 claim premised on a person's arrest); Singer v. Fulton County Sheriff, 63 F.3d 110, 115-16 (2d Cir. 1995)). Accordingly, "Plaintiff's . . . Fourteenth Amendment claim[] must be dismissed because the fourth amendment, and not substantive due process, provides the constitutional home [*23] for false arrest claims." Frazier v. Woods, No. 96-cv-7813 (JFK), 1998 U.S. Dist. LEXIS 3700, 1998 WL 146231, *3 (S.D.N.Y. Mar. 25, 1998).

Plaintiff's also claims a due process violation based upon the search and seizure by Defendant Seabrook of Plaintiff's car on June 27, 1998. (See Am. Compl., P 162.) Since (1) "[§] 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States," Caracciola, 1999 U.S. Dist. LEXIS 2983, 1999 WL 144481, at *4, and (2) Plaintiff seeks damages for this alleged deprivation, the Court will consider this claim as seeking to allege a § 1983 violation. However, a § 1983 action must be commenced within three years of accrual. (See supra Part III.B.2.) Plaintiff knew or should have known of this unreasonable search claim as of June 27, 1998, but on April 27, 2006, more than four (4) years after the expiration of the limitations period, Plaintiff commenced this action. Hence, the Defendants are entitled to the dismissal of this claim as well.

4. Plaintiff's State Law Tort Claims

Plaintiff alleges state law tort claims of (a) intentional infliction of emotional distress, (b) [*24] malicious prosecution, and (c) battery. "The decision whether to exercise supplemental jurisdiction is left to the discretion of the district court." Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 302 (E.D.N.Y. 2005) (citing Ametex Fabrics, Inc. v. Just in Materials,

*Inc.*, 140 F.3d 101, 105 (2d Cir. 1998)), aff'd, 240 Fed. Appx. 887, 888 (2d Cir. 2007); *see also* Serby, 2006 WL 2853869, at *15; 28 U.S.C. § 1367(c)(3) (recognizing courts have discretion to decline exercising jurisdiction they have dismissed all claims over which they had original jurisdiction); 28 U.S.C. § 1367(a) (". . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case of controversy . . ."). Having dismissed all of Plaintiff's claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## IV. PLAINTIFF'S MOTION TO AMEND

### A. Standard of Review for a Motion to Amend

It is well-settled that motions to **[*25]** amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971). It is also settled law that "[t]he decision to grant or deny a request to amend is within the discretion of the district court." *Sanrio Co., Ltd. v. Epic Trading, Inc.*, No. 04-cv-5428 (NG)(MDG), 2005 U.S. Dist. LEXIS 46319, 2005 WL 1705746, *1 (E.D.N.Y. July 21, 2005)(Go, M.J.) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *John Hancock Mut. Life Inc. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994)). This discretionary denial, however, must be based on good cause, such as futility. *See Chill v. General Elec. Co.*, 101 F.3d 263, 272 (2d Cir. 1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).

### B. The Instant Case

The Plaintiff concedes that he improperly named the Police Department as a defendant in his opposition papers and, therefore, seeks to amend his Complaint. (See Pl.'s Mem. Opp'n Mot. Dismiss at 6 (doc. # 25) ("[T]he defendants are correct that the Nassau County Police Department is not the proper defendant as it is only an administrative arm of the County of Nassau without a separate legal identity.").)

He now moves to **[*26]** amend his Complaint "to correct an error in the complaint and name Nassau County as the proper defendant." (Pl.'s Mot. Am. at 2 (doc. # 32).) Granting Plaintiff's motion would be futile.

1. Plaintiff's § 1985(3) Claim

Plaintiff cannot overcome the intra-conspiracy bar to his § 1985(3) claim. *See Danielak*, 2005 U.S. Dist. LEXIS 40901, 2005 WL 2347095, at *13-*14; Armstrong, 2002 WL 13222, at *3. It is clear that all the individual Defendant Officers were employees of the Nassau County Police Department and that they were acting within the scope of their employment as police officers when they arrested Plaintiff. There is no evidence that at the time of Plaintiff's June 27, 1998 arrest, that Plaintiff, much less Defendants, knew that he was mentally disabled. Therefore, Plaintiff cannot establish that any conduct by the Defendant Officers was motivated by some discriminatory animus towards those with mental disabilities. Hence, as to Plaintiff's § 1985(3) cause of action, an amendment would be futile.

2. Plaintiff's § 1983 Causes of Action

Amendment of his Complaint to name the proper sueable entity, i.e., Nassau County, as to Plaintiff's claims of negligent supervision and false imprisonment is also futile as these **[*27]** claims are clearly time-barred. (See supra Part III.B.2.)

3. Plaintiff's Claims of Violation of Due Process

Plaintiff's claims of false arrest and violation of due process were dismissed as time-barred. (See supra Part III.B.3.) Therefore, it would be futile to allow Plaintiff to amend his Complaint to plead these claims against Nassau County.

4. Plaintiff's State Law Tort Claims

Since it would be futile to allow Plaintiff to amend his federal claims, no purpose would be served in granting Plaintiff's Motion to Amend as to his state law tort claims.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is GRANTED. Conversely, Plaintiff's Motion to Amend is DENIED. The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

/s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN

United States District Judge

Dated: April 30, 2008

Central Islip, NY