LEXSEE 2000 U.S. DIST. LEXIS 4237

**MARK KOMLOSI, Plaintiff, -against- MELANIE FUDENBERG, Defendant.**

**88 Civ. 1792 (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 4237*

**March 31, 2000, Decided
March 31, 2000, Filed**

**DISPOSITION:** [*1] Defendant's motion for judgment as matter of law granted in part and denied in part.

**COUNSEL:** For MARK KOMLOSI, plaintiff: Robert E. Goldman, Speno Goldman Goldberg Steingart & Penn, P.C., Mineola, NY.

For KENNETH BRODSKY, IVAN CANUTESON, CHARLES DEYOUNGE, JAMES BRENNAH, ARTHUR FOGEL, ELIN M HOWE, LOUIS GANIM, SHELDON KRAMER, NEW YORK STATE OFFICE OF MENTAL RETRADATION, JOSEPH SABATOS, ARTHUR WEBB, ROBERT WITKOWSKY, WALTER DELEONE, defendants: Robert W Abrams, Attorney General, New York, NY.

For MELANIE FUDENBERG, defendant: Mark E. Goldell, Galasso, Langione, Garden City, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge:

I. *Introduction*

Defendant moves for an order directing the entry of judgment in her favor as a matter of law pursuant to *Rule 50(b), Fed.R.Civ.P.* For the reasons set forth below, the motion is granted in part and denied in part. In addition, unless, within thirty days of the date of this Opinion and Order, plaintiff stipulates to remit all compensatory damages to the extent that they exceed $ 1,872,988.00 and all punitive damages to the extent that they exceed $ [*2] 500,000, I grant defendant's motion to the extent of ordering a new trial limited to the issue of damages. [1]

> 1 Defendant has not expressly moved for a new trial under Rule 59. However, defendant's claim concerning the excessive size of the verdict does not appear to be the type of claim on which a new trial could be granted under *Rule 50(b)(1)(B), Fed.R.Civ.P.* An excessive verdict is cured by a new trial or remittitur, *not* by the entry of judgment for the losing party. *See generally* 9A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2538 at 359 (2d ed. 1994) ("The discretion to order a new trial [under *Rule 50(b)*] exists only if the moving party would be entitled to judgment as a matter of law.") Nevertheless, as discussed at pagea 11-12, below, defendant's notice of motion does expressly raise the issue of excessive damages, a traditional Rule 59 claim. *See generally* 11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2807 (2d ed. 1994). Thus, it appears that the absence of an express reference to Rule 59 may have been an oversight. Accordingly, I deem defendant's notice of motion to be seeking, as alternative relief, a new trial on the grounds of excessiveness of the verdict.

[*3] II. *Facts*

A. *Overview*

This is a civil rights action brought pursuant to *42 U.S.C. § 1983* in which plaintiff, a psychologist formerly employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"),

2000 U.S. Dist. LEXIS 4237, *

claims that defendant violated his federally protected rights by causing false charges of sexual misconduct to be made against him. With the parties' consent pursuant to *28 U.S.C. § 636(c)*, this matter was tried to a jury from May 24, through June 3, 1999. The case was submitted to the jury on three different theories of liability. The jury returned a verdict in plaintiff's favor on two of the three theories submitted to it and awarded $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

### B. *The Evidence at Trial*

The facts underlying this action are discussed in some detail in the Court of Appeals' decision dismissing the claims against all defendants other than Melanie Fudenberg. *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810 (2d Cir. 1995)*. Familiarity with that decision is assumed. I shall review [*4] the facts established at trial to the extent necessary to understand the pending motion.

Plaintiff was born and educated in the Republic of Czechoslovakia and immigrated to the United States in 1970. In 1974, plaintiff obtained permanent employment as a psychologist with the OMRDD. Plaintiff was initially assigned to the Brooklyn Developmental Center ("BDC"); in 1982, he was re-assigned to the Williamsburg Residential Training Center ("WRTC").

WRTC was a residential facility for approximately 46 developmentally disabled male and female adults who were cared for by approximately 60 professional and administrative staff. By 1984, plaintiff had achieved the level of "Psychologist II" and earned approximately $ 32,000 per year. His duties included both administrative and clinical responsibilities. In the early 1980's, he was also working on completing a Ph.D. dissertation in psychology. A doctoral degree would have entitled plaintiff to additional promotions and pay increases.

The defendant, Melanie Fudenberg, was also employed at WRTC. After starting as a switchboard operator, defendant was given a position as a Mental Health Therapy Aide Trainee. She subsequently was promoted to the [*5] position of Therapy Aide. Her duties as a Therapy Aide included assisting the residents of the facility with their activities of daily living and implementing direct care plans prepared by plaintiff and other professional staff members.

In 1984, WRTC had a procedure for its employees to follow to report incidents of suspected abuse of its residents. Any WRTC employee witnessing or suspecting abuse of a resident was required to report the suspected abuse to his or her immediate supervisor and also complete a written incident report. The report of a suspected incident of abuse would trigger an internal investigation into the incident and result in an investigative fact finding report with conclusions, recommendations and, if necessary, action against the employee responsible for the abuse. The incident report and the investigative findings became a permanent record of the facility.

Plaintiff could recall three instances of conflict with his co-employee Melanie Fudenberg at WRTC prior to August 1984. The first involved a resident named Sammy Roche who reported to plaintiff that defendant had struck him in the face. In accordance with WRTC procedure, plaintiff brought Roche to his immediate [*6] supervisor and reported the incident. When confronted by Roche, plaintiff and the supervisor, defendant denied having struck Roche.

The plaintiff and defendant also had a disagreement regarding a treatment plan prepared by the plaintiff for Anthony Ford. Ford had a history of being physically abusive towards staff members and, after determining that restraint and confrontation had not succeeded, plaintiff decided to try a therapy plan that included non-confrontational or passive response to Ford's attacks. Although defendant lacked plaintiff's professional training, she disagreed with and disapproved of plaintiff's approach.

A third incident involved WRTC resident, Marion Greengrass. In August 1984, defendant accompanied Greengrass to WRTC Chief of Services, Arthur Fogel, where Greengrass complained that plaintiff had sexually abused her. Plaintiff was placed on administrative leave and an investigation into the allegation ensued. The investigation concluded that the allegations were unsubstantiated, and that defendant had bribed Greengrass with cigarettes to fabricate the allegation against plaintiff.

During the investigation into Greengrass's allegations, defendant advised Fogel [*7] of other alleged incidents of sexual misconduct by plaintiff directed at other WRTC residents. Investigations of these allegations revealed that these charges were also unfounded. The defendant also accompanied WRTC resident Michael Sakowitz to Fogel's office at which time Sakowitz claimed that plaintiff had sexually abused him. However, after defendant left Sakowitz alone with Fogel, Sakowitz recanted his allegation and stated that defendant had instructed him to make the allegation.

In November 1984, Ivan Canuteson, OMRDD Associate Commissioner of Program Operations visited WRTC. During his visit, defendant approached Canuteson and expressed concerns that the charges of abuse against plaintiff had not been properly investigated. Based upon defendant's complaint to Canuteson, another investigation was ordered by OMRDD. Client's Rights Specialist, Lovetts Joyner, was assigned to conduct the investigation. Following his investigation, Joyner also

determined that the charges were baseless. He prepared a written report dated January 8, 1985 which stated that defendant's charges against plaintiff were unsubstantiated and had been created by defendant with the intent to injure plaintiff's [*8] reputation. He further recommended that a formal letter of exoneration be placed in plaintiff's personnel file and that OMRDD Employee Relations be advised of defendant's wrongful attempt to damage plaintiff's reputation and livelihood.

In March 1985, the defendant threatened WRTC resident David Rosenberg with "trouble" unless Rosenberg accused plaintiff of engaging in acts of sexual impropriety with Rosenberg. These accusations, like the previous allegations the defendant had concocted, were false. As she had done with other residents, the defendant escorted Rosenberg to Fogel's office and caused him to complain that plaintiff had sexually abused him sometime in February or March 1984. The defendant filed the requisite incident report and, again, the investigative process began. The plaintiff vehemently denied that he had sexually abused Rosenberg or any other resident at the facility.

The plaintiff was initially placed on administrative leave and then suspended without pay pending the completion of the investigation. However, the New York City Police Department subsequently started its own investigation, and the BDC's investigation was suspended.

On May 2, 1985, plaintiff was [*9] arrested and charged with nine counts of sexual abuse including rape and forcible sodomy. The alleged victims were all WRTC residents. As a result of the charges, plaintiff was arrested, handcuffed, chained to other suspected offenders, transported to a police station on where he was fingerprinted, photographed, strip searched, booked and jailed. He was later arraigned; bail was set at $ 75,000, which plaintiff was unable to post. He remained in jail for fifteen days; during his incarceration, other inmates threatened him physically and sexually. The New York Post reported the charges against plaintiff under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS." During this time, plaintiff was frightened, humiliated, embarrassed and uncertain what his future would hold. He described his emotional state and experiences to the jury as "a nightmare." Due to concerns for his safety, authorities placed plaintiff in administrative segregation.

From March through May, 1985, Rosenberg stated to Detective Catalfumo of the New York City Police Department and to prosecutors from the Kings County District Attorney's Office that he and plaintiff had engaged in acts of sexual impropriety. Those [*10] state-

ments formed the basis for the arrest and indictment of plaintiff.

In May, 1985, the grand jury indicted the plaintiff on two (2) counts of "deviant sexual intercourse." Plaintiff's bail conditions were subsequently reduced, and plaintiff was released on his own recognizance. He was, however, required to surrender his passport and to attend all court appointments including the trial proceedings. Plaintiff remained suspended without pay from his position pending the disposition of the criminal charges.

Plaintiff's criminal trial commenced in May 1986. During the trial, before plaintiff was to testify, Rosenberg recanted his accusations. As a result of Rosenberg's recantation, the charges against plaintiff were dropped and the case was dismissed.

Plaintiff has been seeing a psychiatrist ever since the charges against him were dismissed and has been diagnosed with post-traumatic stress disorder. In addition to therapy, plaintiff has been prescribed anti-depressant and anti-anxiety medications. Plaintiff's treating psychiatrist characterized plaintiff's condition as chronic and permanent and of sufficient severity that it will continue to compromise plaintiff's personal, professional [*11] and social life. Plaintiff's psychiatrist also testified that plaintiff's fear and anxiety of being falsely accused, criminally charged, jailed and prosecuted for sexually abusing a patient will forever prevent him from practicing as a psychologist.

In September 1986, the plaintiff was offered reinstatement to his position at WRTC. Although plaintiff attempted to resume his duties at WRTC, he was unable to do so because defendant and Rosenberg were still at the facility and plaintiff feared a repeat of the past horrific experiences. The day following his attempt to return to work, plaintiff submitted a written resignation to BDC citing "health reasons" for his departure.

Plaintiff testified that, since his resignation from BDC, he attempted to pursue employment as a psychologist on two occasions. Plaintiff was not hired for the first position because the employer found out that he had been charged with sexual abuse of residents at WRTC. Plaintiff was terminated from the second position because he was unable to restrain a patient who attempted to run from a fire drill; plaintiff feared that he would be accused of improper physical contact with the patient if he attempted to restrain [*12] her physically.

Since 1986, plaintiff has been employed in various menial part-time positions but most steadily as a part-time doorman/concierge. During trial, plaintiff's expert economist, Dean W. Morse, testified that plaintiff's economic damages over his work life expectancy are $ 1,372,988, discounted to present value. Professor Morse

further testified that this is an extremely conservative figure. The defendant did not introduce any evidence to controvert this figure.

The case was submitted to the jury on three different theories of *Section 1983* liability: (1) defendant's alleged conduct constituted a violation of plaintiff's right to continued employment; (2) defendant's alleged conduct violated plaintiff's right to pursue the career of his choice (the "stigma plus" claim), and (3) defendant's alleged conduct violated plaintiff's right to be free of malicious and baseless prosecutions. The jury found for defendant on the first theory and returned a verdict for plaintiff on the second two theories. The jury awarded a total of $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

III. *Analysis*

A. *Standards Applicable To a Rule 50(b) Motion*

[*13] The standards applicable to a motion for judgment as a matter of law are well settled and require only brief review.

"Judgment as a matter of law may not properly be granted under *Rule 50* unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998); see also Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1039 (2d Cir. 1992); Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991).* In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. *See, e.g., Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 289, Vasbinder v. Ambach, 926 F.2d at 1339-40.* Thus, judgment as a matter of law should not be granted unless

(1) there is such a complete [*14] absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there

is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)* (internal quotation marks omitted).

*Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999). See also Fernandez v. North Shore Ortho. Surg. & Sports Med. P.C., 79 F. Supp. 2d 197, 201-02 (E.D.N.Y. 2000); Jarvis v. Ford Motor Co., 69 F. Supp. 2d 582, 590 (S.D.N.Y. 1999); Culp v. Sgt. Zaccagnino, 1999 U.S. Dist. LEXIS 13752, 96 Civ. 3280 (THK), 1999 WL 701394 at *1 (S.D.N.Y. Sept. 8, 1999).*

In an Affirmation annexed to defendant's Notice of Motion, defendant contends that she is entitled to judgment as a matter of law on six different grounds:

6. The defendant respectfully submits that she is entitled to Judgment as a matter of law because: (i) she was not acting under color of state law; [*15] (ii) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to engage in the employment of one's own choosing or to practice the profession of one's own choosing; (iii) because plaintiff was not fired, no liberty interest was implicated by defendant's conduct; (iv) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to be free from malicious prosecution; (v) defendant did not cause plaintiff to be maliciously prosecuted because the chain of causation was broken by the independent police investigation and the District Attorney's prosecution and presentation of the case to the Grand Jury, free of any evidence of pressure, influence or participation by the defendant; and (vi) both the compensatory and punitive damages [awards] are excessive.

(Affirmation of Mark E. Goidell, Esq., dated June 23, 1999 at 6). Notwithstanding the requirements of Local

Case 1:07-cv-06480-JGK   Document 23-3   Filed 08/29/2008   Page 5 of 39

Page 5
2000 U.S. Dist. LEXIS 4237, *

Civil Rule 7.1 [2], the memorandum of law submitted in support of defendant's motion ignores some of the foregoing claims, and raises other arguments not identified in the affidavit. In her memorandum of law, defendant does not address [*16] her contentions that (1) the plaintiff had no clearly established federal right to pursue the career of his choosing, (2) the plaintiff had no clearly established federal right to be free of malicious prosecutions, and (3) the verdict was excessive. In her memorandum of law, however, defendant does raise the additional claim that she is not responsible for any constitutional injury because she did not have discretionary authority to cause constitutional injury. Defendant offers no explanation for the inconsistency between the affirmation annexed to her notice of motion and her memorandum of law.

    2    Rule 7.1 of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York provides:

        Except as otherwise permitted by the court, all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion, and divided, under appropriate headings, into as many parts as there are points to be determined. Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.

    [*17]  The inconsistency between defendant's affirmation and memorandum is troubling and ill serves the Court; the mere identification of an issue, without supporting briefing, is singularly unhelpful when the question before the Court is whether defendant is entitled to judgment as a matter of law. Nevertheless, because the issues raised in defendant's affirmation may be dispositive, I shall consider them notwithstanding defendant's failure to brief them in her memorandum of law.

B. *Plaintiff's "Stigma Plus" Claim*

    1. *Merits of the Claim* [3]

    3    Pursuant to *County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)* and *Medeiros v. O'Connell, 150*

*F.3d 164, 169 (2d Cir. 1998)*, I consider the merits of this claim before addressing the immunity issue.

    Although it is now well settled that damage to an individual's reputation by a state agent coupled with "the termination of some other legal right or status will suffice to constitute a deprivation [*18] of a liberty interest", *Greenwood v. State of New York, 163 F.3d 119, 124 (2d Cir. 1998)* (inner quotations omitted), it is still not clear what satisfies the additional "plus" factor. *See generally* Martin A. Schwartz, *'Stigma Plus' Claims*, N.Y.L.J., Feb. 15, 2000, at 4 ("Supreme Court decisional law, however, has not resolved whether the plus must be a tangible deprivation, such as loss of a job or inability to pursue a profession, or whether it can be the denial of any right or status recognized by state law.").

    Drawing all the inferences in favor of plaintiff, the evidence in this case showed that plaintiff was suspended without pay and subsequently subjected to a criminal prosecution as a result of defendant's causing Rosenberg to make false complaints against plaintiff. After the charges were dismissed, plaintiff was offered reinstatement, but ultimately resigned because the psychological injury he had suffered made it impossible for him to function as a psychologist. The only evidence concerning plaintiff's subsequent efforts to obtain and keep employment as a psychologist showed that one subsequent prospective employer rejected plaintiff when it learned [*19] of the abuse charges and that a second employer terminated plaintiff when he refused to restrain a patient during a fire drill for fear of being charged with inappropriate physical contact.

    As a matter of law, however, suspension without pay is not a sufficient "plus" factor to give rise to a protected liberty interest. In *Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989)*, the plaintiff, a Bridgeport, Connecticut police officer, had cooperated in the federal investigation of another police officer, Fitzgerald. Dobosz testified before the grand jury and at trial against Fitzgerald; Dobosz's testimony suggested that Fitzgerald had killed an individual without justification and subsequently "planted" a knife next to the decedent's body in order to fabricate a claim of self defense.

    After Fitzgerald was acquitted, Dobosz's employer announced that Dobosz would be suspended and prosecuted for perjury. Although departmental charges were subsequently brought against Dobosz, no criminal proceedings were ever commenced against him. After he was acquitted of the departmental charges, he was reinstated with full back pay and seniority credit.

    Dobosz subsequently brought a *Section* [*20] *1983* claim against the superintendent of the Bridgeport Police Department, asserting, among other things, a "stigma

plus" claim. The Court of Appeals affirmed the dismissal of this aspect of Dobosz's claim, stating:

> [*Board of Regents v. Roth*, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)] held that two kinds of liberty concerns trigger due process rights in the public employment context: (i) the employee's interest in good name and reputation; and (ii) the employee's interest in being able to seek other employment opportunities. See *id.* at 573-74, 92 S. Ct. at 2707. Dobosz has alleged that [the Superintendent's] acts and statements were injurious to his reputation. However, under *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law. *See id.* at 710-12, 96 S. Ct. at 1164-65. Dobosz suffered no such alteration. He was reinstated with back pay and seniority credit, and his due process claim thus fails [*21] the *Paul* "reputation plus" test. *See Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S. Ct. 66, 107 L. Ed. 2d 33 (1989); see also *Sparks v. City of Atlanta*, 496 F. Supp. 770 774 (N.D. Ga. 1980) ("stigma" suffered by police officer whose suspension was rescinded does not give rise to due process liberty interest).

892 F.2d at 1140.

Plaintiff makes no attempt to distinguish *Dobosz* or to explain why it is not controlling here. Indeed, plaintiff's post-trial papers do not address *Dobosz* at all.

Since *Dobosz* clearly holds that a suspension without pay is insufficient to satisfy the "plus" element of a "stigma plus" claim, defendant is entitled to judgment as a matter of law on that aspect of plaintiff's claim asserting liability based on defendant's interference with his right to pursue a career of his choosing. [4] In light of this disposition, it is unnecessary to reach the other arguments asserted by defendant concerning the merits of this aspect of plaintiff's claim.

---

4 I assume the jury concluded that defendant's conduct made it substantially more difficult for plaintiff to find employment as a psychologist.

That fact, however, does not salvage plaintiff's "sigma plus" claim. *Siegert v. Gilley*, 500 U.S. 226, 234, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991) ("The statements contained in the letter would undoubtedly damage the reputation of one in [the plaintiff's] position, and impair his future employment prospects. . . . But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action."); *Paul v. Davis*, 424 U.S. 693, 697, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976) (concluding that the plaintiff suffered no violation of a liberty interest, even though his complaint alleged impairment of future employment opportunities).

[*22] *2. Qualified Immunity*

The doctrine of qualified immunity was recently summarized by the Court of Appeals in *McCullough v. Wyandanch Union Free School Dist.*, 187 F.3d 272, 278 (2d Cir. 1999):

> A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent.

*See also Anderson v. Creighton*, 483 U.S. 635, 638-39, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000); [*23] *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998); *Brown v. City of Oneonta*, 106 F.3d 1125, 1130-31 (2d Cir. 1997).

The events giving rise to plaintiff's "stigma plus" claim occurred in 1985. However, except in cases in-

volving a wrongful termination of employment, the elements of a stigma plus claim were not clearly established at that time.

In *Greenwood v. State of New York. supra. 163 F.3d 119 (2d Cir. 1998)*, the issue was whether the elements of a non-termination, "stigma plus" claim had been clearly established as of 1982, and the Court of Appeals concluded that the elements of such a claim were not clearly established as of 1982. *163 F.3d at 124.* In reaching its conclusion concerning the state of the law in 1982, the Court relied on its 1989 statement that "'"stigma plus" is required to establish a constitutional deprivation, but it is not entirely clear what the plus is.'" *163 F.3d at 124, citing Neu v. Corcoran. 869 F.2d 662. 667 (2d Cir. 1989).* Since the contours of the right were not clearly established in 1982, it necessarily follows that they were not clearly established in **[\*24]** 1985.

Thus, defendant is also entitled to judgment as a matter of law on plaintiff's stigma plus claim pursuant to the doctrine of qualified immunity.

*C. Malicious Prosecution*

*1. Merits of the Claim*

Defendant attacks the merits of the malicious prosecution aspect of plaintiff's claim on several grounds. Again, I shall examine each issue relating to the merits of the claim before addressing the qualified immunity defense.

*a. Color of State Law*

Defendant first argues that the verdict cannot stand because there is insufficient proof that she was acting under color of state law. In substance, defendant claims that the evidence established, at most, a personal pursuit by defendant. Since the conduct was personal, says defendant, it is not actionable under *Section 1983*.

"The Supreme Court has broadly interpreted the color of law requirement, concluding that 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law.'" *United States v. Walsh, 194 F.3d 37. 50 (2d Cir. 1999), quoting United States v. Classic, 313 U.S. 299. 326. 85 L. Ed. 1368. 61 S. Ct. 1031 (1941).* [5]

**[\*25]**

To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the

State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Ibid.* "State employment is generally sufficient to render the defendant a state actor." *[Lugar v. Edmondson Oil Co.. 457 U.S. 922. 936 n.18. 73 L. Ed. 2d 482. 102 S. Ct. 2744 (1982)].* It is firmly established that a defendant in a *§ 1983* suit acts under color of state law when he abuses the position given to him by the State. *See Monroe v. Pape, [365 U.S. 167, 172, 5 L. Ed. 2d 492. 81 S. Ct. 473 (1961), overruled in part on other grounds. Monell v. New York City Dep't of Social Servs.. 436 U.S. 658, 695-701. 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)].* Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. *See e.g.. Parratt v. Taylor, [451 U.S. 527, 535-536, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in* **[\*26]** *part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331. 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)]; Adickes v. S.H. Kress & Co.. 398 U.S. 144, 152, 90 S. Ct. 1598. 1605-1606. 26 L. Ed. 2d 142 (1970). See also Flagg Bros., Inc. v. Brooks. [436 U.S. 149. 157 n.5. 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978)].*

*West v. Atkins, 487 U.S. 42, 49-50, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).*

5   Although *Classic* defined "color state of law" in the context of a prosecution under *18 U.S.C. § 241*, the definition is equally applicable to a civil action brought under *42 U.S.C. § 1983. West v. Atkins, 487 U.S. 42, 49, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988).*

There was clearly enough evidence in this case to sustain a finding that defendant acted under color of state law when she caused false charges to be made against plaintiff. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable **[\*27]** inferences in his favor, the evidence established that defendant had access to Rosenberg by virtue of her employment by the state as a Therapy Aide. There was no evidence that defendant ever had any relationship with Rosenberg outside the WRTC. It was only by virtue of her access to Rosenberg that she was able to coerce him to make a false charge of sexual abuse against plaintiff.

Thus, contrary to defendant's argument, this is not a case of purely personal animus that erupted into confrontation while the participants merely happened to be on state property. Rather, this is a case in which plaintiff misused the incidents of her state employment, namely her access to and relationship with Rosenberg, to cause false allegations of misconduct to be made against plaintiff by Rosenberg. In other words, this was a case in which the abuse was "made possible only because the wrongdoer [was] clothed with the authority of state law." *United States v. Classic, supra, 313 U.S. at 326*. The notion that Rosenberg would have submitted to defendant's directions, absent her position as Therapy Aide, is an assumption that is not supported by either the record or common sense.

In support [*28] of her argument, defendant cites a number of cases in which direct physical assaults by state employees on another were found not to constitute state action. *Martinez v. Colon, 54 F.3d 980 (1st Cir. 1995); Hughes v. Halifax Co. School Bd., 855 F.2d 183, 187 (4th Cir. 1988); Segreto v. Kirschner, 977 F. Supp. 553 (D. Conn. 1997); Williams v. Josephs, 1993 U.S. Dist. LEXIS 14079, 91 Civ. 8178 (MBM), 1993 WL 403969 (S.D.N.Y. Oct. 7, 1993).* [6] These cases are all distinguishable. In each, although the assault took place on state property, the state employment provided "at most the occasion but not the means for committing the challenged acts." *Williams v. Josephs, supra, 1993 U.S. Dist. LEXIS 14079, *8, 1993 WL 403969 at *3*. In this case, on the other hand, there was sufficient evidence for the jury to conclude that defendant was able to cause Rosenberg to make the false allegation by virtue of her employment-based relationship with him and that it was defendant's state employment that provided the means for the conduct in issue.

> 6    In this regard, defendant also cites an unpublished Summary Order of the Court of Appeals for the Second Circuit. Since defendant's citation of this Summary Order violates Rule 0.23 of Second Circuit's Rules, I have not considered it.

[*29] Thus, defendant is not entitled to judgment as a matter of law on the theory that there was insufficient evidence that defendant acted under color of state law.

b. *Causation*

Because defendant's remaining arguments address the sufficiency of the proof of the malicious prosecution aspect of plaintiff's claim, it is helpful to first identify those elements.

The elements of a *Section 1983* claim based on malicious prosecution are borrowed from state tort law. *Lee v. Edwards, 101 F.3d 805, 810 n.4 (2d Cir. 1996); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994)*.

In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995);* see *Broughton v. State, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, cert. denied, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975).* [*30]

*Murphy v. Lynn. 118 F.3d 938, 947 (2d Cir. 1997)*. Defendant's challenges here relate to the first and second elements.

Defendant first argues that she is entitled to judgment as a matter of law because the evidence was insufficient to support a finding that she caused the commencement of the criminal prosecution against plaintiff. Specifically, defendant argues that she cannot be found to have initiated the prosecution because plaintiff's indictment was the product of the intervening and independent acts of the grand jury and the Kings County District Attorney (Defendant's Memorandum of Law in Support of her *Rule 50(b)* Motion for Judgment as a Matter of Law ("Def. Memo.") at 19-21).

The direct evidence at trial concerning the commencement and termination of the criminal proceeding against plaintiff consisted primarily of the following stipulated facts:

> David Rosenberg, a resident at the Williamsburg Residential Training Center accused Mr. Komlosi of having sexually abused him.

> An investigation of Mr. Rosenberg's allegation was conducted by the Williamsburg Residential Training Center.

> [In March 1985, through May, 1985, David Rosenberg stated to Detective [*31] Catalfumo of the New York City Police Department and prosecutors of the Kings County District Attorney's Office that he and Mark Komlosi had engaged in acts of sexual impropriety which served as their bases for the arrest and indictment of plaintiff Mark Komlosi, up to the date of dismissal, May 29, 1986.]

Case 1:07-cv-06480-JGK    Document 23-3    Filed 08/29/2008    Page 9 of 39

Page 9
2000 U.S. Dist. LEXIS 4237, *

Mr. Komlosi was arrested by the New York City Police Department.

During the criminal trial against Mr. Komlosi, before Mr. Komlosi was to testify, Mr. Rosenberg recanted, or took back, his accusations against Mr. Komlosi.

As a result of Mr. Rosenberg's recanting his accusation, the criminal charges against Mr. Komlosi were dropped and the criminal case was dismissed.

(Trial Tr. 727-28).

This evidence, in conjunction with Mr. Rosenberg's testimony that defendant forced him to make false allegations of sexual misconduct against plaintiff, supports the conclusion that it was Rosenberg's false statements, made at defendant's instigation, that brought about the commencement of the criminal proceedings against plaintiff. There was no evidence offered at trial that the District Attorney's Office had evidence concerning the alleged incident between Rosenberg and plaintiff from [*32] any other source.

Where, as here, a defendant willfully and maliciously causes false information to be presented to prosecuting officials, the prosecutor's decision, based on the false information, will not shield the source from liability for malicious prosecution.

*White v. Frank, 855 F.2d 956 (2d Cir. 1988)*, involved analogous facts. In that case, the defendants, two police officers, testified falsely before a grand jury, resulting in the plaintiff's indictment. After the perjury was disclosed, plaintiff sued under *Section 1983*, alleging, *inter alia*, malicious prosecution. In dismissing the defendants' appeal from the District Court's denial of a motion to dismiss, the Court of Appeals squarely held that a witness who intentionally provides false testimony to a grand jury or prosecutor may be liable for malicious prosecution.

Appellants also contend that the role of both the public prosecutor and the grand jury in advancing the prosecution of [plaintiff] necessarily insulated them from liability for malicious prosecution. We disagree. The intervening acts of a grand jury have never been enough to defeat an otherwise viable malicious prosecution claim, [*33] whether or not the grand jury votes a true bill or even returns an indictment ultimately determined to be deficient as a matter of law. . . . And though

an indictment by a grand jury is generally considered *prima facie* evidence of probable cause in a subsequent civil action for malicious prosecution, this presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence. *See Hopkinson v. Lehigh Valley R.R. Co., 249 N.Y. 296, 300, 164 N.E. 104, 106 (1928); Dennis v. Ryan, [65 N.Y. 385, 388-89 (1875)]*; W. Prosser, *[Law of Torts, (4th ed. 1971)] § 119 at 846; Restatement (Second) of Torts § 664(2) & comment b (1977).*

The public prosecutor's role in the prosecution likewise does not affect our immunity analysis, though again it may affect appellant's ultimate liability on the merits. No doubt, the availability of the malicious prosecution action has been curtailed with the growth of the office of the public prosecutor. . . . The exercise of independent judgment by the public prosecutor and his active role in initiating criminal prosecutions may decrease the likelihood that a complaining witness will [*34] be considered to have "caused" or "procured" the prosecution, thus defeating grounds for liability under this initial prong of the common law standard. . . .

As with the grand jury, however, the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false. *See Hopkinson v. Lehigh Valley R.R. Co., supra, 249 N.Y. at 300-01, 164 N.E. at 106; Dennis v. Ryan, supra, 65 N.Y. at 388-89; see also Russo v. New York, [672 F.2d 1014, 1018 (2d Cir. 1982), mod. on other grounds, 721 F.2d 410 (2d Cir. 1983)]* (presumption of probable cause arising from arrest warrant disappears where warrant is issued on the basis of sworn accusations of defendant in malicious prosecution action); W. Prosser, *supra, § 119, at 837; Restatement (Second) of Torts, supra, § 653 comment g.* "It is quite clear," wrote two English commentators in the early part of this century, "that a defendant who has misled a tribunal by dishonest evidence and thereby caused it to act to the prejudice of the plaintiff is [*35] liable, even though he

may not have purported to be the prosecutor," J. Clerk & W. Lindsell, [*The Law of Torts*] at 639 [(7th ed. 1921)] (citations omitted).

*855 F.2d at 961-62.* [7] *See also Babi-Ali v. City of New York, 979 F. Supp. 268, 276 (S.D.N.Y. 1997); Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665, 95 Civ. 2176 (JSM), 1997 WL 72155 at \*1-\*2 (S.D.N.Y. Feb. 20, 1997); Crespo v. New York City Police Comm'r, 930 F. Supp. 109, 117-18 (S.D.N.Y. 1996).*

[7] I realize that *Albright v. Oliver, 510 U.S. 266, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)* significantly altered the law applicable to *Section 1983* actions based on a malicious prosection theory. However, nothing in *Albright* addressed the causation issue addressed in *White*, and, therefore, I do not read *Albright* as affecting the continuing vitality of *White*.

Since there was sufficient evidence to sustain defendant's liability on the issue of causation, she is not entitled [*36] to judgment as a matter of law on this ground. [8]

[8] I do not understand defendant to be arguing that she could not have caused plaintiff's prosecution because the evidence showed that it was Rosenberg, and not defendant, who actually provided the false information. If this is defendant's argument it is without merit. As noted above, the evidence was sufficient to support a finding that defendant caused Rosenberg to make the false report. This is sufficient personal involvement to sustain liability under *Section 1983. Jeffries v. Harleston, 21 F.3d 1238, 1247 (2d Cir. 1994)* ("a plaintiff may establish causation under *Section 1983* if he shows that the defendant[] participated in, or [was the] 'moving force[]' behind, the deprivation."), *vacated and remanded on other grounds, 513 U.S. 996 (1994).*

### C. Favorable Termination

Finally, defendant claims that she is entitled to judgment as a matter of law because there was insufficient evidence to sustain a finding that the [*37] criminal proceeding terminated in plaintiff's favor. Defendant claims that the termination of the criminal proceeding against plaintiff was "most analogous," (Def. Memo. at 22) to a dismissal in the interests of justice, and, therefore, not a favorable termination on the merits. *See generally Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992)* ("as a matter of law" a dismissal in the interests of justice

"cannot provide the favorable termination required as the basis for a claim of malicious prosecution").

The leading case in this Circuit addressing this issue is *Murphy v. Lynn, supra, 118 F.3d 938 (2d Cir. 1997),* in which the Court of Appeals stated:

Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused. *See, e.g., Restatement § 660 comment a; Halberstadt v. New York Life Insurance Co., 194 N.Y. 1, 10-11, 86 N.E. 801, 803-04 (1909)* ("Halberstadt"); *Hollender v. Trump Village Cooperative, Inc., 58 N.Y.2d 420, 426, 461 N.Y.S.2d 765, 768, 448 N.E.2d 432 (1983)* [*38] ("Hollender") (quoting Restatement § 660 comment a); *MacFawn v. Kresler, 88 N.Y.2d 859, 860, 644 N.Y.S.2d 486, 486, 666 N.E.2d 1359, (1996)(mem.)(whether "the final disposition of the proceeding involves the merits and indicates the accused's innocence" (citing Hollender)); O'Brien v. Alexander, 101 F.3d 1479, 1486-87 (2d Cir. 1996)* (discussing cases); *Russell v. Smith, 68 F.3d [133, 36 (2d Cir. 1995)]* ("In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.") The answer to whether the termination is indicative of innocence depends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed "implies a lack of reasonable grounds for the prosecution," *Loeb v. Teitelbaum, 77 A.D.2d [92, 101], 432 N.Y.S.2d [487, 494 (2nd Dep't 1980)].*

*118 F.3d at 948.*

In this case, as noted above, the direct evidence concerning the termination of the criminal proceeding against plaintiff consists of several stipulated facts. [9] These stipulated facts show that, during the criminal trial against plaintiff, [*39] Rosenberg recanted his accusations against plaintiff and that, as a result of the recantation, the criminal charges against plaintiff were dropped and the indictment dismissed.

[9] Although the parties had a transcript of the proceedings dismissing the criminal charges

against plaintiff, (see Trial Tr. 17-24), neither side ever offered the transcript in evidence.

The effect of a dismissal resulting from a witness's recantation was discussed in *Russell v. Smith*, 68 F.3d 33 (2d Cir. 1995). In that case, a witness, Viust, gave testimony in the grand jury that implicated Russell, Viust's brother and others. Viust's grand jury testimony was corroborated by another witness and by certain physical evidence. After Russell was indicted, but prior to the criminal trial, Viust recanted his testimony and the state criminal court dismissed the charges against Russell "'with leave to represent.'" 68 F.3d at 35. Russell subsequently sued for malicious prosecution, and Viust refused to testify [*40] or to provide an affidavit in support of Russell's malicious prosecution claim. *Id.* On the basis of the foregoing evidence, the Court of Appeals affirmed the granting of summary judgment in defendant's favor, concluding that Russell had not established a genuine issue that the criminal proceeding had terminated in his favor. 68 F.3d at 38.

*Russell* does not purport to establish a *per se* rule that dismissal based on recantation cannot be favorable to the accused. Moreover, several factual differences demonstrate that *Russell* is not controlling here. First, the dismissal in *Russell* was "'with leave to represent.'" Thus, there was no legal bar to Russell's subsequent re-indictment and conviction. In contrast, the charges in this case were dismissed after the criminal trial had commenced. Thus, any subsequent attempt to reprosecute plaintiff would be barred by the *Double Jeopardy Clause*. Second, Viust's grand jury testimony inculpating Russell was corroborated by other testimony and physical evidence. In this case, it appears that there was no corroboration whatsoever of Rosenberg's testimony inculpating plaintiff. Third, the Court of Appeals noted in [*41] *Russell* that Viust's recantation was suspect because the grand jury testimony he recanted had inculpated his own brother. 68 F.3d at 36. Thus, the recantation in *Russell* assisted a family member. In this case, Rosenberg's recantation benefitted neither Rosenberg nor a family member. Fourth, Viust was unwilling to testify in support of Russell's malicious prosecution case. Rosenberg, on the other hand, did testify in support of plaintiff's claim and re-affirmed that his prior accusations against plaintiff were false and were instigated by defendant. Finally, the fact that plaintiff here was offered reinstatement and provided with back pay for the full period of his suspension evidences a belief by the state that the charges were groundless. If the state believed that plaintiff was, in fact, a sexual predator, it is inconceivable that it would have offered him reinstatement as a psychologist caring for developmentally disabled patients. In view of these distinctions, *Russell* is not controlling here.

The evidence discussed in the foregoing paragraph provided a sufficient basis for the jury to conclude that the charges were dismissed for reasons "indicative of [*42] innocence." Thus, defendant is not entitled to judgment as a matter of law on the theory that plaintiff failed to establish a favorable termination.

2. *Qualified Immunity*

Without citing any authority, defendant claims she is entitled to qualified immunity from plaintiff's malicious prosecution claim because there was no clearly established federal right to be free of malicious prosecutions at the time of her conduct. This argument, however, is clearly incorrect.

In *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995), plaintiff asserted a Section 1983-malicious prosecution claim based on conduct alleged to have occurred in 1991. Although the Court of Appeals ultimately held that the defendants in that case were entitled to qualified immunity because their actions met the standard of objective reasonableness, it noted:

> There is no question that the rights at issue in this case -- to be free from false arrest, malicious prosecution, and excessive force --were clearly established at the time of the incident. *See e.g., Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925)* (recognizing constitutional right not to be arrested [*43] or prosecuted without probable cause) . . . .

66 F.3d at 423. *See also Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)* (right to be free of malicious prosecution clearly established as of 1984-87); *Walker v. New York City Police Dep't, 94 CV 3608, 1996 WL 391564 at *5 (E.D.N.Y. June 24, 1996)* (citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)* for the proposition that the right to be free of malicious prosecution is clearly established); *Kampfer v. Pitcher, 1996 U.S. Dist. LEXIS 858, *15, 95- CV-214, 1996 WL 31161 at *5 (N.D.N.Y. Jan. 19, 1996)* ("A person's right to be free from . . . malicious prosecution has long been clearly established," citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)), aff'd mem., 112 F.3d 504 (2d Cir. 1997); Janetka v. Dabe, 1993 U.S. Dist. LEXIS 2797, 89-C V-3721, 1993 WL 72358 at *3 (E.D.N.Y. Feb. 24, 1993)* (right to be free of malicious prosecution clearly established at least as of 1986).

The relevant conduct in this case occurred in 1985. In view of the foregoing authorities and the repeated reliance [*44] by Courts in this Circuit on *Carroll v.*

*United States* -- a case decided in 1925 -- for the proposition that the right to be free of malicious prosecution has long been clearly established, defendant's qualified immunity argument is without merit.

### D. Damages

#### 1. Excessiveness of the Compensatory Damages

Although defendant claims that the jury's awards of compensatory and punitive damages are excessive, she has submitted no authorities addressing these issues. Nevertheless, the sheer size of the awards warrants their examination.

As a threshold matter, defendant claims plaintiff is not entitled to recover any damages for the period after the criminal proceedings against plaintiff terminated. Defendant argues that a damages remedy must be tailored to the constitutional injury suffered by plaintiff and that the constitutional injury terminated when the criminal charges against plaintiff were dismissed.

Defendant's argument does not withstand analysis. Although the constitutional violation ended when the charges against plaintiff were dropped, the sequelae of this violation did not. There was evidence at trial that plaintiff suffered substantial psychological injury as a **[*45]** result of his criminal prosecution. This psychological injury was established not merely by plaintiff's subjective testimony, *see generally Annis v. County of Westchester, 136 F.3d 239, 248-49 (2d Cir. 1998),* but also by the testimony of his treating psychiatrist, Dr. Gorzynski. In addition, there is circumstantial corroboration of plaintiff's psychological injury in plaintiff's employment history after the termination of the criminal proceedings. Prior to the criminal prosecution plaintiff was able to function as a psychologist; after the termination of the prosecution, concerns about recurring allegations of sexual misconduct limited plaintiff's employment to relatively menial positions. [10] Viewing the evidence in the light most favorable to plaintiff, there was sufficient evidence for the jury to conclude that the baseless and malicious prosecution had consequences that lasted beyond the termination of the violation, and *Section 1983* clearly permits recovery for these consequences. *Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986); Carey v. Piphus, 435 U.S. 247, 264, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)* **[*46]** ("mental and emotional distress . . . is compensable under *§ 1983*"); *Burka v. New York City Transit Auth., 747 F. Supp. 214, 224 (S.D.N.Y. 1990)* (permitting recovery of wages plaintiffs would have earned prospectively but for the constitutional violation).

10  Although it might be argued that plaintiff intentionally limited his employment to low-paying positions to enhance his recovery at trial, the jury obviously did not reach this conclusion, and there is no basis to disturb its findings in this regard.

The jury here awarded $ 6.6 million in compensatory damages. There was uncontradicted evidence that plaintiff's economic loss resulting from his inability to pursue his career as a psychologist totaled $ 1,372,988, reduced to present value (Trial Tr. 410). Thus, it appears that the jury awarded $ 5,227,012 as compensatory damages for plaintiff's mental anguish, including the loss of enjoyment resulting from his inability to pursue the career of his choice.

Where, as here, the issue is whether **[*47]** damages awarded on a federal claim are excessive, the jury's verdict is not to be disturbed unless it shocks the conscience.

> It is well established in this Circuit that in *section 1983* cases "the standard for appellate review of damages awards, whether compensatory or punitive, 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)* (quoting *Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978))* . . . .
>
> As we have noted, the determination of whether a damages award exceeds a reasonable range "should not be made in a vacuum," *Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990),* but should include consideration of the amounts awarded in other, comparable cases, *see, e.g., id. at 186-87; Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir. 1990); Zarcone, 572 F.2d at 54-55; Hogan v. Franco, 896 F. Supp. 1313, 1326 (N.D.N.Y. 1995)* . . . .

*Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997).* In addition, if the verdict is found to be excessive, **[*48]** it should be reduced only to the maximum amount that could be upheld. *Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328-29 (2d Cir. 1990); accord Peterson v. County of Nassau, 995 F. Supp. 305, 321 (E.D.N.Y. 1998).*

The evidence in this case sustains a substantial verdict for mental anguish. Prior to the assertion of defendant's fabricated charges, plaintiff had had no involvement with the criminal justice system. As a result of de-

fendant's misconduct, plaintiff was arrested on charges that bear an extremely high level of disgrace, namely, the sexual abuse by a mental health professional of a developmentally disabled individual placed in his care. [11] The baseless charges against plaintiff were publicized in the New York Post under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS"; there is no evidence that the dismissal of the charges received any publicity whatsoever. Plaintiff was incarcerated for two weeks with sex offenders and murderers as a result of the charge. At the time these events were unfolding, plaintiff had a minor child, and the assertion of the charges adversely affected plaintiff's relationship with this child. Plaintiff required [*49] psychiatric intervention and years of psychotropic medication as a result of the defendant's acts. Before defendant's acts, defendant had the self-confidence and strength to come to a new country, without friends or family, and start a life as a health care professional. After defendant's acts, however, plaintiff was so demoralized and concerned about the possibility of a recurrence of false allegations that he was unable to resume his career as a psychologist and was limited to employment far below his former capabilities.

11    The special opprobrium society has for sex offenders is evidenced by *New York Corrections Law § 168-c et seq.* which requires the registration of sex offenders and public notice of their presence in a community. No similar requirements are applicable to convicted murderers, contract assassins, bombers, robbers, arsonists, burglars, violent muggers or narcotics traffickers who sell drugs to minors.

Although these tribulations are great, an award of more than $ 5 million is clearly excessive. [*50] Indeed, a review of other malicious prosecution and false arrest cases fails to disclose any verdict that exceeds $ 1 million. [12]

*King v. Macri, 993 F.2d 294 (2d Cir. 1993)* - affirming award of $ 75,000 compensatory damages.

*Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992)* - compensatory damages of $ 65,000 awarded; new trial ordered.

*Ismail v. Cohen, 899 F.2d 183 (2d Cir 1990)* - malicious prosecution coupled with beating that caused two displaced vertebrae, cracked rib and serious head trauma; compensatory damages of $ 650,000 upheld.

*Garner v. Meoli, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - jury awarded compensatory damages against two defendants aggregating $ 153,250.

*Martinez v. Gayson, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (ILG), 1998 WL 564385 (E.D.N.Y. June 30, 1998)* - remitting award of $ 310,000 in compensatory damages to $ 150,000.

*Peterson v. County of Nassau, supra, 995 F. Supp. 305 (E.D.N.Y. 1998)* - compensatory damages of $ 160,000 reduced to $ 15,000.

*Mason v. City of New York, 949 F. Supp. 1068 (S.D.N.Y. 1996)* - compensatory damages of $ 100,000 reduced [*51] to $ 10,000.

*Vitale v. Hagan, 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987), modified on other grounds, 71 N.Y.2d 955, 524 N.E.2d 144, 528 N.Y.S.2d 823 (1988)* - affirming award of $ 750,000 for malicious prosecution.

12    Obviously, every case is different, and the results in other cases constitute, at best, a rough guide to the range or appropriate verdicts.

One qualitative difference between the foregoing cases and the present case is that none of the foregoing cases involved conduct that either effectively drove plaintiff out of his career or made it extremely difficult for plaintiff to pursue his career. A review of the cases involving such a consequence yields the following results:

*Ortiz-Del Valle v. National Basketball Ass'n, 42 F. Supp. 2d 334 (S.D.N.Y. 1999)* - Title VII case; female plaintiff barred from career as NBA referee; $ 750,000 in emotional distress damages reduced to $ 20,000.

*Davis v. City of New York, 264 A.D.2d 379, 693 N.Y.S.2d 230* [*52] (2d Dep't 1999) - as a result of lead poisoning, infant plaintiff required to undergo remedial instruction to advance in school and likely to have difficulty throughout his life with

personal relationships and work - and school-related pursuits; verdict of $ 1 million reduced to $ 150,000 for future pain and suffering, no award for lost earning capacity.

*Osiecki v. Olympic Regional Dev. Auth., 256 A.D.2d 998, 682 N.Y.S.2d 312* (3rd Dep't 1998) - plaintiff unable to pursue career as architect as a result of physical injury; award of $ 495,000 for future pain and suffering reduced to $ 243,000.

*Gallo v. Supermarkets General Corp., 112 A.D.2d 345, 491 N.Y.S.2d 796* (2d Dep't 1985) - plaintiff suffered severe burning, scarring and disfigurement in an industrial accident; as a result of his physical appearance, plaintiff was unable to work, feared contact with other people, was unable to look at himself in the mirror, was unable to lead normal life and required ten years of psychotherapy; award of $ 1.4 million for pain and suffering affirmed.

Although none of these cases involved facts identical to the facts in this case, they all underscore [*53] the excessiveness of the $ 5.2 million awarded as noneconomic compensatory damages in a case where plaintiff suffered no physical injury. *See generally Mathie v. Fries, supra, 121 F.3d at 813-14* (surveying range of compensatory damages awarded in cases of rape, sexual assault and police misconduct; awards ranged from $ 80,000 to $ 1.75 million).

Based on the foregoing and giving appropriate weight to the profound impact that defendant's misconduct had on plaintiff's life, I conclude that the appropriate measure of compensatory damages for non-economic loss is $ 500,000.00. Although this figure is at the high end of the range of verdicts awarded in the foregoing cases, it is proper here primarily because the false charge against plaintiff involved the highest level of moral turpitude, implicated his professional fitness in the most serious manner possible and destroyed his ability to practice his profession. Although plaintiff suffered no physical injury, his serious psychological injury was confirmed by his physician, circumstantially corroborated by plaintiff's employment history and may be of longer duration than many physical injuries.

Accordingly, to the extent [*54] defendant seeks a new trial on the issue of compensatory damages, the motion is granted unless plaintiff stipulates within thirty

(30) days of the date of this Opinion and Order to remit all compensatory damages awarded by the jury to the extent those compensatory damages exceed a total of $ 1,872,988.00.

### 2. Excessiveness of the Punitive Damages

The standards relevant to judging the excessiveness of punitive damages in a *Section 1983* were comprehensively set forth in *Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996)*. Because the opinion in *Lee* is such a comprehensive statement of the relevant principles, I quote it at length.

> Punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983)*. Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 883 [*55]* (2d Cir.) (quoting *Zarcone v. Perry, 572 F.2d 52, 56-57 (2d Cir. 1978)*), cert. denied, 488 U.S. 967, 109 S. Ct. 495, 102 L. Ed. 2d 532 (1988). "If the district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995)*.
>
> We review for abuse of discretion a district court's ruling that a punitive damage award does not "shock the judicial conscience." *Hughes, 850 F.2d at 883*. "'We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.'" *Gasperini v. Center for Humanities, [518 U.S. 415, 435], 116 S. Ct. 2211, 2223-24, 135 L. Ed. 2d 659 (1996)* (quoting *Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961)*).

In gauging excessiveness, [*56] we must keep in mind the purpose of punitive damages: "to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)* (citing *Smith, 461 U.S. at 54, 103 S. Ct. at 1639*). Thus, our task is "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Id. at 121* (quoting *Pacific Mut. Life Ins. co. v. Haslip, 499 U.S. 1, 21, 111 S. Ct. 1032, 1045, 113 L. Ed. 2d 1 (1991)); see also BMW of North America, Inc. v. Gore, [517 U.S. 559, 568], 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996)* (punitive damages vindicate a state's legitimate interests in punishment and deterrence).

The Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes, 850 F.2d at 883.* These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of [*57] punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore, [517 U.S. at 575], 116 S. Ct. at 1598-99.*

101 F.3d at 808-09. See also Mathies v. Fries, supra, 121 F.3d at 816-17; Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 344-46; Ettinger v. State University of New York, 1998 U.S. Dist. LEXIS 2289, 95 Civ. 9893 (RWS), 1998 WL 91089 at *10 (S.D.N.Y. March 2, 1998).

Applying the three *Gore* factors identified in *Lee* demonstrates that the jury's award of $ 10 million in punitive damages is far beyond the range of reasonableness and shocks the conscience.

*Reprehensibility.* Reprehensibility is the most important of the *Gore* factors. *Lee v. Edwards, supra, 101 F.3d at 809.* The Supreme Court has identified three aggravating sub-factors to be considered in evaluating reprehensibility: "(1) whether a defendant's conduct was violent or presented a threat of violence; (2) whether

[*58] a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant engaged in repeated instances of misconduct." *Lee v. Edwards, supra, 101 F.3d at 809.* The third sub-factor requires inquiry into whether defendant has engaged in similar conduct aimed at individuals other than plaintiff. *Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207 n. 15; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 345.*

Although only one of the aggravating factors identified in *Gore* is present in this case, to wit, malice, I find that defendant's conduct involved the highest degree of reprehensibility. First, the nature of the charge she caused to be made against plaintiff -- sexual assault on a developmentally disabled patient entrusted to plaintiff's care -- is the most serious charge that can be made against a mental health professional. It not only goes to the heart of plaintiff's profession, it also constitutes an allegation that plaintiff has abused his position of trust with a particularly vulnerable victim to satisfy the basest of desires. A mental [*59] health care professional may engage in a wide range of professional misconduct -- from bill-padding to malpractice. However, a charge of sexual misconduct with a developmentally disabled patient is qualitatively different and carries with it a stigma that is unlike that resulting from any other form of professional misconduct.

Second, the means plaintiff used exhibited not only malice toward plaintiff, but the most callous disregard for her own responsibilities as a Therapy Aide. Defendant did not directly allege that she saw plaintiff engaging in misconduct. Instead, she manipulated a patient into doing her sinister deed for her. Rather than care for the patients who were entrusted to her, defendant instead made them tools to carry out her malicious plan. Thus, in implementing her scheme, plaintiff not only caused plaintiff profound injury, she abused her own position of trust with a vulnerable patient.

Accordingly, defendant's misconduct here was extremely reprehensible.

*Ratio of Punitive to Compensatory Damages.* Prior to the remittitur determined above, the award of punitive damages was less than twice the jury's award of compensatory damages. If plaintiff accepts the remittitur, [*60] the jury's award of punitive damages is approximately 5.2 times the reduced award. Neither ratio is conscience-shocking.

*Comparison with Other Awards.* A survey of the punitive damages awards in other malicious prosecution cases clearly demonstrates the excessive nature of the punitive damages awarded against defendant.

*Lee v. Edwards, supra, 101 F.3d 805* - reducing verdict of $ 200,000 to $ 75,000.

*King v. Macri, supra, 993 F.2d 294 (2d Cir. 1993)* - punitive damages awards against two defendants aggregating $ 250,000 reduced to an aggregate of $ 150,000.

*Garner v. Meoli, supra, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - declining to reduce punitive damages awards of $ 500,000 and $ 250,000 against two defendants.

*Martinez v. Gayson, supra, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (I.G.), 1998 WL 564385 (E.D.N.Y. 1998)* - jury award of $ 10,000 in punitive damages found appropriate.

As noted in the discussion above concerning compensatory damages, every case involves factual distinctions. The verdicts in other cases are, therefore, probably best viewed as suggesting the dimensions of the range of reasonableness rather [*61] than as establishing any firm rules.

In light of all the foregoing factors, I conclude that the maximum amount of punitive damages that a reasonable jury could have awarded in this case is $ 500,000.00. Again, I believe this amount is toward the upper end of the range of reasonableness, but I find that it is warranted by the high degree of reprehensibility of the defendant's conduct. It is difficult to conceive of a more infernal and hateful scheme for demolishing a life than that hatched and executed by defendant in this case. The outrageous nature of her conduct requires a substantial award of punitive damages.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, defendant's motion for judgment as a matter of law is granted to the extent that it seeks judgment in defendant's favor on plaintiff's "stigma plus" theory. Defendant's motion is denied to the extent it seeks judgment in defendant's favor on plaintiff's malicious prosecution theory. Defendant's motion addressed to plaintiff's 1983 malicious prosecution claim is granted to the extent that a new trial limited to the issue of damages is granted unless, within thirty (30) days of the date of this Opinion and [*62] Order, plaintiff stipulates to accept a total award of compensatory damages of $ 1,872,988.00 and a total award of punitive damages of $ 500,000.00.

Dated: New York, New York

March 31, 2000

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

LEXSEE 2002 U.S. DIST. LEXIS 13696

**KEITH LEE, Plaintiff, -against- THE CITY OF NEW YORK, HOWARD SAFIR, COMMISSIONER, NEW YORK POLICE DEPARTMENT, JOHN LAYDEN, MARK KOBNER, KEVIN HANNA, and PAUL WASIELWSKI, Defendants.**

**00-CV-3181(JG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 13696*

**July 22, 2002, Decided**

**NOTICE:**   [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:**   Summary judgment granted in part and denied in part, Defendant City's motion in limine regarding CCRB study granted and decision reserved on Defendants' motion in limine regarding O'Neil's testimony.

**COUNSEL:** JON L. NORINSBERG, ESQ., New York, New York, for Plaintiff.

Leticia J. Santiago, MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, New York, New York, for Defendants.

**JUDGES:** JOHN GLEESON, United States District Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

*MEMORANDUM AND ORDER*

JOHN GLEESON, United States District Judge:

Plaintiff Keith Lee brings this action pursuant to *42 U.S.C. § 1983* against the City of New York, individual officers of the New York City Police Department, and the former Police Commissioner Howard Safir. He alleges that his *Fourth* and *Fourteenth Amendment* rights were violated when he was subjected to a false arrest and excessive force. He also asserts claims under the *Equal Protection Clause*, as well as various state law claims.

Defendants move for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, claim-

ing that: (1) the Court lacks personal jurisdiction over the individual officers because service [*2]  of process was insufficient; (2) the false arrest claim must be dismissed (a) because the encounter was either an investigative detention supported by reasonable suspicion or an arrest supported by probable cause; or (b) because the officers have qualified immunity; (3) the false arrest and excessive force claims against Hanna and Wasielwski must be dismissed; (4) Lee fails to state an equal protection claim; (5) Lee fails to state a claim against the City and former Commissioner Safir.

The City also moves *in limine* to preclude: (1) reference to or introduction of a June 2001 Civilian Complaint Review Board ("CCRB") study entitled, "Street Stop Encounters Report: An Analysis of CCRB Complaints resulting from New York Police Department's 'Stop and Frisk' Practices"; and (2) the testimony of Lee's police liability expert, Robert O'Neil.

For the reasons stated below, summary judgment is granted in part and denied in part, the City's motion *in limine* regarding the CCRB study is granted, and decision is reserved regarding O'Neil's testimony.

BACKGROUND

The following facts are either undisputed or are the result of construing disputed facts favorably to the plaintiff.

At around [*3]  3:30 a.m. on January 16, 2000, the police stopped Maria Cabrera at a known drug location, suspecting that she was involved in a drug transaction. (Deposition of Kevin Hanna dated May 17, 2001 ("Hanna Tr.") at 11.) Cabrera admitted to the police that she had attempted to purchase crack cocaine at that location, but said that she had just been robbed of ten dollars. (Hanna Tr. at 11, 13.) She told Detective Kevin Hanna that the robber was a black male wearing a green coat

and a knit hat, and Hanna immediately transmitted this description over the radio. (Hanna Tr. at 13, 18.)

Sergeant Mark Kobner and Lieutenant John Layden heard the transmission. Kobner claims that the transmission said the robber was a black male of medium build with a green army-type jacket and a dark-colored knit hat. (Deposition of Mark Kobner dated May 17, 2001 ("Kobner Tr.") at 10.) Layden claims that the transmission said the robber was a black male in his mid-thirties, with a medium build, wearing a camouflage jacket and a dark knit cap. (Deposition of John Layden dated June 19, 2001 ("Layden Tr.") at 7.)

Minutes later, plaintiff Keith Lee, a thirty-eight-year-old black male, was walking by himself near the [*4] location where Cabrera had been stopped. Lee was wearing a green jacket and knit cap. (Layden Tr. at 7, 17.) At the intersection of Vermont and Sutter Avenues, while he waited for the traffic signal to turn green, he noticed a vehicle idling at the corner. (Deposition of Keith Lee dated June 22, 2001 ("Lee Tr.") at 52, 68.) Lee was unaware that this vehicle was Kobner and Layden's unmarked police car. (Lee Tr. at 62.) When the signal turned green, Lee motioned for the driver to go, but the vehicle remained stationary. (Lee Tr. at 62.) Lee walked around the back of the vehicle in order to cross the intersection. (Lee Tr. at 79.) As he was about to step onto the curb, Layden emerged from the vehicle and ordered him to "come here." Layden was dressed in plain clothes and did not identify himself as a police officer. (Lee Tr. at 85-86.)

According to Lee, [1] Layden suddenly stepped out of the car and lunged toward him. Layden hit him in the face with his right hand, knocking him to the ground, and then he jumped on top of him. (Lee Tr. at 86-88.) While Lee was down, Kobner walked over and put his foot on the right side of Lee's face and neck. (Lee Tr. at 88, 90.) Kobner then removed his [*5] foot and squeezed Lee's face with one hand, using the other to shine a flashlight in his face. (Lee Tr. at 90, 98.) Layden grabbed Lee by his neck and belt, picked him up and said "get up." Layden then threw him onto the hood of the police car, where he remained in a spread eagle position. (Lee Tr. at 98, 107-08.) A third officer then approached Lee and struck him in his kidney with his forearm while saying "get on the car motherfucker, before I bust your motherfucking head wide open." (Lee Tr. at 116.)

[1]    The officers provide an entirely different description of their encounter with Lee, contending that it was brief and nonviolent. Layden and Kobner claim that no physical force was used. (Layden Tr. at 46, 80; Kobner Tr. at 32, 46, 49.) Layden says that he merely "guided" and "escorted" Lee to a nearby fence, and that this con-

tact lasted only a "couple of seconds." (Layden Tr. at 30, 46.) He further claims that Lee was never hit, put on the ground, or placed against the hood of the vehicle. (Layden Tr. at 45, 47, 50.)

[*6]    Thereafter, Hanna and Detective Paul Wasielwski arrived on the scene in a minivan, along with Maria Cabrera, whom they brought to conduct a show-up identification. (Lee Tr. at 122-24; Layden Tr. at 57, 59, 60.) Cabrera stepped out of the minivan and looked at Lee. (Lee Tr. at 128, 143.) Layden asked her if Lee was the man who had robbed her. (Lee Tr. at 124.) She responded that he was not the robber. (Layden Tr. at 61; Lee Tr. at 128.) [2] After recording some information from Cabrera, the police drove her back to her apartment on Sutter Avenue. Lee was then allowed to leave the scene. (Layden Tr. at 66.) The entire encounter between Lee and the police lasted eight to ten minutes. (Lee Tr. at 170.)

[2]    According to Lee, Cabrera stated "No, that's not him. I said he's wearing a blue coat with a white ring around his sleeve." (Lee Tr. at 124, 128.) Lee's contention is at odds with Hanna's testimony that Cabrera said the robber wore a green army-type jacket, as well as Kobner and Layden's testimony that Hanna transmitted Cabrera's description as such. Moreover, Lee's contention is discredited by Cabrera's verified CCRB statement, in which she said that the robber wore a green army jacket. See Declaration of Leticia J. Santiago dated Jan. 23, 2002, ("Santiago Decl.") Ex. C.

[*7] DISCUSSION

A. The Summary Judgment Standard

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998).

The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. See Adams v. Department of Juvenile Justice, 143 F.3d 61, 65 (2d Cir. 1998). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with spe-

cific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* **[*8]** (citations and internal quotation marks omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on the pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (quoting *First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).*

### B. *Service of Process*

Layden, Wasielwski, Hanna and Kobner contend that service of process upon them was insufficient and therefore this Court lacks personal jurisdiction over them. Specifically, these defendants cite defects in "the manner in which service [was] made and not . . . the court's power to adjudicate [plaintiff's] rights and liabilities." *United States v. International Bhd. of Teamsters, 816 F. Supp. 864, 870 (S.D.N.Y. 1992)* (quoting *Santos v. State Farm Fire & Cas. Co., 902 F.2d 1092, 1095 (2d Cir. 1990)* (internal citation omitted)). Thus, their defense is properly treated as one of insufficiency of service of process rather than lack of personal **[*9]** jurisdiction. *See id.; Santos, 902 F.2d at 1095.*

Plaintiffs are generally required to effect proper service within 120 days after filing the complaint. *Fed. R. Civ. P. 4(m). Rule 4(e)(1)* provides that an individual may be served pursuant to the law of the forum state. *Fed. R. Civ. P. 4(e)(1).* In New York, service upon a natural person is governed by *Section 308 of the New York Civil Practice Law* and Rules ("C.P.L.R."), which provides, in pertinent part as follows:

> Personal service upon a natural person shall be made . . . by delivering the summons within the state to a person of suitable age and discretion at the actual place of business . . . of the person to be served **and** by . . . mailing the summons by first class mail to the person to be served at his or her actual place of business . . ., such delivery and mailing to be effected within twenty days of each other. . . .

*C.P.L.R. § 308(2)* (McKinney's 2000) (emphasis added).

Lee has failed to meet these requirements with respect to the individual officers. Specifically, (1) the record contains no proof, other than an unsupported declaration by Lee's former attorney, that Layden was ever served; **[*10]** (2) service for Wasielwski was left at the

wrong address and was never mailed to him; and (3) service for Hanna and Kobner, although presumably left at the right address with a person of suitable age and discretion, was never mailed to them. Lee does not contest these points. Rather, he contends that by their own conduct, the defendants have waived the defense of insufficiency of service of process. For the reasons stated below, I agree with Lee.

Pursuant to *Rule 12(b),* a defendant shall assert the defense of insufficiency of service of process either in a responsive pleading or by motion. The Rule provides, in pertinent part, as follows:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion; . . . (5) insufficiency of service of process. . . . A motion making any of these defenses shall be made before pleading if a further pleading is permitted. . . .

*Fed. R. Civ. P. 12(b).* Pursuant to *Rule 12(h)(1),* a party waives the defense **[*11]** of insufficiency of service of process "if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by *Rule 15(a)* to be made as a matter of course." *Fed. R. Civ. P. 12(h)(1).* Moreover, a party may waive the defense of insufficiency of service of process through "defense of the action on the merits or other conduct inconsistent with the defense." *See Williams v. Helbig, 2001 U.S. Dist. LEXIS 6576,* at *5-6, 00 Civ. 2169 (S.D.N.Y. May 21, 2001).* In *Williams,* the court described when waiver is appropriate as follows:

> When determining whether a party has waived its jurisdictional objections, the court must focus its attention on the nature and extent of defendants' contacts with the court.

> Courts have typically held that actual knowledge of a suit coupled with extensive participation in pretrial proceedings will result in a waiver of the defense, especially where the delay has operated to the plaintiff's detriment.

> In contrast, limited participation in pretrial proceedings does not result in waiver

of the defense, even where the defendant has actual knowledge of the suit.

*2001 U.S. Dist. LEXIS 6576* at *6-*7. (citations omitted).

[*12] The defendants' participation in this case for nearly two years without ever raising the defense of insufficiency of service of process constitutes a waiver by conduct. Their participation was extensive in that each gave deposition testimony and produced documents in compliance with the Court's discovery orders. Defendants' argument that they merely participated in the lawsuit on behalf of the City of New York is belied by their counsel's admission at oral argument that at the time they were deposed, each of the officers had actual knowledge that he was named in the suit. In sum, because the officers participated extensively in the lawsuit and failed to raise the insufficiency of service of process defense until this late stage in the litigation, I conclude that their defense is waived. *Cf. Santos, 902 F.2d at 1096* (finding waiver where defendant first raised defective service objection nearly two years after service was attempted); *Datskow v. Teledyne, 899 F.2d 1298, 1303 (2d Cir. 1990)* (even where defective service objection was asserted in answer, waiver existed where defendant participated in conference with magistrate, [*13] scheduling of discovery, and motion practice without raising the issue); *International Bhd. of Teamsters, 816 F. Supp. at 870* (finding waiver where defendants appeared at evidentiary hearing and engaged in settlement negotiations but failed to object to defective service for over one year after evidentiary hearing); *Burton v. Northern Dutchess Hosp., 106 F.R.D. 477, 481 (S.D.N.Y. 1985)* (finding waiver where defendant waited three and one-half years to raise defective service claim after having participated in discovery, motion practice, and pre-trial conferences).

*C. False Arrest*

Lee claims the individual officers subjected him to a false arrest, in violation of *42 U.S.C. § 1983*. Claims brought under *§ 1983* are guided by the tort law of the forum state. *See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)*. Thus, a claim for false arrest, premised on the *Fourth Amendment* right to be free from unreasonable seizures, is "substantially the same" as a false arrest claim under New York law. *See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)*. To state a claim of false arrest, [*14] a plaintiff must establish that (1) the defendants intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See Singer, 63 F.3d at 118-19.* [3]

3 The common law elements of false arrest and false imprisonment under New York law are the same. *See Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)* (citing *Jacques v. Sears, Roebuck & Co., 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)*). Thus, I construe Lee's claims for false arrest and false imprisonment as one claim.

Defendants move for summary judgment on the false arrest claim, contending that Lee's detention was merely an investigative detention supported by reasonable suspicion. In the alternative, they contend that even if the detention amounted to an arrest, it was privileged because it was supported by probable cause. *See Decker v. Campus, 981 F. Supp. 851, 856 (S.D.N.Y. 1997)* [*15] ("[if there existed probable cause at the time of the arrest, the arrest is 'privileged,' and the individual has no constitutional or statutory claim against the officer who made the arrest.").

As the Second Circuit explained in *Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991)*, there are two categories of seizures that implicate *Fourth Amendment* protections:

The first, an 'investigative detention' or a *Terry* stop, employs 'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,' and can be supported by reasonable suspicion, instead of probable cause. As the level of intrusiveness rises, however, an encounter between the police and a citizen is more properly categorized as an arrest -- the second category of seizures of the person. 'If the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause.'

*Id. at 98* (citations omitted).

In *United States v. Perea, 986 F.2d 633,* [*16] (2d Cir. 1993), the Second Circuit described the factors central to determining whether an encounter between the police and a suspect is an arrest or an investigative stop. The pertinent considerations include: the amount of force used by the police; the need for such force; the extent to which the individual's freedom of movement was restrained; the number of agents involved; and whether guns or handcuffs were used. *See id. at 645.* Also relevant are the nature of the crime under investigation, the

degree of suspicion, the location of the stop, the time of day, and the reaction of the suspect to the approach of the officers. *See United States v. Nargi, 732 F.2d 1102, 1106 (2d Cir. 1984); see also Posr, 944 F.2d at 98* ("Whether a seizure is an arrest or merely an investigative detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances.").

Taking the encounter as the officers describe it, Lee's detention amounted to merely an investigative stop. According to the officers, the encounter involved no force and the only physical contact with Lee was when Layden "guided" and "escorted" him [*17] to a nearby fence, which lasted a "couple of seconds." Under these facts, the officers were justified in conducting an investigative stop. [4] Lee matched the profile that Hanna transmitted by radio in terms of race, gender, and clothing. Moreover, he was spotted minutes after the transmission was aired, walking alone in the vicinity of the robbery at 3:30 a.m. in the dead of winter. Therefore, the police could have rationally inferred that Lee might have been the robber. *Cf. Dempsey v. Town of Brighton, 749 F. Supp. 1215, 1224 (W.D.N.Y. 1990)* (reasonable suspicion to support investigative detention existed where: (1) suspect matched radio broadcast description of robber described as a young black male, about six feet tall with a slim build wearing a long-sleeved purple shirt, or possibly a blue jacket, a hat and sunglasses; and (2) suspect was seen carrying a bag and jumping into a waiting car).

    4 Lee does not appear to contest this point.

Nonetheless, as Lee describes the encounter, it clearly [*18] rose to the level of an arrest. Lee claims that he was knocked to the ground, jumped upon, kicked, thrown on the hood of a police car, and then struck in the kidney. Because this violence restrained his freedom of movement and restricted him, it therefore constitutes a full arrest. *See Posr, 944 F.2d at 98* (an arrest occurs when an individual is restrained and his freedom of movement is restricted); *see, e.g., United States v. Moreno, 897 F.2d 26 (2d Cir. 1990)* (arrest occurred when suspect was pushed against a wall and told not to move); *United States v. Levy, 731 F.2d 997 (2d Cir. 1984)* (arrest occurred when suspect was ordered to "freeze" and stand spread-eagle against a wall). Because the parties present conflicting accounts of the detention, the issue of whether Lee was subjected to an arrest must go to the jury.

Assuming that the jury finds he was subjected to an arrest, as opposed to merely an investigative stop, Lee must show that the officers lacked probable cause to arrest him. *See Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)* (to succeed on a claim of false arrest, a plaintiff has the burden [*19] to show that there was a lack of probable cause for the arrest); *Weyant, 101 F.3d*

at 852 (2d Cir. 1996) ("The existence of probable cause to arrest . . . 'is a complete defense to an action for false arrest.'" (citation omitted).

### 1. Probable Cause to Arrest

Probable cause to arrest exists whenever an "arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer, 63 F.3d at 119* (quoting *O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993)* (internal quotation marks omitted)). Probable cause may "exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard, 25 F.3d at 102*. To establish probable cause, defendants must show a "substantial chance" of criminal activity, but not that criminal activity actually occurred. *See Illinois v. Gates, 462 U.S. 213, 244 n.13, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)*.

If the determination of whether an arresting [*20] officer had probable cause requires the resolution of disputed facts, the existence of probable cause is to be decided by a jury. *See Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)*. Where there is no dispute as to the pertinent events and the knowledge of the arresting officer, probable cause may be determined as a matter of law. *See Weyant, 101 F.3d at 852; Singer, 63 F.3d at 118-19*.

Here, the defendants move for summary judgment on the ground that probable cause to arrest Lee existed as a matter of law. The factors which they rely upon are that (1) Lee matched the victim's description of the perpetrator in terms of sex, race, and clothing; and (2) Lee was in close physical and temporal proximity to the robbery. The officers emphasize the fact that the perpetrator's description came from the crime victim herself.

Standing alone, these factors are insufficient for me to determine that probable cause existed as a matter of law. A crime victim's statement is generally considered more trustworthy than the statement of a third party witness. *See, e.g., Thomas v. Culberg, 741 F. Supp. 77, 80 (S.D.N.Y. 1990)* ("Officers [*21] have probable cause to arrest if they receive 'information from some person -- normally the putative victim or eyewitness -- who it seems reasonable to believe is telling the truth.'") (quoting *Daniels v. United States, 129 U.S. App. D.C. 250, 393 F.2d 359, 361 (D.C. Cir. 1968)*). However, in this case, the victim herself had just engaged in criminal activity, and therefore had obvious incentives to divert the officers' attention away from herself.

Apart from the reliability of Cabrera, there are questions of fact as to precisely what information was conveyed to the arresting officers. Kobner and Layden dif-

fered on whether Lee wore a green army jacket or a camouflage jacket. Kobner's description does not include the suspect's approximate age; Layden's does. Lee's version of Cabrera's statements at the showup may support an inference that neither officer was truthful.

These factual issues are critical because the existence of probable cause to arrest Lee may depend in part on the number of identifying characteristics he had in common with the perpetrator described by Cabrera.

In sum, whether Cabrera's description of the robbery and its perpetrator, in addition to [*22] any other factors that the defendants may put forth at trial, provided a sufficient basis for the officers to arrest Lee is a question that must be decided by the jury. [5]

> 5 Because Lee has not made a cross motion for summary judgment, I need not address at this time whether, as a matter of law, there was an absence of probable cause to arrest him.

## 2. Qualified Immunity

Next, the defendants argue that even if Lee was subjected to an arrest without probable cause, they are still entitled to summary judgment on the false arrest claim because they have qualified immunity. Qualified immunity shields police officers from civil liability where the performance of their discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Mitchell v. Forsyth, 472 U.S. 511, 556, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985).* The [*23] right at issue here -- the right to be free from arrest absent probable cause -- is a clearly established constitutional right. *See Soares v. State of Connecticut, 8 F.3d 917, 920 (2d Cir. 1993).* Thus, as the Second Circuit has explained, there are two instances in which the officers can have qualified immunity from a false arrest claim:

> In the context of allegations of false arrest. . . . an arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.

*Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997)* (internal quotation marks and citation omitted).

Immunity should ordinarily be decided by the court "when the facts concerning the availability of the defense are undisputed." *Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994)* (citing *Hunter v. Bryant, 502 U.S. 224, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991)).* However, if determining the objective reasonableness [*24] of the police officers' conduct requires further fact finding, it is appropriate to submit the issue of qualified immunity to the jury. *See id.* [6]

> 6 After giving counsel an opportunity to be heard, I will decide whether the jury should decide only issues of historical fact, reserving for decision by me whether those facts constitute probable cause to arrest.

In the instant case, I cannot conclude as a matter of law that it would have reasonable for the officers to think that they had probable cause to arrest Lee. As stated above, the existence of probable cause will depend on the resolution of certain disputed or unclear facts. Similarly, whether it was objectively reasonable for the officers to believe (albeit erroneously) that they had probable cause to arrest Lee depends on the operative facts. For example, if the jury concludes that Cabrera told the officers that the perpetrator was wearing a blue coat with a white ring around the sleeve, the officers' conduct may not have been objectively reasonable. [*25] If the facts are that Lee bore several similarities to the perpetrator described by Cabrera, the defense may well be available. Because this determination will depend on the resolution of certain disputed factors, summary judgment is denied. *Cf. Oliveira, 23 F.3d at 649.*

## 3. Liability as to Hanna and Wasielwski

Assuming that Lee was arrested, he has failed to demonstrate that either Hanna or Wasielwski was actively involved the arrest. *See Jeffries v. Harleston, 21 F.3d 1238, 1247 (2d Cir. 1994), vacated on other grounds, 513 U.S. 996 (1994)* (to establish the requisite causation under § 1983, plaintiffs must show that the defendant participated in or was the "moving force" behind the constitutional deprivation). There is no evidence that Hanna's radio transmission instructed the other officers to arrest Lee. Nor is there any evidence that Hanna or Wasielwski was present when the arrest occurred. Therefore, Lee has failed to demonstrate causation as to Hanna and Wasielwski and summary judgment is granted as to these two defendants on the false arrest and false imprisonment claims.

## D. Excessive Force

Lee complains that excessive [*26] force was used in the course of his arrest, resulting in multiple injuries, including a torn rotator cuff in his left shoulder. The offi-

cers move for summary judgment on the issue of excessive force. Claims of excessive force in the context of an arrest are properly analyzed under the *Fourth Amendment's* objective reasonableness standard without regard to a police officer's underlying intent or motivation. *See Graham v. Connor, 490 U.S. 386, 388, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).* Since the right to make an arrest necessarily allows the use of some degree of force to effect it, the determination of whether a particular use of force was objectively reasonable requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *490 U.S. at 396.*

*1. Layden and Kobner*

In this case, there is a genuine issue of material fact that must be determined by the jury as to whether Layden and Kobner subjected Lee to excessive force.

*2. Hanna and Wasielwski*

[*27] As for Hanna and Wasielwski, neither of whom actively subjected Lee to force, the question is whether they are liable for failure to intercede. Every police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).* Generally, the duty to intercede is described as follows:

> [Any officer] who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, . . . (2) that a citizen has been unjustifiably arrested, . . . or (3) that any constitutional violation has been committed by a law enforcement official. . . . In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.

*Anderson v. Branen, 17 F.3d 552, 557, reh'g denied, 27 F.3d 29 (2d Cir. 1994)* (citations omitted). Failure to intercede must be a proximate cause of the violation. *See O'Neill, 839 F.2d at 11.* [*28]

Whether or not the other officers employed excessive force against Lee, neither Hanna nor Wasielwski can be found liable for his conduct because neither was present when the claimed excessive force was used, and

there is no basis in the evidence for a finding that either had reason to know that excessive force was being used. Moreover, there is no evidence that would support a finding that either officer had a realistic opportunity to prevent unconstitutional conduct from occurring. Therefore, summary judgment is granted as to these defendants on the excessive force claim.

*E. Municipal Liability*

In addition to his claims against the individual officers, Lee has sued the City of New York and former Police Commissioner Howard Safir. A municipality cannot be liable under § 1983 on a theory of respondeat superior for the isolated unconstitutional acts of its employees. *See Monell v. Department of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* Instead, in order to establish liability against the City, plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy. *See id.* There are generally [*29] four circumstances in which a municipality may be held liable for the unconstitutional acts of its employees. *See White-Ruiz v. City of New York, 1996 U.S. Dist. LEXIS 15571, 93 Civ. 7233, 1996 WL 603983, at *7 (S.D.N.Y. Oct. 22, 1996).* These circumstances are as follows: (1) where a plaintiff's constitutional rights are violated due to a formal policy that is officially promulgated or adopted by the municipal defendant, *see Monell, 436 U.S. at 690;* (2) where a plaintiff's constitutional rights are violated due to a specific action or decision by an official responsible for establishing final policy with respect to the subject matter, *see Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986)* (plurality opinion); (3) where a plaintiff's constitutional rights are violated due to the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a "custom or usage" and so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, *see City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 130, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988); Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992);* [*30] and (4) where a plaintiff's constitutional rights are violated due to the City's failure to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights, if such failure amounts to "deliberate indifference" to the rights of those with whom the municipal employees will come into contact, *see Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996); Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992). See White-Ruiz, 1996 U.S. Dist. LEXIS 15571, 1996 WL 603983, at *7.*

To state a claim against an officer of the City in his official capacity, the complaint must show that the indi-

vidual defendant was directly and personally responsible for the purported unlawful conduct. *See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991).* A defendant may not be held liable for constitutional violations merely because he held a high position of authority. *See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).* Rather, a defendant who holds a supervisory position can only be found liable in one of the following ways: **[*31]** (1) by direct participation in the incident; (2) by failing to remedy the alleged wrong after learning of it; (3) by creating a policy or custom under which unconstitutional practices occurred; (4) by exercising gross negligence in managing subordinates; or (5) by "deliberate indifference" to the constitutional rights of an individual by failing to act on information indicating that unconstitutional practices were taking place. *See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).*

Lee argues that the City and Safir have violated his constitutional through their unconstitutional policies of: (1) condoning the detention of African-Americans and Hispanics in minority neighborhoods without probable cause, *see* Complaint ("Compl." P 30, 31; (2) failing to properly train police officers in the investigation of crimes, *see* Compl. P 33; (3) subjecting African-American and Hispanic detainees to more excessive force than they subject white detainees to, *see* Compl. P 34; and (4) allowing police officers to act more abusively in minority neighborhoods than they do in white neighborhoods, *see* Compl. P 35. Lee argues that Safir is directly liable as a policy maker **[*32]** at the New York City Police Department. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Summary Judgment at 23 n.5.

In support of these claims, Lee relies upon a June 2001 Civilian Complaint Review Board ("CCRB") study entitled, "Street Stop Encounters Report: An Analysis of CCRB Complaints resulting from New York Police Department's 'Stop and Frisk' Practices." *See* Norinsberg Decl., Ex. J. This study examines the role of race in CCRB complaints relating to 1,346 street stops conducted from January 1, 1997 through March 31, 1999. It is based solely on information provided by complainants themselves. The City moves *in limine* to preclude any reference to or introduction of this report. For the reasons stated below, I grant the City's motion.

The primary problem with the CCRB study is that it does not analyze stops like the one at issue here. This case involves a detention based upon a complaint received in the street from a third party, Maria Cabrera. The study states that the majority of complaints it reviewed arose out of detentions based upon officers' personal observations, rather than third-party information. Indeed, the study **[*33]** concludes that when the police

relied upon third-party information, race did not play a factor in their decision to conduct stops. *See* Santiago Decl. Ex. N. I conclude that the study will be far more prejudicial than probative in this case, and thus I grant the City's motion *in limine* to preclude it at trial. [7]

> 7    The City correctly notes that the report has other flaws: (1) the data is based only on people who filed complaints with CCRB, rather than everyone who had an encounter with the police; (2) the data reflects only CCRB complaints of street stops disclosed to the CCRB during the period between January 1, 1997 and March 31, 1999, the bulk of which occurred in 1997 and 1998; and (3) African-Americans were overrepresented in the sample of street-stop complaints.
>
> Because I find the report to be insufficiently probative in this case to justify its admission into evidence, I need not decide whether the report comes within the public records exception to the hearsay rule.

Lee has failed to provide **[*34]** any evidence to support a claim of municipal liability. Even if he were to succeed against the individual defendants, his claims of municipal liability would still fail. *See Oklahoma City v. Tuttle, 471 U.S. 808, 823-4, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)* ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Because Lee fails to demonstrate that his alleged arrest was caused by any custom or policy of the City or by any wrongdoing by Safir, summary judgment is granted on all claims as to these two defendants. [8]

> 8    In light of my exclusion of the CCRB study, Lee's equal protection claim fails on summary judgment. The *Equal Protection Clause of the Fourteenth Amendment* directs that all persons similarly situated should be treated alike. *See Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)* (citing *City of Cleburne v. Cleburne Living Ctr., Inc. 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985)).* To establish an equal protection violation, plaintiff must prove purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir.1995).* Furthermore, "it is axiomatic that plaintiff must allege that similarly situated persons were treated differently." *Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir.1994).* Other than the CCRB study, Lee

Case 1:07-cv-06480-JGK    Document 23-3    Filed 08/29/2008    Page 25 of 39

Page 9
2002 U.S. Dist. LEXIS 13696, *

offers no evidence that he was subjected to purposeful discrimination or that he was treated differently than other similarly situated persons.

## [*35] F. Testimony of Robert O'Neil

Finally, defendants move to preclude the testimony of Lee's purported expert witness, Robert O'Neil. O'Neil is a former member of the New York Police Department with over thirty years of experience there. Although it is not entirely clear at this point, it seems that Lee seeks to elicit testimony from O'Neil on two points: (1) the appropriate standards and guidelines relating to investigative stops and the use of force as set forth in the N.Y.P.D. Patrol Guide; and (2) whether or not the officers acted in conformity with these guidelines during their encounter with Lee.

Defendants contend that O'Neil's testimony is inadmissible under *Rule 702*, which provides as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Fed R. Evid. 702.* The Rule makes clear that there are two prerequisites that must be met before the testimony of an expert witness can be admitted into evidence. First, the [*36] court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical or specialized in nature, *see, e.g., Jazmin Campbell v. Metro. Prop. & Cas. Ins Co., 239 F.3d 179, 183 (2d Cir.2001)* ("preliminary assessment [is] whether the reasoning or methodology underlying the testimony

is scientifically valid") (internal quotation marks omitted), and second, the court must determine that the expert's testimony "'will assist the trier of fact to understand the evidence or determine a fact in issue.'" *Id.* (quoting *Fed. R. Evid. R 702*) (citing *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)).* Defendants argue that O'Neil's testimony will invade the province of the jury and will confuse the jury as to the issues in this case.

Although defendants' argument appears to have merit, I decline to rule on this motion at the present time because the precise testimony that Lee intends to elicit is not yet clear. I will rule on the motion once Lee provides a precise proffer of O'Neil's testimony or I hear O'Neil's testimony outside of the presence of the jury.

## CONCLUSION

[*37] For the reasons set forth above, summary judgment is granted as to (1) the false arrest claims against Hanna and Wasielwski; (2) the excessive force claims against Hanna and Wasielwski; (3) all Equal Protection Claims; and (4) all claims against the City and Safir. Summary judgment is denied as to all other claims. Defendants' motion *in limine* regarding the CCRB study is granted. Finally, decision is reserved on defendants' motion *in limine* regarding O'Neil's testimony.

The parties shall appear for a final pre-trial conference on August 26, 2002 at 3:00 p.m. The trial shall commence on September 9, 2002 at 9:30 a.m.

So Ordered.

JOHN GLEESON, U.S.D.J.

DATED: Brooklyn, New York

July 22, 2002

LEXSEE 1993 U.S. DIST. LEXIS 5874

**LEE MCGAW, Plaintiff, pro se, v. THE CITY OF NEW YORK, WILLIAM H. MACKAY, and THE NEW YORK CITY POLICE DEPARTMENT, Defendants.**

**90 Civ. 7413 (LBS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1993 U.S. Dist. LEXIS 5874*

**May 4, 1993, Decided**
**May 4, 1993, Filed**

**COUNSEL:** [*1] LEE MCGAW, pro se.

O. PETER SHERWOOD, Corporation Counsel of the City of New York, Attorneys for Defendants, 100 Church Street, New York, New York 10007, GABRIEL TAUSSIG, ESQ., VIRGINIA WATERS, ESQ., DIANE BETLEJESKI, ESQ., Of Counsel.

**JUDGES:** Sand

**OPINION BY:** LEONARD B. SAND

**OPINION**

OPINION

SAND, J.

This is an action brought by *pro se* plaintiff Lee McGaw under *42 U.S.C. § 1983*, against defendants the City of New York. Police Officer William H. Mackay, and the New York City Police Department. Currently before the Court is defendants' motion for summary judgment pursuant to *Rule 56(b) of the Federal Rules of Civil Procedure*. Because we find that defendants are entitled to judgment as a matter of law, the motion is granted.

*Background*

The facts relevant to this motion are undisputed and can be briefly stated. On June 9, 1987, Bryan Etkins ("complainant") filed a complaint claiming that he just had been robbed at knifepoint by two men. On that same date, the complainant was shown photographs at the Midtown North Robbery Identification Program Unit. He picked out one photograph of a person who resembled one of the perpetrators. Upon learning that the person

whom the [*2] complainant had identified was then incarcerated and therefore could not have committed the crime, the complainant was sent to the Manhattan Catch Unit to view more photographs maintained by that unit.

At the second unit, complainant looked through numerous photographs, and picked out a photograph of plaintiff, positively identifying him as one of the perpetrators. Plaintiff was arrested on August 4, 1987 and charged with one count each of robbery in the first degree, criminal possession of a weapon in the fourth degree, and criminal possession of stolen property in the third degree.

The arresting officer, Officer Mackay, and his partner brought plaintiff to the Midtown North Precinct, where plaintiff was placed in a line-up conducted by Officer Mackay. Complainant positively identified plaintiff as the person who had robbed him.

Plaintiff was arraigned on August 5, 1987, and subsequently indicted by a grand jury for robbery in the first degree and robbery in the second degree. Plaintiff's attorney moved to suppress the evidence of the photo identification and the line-up identification at plaintiff's criminal trial. On February 15, 1988 plaintiff was released from jail on bail. On [*3] March 15, 1988 and May 10, 1988 the trial court held a *Wade* hearing, immediately followed by the bench trial on this indictment. After hearing testimony from Office Mackay and Officer Morrow of the Midtown Catch Unit, Judge Galligan denied plaintiff's motion to suppress the identification testimony.

The witnesses who testified at the bench trial were the complainant and Officer Mackay. After considering their testimony, as well as the two identifications. Judge Galligan found plaintiff not guilty on both counts of robbery.

*Discussion*

The action currently before this Court was brought by plaintiff in November 1990, and an amended complaint was filed in January, 1991 pursuant to the Federal Civil Rights Act, *42 U.S.C. § 1983* to recover damages against defendants for an alleged violation of plaintiff's constitutional rights. Plaintiff alleges that Officer Mackay conducted a tainted line-up which was unduly suggestive in that plaintiff was allegedly displayed with approximately five other men with physical characteristics dissimilar to his own. Plaintiff also alleges that the line-up was improper because he was denied the opportunity to call **[*4]** an attorney to be present at the line-up. Finally, plaintiff alleges that if proper police procedure had been utilized, he would not have had to spend time in jail for a crime of which he was ultimately acquitted.

Defendants have moved for summary judgment. Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment is appropriate if the supporting evidence demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See, e.g., Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied. 480 U.S. 932 (1987).* Summary judgment is likewise appropriate where the movant demonstrates that the plaintiff has failed to present any credible evidence to support a necessary element of his claim. *Rosenthal v. Kingsley, 674 F. Supp. 1113, 1115 (S.D.N.Y. 1987).*

We find that plaintiff has failed to present any credible evidence of a deprivation of a right guaranteed by the United States Constitution. which is a necessary element of a claim under *§ 1983.* We will discuss each of plaintiff's contentions **[*5]** in turn.

Plaintiff claims that the line-up identification was tainted and unduly suggestive, and that the admission of that evidence in his criminal trial is a violation of his constitutional rights. There are several deficiencies in plaintiff's argument.

First and foremost, plaintiff is collaterally estopped from making this argument, because he received a full hearing on the propriety of the admission of the evidence in state court. Collateral estoppel or issue preclusion may be invoked where an issue of law or fact raised in an action has been litigated and determined in a prior proceeding by a valid and final judgment. *Wilson v. Steinhoff, 718 F.2d 550, 552 (2d Cir. 1983).* For collateral estoppel to apply, there must have been a final determination on the merits, the issue sought to be precluded must be the same issue which was involved in the prior proceeding, and the party against whom preclusion is sought must have had a full and fair opportunity to litigate in the prior forum. *Ryan v. New York Telephone*

*Co., 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826-27, 467 N.E.2d 487 (1984).*

It is clear that under this legal standard, **[*6]** plaintiff is precluded from raising the issue that the identification was unduly suggestive. The trial court conducted a full *Wade* hearing, in which the plaintiff, who was at that time the defendant in the criminal proceeding, had a full and fair opportunity to litigate the same issue as he raises in this proceeding. The trial court came to a final determination on the merits, finding the identification proceedings to be proper.

Furthermore, even if plaintiff were not collaterally estopped and could in fact establish that the identification evidence was tainted, the admission of the evidence would not rise to a constitutional violation. As the Supreme Court has stated "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite, 432 U.S. 98, 113, n.13 (1977).* This principle was recently reaffirmed in *Haupt v. Dillard, 794 F. Supp. 1480, 1489 (D. Nev. 1992),* where the court ruled that

> use of an unduly suggestive identification procedure does not amount to a constitutional infringement sufficient to support a claim under *§ 1983* **[*7]** . . . Just as *Miranda* concerned only the exclusion of confessions made without appropriate warning, the Supreme Court holdings of *Manson v. Brathwaite, 432 U.S. 98 (1977)* and *Stovall v. Denno, 388 U.S. 293,* (1967) which establish the standard whereby suggestive identifications should be suppressed. establish only the fact that unreliable identifications should not be used at trial. Such cases do not stand for the proposition that an accused has a constitutional right to an impartial line-up, and if such occurs, that the result is a cause of action under *§ 1983.*

See also *Sejnoha v. The City of Bisbee, 1993 U.S. Dist. LEXIS 3254, F. Supp. , 1993 WL 73865* at *3 (D. Ariz. 1993)* ("even if the photographic lineup was unduly suggestive, Sejnoha has no cause of action under *42 U.S.C. § 1983* because there is no constitutional right to a photographic lineup that is not unduly suggestive.")

Plaintiff's second argument is that he was deprived of his constitutional rights because he was not allowed to call an attorney to be present at the line-up identification. However, to prevail on a *§ 1983* claim, **[*8]** plaintiff must prove that the conduct complained of deprived him

of a right, privilege or immunity secured to him by the constitution or laws of the United States.

It is well established that a suspect to a crime does not have a right to counsel at a line-up conducted before formal criminal proceedings have been initiated, that is, before the filing of an accusatory instrument against the suspect. *Kirby v. Illinois. 406 U.S. 682 (1972); Moore v. Illinois, 434 U.S. 220 (1977)*. In this case, the line-up took place immediately after plaintiff's arrest, and before any accusatory instrument or formal charge had been filed against plaintiff. Therefore, the plaintiff did not have a constitutional right to counsel at the line-up, and the fact that he was deprived an opportunity to have counsel present cannot be the basis for § 1983 liability.

Finally, the municipal defendants are additionally entitled to summary judgment because plaintiff has failed to plead the existence of any unconstitutional or unlawful policy, custom, or practice on the part of the city of New York or the Police Department as required for § 1983 liability [*9] under *Monell v. Department of Social Services, 436 U.S. 658 (1978)*. Under that case and its progeny, to prevail against municipal defendants a plaintiff must demonstrate that the governmental entity had an unconstitutional or unlawful policy, and that the policy caused or was the moving force behind the violation of plaintiff's rights. Plaintiff here has made no attempt to allege, much less to provide sufficient factual support, that the municipal defendants had any unconstitutional or unlawful policy concerning line-ups.

Moreover, a municipality may not be held liable for the actions of its employees on a *respondeat superior* theory. *Monell, supra 436 U.S. at 691*. A municipality or agency may be liable under *Monell* where it has been established that the municipality or agency engaged in a course of conduct of recklessness or gross negligence in the training or supervision of its employees so as to evidence a deliberate indifference to the deprivation of the citizen's constitutional rights. *City of Canton v. Harris, 489 U.S. 378 (1989)*. Plaintiff has not attempted to make any showing [*10] that the City or the Police Department were reckless or grossly negligent in the training of the police officers in conducting line-ups and that such recklessness or negligence led to a violation of plaintiff's civil rights.

*Conclusion*

For the reasons stated above, we find that the defendants are entitled to summary judgment as a matter of law and their motion is granted. The amended complaint is therefore dismissed in its entirety. We certify pursuant to *28 U.S.C. § 1915(a)* that any appeal from this Order would not be taken in good faith.

SO ORDERED.

Dated: New York, New York

May 4, 1993

Leonard B. Sand

U.S.D.J.

LEXSEE 1997 U.S. DIST. LEXIS 23686

**MAURICE OPARAJI, Plaintiff, -against- THE CITY OF NEW YORK and ROBERT WESTON, Defendants.**

**96 Cv. 6233**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 23686*

**March 21, 1997, Decided
March 25, 1997, Filed**

**DISPOSITION:**     [*1]  City's motion to dismiss granted and the complaint dismissed as against both defendants.

**COUNSEL:** For MAURICE OPARAJI, plaintiff: Michael J. Resko, New York, NY.

**JUDGES:** I. Leo Glasser, U.S.D.J.

**OPINION BY:** I. Leo Glasser

**OPINION**

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge:

*SUMMARY*

This is an action brought by plaintiff Maurice Oparaji under *42 U.S.C. §§ 1981* and *1983* and New York state law seeking damages and other relief from defendants the City of New York and Robert Weston. The case is now before the court on the City's motion to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons that follow, the motion should be granted and the complaint should be dismissed as to both defendants.

*FACTS*

The following facts are accepted as true for purposes of this motion.

Plaintiff is a native of Nigeria and a naturalized United States citizen. Defendant Weston, who does not appear on this motion, is the owner of an automotive and gas station in Queens, New York. Compl. P 12. On or

about July 17, 1995, Weston, through one of his employees, told plaintiff that plaintiff's car had failed the New York State Emissions and [*2] Inspection test. *Id.* Plaintiff was also told, falsely, that the car would require $ 295 in repairs in order to pass inspection but that he could pay $ 65 for a fraudulent inspection sticker. *Id.* Plaintiff refused that offer and filed a complaint against Weston with the New York State Department of Motor Vehicles. *Id.*

On or about July 25, 1995, plaintiff left the United States for Nigeria in connection with his employment with the Nigerian-based Gospel Missionary Foundation International, Inc. ("GMFI"). He remained in Nigeria until April 1, 1996. Compl. P 13. While plaintiff was in Nigeria, Weston made a false complaint to the New York City Police Department ("NYPD") accusing plaintiff of intentionally damaging three gas pump hoses at Weston's gas station on July 31, 1995. Compl. P 14. After conducting an investigation, the NYPD obtained an arrest warrant and arrested plaintiff at his home on April 8, 1996. Compl. P 15. Plaintiff claims the NYPD's investigation was flawed, and a proper investigation would have revealed that he was in Nigeria at the time of the incident. *Id.*

Following his arrest, plaintiff was incarcerated for approximately 48 hours during which he [*3] allegedly contracted tuberculosis. Compl. P 17. He was arraigned on April 10, 1996 on charges of criminal mischief in violation of *New York Penal Law § 145.00(1)*, and was thereafter released from custody on his own recognizance. He returned to court four more times before the charge against him was dismissed on or about June 12, 1996. Compl. P 18. Because plaintiff was unable to travel to Nigeria during the pendency of his criminal case, he lost his job with GMFI. Compl. P 20.

Case 1:07-cv-06480-JGK    Document 23-3    Filed 08/29/2008    Page 30 of 39

Page 2
1997 U.S. Dist. LEXIS 23686, *

The complaint in this action asserts five claims based on the events described above. The first claim, under *§ 1983*, charges the City with malicious prosecution and false arrest in violation of plaintiff's *Fourth Amendment* rights. The second charges that plaintiff's arrest and prosecution were motivated by racial animus in violation of *42 U.S.C. § 1981*. Plaintiff's third claim appears to relate back to the first as it charges the City with maintaining a policy, practice, or custom of failing to adequately train its police officers to avoid engaging in malicious prosecution. The fourth claim is against the City for common law malicious prosecution. The fifth claim asserts various causes [*4] of action against Weston under New York state law. Jurisdiction over the federal claims is founded on *28 U.S.C. §§ 1331* and *1343(3)-(4)* and over the pendent state law claims on *28 U.S.C. § 1367*.

## DISCUSSION

### I. *Legal Standard*

In analyzing a motion to dismiss for failure to state a claim, the court must view the complaint in the light most favorable to plaintiff and accept all allegations contained therein as true. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. Dismissal of a complaint under *Fed. R. Civ. P. 12(b)(6)* is inappropriate "unless it appears beyond doubt that the claim can prove no set of facts in support of his claim which would entitle him to relief." *Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

### II. *The Malicious Prosecution Claims*

Malicious prosecution claims brought under *§ 1983* are governed by state law. *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)*. A cause of action for malicious prosecution in New [*5] York has four elements: (1) the initiation of an action by the defendant against the plaintiff; (2) begun with malice; (3) without probable cause; (4) that terminates in favor of the plaintiff. *See e.g., O'Brien v. Alexander, 101 F.3d 1479, 1484 (2d Cir. 1996)*; *Russell v. Smith, 68 F.3d at 36*. The City contends that plaintiff has failed to allege facts showing that the criminal action against plaintiff was begun with malice and without probable cause.

Malice in this context does not have to be actual spite or hatred; it means only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996)*(quoting *Nardelli v. Stamberg, 44 N.Y.2d 500, 502-03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)*. Taking plaintiff's version of events as accurate, there are no facts alleged from which

one could infer that any City police officer acted due to a wrong or improper motive. To the contrary, the complaint alleges that the police acted reasonably in that they were informed [*6] of the unlawful destruction of property at Weston's gas station, they conducted an investigation, obtained an arrest warrant and arrested plaintiff pursuant thereto. As elaborated upon below, plaintiff's naked assertion that "racial bias" motivated the arresting officers finds no support from the facts set forth in the complaint.

Nor has plaintiff alleged facts sufficient to raise an inference that City police officers acted without probable cause. It has been recognized that "information provided by an identified citizen accusing another of a crime is legally sufficient to provide the police with probable cause to arrest." *People v. Banks, 151 A.D.2d 491, 542 N.Y.S.2d 280 (2d Dep't. 1989)*; *see also Woodard v. Hardenfelder, 845 F. Supp. 960, 967 (E.D.N.Y. 1994)*("Probable cause exists where officer receives 'information from some person -- normally the putative victim or eyewitness -- who it seems reasonable to believe is telling the truth.'")(quoting *Thomas v. Culberg, 741 F. Supp. 77, 80 (S.D.N.Y. 1990)*); *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)*(probable cause exists even where it is based upon mistaken [*7] information, so long as the arresting officer was reasonable in relying on that information). As the investigating officers were informed by Weston that plaintiff had vandalized his gas station, they clearly had probable cause to obtain a warrant for plaintiff's arrest. The argument advanced in plaintiff's Memorandum of Law which suggests that the investigating officers "knew, the day following the incident alleged in the criminal complaint, that [plaintiff] was out of the country," *see* Pl. Mem. of Law at 4-5, is not attended by any citation to the complaint and indeed the complaint makes no such allegation. Moreover, an officer executing an arrest warrant is not 'required by the Constitution to investigate independently every claim of innocence.'" *Katz v. Morgenthau, 709 F. Supp. 1219, 1229 (S.D.N.Y. 1989)*(quoting *Baker v. McCollan, 443 U.S. 137, 145-46, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)*.

Because plaintiff has failed to adequately plead two essential elements, his malicious prosecution claims under *§ 1983* and New York state law should be dismissed. To the extent plaintiff has attempted to assert a claim of false arrest under *§ 1983* [*8] he has also failed because probable cause is a complete defense to such an action. *Bernard, 25 F.3d at 102 (2d Cir. 1994)*.[1]

---

[1]    The opening paragraph of the complaint also makes reference to a violation of plaintiff's rights under the *Fourteenth Amendment*. However, the Second Circuit has held that "the *Fourteenth*

*Amendment* right to substantive due process will not support a federal claim for malicious prosecution." *Singer v. Fulton County Sheriff, 63 F.3d 110, 114 (2d Cir. 1995), cert. denied, 517 U.S. 1189, 116 S. Ct. 1676, 134 L. Ed. 2d 779 (1996).*

### III. *Municipal Liability Under § 1983*

Even if plaintiff had adequately plead a malicious prosecution claim, his *§ 1983* claims against the City would still have to be dismissed. It is well established that a municipality may not be held liable under *§ 1983* for actions of its employees based on a theory of respondeat superior. *Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* **[\*9]** In order to establish municipal liability for unconstitutional acts by municipal employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy, custom or practice. *Id.; Oklahoma City v. Tuttle, 471 U.S. 808, 817, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)*("The city may only be held accountable if the deprivation was the result of municipal 'custom or policy.'")(citing *Monell*).

With regard to pleading claims of municipal liability under *§ 1983*, the Second Circuit has instructed that,

> the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.. . . Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.

*Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)* **[\*10]** (internal citations omitted).

Here, plaintiff alleges only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights. *See* Compl. PP 27-29; Pl. Mem. of Law at 7. Plaintiff's complaint, even if read liberally, does not contain a single fact in support of this conclusory allegation. Accordingly, plaintiff has failed to state a claim against the City under *§ 1983.*

### IV. *§ 1981*

Neither party addresses in its memoranda plaintiff's second claim which asserts a violation of *42 U.S.C. § 1981* by the City through its police officers. *Section 1981* bars certain racially motivated and purposefully discriminatory acts. It provides:

> all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every **[\*11]** kind, and to no other.

At least one district court in this Circuit has held that in order to assert a *§ 1981* claim against a municipal entity, a plaintiff must allege a violation of *§ 1983* and meet the requirements of *Monell. See Philippeaux v. North Central Bronx Hospital, 871 F. Supp. 640, 656 (S.D.N.Y. 1994), aff'd. mem. 104 F.3d 353 (2d Cir. 1996), cert. denied, 520 U.S. 1105, 117 S. Ct. 1110, 137 L. Ed. 2d 312, 1997 WL 85499 (1997).* As noted above, plaintiff has failed to do either. However, even if plaintiff had stated a valid *§ 1983* claim against the City under *Monell*, his claim under *§ 1981* would still have to be dismissed.

To state a claim under *§ 1981*, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin, & Jenrette Secs., 7 F.3d 1085, 1087 (2d Cir. 1993).* "Under *§ 1981*, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating **[\*12]** factor for the defendant's actions must be specifically pleaded in the complaint to withstand dismissal under *Rule 12(b)(6)*." *Yusuf v. Vassar College, 827 F. Supp. 952, 955 (S.D.N.Y. 1993), aff'd in part, rev'd in part, 35 F.3d 709 (2d Cir. 1995).*

The complaint in this case is wholly devoid of any facts from which an intent to discriminate against plaintiff on the basis of race may be inferred. Beyond mentioning that plaintiff was born in Nigeria, there are no allegations that refer to the race of any of the participants in the events described and absolutely nothing which suggests that the police or the City harbored any bias toward plaintiff. Plaintiff's mere conclusory allegations

of racial animus will not suffice. *See Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987)*(complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights "instead of a litany of general conclusions that shock but have no meaning."). Therefore, plaintiff's § 1981 claim should be dismissed.

### V. *Pendent Jurisdiction*

The exercise of pendent jurisdiction is a matter committed to the sound discretion **[*13]** of the trial court. *Perez v. Ortiz, 849 F.2d 793, 798 (2d Cir. 1988).* It is well-settled that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).* In addition, federal courts have a duty to confirm that subject matter jurisdiction exists at every stage of a litigation, and must dismiss even *sua sponte* if it appears at any time that subject matter jurisdiction is lacking. *United Food &*

*Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994).*

Dismissal of plaintiff's claims against the City leaves the court with no independent jurisdictional basis over his state law claims against Weston. Accordingly, they should be dismissed as well.

### *CONCLUSION*

For the foregoing reasons, the City's motion to dismiss should be granted and the complaint should be dismissed as against both defendants.

SO ORDERED.

Dated: March *21st*, 1997

Brooklyn, New York

I. Leo Glasser, **[*14]** U.S.D.J.

LEXSEE 2003 U.S. DIST. LEXIS 19078

**WILLIAM TURNER WILLIAMS, JR., Plaintiff, -against- CITY OF NEW YORK, DET. VIVIAN POTTER, individually, and UNIDENTIFIED NEW YORK CITY POLICE DEPARTMENT PERSONNEL, individually, Defendant.**

**02 Civ. 3693 (CBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 19078*

**October 23, 2003, Decided
October 23, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Williams v. City of New York, 2005 U.S. App. LEXIS 1207 (2d Cir. N.Y., Jan. 21, 2005)*

**DISPOSITION:**     [*1] Defendants motion for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* was granted.

**COUNSEL:** S. Jean Smith, New York, NY, for the plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, by John M. Lambros, Corporation Counsel of the City of New York, for Defendants City of New York and Detective Vivian Potter.

**JUDGES:** CONSTANCE BAKER MOTLEY, United States District Judge.

**OPINION BY:** CONSTANCE BAKER MOTLEY

**OPINION**

MOTLEY, District Judge.

Plaintiff William T. Williams, Jr. brings this action pursuant to *42 U.S.C. § 1983 ("Section 1983")* against defendants Vivian Potter, former Detective for the City of New York; New York City ("City"), a municipality within the state of New York, and unidentified personnel of the New York City Police Department, alleging violations of his rights under the *Fifth* and *Fourteenth Amendments to the United States Constitution.* Specifically, plaintiff charges false arrest, false imprisonment, and malicious prosecution.

Defendants move for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* [*2] For the reasons stated in the opinion below, defendants' motion is hereby GRANTED.

BACKGROUND

On the morning of February 5, 2000, Michael O'Hern was stabbed four times at West 3rd Street and Sixth Avenue, New York, NY.

I. Police Reports Describing the Assault and the Assailant

Police reports about the incident state that there was a scuffle between O'Hern and another man during a narcotics transaction, during which the man demanded $ 20.00 from O'Hern and stabbed him. The perpetrator is described as a Black man, age 50, 5'11" and 150 pounds, with a salt and pepper beard and moustache. All of the reports conform to this account of the stabbing and the assailant, with two reports including the additional information that O'Hern spit a razor blade from his mouth towards his assailant according to witness Willmont Rush, and that the assailant had a Jamaican accent according to witness Monica Wickers.

II. The Assault Weapon

At the time of the stabbing, Officers Wright and Bernard Williams were in the West 3rd Street subway station when they heard commotion coming from West 3rd Street. Officer Williams subsequently stopped a Black man, age 50,5'10" - 5'11" [*3] and 150 pounds, unshaven, wearing a black parka jacket with a hood and dark clothing. Williams confiscated a closed knife from the man and then permitted him to proceed. Shortly thereafter, upon learning of the knife's possible connec-

tion to a crime, Williams gave the knife to another offi-
cer who arrived at the scene of the assault to investigate.
Later, the blood on the knife was found to be connected
to the blood found where O'Hern was stabbed.

## III. Victim's Account of the Assault and his Identification of Plaintiff Williams as the Assailant

On February 6, Detective Vivian Potter and Detec-
tive Moller went to St. Vincent's Hospital to interview
O'Hern. According to O'Hern's version of the assault and
the events leading up to it, the night before the stabbing,
he partied all night with DC, Tina, and a man he knew as
"Dred" or "Black." The next morning, the group was
attempting to purchase narcotics when "Dred" accused
O'Hern of taking $ 20 from him and stabbed him. O'Hem
described "Dred" as a Black man, in his 50's, 5'11", with
a full beard and salt and pepper dreadlocks, wearing a
dark coat. The officers showed O'Hem some photographs
in attempt to identify Dred, but O'Hern [*4] did not
make a positive identification at this time.

After O'Hern was released from the hospital, he
went to the 6th precinct police station and looked at the
police's PIMS computer database with Detective Potter.
Detective Potter describes the PIMS database as a photo-
imaging system that allows the police to input various
descriptive characteristics of an individual and the sys-
tem generates photographs of individuals matching the
description given. Based on O'Hern's description, the
database produced photographs from which O'Hern iden-
tified plaintiff Williams as his attacker. O'Hem swears
that "there were hundreds of pictures to choose from. I
had no trouble identifying William T. Williams." O'Hem
further swears that the police did not attempt to influence
his identification.

On February 18th, plaintiff Williams was arrested by
two undercover officers for possessing a crack pipe. At
the police station, Detective Potter showed Williams a
picture of O'Hern. Williams said that he'd seen the man
in the picture around and identified him as "Lefty",
claiming that he wasn't aware of Lefty's proper name. He
also stated that he was with Mr. O'Hern immediately
before the stabbing because [*5] he was trying to buy
crack for Mr. O'Hern.

Thereafter, Detective Potter arranged a line-up in-
cluding plaintiff Williams. O'Hern viewed the line-up
and identified Williams as his attacker. O'Hern swears
that "no one, in any way, suggested to me that I identify
any (sic) particular person. All of the people in the line-
up looked somewhat similar but I could easily identify
William T. Williams because he stabbed me. I could not
forget him." Detective Potter testified that based on her
impression of O'Hern identification, O'Hern was "posi-
tive", "lucid", and "sure." She states: "If there had been

any doubt in my mind, then I may have gone for addi-
tional witnesses."

In his deposition, plaintiff Williams states that to his
knowledge, O'Hern does not have anything against him.

## IV. The Prosecution of Plaintiff Williams

On February 19th, Williams was arrested and
charged with attempted murder in the 2nd degree, assault
in the 1st degree, robbery in the 1st degree and criminal
possession of a controlled substance. O'Hem testified
before the Grand Jury that Williams was his assailant.
The Grand Jury indicted Williams for attempted murder,
assault, and attempted robbery. On June 7, 2000, New
[*6] York Supreme Court Justice James Yates denied
Williams' motion to dismiss the charges, stating that
"having examined the Grand Jury minutes, the evidence
adduced before the Grand Jury was legally sufficient to
support the charges."

On September 21, 2000, a DNA test of the blood on
the knife revealed that the blood belonged to Mr. O'Hern
and an unidentified individual, but not plaintiff Williams.
On November 13, 2001, on the court's own motion, Jus-
tice Yates dismissed the indictment against plaintiff Wil-
liams.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

According to *Fed. R. Civ. P. 56(c)*, summary judg-
ment "shall be rendered forthwith" if it is shown that
"there is no genuine issue of material fact and that the
moving party is entitled to a judgment as a matter of
law." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.
Ed. 2d 265, 106 S. Ct. 2548, 2552, (1986).* "Genuineness
runs to whether disputed factual issues can reasonably be
resolved in favor of either party, [while] materiality runs
to whether the dispute matters, i.e., whether it concerns
facts that can affect the outcome under the applicable
[*7] substantive law." *Mitchell v. Washingtonville Cent.
Sch. Dist., 190 F.3d 1, 5 (2d Cir. 1999)* (internal quota-
tions and citations omitted). In order to prove that a
genuine issue of material fact exists, a plaintiff "may not
rest upon the mere allegations or denials of the plead-
ing[s]," but must by affidavit or otherwise "set forth spe-
cific facts showing that there is a genuine issue for trial."
*Fed. R. Civ. P. 56(e).* "Conclusory statements, conjecture
or speculation by the party resisting the motion will not
defeat summary judgment." *Kulak v. City of New York,
88 F.3d 63, 71 (2d Cir. 1996).*

Courts must resolve all ambiguities and draw all rea-
sonable factual inferences in favor of the non-moving
party. See *Nora Beverages, Inc. v. Perrier Group of Am.,
Inc., 164 F.3d 736, 742 (2d Cir. 1998).* The moving
party bears the initial burden of demonstrating an ab-

Case 1:07-cv-06480-JGK    Document 23-3    Filed 08/29/2008    Page 35 of 39

Page 3
2003 U.S. Dist. LEXIS 19078, *

sence of genuine issues of material fact. See *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).* If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact **[*8]** exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* (internal quotations and citations omitted) (alteration in original).

ANALYSIS

I. False Arrest

A *§ 1983* claim for false arrest derives from the right to be free from unreasonable search and seizures, including the right to be free from arrest absent probable cause. *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).* A false arrest claim under *§ 1983* "is substantially the same as a claim for false arrest under New York law." *Weyant, 101 F.3d at 852* (citations omitted). Under New York law, "a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Id. at 852.* Probable cause constitutes justification, and is therefore a complete defense to an action for false arrest. *Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003).* See also *Weyant, 101 F.3d at 852* ("The existence of probable **[*9]** cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under *§ 1983*") (internal citations omitted) (citations omitted). The issue of whether an arresting officer had probable cause to arrest can be determined as a matter of law if "the pertinent events and knowledge of the officers" are not in dispute. *Weyant, 101 F.3d at 852.* The plaintiff bears the burden of demonstrating a lack of probable cause for the arrest. *Baker v. McCollan, 443 U.S. 137, 143-46, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).*

Whether or not there was probable cause to arrest depends on the information available at the time of the arrest, *Peterson v. County of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y 1998),* judged against the "totality of the circumstances." *Illinois v. Gates, 462 U.S. 213, 233, 101 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).* There is probable cause to arrest "when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the **[*10]** person to be arrested.'" *O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993).* See also *Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).* The amount of evidence "need not reach the level of evidence necessary to support a conviction... but it must constitute more than rumor, suspicion, or even a strong reason to suspect."

*United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)* (citations omitted) (internal citations omitted).

Applying these standards to the case at bar, there was probable cause to arrest plaintiff Williams for O'Hern's assault. The victim identified Williams first in a photograph display, then again in a line-up. [1] O'Hern was unequivocal in his identification and Detective Potter had no reason to question O'Hern's statement. Williams admitted that he was with O'Hern immediately before the assault and that O'Hern had nothing against him. Given these facts, an officer of reasonable caution would have believed that Williams was O'Hern's assailant.

> [1] Plaintiff disputes that the PIMS identification ever took place on the grounds that a photo from the PIMS result cannot be found in Potter's case file and according to the six birth dates he gave upon arrest, the PIMS database would not have produced his photograph. By contrast, O'Hern swears in an affidavit that he identified Williams from photos generated by the PIMS database. Detective Potter, in her deposition, states that the fact that the date she put in for Williams' actual age may not have been correct is not dispositive. "... I'm not sure the photo listed his correct age. Sometimes there are different photos of the same perpetrator in the PIMS machine. If it isn't in their arrest history and tied into their age or date of birth, things can come up differently." Because plaintiff cannot rely on conclusory allegations or speculation to create a factual dispute about the photo identification and plaintiff has not produced specific facts indicating that a genuine issue of fact exists, plaintiff's claim that the photo identification did not take place is merely colorable and does not defeat summary judgment. See *Scotto Almenas 143 F.3d at 114.*

**[*11]** Plaintiff argues that probable cause is defeated by the fact that Detective Potter did not further investigate information plaintiff alleges cast doubt on his guilt, such as the eyewitness description of the assailant as having a Jamaican accent (whereas Williams allegedly does not), the possibility that O'Hern may have had a razor in his mouth, and the fact that O'Hern stated "I recognize him from when I was stabbed," but had previously stated that he "knew" the assailant from having partied with him the night before the assault.

While "the police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause," probable cause attaches to a warrantless arrest even if police could have undertaken further investigation. *Richards v. City of New York, 2003 U.S. Dist. LEXIS 8037, 2003 WL 21036365, *16 (S.D.N.Y. May 7, 2003)* See also *Gisondi v. Harrison,*

Case 1:07-cv-06480-JGK    Document 23-3    Filed 08/29/2008    Page 36 of 39

Page 4
2003 U.S. Dist. LEXIS 19078, *

72 N.Y.2d 280, 285, 532 N.Y.S.2d 234, 237, 528 N.E.2d 157 (1988) ("The police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it." but they may not withhold evidence **[\*12]** where "discrepancies are so substantive that failure to disclose them would be comparable to fraud or perjury"); *Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)* ("It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior to be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity"); *Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)* ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"). Applying these standards, Detective Potter was not obligated to address every possible discrepancy or alternative prior to arresting Williams. None of the "discrepancies" plaintiff points to are so glaring that failure to pursue them constitutes unreasonable police conduct. In fact, even if further investigation had yielded results in plaintiff's favor, the evidence would not have voided probable.

Plaintiff also challenges probable cause on the grounds that O'Hern's credibility was too **[\*13]** weak to warrant a reasonable police officer in relying on his identification of Williams. However, the law dos not require police officers to engage in extensive fact-finding regarding the victim's credibility.

> "To ... insist upon a collateral investigation into the credibility of the complainants would place an unfair burden on law enforcement officers. It would be unreasonable and impractical to require that each complainant be assessed prior to police action regarding the subject of the complaint. Under our system of justice, 'it is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer.'"

McDermott v. City of New York, 1995 WL 347041, \*4 (May 30, 1995, E.D.N.Y.) citing *Krause v. Bennett, 887 F.2d at 371*. The fact that the victim and the arrestee present conflicting accounts does not negate probable cause. *Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)* (citations omitted). In the Second Circuit, "an arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint ... charging someone with the crime, has probable **[\*14]** cause to effect an arrest absent circumstances that raise

doubts as to the victim's veracity." *Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995); Mistretta v. Prokesch, 5 F. Supp.2d 128, 133 (E.D.N.Y. 1998); Miloslavsky v. AES Eng'g Soc'y, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992)*, aff'd without opinion, *993 F.2d 1534 (2d Cir. 2003)*. "The most common situation in which (doubts as to veracity) arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *Mistretta, 5 F. Supp.2d at 133*. These cases do not require that the victim's statement be wholly ignored, but "that the police have additional information to buttress the victim's statement." *McBride v. City of New Haven, 2000 U.S. Dist. LEXIS 15964, 2000 WL 559087, \*11 (D.Conn. March 30, 2000)*, citing *Singer, 63 F.3d at 119*.

Here, defendants did not have reason to question O'Hern's credibility based on his possible prior relationship with Williams because Williams admitted that O'Hern bore no animosity towards him. Even if O'Hern's veracity could be **[\*15]** questioned on this basis, probable cause was not lacking because the defendants "did more" than rely on O'Hern's identification. Williams' own statement that he was with O'Hern immediately before the stabbing and he knew O'Hern verified O'Hern's veracity, in addition to O'Hern's repeated unequivocal identification of Williams as the man who stabbed him.

Because probable cause attached to plaintiff Williams' arrest, as a matter of law, Williams' false arrest claim cannot stand. *Weyant, 101 F.3d at 852*.

## II. Malicious Prosecution

To sustain a § 1983 claim based on malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and results in a constitutionally cognizable deprivation of liberty. *Singer v. Fulton County Sheriff, 63 F.3d at 116*. To make out a claim for malicious prosecution under New York State law, a plaintiff must prove "1) the initiation or continuation of a criminal proceeding against plaintiff; 2) termination of the proceeding in plaintiff's favor; 3) lack of probable cause for commencing the proceeding; *and* 4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2nd Cir. 1995)* **[\*16]** (emphasis added). As with a false arrest claim, the existence of probable cause entitles the defendants to summary judgment. See *Broughton v. State, 37 N.Y.2d 451, 456-57, 373 N.Y.S.2d 87, 92-93, 335 N.E.2d 310 (1975)*, cert denied sub nom, *423 U.S. 929, 46 L. Ed. 2d 257, 96 S. Ct. 277 (1975)*.

The plaintiff satisfies the first prong; clearly a prosecution was initiated against him. See *Mejia v. City of New York, 119 F. Supp.2d 232, 254 (E.D.N.Y. 2000)* (in the case of a warrantless arrest, the prosecution com-

mences at the time of the arraignment or grand jury indictment). Plaintiff also satisfies the second prong; because the judge dismissed the charges against him stemming from O'Hern's assault, the prosecution clearly terminated in his favor.

It is the third prong - whether or not there was probable cause to prosecute - where plaintiff's malicious prosecution claim falters. "In the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie." McDermott v. City of New York, 1995 WL 347041, [*17] *5 (E.D.N.Y. May 30, 1995,); Feinberg v. Saks & Co., 56 N.Y.2d 206, 451 N.Y.S.2d 677, 436 N.E.2d 1279 (1982). See also Lowth v. Town of Cheektowaga, 82 F.3d 563, 571-72 (2d Cir. 1996). Because there was probable cause to arrest plaintiff, and plaintiff has not introduced evidence to suggest that the defendants had different information available to them between the time of Williams' arrest and his grand jury indictment, defendants had probable cause to prosecute plaintiff Williams.

Moreover, probable cause to prosecute Williams is assumed because a Grand Jury indicted him. Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983), rearg denied, 61 N.Y.2d 670, 472 N.Y.S. 2d 1028 (1983). Plaintiff may rebut the presumption by evidence establishing that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. Id. at 83; Bernard v. United States, 25 F.3d 98, 104; Broughton v. State, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93. Alternatively, the presumption "'can be overcome by [*18] a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.'" Richards, 2003 U.S. Dist. LEXIS 8037, 2003 WL 21036365 at * 14, citing Harris v. State, 302 A.D.2d 716, 756 N.Y.S.2d 302, 303 (February 13, 2003).

Here, plaintiff argues that the presumption is overcome by the possibility that Detective Potter failed to tell the Judge or Grand Jury about allegedly exculpatory information. As a preliminary matter, plaintiff's claim can only be directed towards Detective Potter because prosecutors are entitled to absolute immunity for activities that are intimately associated with the judicial phase of the criminal process, Imbler v. Pachtman, 424 U.S. 409, 430, 96 S. Ct. 984, 995, 47 L. Ed. 2d 128 (1976), including the choices they make regarding evidence presented to the Grand Jury. Maglione v. Briggs, 748 F.2d 116, 118 (2d Cir. 1984) (per curiam). At the same time, Detective Potter is not liable for malicious prosecution on this basis

unless there is evidence that she misled the prosecuting attorney. Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999). [*19] Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution. Id. Plaintiff Williams has not provided any evidence showing that Detective Potter misled the prosecutor, so he cannot argue that her failure to present information to the Grand Jury defeats probable cause to prosecute.

Further, the possibility that Potter did not tell the Grand Jury about victim's potential possession of a razor blade and that officers at the scene did not identify Williams in a photo display falls short of the required showing of fraud, perjury, or bad faith to overcome the presumption of probable cause. [2] "The People maintain broad discretion in presenting its case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused." People v. Mitchell, 82 N.Y.2d 509, 515, 605 N.Y.S.2d 655, 658, 626 N.E.2d 630 (1993). In Gisondi v. Harrison, supra, the police arrested a man who matched certain [*20] characteristics given by the victim, but also deviated considerably from other identifying information provided by the victim and had a strong alibi. The arrestee, as a civil plaintiff, alleged that the police officer's failure to investigate his alibi and disclose these discrepancies constituted fraud, perjury, or bad faith sufficient to defeat probable cause. Gisondi disagreed.

"There may be extraordinary cases in which particular discrepancies are so substantive that failure to disclose them would be comparable to fraud or perjury. For instance, if the police knew that a person identified as a rapist by the victim was in fact in custody in the police station at the time of the rape, they could not withhold that evidence from the court with impunity ... But there are no such discrepancies in this case. On the contrary, the discrepancies which the police 'failed' to disclose here are not at all unusual, nor was it unusual or improper for them to do so. If the failure to disclose this type of discrepancy were held to constitute withholding of evidence, virtually every failed prosecution in which the police applied for an arrest warrant or testified at a felony hearing without [*21] noting every discrepancy revealed during the investigation, would give rise to suit

and trial for false arrest and imprisonment or malicious prosecution."

*Gisondi v. Harrison, 72 N.Y.2d at 285, 532 N.Y.S.2d 234* (internal citations omitted) (citations omitted). By contrast, in Richards v. City of New York, 2003 U.S. Dist. LEXIS 8037, supra, an investigator's notes from the day of the murder and investigation included conflicting eyewitness accounts about the identity of the murderer and a statement by the leading eyewitness that someone else committed the crime. The plaintiff presented evidence that the notebook was not provided to the District Attorney and other investigators, thereby defeating the presumption that defendants had probable cause to prosecute. Although the information in the notebook about conflicting eyewitness accounts would not have voided probable cause, the leading witness' statement that someone else committed the crime could have affected the Grand Jury's decision. Richards v. City of New York, 2003 U.S. Dist. LEXIS 8037, 2003 WL 21036365, *17.

   2   Plaintiff does not present any evidence that Williams' photo was included in the photos the officers examined. In order for the fact that the officers did not identify Williams to be relevant, Plaintiff would first need to show that they looked at his picture and affirmatively declined to identify him as the man they stopped and confiscated the knife from following the assault.

**[*22]** This case is more like Gisondi than Richards. As in Gisondi, even if Potter did not inform the Grand Jury of the allegedly exculpatory information, this information was not so substantive such that failure to disclose it was comparable to fraud or perjury. The information plaintiff identifies as central to his criminal innocence does not go to the heart of probable cause in the same fashion as the information in Richards. Unlike eyewitness testimony that someone else had committed the crime, the information here does not negate the possibility that plaintiff had in fact stabbed O'Hern.

Finally, Plaintiff cannot defeat the presumption of probable cause that attaches to the Grand Jury indictment simply by claiming that the information in question "was not likely to have been presented to the Grand Jury or Justice Yates." Plaintiff is not permitted to establish bad faith, fraud, perjury, or suppression of evidence by mere conjecture or surmise; rather, he must put forth evidence sufficient for a reasonable jury to make such a finding. See *Savino v. New York, 331 F.3d 63, 73 (2nd Cir. 2003)*. In fact, the law presumes that Detective Potter communicated **[*23]** the information in question: "Where law enforcement authorities are cooperating in

an investigation, ... the knowledge of one is presumed shared by all." *Illinois v. Andreas, 463 U.S. 765, 772, n. 5, 103 S. Ct. 3319, 77 L. Ed. 2d 1003*; *Savino, 331 F.3d at 74*. Even if plaintiff could show that Detective Potter did not pass on information to the prosecuting attorney, plaintiff cannot show that Potter's failure to do so was intentional. Id. ("In any event, even if other officers were aware that Sergeant Brooks had observed Savino continuously while he was alone in the room and that she did not see him take the ring, Savino has presented no evidence that this information was intentionally withheld from ADA Sullivan").

Finally, plaintiff cannot make out the fourth prong of a malicious prosecution claim because plaintiff cannot show that malice motivated Detective Potter's actions. Malice is "a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth, 82 F.3d at 573*. Plaintiff has not offered any evidence suggesting that if Detective Potter failed to disclose information to the prosecuting attorney **[*24]** or the Grand Jury, her motives were malicious.

Plaintiff cannot establish two of the four prongs necessary to sustain a claim for malicious prosecution. Plaintiff cannot overcome the presumption of probable cause created by the Grand Jury indictment and the existence of probable cause is a complete defense to a malicious prosecution claim. *Savino, 331 F.3d at 75*. Also, plaintiff fails to show that Detective Potter acted with malice. As such, defendants are entitled to summary judgment on plaintiff's claim for malicious prosecution as a matter of law.

III. Qualified Immunity

The threshold question in conducting a qualified immunity analysis is whether "taken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven, 950 F.2d at 870*.

"In an unlawful action, an officer is immune if he has **[*25]** 'arguable probable cause,' and is subject to suit only if his 'judgment was so flawed that no reasonable officer would have made a similar choice.'" *Provost v. City of Newburgh, 262 F.3d 146, 169 (2d Cir. 2001)*, citing *Lee v. Sandberg, 136 F.3d 94, 103 (2d Cir. 1997)*; *Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995)*; *Rogers v. City of Amsterdam, 303 F.3d 155, 158 (2d Cir. 2002)*, citing *Golino, 905 F.2d at 870*. "Arguable probable cause" is all that is required because "the concern of the immunity inquiry is to acknowledge that reasonable

mistakes can be made as to the legal constraints on particular police conduct." *Saucier, 533 U.S. at 205, 121 S. Ct. 2151.*

Although defendant Detective Potter is entitled to summary judgment on the basis that probable cause attached to plaintiff's arrest and prosecution, alternatively, Potter is entitled to summary judgment on the basis of qualified immunity. In the face of repeated victim identifications of Williams as the assailant, coupled with Williams' admission that he was present at the scene of the stabbing and that the victim bore no animosity [*26] towards him, it was objectively reasonable for Potter to believe there was probable cause to arrest and prosecute plaintiff. The fact that DNA testing subsequently revealed another individual's blood on the assault weapon is immaterial: "For the purposes of the qualified immunity analysis, we consider only those facts that were actually available to the police officers, or could reasonably have been perceived by them, at the moment they engaged in the challenged conduct." *Lowth, 82 F.3d at 567.*

## IV. Municipal Liability

To make out a claim against a municipality under § 1983, a plaintiff must show that a municipal policy or custom resulted in a violation of his constitutional rights. *Monell v. Dep't of Social Services, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469, 478-83, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).* "Though this does not mean that plaintiff must show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show [*27] a municipal policy." *Ricciuti, 941 F.2d at 123* (citations omitted). A § 1983 claim will not stand on the basis of vague and conclusory assertions. *Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987).*

"In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991)* (internal quotation omitted). Allegations that supervisory officials were deliberately and grossly negligent in training their subordinates in the police department and district attorney's office satisfy the "personal involvement" prerequisite to an award of damages against them under § 1983. *Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997).* However, "a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised." *Ricciuti, 941 F.2d at 132,* citing *City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986).* [*28]

Because the individual defendants in this case did not violate plaintiff's constitutional rights, plaintiff cannot sustain a claim of municipal liability. Even absent such a finding, plaintiff would not to be entitled to relief on this basis. Plaintiff does not offer any evidence suggesting a specific failure in defendants' training; rather, plaintiff relies on vague and conclusory allegations about the failure of the New York Police Department to train its officers about probable cause. These allegations fall far short of what is required to subject defendants to municipal liability. Accordingly, defendants are entitled to summary judgment on the municipal liability claims.

## CONCLUSION

Because defendants had probable cause to arrest and prosecute plaintiff Williams, plaintiff cannot make out a claim for false arrest or malicious prosecution. At the very least, defendants had arguable probable cause for their actions, entitling them to qualified immunity from plaintiff's claims. In turn, plaintiff's claim for municipal liability fails as a matter of law. For the foregoing reasons, defendants' motion for summary judgment is HEREBY GRANTED.

SO ORDERED.

Dated: [*29] October 23, 2003

CONSTANCE BAKER MOTLEY

United States District Judge