UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

DIEGO ALCANTARA,

                        **Plaintiff,**             07 Civ. 6480 (JGK)

        - against -               <u>OPINION AND ORDER</u>

THE CITY OF NEW YORK, et al.,

                     **Defendants.**
────────────────────────────────────

JOHN G. KOELTL, District Judge:

       This is a malicious prosecution action arising out of an undercover federal investigation into drug-money laundering known as "Operation White Dollar."  In October 2001 the plaintiff was tentatively identified as the drug-money courier in a transaction observed by Special Agents Mark Crane, John Oldano, and Michael Dellamura of the United States Department of Justice Drug Enforcement Administration (the "DEA"), who were conducting surveillance pursuant to Operation White Dollar.  The transaction was between the courier and an undercover officer employed by the Office of the Special Narcotics Prosecutor for the City of New York (the "UC").  The tentative identification was made in several DEA Reports of Investigation ("DEA Reports") by Special Agent Crane summarizing the surveillance, one of which explained that the basis for the identification was that the vehicle driven by the courier on the night of the transaction was registered to the plaintiff.  The DEA reports

were also signed by DEA Special Agent Nicholas Caruso, who supervised the surveillance.

Over two-and-one-half years later, in the spring of 2004, the plaintiff was indicted by a Grand Jury for offenses related to money laundering.  The charges were based on the transaction observed in the course of surveillance in October 2001.  The plaintiff was arrested pursuant to a warrant signed by a magistrate judge, arraigned on the charges, and detained in federal prison for 72 days before making reduced bail.  On January 10, 2005, at the request of the Government, the district court issued a nolle prosequi order "in the interests of justice."

The plaintiff now brings this action for malicious prosecution against Special Agents Crane, Oldano, Dellamara, and Caruso (the "DEA defendants") in their individual capacities pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and against the UC in his individual and official capacities pursuant to 42 U.S.C. § 1983.[1]  The defendants move to dismiss the action or, in the alternative, for summary judgment.

---

[1]    The plaintiff originally also alleged claims of false arrest against all defendants and unspecified Fourth and Fifth Amendment claims against the DEA defendants, but those claims have been voluntarily dismissed.

I

All of the parties, including the plaintiff, have submitted declarations, numerous exhibits, and Local Rule 56.1 Statements of Undisputed Material Facts.  The defendants' motions plainly placed the plaintiff on notice that the defendants sought summary judgment as an alternative to their motions to dismiss. Because all parties have submitted declarations, exhibits, and 56.1 Statements, and the Court has considered them, the Court will treat these motions as motions for summary judgment.  See Rutilgiano v. City of New York, No. 07 Civ. 4614, 2008 WL 110946, at *2 (S.D.N.Y. Jan. 2, 2008) ("[T]he essential inquiry [in converting a motion to dismiss to a summary judgment motion] is whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment . . . .") (quoting Krijn v. Pogue Simone Real Estate Co., 896 F.2d 687, 689 (2d Cir. 1990); see also Haji v. United States, No. 08 Civ. 2230, 2009 WL 602972, at *1 (S.D.N.Y. Mar. 9, 2009); Frimpong v. 1199SEIU United Healthcare Workers East, No. 07 Civ. 7375, 2008 WL 3861449, at *1 (S.D.N.Y. Aug. 19, 2008).

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and

3

any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526

U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v.
Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).  In
determining whether summary judgment is appropriate, a court
must resolve all ambiguities and draw all reasonable inferences
against the moving party.  See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United
States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also
Gallo, 22 F.3d at 1223.  Summary judgment is improper if there
is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the nonmoving
party.  See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37
(2d Cir. 1994).  If the moving party meets its initial burden of
showing a lack of a material issue of fact, the burden shifts to
the nonmoving party to come forward with "specific facts showing
a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-
moving party must produce evidence in the record and "may not
rely simply on conclusory statements or on contentions that the
affidavits supporting the motion are not credible."  Ying Jing
Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see
also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998);
Singh v. New York City Off-Track Betting Corp., No. 03 Civ.
5238, 2005 WL 1354038, at *1 (S.D.N.Y. June 8, 2005).

II

The following facts are undisputed, unless otherwise indicated.

In October 2001, the DEA defendants worked as members of a surveillance team involved in Operation White Dollar.  (DEA Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("DEA 56.1 Stmt.") ¶ 1; Plaintiff's Counterstatement to DEA 56.1 Stmt. ("Pl.'s DEA 56.1 Stmt.") ¶ 1.)  Operation White Dollar consisted of approximately thirty related investigations authorized by the United States Attorney General to permit the DEA to launder drug proceeds in an effort to identify, arrest, and prosecute members of drug money laundering organizations. (DEA 56.1 Stmt. ¶ 2; Pl.'s DEA 56.1 Stmt. ¶ 2.)  Agents involved in investigations pursuant to Operation White Dollar used informants, or confidential sources ("CS"), affiliated with money launderers in Colombia.  (DEA 56.1 Stmt. ¶ 3; Pl.'s DEA 56.1 Stmt. ¶ 3.)  Typically the CS would inform money launderers in Colombia that he knew of American or Canadian sources who were willing to receive illicit drug money, place the money in the United States banking system, and transfer it to accounts controlled by the Colombian money launderers.  (DEA 56.1 Stmt. ¶ 4; Pl.'s DEA 56.1 Stmt. ¶ 4.)  Couriers would then deliver large amounts of United States currency to undercover officers working

with the DEA; the undercover officers would, in turn, transfer
the money to DEA agents, who would deposit it in DEA-controlled
undercover bank accounts, and thereafter wire the money to other
bank accounts.  (DEA 56.1 Stmt. ¶ 5; Pl.'s DEA 56.1 Stmt. ¶ 5.)

On or about October 15, 2001, a CS contacted Special Agent
Oldano and informed him that a certain individual affiliated
with a known Colombian money-laundering organization was seeking
to launder approximately $150,000 in United States Currency.
(DEA 56.1 Stmt. ¶ 6; Pl.'s DEA 56.1 Stmt. ¶ 6.)  The CS provided
a prepaid cellular telephone number for the currency courier.
(DEA 56.1 Stmt. ¶ 7; Pl.'s DEA 56.1 Stmt. ¶ 7.)  The UC
contacted the courier at the number provided by the CS, and
arranged to take delivery of the currency from the courier on
October 17, 2001 in the vicinity of 96th Street and Broadway in
New York City.  (DEA 56.1 Stmt. ¶ 8; Pl.'s DEA 56.1 Stmt. ¶ 8.)

On October 17, 2001, Special Agents Crane, Dellamura, and
Oldano were part of a team assigned to conduct surveillance of
the delivery of the currency.  (DEA 56.1 Stmt. ¶ 9; Pl.'s DEA
56.1 Stmt. ¶ 9.)  Special Agent Caruso was the supervisor of
that team.  (DEA 56.1 Stmt. ¶ 18; Pl.'s DEA 56.1 Stmt. ¶ 18.)
At approximately 3:20 p.m., the surveillance team observed the
courier meet the UC at the intersection of 94th Street and
Broadway and speak with him for approximately ten minutes.  (DEA
56.1 Stmt. ¶ 10; Pl.'s DEA 56.1 Stmt. ¶ 10.)  During that

encounter, the surveillance team observed that the courier was driving a red Ford Escort, and they recorded the license plate number. (DEA 56.1 Stmt. ¶ 11; Pl.'s DEA 56.1 Stmt. ¶ 11.) The UC and the courier then parted ways, and Special Agent Dellamura followed the courier to a building in the Bronx. (DEA 56.1 Stmt. ¶ 12; Pl.'s DEA 56.1 Stmt. ¶ 12.) Special Agent Dellamura observed the courier enter the building and emerge shortly thereafter with a black backpack. (DEA 56.1 Stmt. ¶ 13; Pl.'s DEA 56.1 Stmt. ¶ 13.)

At approximately 5:15 p.m., the courier and the UC met again near the intersection of 125th Street and Broadway, and the courier placed the backpack in the UC's car. (DEA 56.1 Stmt. ¶ 14; Pl.'s DEA 56.1 Stmt. ¶ 14.) The backpack turned out to contain a large amount of United States currency. (DEA 56.1 Stmt. ¶ 15; Pl.'s DEA 56.1 Stmt. ¶ 15.)

On October 18, 2001, Special Agent Crane determined that the Ford Escort driven by the courier was registered to the plaintiff. (DEA 56.1 Stmt. ¶ 17; Pl.'s DEA 56.1 Stmt. ¶ 17.) In late October, Special Agent Crane prepared three DEA Reports of Investigation (the "DEA Reports" or "reports") summarizing the October 17 surveillance and the evidence in connection with that surveillance. (DEA 56.1 Stmt. ¶ 18; Pl.'s DEA 56.1 Stmt. ¶ 18.) Special Agent Caruso signed the DEA Reports as the approving official. (DEA 56.1 Stmt. ¶ 18; Pl.'s DEA 56.1 Stmt.

¶ 18.)  Although one of the DEA Reports is dated October 17 and
the other two are dated October 18 (see Declaration of Joanne M.
Dwyer with Respect to DEA Agent Defendants ("Dwyer Decl.") Exs.
2, 3 & 4, respectively),[2] the actual dates of the reports are
unclear because one of the reports dated October 18 refers to an
action taken on October 22 (see Dwyer Decl. Ex. 3), the report
dated October 17 refers to one of the reports dated October 18
(see Dwyer Decl. Ex. 2.), and the October 17 report refers to
the identification of the courier, which occurred on October 18
through tracing the registration of the vehicle driven by the
courier (see Dwyer Decl. Ex. 2.)

    One of the three DEA Reports (the "first report") explained
how the courier came to be associated with the plaintiff because
the vehicle driven by the courier was registered to the
plaintiff.  (DEA 56.1 Stmt. ¶ 19; Pl.'s DEA 56.1 Stmt. ¶ 19;
Dwyer Decl. Ex. 3.)  The first report indicated that Special
Agent Crane had also sent a subpoena to the New York State
Department of Motor Vehicles to obtain a photograph of the
plaintiff.  (Dwyer Decl. Ex. 3; see also Crane Decl. ¶ 6.)
Neither the first report nor any other report indicated that
such a photograph was ever received or that the association of
the courier with the plaintiff was based on such a photograph in

---

[2]    Plaintiff's counsel also submitted a Declaration with Respect to
Defendant UC 133.  The exhibits appended to that Declaration are identical to
the exhibits appended to the Declaration with Respect to DEA Agent
Defendants.

any way.  Another of the three DEA Reports (the "second report")
described the courier as "tentatively identified as Alcantara,
Diego S."  (DEA 56.1 Stmt. ¶ 19; Pl.'s DEA 56.1 Stmt. ¶ 19;
Dwyer Decl. Ex. 4.)  The third DEA Report (the "third report")
described the courier as "an unidentified Dominican male
(Subsequently identified as Alcantara, Diego)" and in the
context of that identification explicitly referred to the first
report explaining that the registration of the vehicle driven by
the courier had been traced to the plaintiff. (Dwyer Decl. Ex.
2.)

     Special Agent Crane prepared a fourth document on October
22, 2001, which was not signed by Special Agent Caruso.  That
document, unlike the three DEA Reports, was not a DEA Report of
Investigation.  (See Dwyer Decl. Ex. 5.)  The document listed
four articles of non-drug evidence seized in connection with the
October 17 surveillance.  The document referred to the courier
as the plaintiff.  (Pl.'s DEA 56.1 Stmt. ¶ 32; DEA 56.1
Counterstatement ¶ 32; Dwyer Decl. Ex. 5.)

     The most recent DEA Report of Investigation mentioning the
plaintiff was prepared by an unidentified DEA Special Agent on
May 7, 2003 and signed by Special Agent Caruso on May 9, 2003
(the "May 7 Report").  The May 7 Report referred to the courier
as "tentatively identified as [the plaintiff]."  (Pl.'s DEA 56.1
Stmt. ¶ 38; DEA 56.1 Counterstatement ¶ 38; Dwyer Decl. Ex. 6.)

10

The UC also prepared a Report of Investigation (the "UC Report"). The date of the UC Report is unclear because although it was dated October 17, 2001, it referred to the first report prepared by Special Agent Crane which explained how the courier came to be associated with the plaintiff because the vehicle driven by the courier was registered to the plaintiff, and which was dated October 18, 2001. The UC report referred to the courier as "later identified as [the plaintiff]," and in the context of making that identification explicitly referred back to the first report by Special Agent Crane explaining the basis for the association of the courier with the plaintiff. The substance of the UC Report was a description of the role played by the UC in the October 17 surveillance. (Dwyer Decl. Ex. 1.)

Approximately two-and-one-half years after the October 17, 2001 surveillance, in May 2004, a Grand Jury in this district returned an indictment against the plaintiff and 33 other individuals, charging them with offenses related to money-laundering. The magistrate judge signed a warrant for the plaintiff's arrest. (DEA 56.1 Stmt. ¶ 21; Pl.'s DEA 56.1 Stmt. ¶ 21.) The plaintiff was arrested on May 3, 2004, pursuant to the arrest warrant. (DEA 56.1 Stmt. ¶ 22; Pl.'s DEA 56.1 Stmt. ¶ 22.)

Each of the DEA defendants provided a sworn declaration in this case. In those sworn declarations each of the DEA

11

defendants asserted that they played no role in the plaintiff's arrest, that they did not testify before the Grand Jury, that they provided no written materials to the Grand Jury, that they played no role in the decision to indict the plaintiff, and that they played no role in the decision to prosecute the plaintiff. (DEA 56.1 Stmt. ¶ 22; Crane Decl. ¶¶ 8-9; Caruso Decl. ¶ 7; Oldano Decl. ¶¶ 11-12; Dellamura Decl. ¶¶ 7-8.)  Special Agents Crane, Oldano, and Dellamura further asserted that they played no role in any investigation of the plaintiff after their activities in connection with the surveillance – and in the case of Special Agent Crane, the preparation of the reports – in October 2001.  (Crane Decl. ¶ 8; Oldano Decl. ¶ 12; Dellamura Decl. ¶ 7.)  Special Agent Caruso asserted in his sworn declaration that he played no role in any investigation of the plaintiff beyond his signing a total of six Reports of Investigation (including the first, second, and third reports described above and the May 7 Report), three of which referred to the courier having been "tentatively identified" as the plaintiff, two others of which explicitly referenced the first report by Special Agent Crane explaining how the courier came to be associated with the plaintiff through the tracing of the vehicle registration, and the last of which merely noted that the plaintiff's name was recovered from the garbage of a location under DEA surveillance.  (Caruso Decl. ¶ 5.)  The

plaintiff has come forward with no evidence to contradict any of those assertions in the DEA defendants' sworn declarations but seeks further discovery with respect to the role the DEA defendants played in the investigation of the plaintiff.

After his arrest, the plaintiff was arraigned on charges of conspiring to engage in money laundering and money laundering of narcotics proceeds in violation of federal law. (Local Rule 56.1 Statement of UC ("UC 56.1 Stmt.") ¶ 10; Pl.'s Counterstatement to UC 56.1 Stmt. ("Pl.'s UC 56.1 Stmt.") ¶ 10.) The overt act that was the basis of the charges against the plaintiff was that he had transferred United States currency to an undercover officer on October 17, 2001, in violation of federal law. (UC 56.1 Stmt. ¶ 11; Pl.'s UC 56.1 Stmt. ¶ 11.) The plaintiff pleaded not guilty. He spent 72 days in jail, eventually making bail after it was reduced from $250,000 to $10,000. (DEA 56.1 Stmt. ¶ 23; Pl.'s DEA 56.1 Stmt. ¶ 23.) On January 10, 2005, the district court issued an order of nolle prosequi "in the interests of justice" at the request of the Government. (DEA 56.1 Stmt. ¶ 24; Pl.'s DEA 56.1 Stmt. ¶ 24.)

At the time the October 17, 2001 surveillance took place, the UC assisted federal DEA agents in connection with investigations such as the one at issue in this case. (UC 56.1 Stmt. ¶ 28; Pl.'s UC 56.1 Stmt. ¶ 28.) The UC provided a sworn declaration in this case. In that sworn declaration the UC

13

asserted that his role in the investigations pursuant to
Operation White Dollar was limited to transactions in which he
arranged meetings with a member or members of a drug-money-
laundering conspiracy, attended those meetings, took the money
from the courier, and transferred the money to one or more DEA
agents.  (UC 56.1 Stmt. ¶ 29.)  The UC also asserted that it was
not his responsibility to identify couriers with whom he came
face to face in undercover operations such as the one at issue
in this case.  (UC 56.1 Stmt. ¶¶ 32-33.)  The UC further
asserted that he played no role in the arrest or decision to
arrest or prosecute anyone related to Operation White Dollar,
and that he never sought an indictment, testified before a grand
jury, or provided information to be presented to a grand jury in
connection with Operation White Dollar, including in the
plaintiff's case.  (UC 56.1 Stmt. ¶¶ 34-35.)  The plaintiff has
presented no evidence to dispute any of those assertions in the
UC's sworn declaration but seeks additional discovery with
respect to the UC's role in investigations pursuant to Operation
White Dollar, including the investigation at issue in this case.


III

    The plaintiff brings malicious prosecution claims against
the DEA defendants in their individual capacities pursuant to
Bivens, and against the UC in his individual and official

14

capacities pursuant to § 1983.  A <u>Bivens</u> action "requires a plaintiff to allege that a defendant acted under color of federal law to deprive plaintiff of a constitutional right." <u>Tavarez v. Reno</u>, 54 F.3d 109, 110 (2d Cir. 1995).  A § 1983 action requires a plaintiff to "allege the violation of a right secured by the Constitution and laws of the United States, and [to] show that the alleged deprivation was committed by a person acting under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>see also, e.g.</u>, <u>Feingold v. New York</u>, 366 F.3d 138, 159 (2d Cir. 2004).

"[F]ederal courts have typically incorporated § 1983 law into <u>Bivens</u> actions." <u>Tavarez</u>, 54 F.3d at 110.  Both <u>Bivens</u> actions and § 1983 suits require personal involvement of the defendants in the alleged constitutional deprivation.  <u>See, e.g.</u>, <u>Hallock v. Bonner</u>, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) (<u>Bivens</u>); <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (§ 1983).  To sustain a claim under <u>Bivens</u> or § 1983 based on malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty. See <u>Ramos v. City of New York</u>, 298 Fed. Appx. 84, *1 (2d Cir. 2008) (citing <u>Rohman v. New York City Transit Authority</u>, 215 F.3d 208, 215 (2d Cir. 2000); <u>see also</u> <u>Evans v. City of New York</u>, 308 F. Supp. 2d 316, 330 (S.D.N.Y. 2004).  All parties in

this case cite to New York State law and agree that New York State law is the applicable state law in this case.

"In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997) (quoting Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)); see also Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003); Evans, 308 F. Supp. 2d at 330.


A

The plaintiff has failed to satisfy the first element of a malicious prosecution claim against any of the defendants.  The plaintiff cannot show that any of the defendants were sufficiently personally involved in the alleged deprivation of his constitutional rights to be considered responsible for the initiation or continuation of the criminal proceeding against him.

In any Bivens or § 1983 action, a plaintiff must "demonstrate[] that a defendant directly participated in the acts alleged to constitute a violation of the plaintiff's

rights." <u>Wallace v. Conroy</u>, 945 F. Supp. 628, 637 (S.D.N.Y. 1996).  "The [Constitutional] right implicated in a malicious prosecution action is the right to be free of unreasonable seizure; in other words, it is the right to be free of 'unreasonable or unwarranted restraints on personal liberty.'" <u>Mitchell v. Victoria Home</u>, 434 F. Supp. 2d 219, 226 (S.D.N.Y. 2006) (quoting <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 116 (2d Cir. 1995)).  "Being compelled to attend criminal proceedings suffices as a . . . deprivation of liberty." <u>Carter v. Port Auth. of New York and New Jersey</u>, No. 03 Civ. 8751, 2004 WL 2978282, at *8 (S.D.N.Y. Dec. 20, 2004).  To establish a claim for malicious prosecution, the plaintiff must first show that the defendant initiated or continued the criminal proceeding that allegedly violated the plaintiff's constitutional rights.

Where an allegation of misconduct is directed at the police, "a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by [the] police." <u>Hartman v. Moore</u>, 547 U.S. 250, 263 (2006) (citing <u>Dellums v. Powell</u>, 566 F.2d 167, 192-93 (C.A.D.C. 1977)).  "[T]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." <u>Crenshaw v. City of Mount Vernon</u>, No. 06 Civ.

2722, 2008 WL 4452223, at *8 (S.D.N.Y. Sept. 30, 2008); see also
Brome v. City of New York, No. 02 Civ. 7184, 2004 WL 502645 at
*5 (S.D.N.Y. Mar. 15, 2004).  Where the defendant in a malicious
prosecution action is a police officer, "courts have found a
triable issue of fact as to the initiation element where the
defendant-officer brought formal charges and had the person
arraigned, filled out complaining and corroborating affidavits,
swore to and signed a felony complaint, or created false
information and forwarded it to prosecutors."  Espada v.
Schneider, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007); see also
Llerando-Phipps v. City of New York, 390 F. Supp. 2d 372, 382-83
(S.D.N.Y. 2005).

        In this case, none of the defendants exerted any pressure
on the prosecutor to bring criminal charges against the
plaintiff.  Put simply, none of the defendants took any of the
actions courts have found to create a triable issue of fact with
respect to initiating a criminal proceeding for purposes of a
malicious prosecution claim against law enforcement officers.
The defendants participated in surveillance – and in the case of
the UC, in the prearranged transaction that was the object of
the surveillance - on which an arrest was based two-and-one-half
years later, and wrote reports on that surveillance two-and-one-
half years before the arrest without forwarding those reports to
a prosecutor or otherwise using the reports to set in motion the

arrest and prosecution of the plaintiff.  Cf. Zahrey v. Coffee,
221 F.3d 342, 348 (2d Cir. 2000) (denying motion to dismiss due
process claim against prosecutor accused of fabricating evidence
and causing its use but noting that no Constitutional violation
would result from "'the existence of a false police report,
sitting in a drawer in a police station . . . .'") (quoting
Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980);
Jouthe v. City of New York, No. 05-1374, 2009 WL 701110, at *11
(E.D.N.Y. Mar. 10, 2009) ("A police officer may also be held
liable for malicious prosecution if he provides false
information to the prosecutor that influences a decision whether
to prosecute.") (internal quotation marks omitted).

        The evidence is clear that despite the plaintiff's argument
to the contrary, the defendants were not complaining witnesses
against the plaintiff for purposes of bringing charges against
him.  None of the defendants participated in the plaintiff's
arrest.  None of the defendants brought formal charges against
the plaintiff or had him arraigned.  None of the defendants
filled out complaining or corroborating affidavits, swore to any
felony complaint, or forwarded any information to prosecutors in
any way.  On these grounds alone, the malicious prosecution
claims against all of the defendants fail.  See Carter, 2004 WL
2978282, at *8 (granting summary judgment on malicious
prosecution claim against officer who filled out witness

statement that "was not one of the required documents to
initiate criminal process," while upholding malicious
prosecution claim against officers who swore out "complaining
and corroborating affidavits"). Cf., e.g., Stewart v. City of
New York, No. 06 Civ. 15490, 2008 WL 1699797, at *7 (S.D.N.Y.
Apr. 9, 2008) (denying summary judgment against undercover
officer in malicious prosecution action where dispute of fact
existed as to whether undercover officer testified falsely to
grand jury and conveyed false information to prosecutor);
Cunningham v. New York City, No. 04 Civ. 10232, 2007 WL 2743580,
at *5 (S.D.N.Y. Sept. 18, 2007) ("Officer Rollins initiated the
robbery prosecution by filing the charges . . . against the
plaintiffs."). Cf. also Zahrey, 221 F.3d at 348 (noting that
"if [the plaintiff] had claimed only that [the defendant]
fabricated evidence and did nothing to precipitate the sequence
of events that resulted in a deprivation of [the plaintiff's]
liberty, no constitutional violation would have been alleged.").

    Even if the defendants could be considered to have
forwarded information to prosecutors, or to have participated in
the arrest of the plaintiff, they would not be subject to a
malicious prosecution action "in the absence of evidence that
[they] misled or pressured the official who could be expected to
exercise independent judgment." Townes v. City of New York, 176
F.3d 138, 147 (2d Cir. 1999); see also Douglas v. City of New

York, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) ("In general,
once a criminal defendant has been formally charged, the chain
of causation between the officer's conduct and the claim of
malicious prosecution is broken by the intervening actions of
the prosecutor, thereby abolishing the officer's responsibility
for the prosecution.  There is an exception, however: in a
situation where a police officer is accused of providing false
information to a prosecutor that influences a decision whether
to prosecute, he may be held liable for malicious prosecution.")
(internal citations, quotation marks and alterations omitted).
There is no such evidence in this case.

There is no evidence in this case that any of the
defendants provided false or misleading information about the
surveillance.  Two of the defendants, Special Agents Dellamura
and Oldano, do not appear to have communicated any information
about the surveillance in any report or other document.
Therefore, they did not provide false or misleading information
about the surveillance.

Special Agent Crane wrote four reports in connection with
the surveillance: three DEA Reports of Investigation and one
document that was not a DEA Report of Investigation.  Taken
together, the reports prepared by Special Agent Crane
"tentatively" identified the courier as the plaintiff and
described precisely how that tentative identification was made

through tracing the registration of the vehicle driven by the
courier on the night of the surveillance.  Thus any official
reading the reports would not only know that Special Agent Crane
considered the identification tentative, but would also know
exactly how the identification was made, and could therefore
evaluate the reliability and sufficiency of the identification.

The plaintiff argues that because not all of the reports
contained the qualifier "tentatively," the reports somehow
suggested that a firm identification had been made, which was
not supported by the information actually possessed by Special
Agent Crane or the other DEA defendants.  That argument is
without merit.  Taken together, the reports plainly indicated
that the identification was tentative and set forth precisely
how the identification was made.  Two of Special Agent Crane's
reports did not repeat the qualifier "tentatively."  One of
those reports was the third report, which made explicit
reference to the first report explaining precisely how the
identification was made.  Therefore it cannot be said that the
third report was misleading or false.  The other report omitting
the "tentatively" qualifier was the document prepared on October
22, 2001.  That document was not a DEA Report of Investigation
but rather a basic list of non-drug evidence and brief remarks
concerning such evidence.  (Dwyer Decl. Ex. 5.)  The October 22
document followed the three DEA Reports prepared by Special

Agent Crane and it would be artificial to read the October 22 document in isolation from those reports.  The October 22 document provided no background or context for the information it listed and indeed made no reference to the October 17 surveillance.  It would therefore be unreasonable for any official to rely on the October 22 document, out of context, in deciding to prosecute the plaintiff for conduct observed in the course of the October 17 surveillance.  It is plain that the October 22 document must be read in its proper context, which is the series of reports prepared in connection with the October 17 surveillance.  Those reports on the whole left no question with respect to precisely how the courier was identified or that the identification was not a matter of certainty.  Nothing in any of the reports suggested that the identification was made or confirmed in any other way than was described in the first report.

Because the reports did not contain false or misleading information, Special Agent Crane could not be found liable for malicious prosecution on the basis of the information set forth therein.  Cf. White v. Frank, 855 F.2d 956, 957, 962 (2d Cir. 1988) (rejecting motion to dismiss malicious prosecution claim where defendant's testimony in criminal proceeding against plaintiff "had been perjured," but noting that "[i]f the defendant merely states what he believes, leaving the decision

23

to prosecute entirely to the uncontrolled discretion of the
officer[,] the defendant is not regarded as having instigated
the proceeding.") (internal quotation marks, ellipses and
alterations omitted).  For the same reason, Special Agent Caruso
could not be found liable for malicious prosecution on the basis
of the information in the reports that he signed.  Special Agent
Caruso's role in the events at issue in this case was limited to
supervising the surveillance team and signing the reports by
Special Agent Crane and substantially similar reports by unnamed
DEA officers.  Those reports were truthful.  Therefore there is
no basis on which Special Agent Caruso could be held liable for
malicious prosecution.

The UC also did not set forth any false information.  The
report prepared by the UC described his own role in the
prearranged transaction with the courier that was the object of
the October 17 surveillance.  In noting that the courier was
"later identified" as the plaintiff, the UC Report made explicit
reference to the first report by Special Agent Crane explaining
the precise basis of that identification.  Thus the UC Report
was not misleading and in fact referred anyone reading it to the
explanation of how the courier came to be associated with the
plaintiff.  The UC Report did not purport to rely on any
independent identification of the courier, and indeed it was not
the responsibility of the UC to make any identification.

For the foregoing reasons, none of the defendants in this action can be considered to have initiated the criminal proceeding against the plaintiff.  The defendants were not sufficiently personally involved in the criminal proceeding to support a malicious prosecution claim against any of them.


                                  B

The plaintiff's malicious prosecution claims against each of the defendants also fail for the independent reason that the plaintiff cannot show a lack of probable cause for commencing the criminal proceeding against him.  The return of the indictment against the plaintiff by the grand jury, and the signing of a valid warrant for the plaintiff's arrest by a magistrate judge, each created a presumption of probable cause.  See, e.g., Donnelly v. Morace, 556 N.Y.S.2d 605, 606 (App. Div. 1990) ("[A] presumption that there was probable cause for the prosecution . . . exists when the plaintiff was indicted or arrested by warrant."); see also, e.g., Rothsteine v. Carriere, 373 F.3d 275, 282-83 (2d Cir. 2004).  "The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith."  Colon v. City of New

York, 455 N.E.2d 1248, 1250-51 (N.Y. 1983); see also Haji, 2009
WL 602972, at *5; Hernandez v. State, 644 N.Y.S.2d 380, 382
(App. Div. 1996) ("[W]here it can be shown that the conduct of
the police deviated so egregiously from acceptable police
activity as to demonstrate an intentional or reckless disregard
for proper procedures, the presumption of probable cause may be
overcome.").

In this case the plaintiff has failed to overcome the
presumption of probable cause created by the return of the
indictment by the grand jury and the warrant signed by the
magistrate judge.  First, the defendants never made any
statement regarding the surveillance to the grand jury or the
prosecutor; as explained above, they were not complaining
witnesses in this case and did not file any complaint or
affidavit, testify before the grand jury, or forward any other
document to the prosecutor.  Moreover, the reports of
investigation filed by Special Agent Crane and the UC, and
signed by Special Agent Caruso, were not misleading, for the
reasons already explained, and did not reflect bad faith in any
way.

The plaintiff argues that the DEA defendants should have
confirmed the identification of the courier by obtaining a
photograph of the plaintiff, because they knew that their
identification based on the registration of the vehicle was

tentative.  The first report indicated that Special Agent Crane did attempt to obtain a photograph of the plaintiff for this purpose.  However, there is no indication that he ever received the photograph, and there was no representation in any of the reports that the photograph was received or that the identification of the courier was based on anything other than tracing the registration of the vehicle.  The DEA defendants did not arrest or advise in the arrest of the plaintiff based on their tentative identification, and they did not represent that their identification was based on anything more than tracing the registration of the vehicle driven by the courier.  Their mere failure to investigate the identity of the courier by following up on Special Agent Crane's request for a photograph does not provide the basis to overcome the presumption of probable cause. See Haji, 2009 WL 602972, at *5 ("The police's failure to pursue other avenues of investigation that were available is 'not the equivalent of fraud or the suppression of evidence.'") (quoting Colon, 455 N.E.2d at 1251).  There is no evidence and no conceivable reason to believe that reporting a tentative identification and explaining truthfully the precise basis for that identification, without more, was an egregious deviation from acceptable police activity.  Cf. Boomer v. State, 733 N.Y.S.2d 518, 520-21 (App. Div. 2001) ("[I]t is insufficient for claimant to simply argue that the [police] should have or could

27

have done more.  There must be evidence of fraud, perjury or
suppression of evidence by the police.") (internal citation
omitted); <u>Harris v. State</u>, 756 N.Y.S.2d 302, 304 (App. Div.
2003).  This is not a case where police officers made a
tentative identification, misrepresented the certainty of that
identification and advised or otherwise participated in the
arrest or prosecution of the plaintiff based on such a
misrepresentation.  Rather, this is a case where police officers
simply made a tentative identification and prepared DEA Reports
of Investigation to reflect that.

The plaintiff similarly fails to overcome the presumption
of probable cause with respect to the conduct of the UC.  For
the reasons explained above, the report written by the UC did
not reflect the bad faith necessary to overcome the presumption
of probable cause.  The plaintiff argues that the UC should have
made a more reliable identification of the courier, but the
evidence indicates that identifying the courier was not one of
the UC's responsibilities, and there is nothing in the record to
suggest otherwise.  Therefore, there is no basis to find that
the UC's conduct was an egregious deviation from acceptable
police practice.[3]

---

[3]     Because the plaintiff has not established a constitutional violation by
the UC in his individual capacity, there can be no claim against the UC in
his official capacity.  "[A] § 1983 suit against a municipal officer in his
official capacity is treated as an action against the municipality itself."
<u>Coon v. Town of Springfield</u>, 404 F.3d 683, 687 (2d Cir. 2005).  There can be

For the foregoing reasons, the plaintiff cannot satisfy the element of a malicious prosecution claim requiring a showing that the defendants lacked probable cause.[4]

C

Moreover, each of the defendants is entitled to summary judgment on the basis of qualified immunity.  "While the right to be free from malicious prosecution is a clearly established right, defendants may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate that right."  Bonide Products, Inc. v. Cahill, 223 F.3d 141, 145 (2d Cir. 2000) (per curiam) (internal quotation marks and alterations omitted).  "Normally, it is only the 'plainly incompetent or those who knowingly violate the law' – those who are not worthy of the mantle of office – who are precluded from claiming the protection of qualified immunity."

---

no municipal liability in this case because the plaintiff has failed to establish any underlying constitutional violation.  See, e.g., Phillips v. DeAngelis, 571 F. Supp. 2d 347, 359 (N.D.N.Y. 2008) ("[C]laims based on municipal liability . . . cannot stand without an underlying constitutional violation.").

[4]   Because the plaintiff has failed to satisfy the initiation and lack of probable cause elements of a malicious prosecution claim, his claims are fatally flawed and it is unnecessary to determine whether he satisfied the favorable termination element of a malicious prosecution claim by means of the dismissal of the criminal proceeding against him in the interests of justice.  Compare, e.g., Haji, 2009 WL 602972, at *4 (holding that dismissal in the interest of justice cannot provide basis for malicious prosecution claim because it leaves question of innocence unanswered), with Arum v. Miller, 273 F. Supp. 2d 229, 234-35 (E.D.N.Y. 2003) (finding favorable termination based on dismissal in the interest of justice because it left question of innocence unanswered).

Moore v. Andreno, 505 F.3d 203, 214 (2d Cir. 2007) (quoting
Malley v. Briggs, 475 U.S. 335, 341 (1986)).

It was objectively reasonable for the defendants to believe
that their actions did not violate the plaintiff's right to be
free from malicious prosecution.  Special Agent Crane wrote
several reports that included a description of precisely how the
courier was identified and also included the disclaimer that the
identification was tentative.  Special Agent Caruso signed those
reports.  Neither Special Agent Crane nor any of the other DEA
defendants could be expected to know that conducting
surveillance and subsequently preparing truthful reports about
observations made during that surveillance would violate the
plaintiff's constitutional rights, particularly where the
defendants did not forward the reports to a prosecutor or
otherwise participate or advise in the arrest or prosecution of
the plaintiff.  Similarly, the UC could not be expected to know
that participating in the undercover transaction and
subsequently referring to the courier as having been later
identified as the plaintiff, in transparent reliance on another
report explaining how the identification was made, would violate
the plaintiff's constitutional rights, particularly where it was
not the responsibility of the UC to make an identification and
the UC did not forward his report to a prosecutor or otherwise
participate or advise in the arrest or prosecution of the

plaintiff.  Neither the DEA defendants nor the UC exhibited the
"plain[] incompetence" necessary to overcome the qualified
immunity defense that is asserted by the defendants.

Therefore, the defendants are entitled to qualified
immunity.


IV

The plaintiff requests further discovery in connection with
its malicious prosecution claims.  That request is without
merit.  A party resisting summary judgment on the grounds that
the party needs additional discovery must submit an affidavit
showing (1) what facts are sought to resist the motion and how
they are to be obtained, (2) how those facts are reasonably
expected to create a genuine issue of material fact, (3) what
effort the affiant has made to obtain them, and (4) why the
affiant was unsuccessful in those efforts.  See Gurary v.
Winehouse, 190 F.3d 37, 43 (2d Cir. 1999); Cooney v. Consol.
Edison, 220 F. Supp. 2d 241, 247-48 (S.D.N.Y. 2002), aff'd, 63
Fed. Appx. 579, 2003 WL 21105351 (2d Cir. 2003); see also Cress
v. Wilson, No. 06 Civ. 2717, 2008 WL 5397580, at *11 (S.D.N.Y.
Dec. 29, 2008); DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd., 06
Civ. 5474, 2008 WL 857492, at *17 (S.D.N.Y. Mar. 31, 2008);
Estevez-Yalcin v. Children's Vill., 331 F. Supp. 2d 170, 179-80
(S.D.N.Y. 2004). A district court's decision whether to grant a

Rule 56(f) motion for a continuance is discretionary.  See, e.g., Axis Reinsurance Co. v. Bennett, No. 07 Civ. 7924, 2008 WL 2485388, at *7 (S.D.N.Y. June 19, 2008).

The plaintiff has failed to submit an affidavit meeting the requirements set forth in Rule 56(f).  The plaintiff has provided no reason to believe that further discovery will uncover previously undisclosed involvement on the part of any of the defendants in the criminal proceeding against the plaintiff. The plaintiff has only provided an indication of what information he would hope to unearth in the course of further discovery.  However, "a plaintiff cannot defeat a motion for summary judgment by merely restating . . . conclusory allegations . . . and amplifying them only with speculation about what discovery might uncover.  An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion . . . .  Courts must be particularly cautious to protect public officials from protracted litigation involving specious claims."  Contemporary Mission, Inc. v. United States Postal Service, 648 F.2d 97, 107 (2d Cir. 1981) (internal quotation marks and citations omitted).  Because the plaintiff has failed to satisfy the requirements of Rule 56(f), his request to defer decision on the summary judgment motion in favor of further discovery is unavailing.

CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For all of the reasons explained above, the plaintiff's claims of malicious prosecution fail with respect to each of the defendants. Therefore, the defendants' motions for summary judgment are **granted**. The Clerk is directed to close Docket Nos. 12 and 21. The Clerk is directed to enter Judgment dismissing the Second Amended Complaint and closing the case.

**SO ORDERED.**

**Dated:   New York, New York**
         **June 22, 2009**

John G. Koeltl
United States District Judge

33